# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF TEXAS
# VICTORIA DIVISION

| | |
|---|---|
| STATE OF TEXAS, | Civ. Action No. _____ |
| *Plaintiff,* | |
| v. | **COMPLAINT** |
| The UNITED STATES OF AMERICA; DAVID PEKOSKE, Acting Secretary of the United States Department of Homeland Security, in his official capacity; UNITED STATES DEPARTMENT OF HOMELAND SECURITY; TROY MILLER, Senior Official Performing the Duties of the Commissioner of U.S. Customs and Border Protection, in his official capacity; U.S. CUSTOMS AND BORDER PROTECTION; TAE JOHNSON, Acting Director of U.S. Immigration and Customs Enforcement, in his official capacity; U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; TRACY RENAUD, Senior Official Performing the Duties of the Director of the U.S. Citizenship and Immigration Services, in her official capacity; U.S. CITIZENSHIP AND IMMIGRATION SERVICES, | |
| *Defendants.* | |

## INTRODUCTION

1. On its first day in office, the Biden Administration cast aside congressionally enacted immigration laws and suspended the removal of illegal aliens whose removal is compelled by those very laws. In doing so, it ignored basic constitutional principles and violated its written pledge to work cooperatively with the State of Texas to address shared immigration enforcement concerns. This unlawful reversal will cause Texas immediate and irreparable harm if it is not enjoined.

2. Wednesday night, the alleged acting secretary of the Department of Homeland Security ("DHS") ordered a halt on nearly all deportations of illegal aliens, including those whose removal was ordered following a full and fair hearing and those who are not entitled—and do not claim to be entitled—to further immigration benefits. If left unchallenged, DHS could re-assert this suspension power for a longer period or even indefinitely, effectively granting a blanket amnesty to illegal aliens that Congress has refused to pass time and time again. The Constitution, controlling statutes, and prior Executive pledges prevent a seismic change to this country's immigration laws merely by memorandum.

## I. PARTIES

3. Plaintiff State of Texas is a sovereign State, subject only to the Constitution of the United States. Tex. Const. art. I, § 1. Texas has the authority and responsibility to protect the health, safety, and welfare of its citizens.

4. Texas has interests that fall within the zone of interests of federal statutes on immigration policy. "The pervasiveness of federal regulation does not diminish the importance of immigration policy to the States," which "bear[ ] many of the consequences of unlawful immigration." *Arizona v. United States*, 567 U.S. 387, 397 (2012).

5. When DHS fails to remove illegal aliens in compliance with federal law, Texas faces significant costs. A higher number of illegal aliens in Texas leads to budgetary harms, including higher education and healthcare costs.

6. Defendants are appointed officials of the United States government, United States governmental agencies responsible for the issuance and implementation of the challenged memorandum, and the United States.

7. Defendant the United States of America is sued under 5 U.S.C. sections 702–703 and 28 U.S.C. section 1346.

8. Defendant David Pekoske is the alleged Acting Secretary of the United States Department of Homeland Security. He issued the January 20 Memorandum. He is sued in his official capacity only.

9. Defendant the United States Department of Homeland Security ("DHS") will implement the January 20 Memorandum. DHS oversees Defendants U.S. Citizenship and Immigration Services ("USCIS"), U.S. Customs and Border Protection ("CBP"), and U.S. Immigration and Customs Enforcement ("ICE").

10. Defendant Troy Miller is the Senior Official Performing the Duties of the Commissioner of CBP. He received the January 20 Memorandum. He is sued in his official capacity only.

11. Defendant Tae Johnson is the Acting Director of ICE. He received the January 20 Memorandum. He is sued in his official capacity only.

12. Defendant Tracy Renaud is the Senior Official Performing the Duties of the Director of USCIS. She received the January 20 Memorandum. She is sued in her official capacity only.

## II. JURISDICTION AND VENUE

13. The Court has subject matter jurisdiction pursuant to 28 U.S.C. sections 1331, 1346, 1361 and 5 U.S.C. sections 702–703.

14. The Court is authorized to award the requested declaratory and injunctive relief under 5 U.S.C. section 706, 28 U.S.C. section 1361, and 28 U.S.C. sections 2201–2202.

15. Venue lies in this district pursuant to 28 U.S.C. section 1391 because the State of Texas is a resident of this judicial district, and a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District. Venue is also proper under Section VIII of the Agreement.

## III. FACTUAL BACKGROUND

### A. The Agreement

16. Cooperation and coordination between federal and state officials are essential to the effective enforcement of federal immigration law.

17. To promote such cooperation and coordination, Texas and DHS entered into a mutually beneficial agreement. *See* Ex. A, Agreement between Department of Homeland Security and the State of Texas (hereinafter, the "Agreement"). The Agreement establishes a binding and enforceable commitment between DHS and Texas. *Id.* § 2.

18. Generally, the Agreement provides that "Texas will provide information and assistance to help DHS perform its border security, legal immigration, immigration enforcement, and national security missions in exchange for DHS's commitment to consult Texas and consider its views before taking" certain administrative actions. Ex. A § 2.

19. For example, DHS must "[c]onsult with Texas before taking any action or making any decision that could reduce immigration enforcement" or "increase the number of removable or inadmissible aliens in the United States." Ex. A § III.A.2. That "includes policies, practices, or procedures which have as their purpose or effect":

- "reducing, redirecting, reprioritizing, relaxing, lessening, eliminating, or in any way modifying immigration enforcement";
- "pausing or decreasing the number of returns or removals of removable or inadmissible aliens from the country"; or
- "declining to decrease the number of lawful, removable, or inadmissible aliens residing in the United States."

Ex. A § III.A.2.a, c, f.

20. To enable this consultation process, the Agreement requires DHS to "[p]rovide Texas with 180 days' written notice of any proposed action" subject to the

consultation requirement. Ex. A § III.A.3. That gives Texas "an opportunity to consult and comment on the proposed action." *Id.* After Texas submits its views, "DHS will in good faith consider Texas's input and provide a detailed written explanation of the reasoning behind any decision to reject Texas's input before taking any action" covered by the consultation requirement. *Id.*

21. The Agreement authorizes adjudication of disputes about the Agreement "in a United States District Court located in Texas." Ex. A § VIII.

22. To the extent DHS fails to comply with its obligations, the Agreement expressly provides for injunctive relief. It would "be impossible to measure in money the damage that would be suffered if the parties fail[ed] to comply with" the Agreement. Ex. A § VI. "[I]n the event of any such failure, an aggrieved party [would] be irreparably damaged and [would] not have an adequate remedy at law." *Id.* "Any such party shall, therefore, be entitled (in addition to any other remedy to which it may be entitled in law or in equity) to injunctive relief, including specific performance, to enforce such obligations, and if any action should be brought in equity to enforce any of the provisions of this Agreement, none of the parties hereto shall raise the defense that there is an adequate remedy at law." *Id.*

23. The Agreement provides mechanisms by which it can be modified or terminated. *See* Ex. A §§ XIV–XV. Neither Texas nor DHS has sought to modify or terminate the Agreement.

### B.   The January 20 Memorandum

24. On January 20, 2021, Acting Secretary of DHS David Pekoske issued a memorandum "directing an immediate pause on removals of any noncitizen with a

6

final order of removal (except as noted below) for 100 days." *See* Ex. B, Memo. from David Pekoske, *Review of and Interim Revision to Civil Immigration Enforcement and Removal Policies and Priorities* (Jan. 20, 2021) at 3 (footnote omitted) (hereinafter, the "January 20 Memo.").

25. The January 20 Memorandum includes only four narrow exceptions. "The pause on removals applies to any noncitizen present in the United States when [the memorandum] takes effect with a final order of removal except one who: 1. According to a written finding by the Director of ICE, has engaged in or is suspected of terrorism or espionage, or otherwise poses a danger to the national security of the United States; or 2. Was not physically present in the United States before November 1, 2020; or 3. Has voluntarily agreed to waive any rights to remain in the United States, provided that he or she has been made fully aware of the consequences of waiver and has been given a meaningful opportunity to access counsel prior to signing the waiver; or 4. For whom the Acting Director of ICE, following consultation with the General Counsel, makes an individualized determination that removal is required by law." Ex. B at 3–4 (footnote omitted).

26. As a result, the January 20 Memorandum will prevent the vast majority of removals from taking place.

27. The January 20 Memorandum "go[es] into effect as soon as practical and no later than January 22, 2021." Ex. B at 3.

28. DHS did not follow the procedures outlined in the Agreement. DHS neither notified Texas that it was considering such changes nor consulted with Texas about such changes.

29. The January 20 Memorandum was issued without notice and comment under the APA.

30. The January 20 Memorandum did not consider any of the significant harms that Texas faces as a result of DHS suspending the removal of illegal aliens.

    **C.**    **Imminent and Irreparable Harms to Texas**

31. DHS has already acknowledged the effect that its decisions have on Texas. "Texas, like other States, is directly and concretely affected by changes to DHS rules and policies that have the effect of easing, relaxing, or limiting immigration enforcement. Such changes can impact Texas's law enforcement, housing, education, employment, commerce, and healthcare needs and budgets." Ex. A § II.

32. Indeed, DHS has specifically admitted that "a decrease or pause on returns or removals of removable or inadmissible aliens" would "result in concrete injuries to Texas." Ex. A § II.

33. Texas has already been harmed and faces additional immediate by the rushed implementation of the January 20 Memorandum. The Memorandum has already deprived Texas of the option of adjusting its policies in light of the federal shift. As DHS itself has acknowledged, "[t]he harm to Texas is particularly acute where its budget has been set months or years in advance and it has no time to adjust its budget to respond to DHS policy changes." Ex. A § II.

34. For example, Texas expends funds to provide social services to illegal immigrants each year, including health care and education expenses, and must account for those anticipated expenditures through in its budget. Those amounts will increase should DHS halt nearly all of the removals from Texas.

35. To avoid these harms, Texas asked DHS to immediately rescind the January 20 Memorandum. *See* Ex. C, Jan. 21, 2020 letter from Ken Paxton to David Pekoske. Texas has not received a response as of the filing of this complaint.

36. DHS's implementation of the January 20 Memorandum is imminent. *See* Ex. B at 3 (providing that the "immediate pause on removals" will "go into effect as soon as practical and no later than January 22, 2021").

37. These imminent and irreparable harms have forced Texas to seek immediate relief.

## IV. CLAIMS

### COUNT I

**Failure to Provide Notice to and Consult with Texas**

38. Plaintiff incorporates by reference all preceding paragraphs.

39. DHS issued the January 20 Memorandum without following the notice and consultation requirements contained in the Agreement.

40. The January 20 Memorandum is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" and "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (D).

41. The January 20 Memorandum exceeds the authority DHS can delegate to Acting Secretary Pekoske and is therefore *ultra vires*.

42. As a result of the January 20 Memorandum, Texas "will be irreparably damaged and will not have an adequate remedy at law." Ex. A § VI. Texas is therefore "entitled . . . to injunctive relief . . . to enforce [DHS's] obligations" under the Agreement. *Id.* § VI.

## COUNT II

### Failure to Remove Illegal Aliens in Violation of 8 U.S.C. § 1231

43. Plaintiff incorporates by reference all preceding paragraphs.

44. The January 20 Memorandum is unlawful because it violates 8 U.S.C. Section 1231. Section 1231 provides that "when an alien is ordered removed, the Attorney General shall remove the alien from the United States within a period of 90 days." 8 U.S.C. § 1231(a)(1)(A).

45. By "pausing" removals for 100 days, the January 20 Memorandum will prevent DHS from complying with Section 1231. It therefore violates the APA. The January 20 Memorandum is both "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" and "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. § 706(2)(A), (C).

46. In the January 20 Memorandum itself, DHS recognizes the importance of this 90-day deadline. *See* Ex. B at 4. It commands the Acting Director of ICE to develop guidance on how "to implement this pause" for illegal aliens "who have been ordered removed for 90 days or more." *Id.* But the statute does not empower DHS or ICE to alter the 90-day deadline. Instead, it provides that the 90-day period can be suspended based on the actions of the alien, not DHS. *See* 8 U.S.C. § 1231(a)(1)(C).

10

Thus, a 100-day "pause" will necessarily cause violations of Section 1231's 90-day deadline.

47. Even if forthcoming guidance could eventually fix that problem (it cannot), it would not do so immediately. The January 20 Memorandum will cause DHS to violate Section 1231's 90-day deadline for some aliens before the February 1 guidance is issued. DHS seems to recognize this issue. It acknowledges that implementing the "pause" for aliens "who have been ordered removed for 90 days or more" presents a problem. Ex. B at 4. That is why it asked for the February 1 guidance on new "disposition[s] for individual who have been ordered removed for 90 days or more." *Id.* But DHS nevertheless intends to implement the January 20 Memorandum for 10 days before the February 1 guidance comes out.

48. The January 20 Memorandum is an agency action reviewable under the APA. *See* 5 U.S.C. § 701(a). Defendants cannot identify any "clear and convincing evidence of legislative intention to preclude review" of the January 20 Memorandum. *Japan Whaling Ass'n v. Am. Cetacean Soc'y*, 478 U.S. 221, 230 n.4 (1986).

49. A statute precludes courts from hearing certain claims "on behalf of any alien arising from the decision or action . . . to commence proceedings, adjudicate cases, or execute removal orders," 8 U.S.C. § 1252(g), but it does not apply here. Texas is not suing "on behalf of any alien." *Id.*; *see also Texas v. United States*, 809 F.3d 134, 164 (5th Cir. 2015).

## COUNT III

### Failure to Take Care that the Laws be Faithfully Executed

50. Plaintiff incorporates by reference all preceding paragraphs.

11

51. The Constitution requires the President to "take Care that the Laws be faithfully executed." U.S. Const. art. II, § 3.

52. This constitutional limitation is binding on agencies and officers exercising executive power. *See* U.S. Const. art. II, § 1, cl. 1 (vesting "[t]he executive Power" in the President).

53. The January 20 Memorandum is unconstitutional because it directs executive officials not to enforce federal law.

54. The January 20 Memorandum is not a proper exercise of "prosecutorial discretion." It does not address whether DHS should spend resources to seek the removal of a particular illegal alien. Instead, the January 20 Memorandum directs DHS to disregard final orders of removal that DHS has already secured. *See* Ex. B at 3.

55. Moreover, the January 20 Memorandum applies categorically. It does not allow for individualized consideration of particular illegal aliens. Instead, it suspends removal for the vast majority of illegal aliens without any consideration for individual circumstances. *See* Ex. B at 3. Indeed, the Memorandum requires individualized consideration for immigration officials to *enforce* the laws in narrow circumstances, creating a default position of non-enforcement. This blanket presumption against enforcing a law violates the constitutional duty of faithful execution.

56. Unconstitutional agency action or inaction violates the APA. *See* 5 U.S.C. § 706.

57. This constitutional violation is also actionable independent of the APA. Federal courts have long exercised the power to enjoin federal officers from violating the Constitution. *See Armstrong v. Exceptional Child Center, Inc.*, 575 U.S. 320, 327–28 (2015) (discussing "a long history of judicial review of illegal executive action, tracing back to England").

## COUNT IV

### Arbitrary and Capricious Agency Action

58. Plaintiff incorporates by reference all preceding paragraphs.

59. The APA prohibits agency actions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

60. DHS has previously recognized the importance of removing illegal aliens subject to a final order of removal. *See, e.g.*, Ex. A § II. Indeed, it committed to "enforcing the immigration laws of the United States to prohibit the entry into, and promote the return or removal from, the United States of inadmissible and removable aliens." *Id.* § III.A.1.a.

61. The January 20 Memorandum represents a sharp departure from DHS's previous policy. Because it does not sufficiently explain that sudden departure, the January 20 Memorandum is arbitrary and capricious.

62. DHS ignored the harms that pausing removals will cause. The January 20 Memorandum did not analyze those costs. Failing to consider important costs of a new policy renders that policy arbitrary and capricious. *See Michigan v. EPA*, 135 S. Ct. 2699, 2706 (2015) ("[A]gency action is lawful only if it rests 'on a consideration of the relevant factors.'").

63. The January 20 Memorandum also failed to consider alternative approaches that would allow at least some additional removals to continue. The Supreme Court recently held that a DHS immigration action was arbitrary and capricious because it was issued "'without any consideration whatsoever' of a [more limited] policy." *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1912 (2020) (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 51 (1983)).

64. Even if there were some way to explain or justify DHS's decision, it would be irrelevant because DHS did not provide any such explanation or justification in the January 20 Memorandum. *See SEC v. Chenery Corp.*, 318 U.S. 80, 87 (1943) ("The grounds upon which an administrative order must be judged are those upon which the record discloses that its action was based.").

## COUNT IV

**Failure to Follow the Requirements of Notice-and-Comment Rulemaking**

65. Plaintiff incorporates by reference all preceding paragraphs.

66. The January 20 Memorandum is a substantive or legislative rule that required notice-and-comment rulemaking under the APA. *See* 5 U.S.C. § 553. It is not exempt from the APA's notice-and-comment requirements as an interpretive rule, a general statement of policy, or a rule of agency organization, procedure, or practice. *See id.* § 553(b)(A).

67. Because DHS failed to use notice-and-comment procedures, the January 20 Memorandum is invalid. *See* 5 U.S.C. § 706.

## COUNT V

### Failure to Promote the Removal of Illegal Aliens

68. Plaintiff incorporates by reference all preceding paragraphs.

69. The January 20 Memorandum violates the Agreement by preventing DHS from "enforcing the immigration laws of the United States to . . . promote the return or removal from[] the United States of inadmissible and removable aliens." Ex. A § III.A.1.a.

70. The January 20 Memorandum is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

71. The January 20 Memorandum exceeds the authority DHS can delegate to Acting Secretary Pekoske and is therefore *ultra vires*.

72. As a result of the January 20 Memorandum, Texas "will be irreparably damaged and will not have an adequate remedy at law." Ex. A § VI. Texas is therefore "entitled . . . to injunctive relief . . . to enforce [DHS's] obligations" under the Agreement. Ex. A § VI.

### V. PRAYER FOR RELIEF

Wherefore, Plaintiffs pray the Court:

    a.    Hold unlawful and set aside the January 20 Memorandum;

    b.    Declare that the January 20 Memorandum is unlawful;

    c.    Issue preliminary and permanent injunctive relief enjoining Defendants from enforcing or implementing the January 20 Memorandum;

    d.    Postpone the effective date of the January 20 Memorandum;

    e.    Award Texas the costs of this action and reasonable attorney's fees; and

    f.    Award such other and further relief as the Court deems equitable and just.

Respectfully submitted this the 22nd day of January, 2021,

>KEN PAXTON
>Attorney General of Texas
>
>BRENT WEBSTER
>First Assistant Attorney General
>
>PATRICK K. SWEETEN
>Associate Deputy Attorney General for
>Special Litigation
>
>/s/ William T. Thompson
>WILLIAM T. THOMPSON
>Special Counsel
>Special Litigation Unit
>*Attorney-in-Charge*
>Texas Bar No. 24088531
>Southern District of Texas Bar No. 3053077
>Special Litigation Division
>P.O. Box 12548
>Austin, Texas 78711-2548
>Phone: (512) 936-2567
>Fax: (512) 936-0545
>Will.Thompson@oag.texas.gov
>
>*Counsel for the State of Texas*