# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### VICTORIA DIVISION

| | |
|---|---|
| STATE OF TEXAS,<br><br>        *Plaintiff,*<br><br>v.<br><br>The UNITED STATES OF AMERICA; DAVID PEKOSKE, Acting Secretary of the United States Department of Homeland Security, in his official capacity; UNITED STATES DEPARTMENT OF HOMELAND SECURITY; TROY MILLER, Senior Official  Performing the Duties of the Commissioner of U.S. Customs and Border Protection, in his official capacity; U.S. CUSTOMS AND BORDER PROTECTION; TAE JOHNSON, Acting Director of U.S. Immigration and Customs Enforcement, in his official capacity; U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; TRACY RENAUD, Senior Official Performing the Duties of the Director of the U.S. Citizenship and Immigration Services, in her official capacity; U.S. CITIZENSHIP AND IMMIGRATION SERVICES,<br><br>        *Defendants.* | Civ. Action No. 6:20-cv-00003<br><br><br><br>**EMERGENCY APPLICATION FOR A TEMPORARY RESTRAINING ORDER** |

## INTRODUCTION

With no notice, the Acting Secretary of Homeland Security issued an unlawful memorandum preventing the removal of illegal aliens subject to final orders of removal. Unless this Court acts, that memorandum will take effect today and irreparably injure the State of Texas.

Texas respectfully requests a temporary restraining order ("TRO") to avoid that harm and maintain the status quo. The State is likely to succeed on the merits because Defendants' memorandum violates the Constitution, the Administrative Procedure Act ("APA"), and a binding agreement between Texas and the Department of Homeland Security ("DHS"). Without emergency relief, Texas faces irreparable harm from having to provide costly educational, social, welfare, healthcare, and other services to illegal aliens who remain in Texas because Defendants have ceased removing them. By contrast, neither Defendants nor the public would be harmed by a TRO preventing implementation of Defendants' unlawful memorandum until the Court can consider whether a preliminary injunction is warranted.

## FACTUAL BACKGROUND

### I.    DHS's and Texas's Agreement to Cooperate

Cooperation and coordination between federal and state officials are essential to the effective enforcement of federal immigration law. To promote such cooperation and coordination, Texas and DHS entered into a mutually beneficial agreement. *See* Ex. A ("Agreement"). The "Agreement establishes a binding and enforceable commitment between DHS and Texas." *Id.* § 2.

Generally, the Agreement provides that "Texas will provide information and assistance to help DHS perform its border security, legal immigration, immigration enforcement, and national security missions in exchange for DHS's commitment to consult Texas and consider its views before taking" certain administrative actions. Ex. A § 2.

For example, the Agreement requires DHS to "[c]onsult with Texas before taking any action or making any decision that could reduce immigration enforcement" or "increase the number of removable or inadmissible aliens in the United States." Ex. A § III.A.2. That "includes policies, practices, or procedures which have as their purpose or effect":

- "reducing, redirecting, reprioritizing, relaxing, lessening, eliminating, or in any way modifying immigration enforcement";

- "pausing or decreasing the number of returns or removals of removable or inadmissible aliens from the country"; or

- "declining to decrease the number of lawful, removable, or inadmissible aliens residing in the United States."

Ex. A § III.A.2.a, c, f.

To enable this consultation process, the Agreement requires DHS to "[p]rovide Texas with 180 days' written notice of any proposed action" subject to the consultation requirement. Ex. A § III.A.3. That gives Texas "an opportunity to consult and comment on the proposed action." *Id.* After Texas submits its views, "DHS will in good faith consider Texas's input and provide a detailed written explanation of the reasoning behind any decision to reject Texas's input before taking any action" covered by the consultation requirement. *Id.*

The Agreement authorizes adjudication of disputes about the Agreement "in a United States District Court located in Texas." *Id.* § VIII. To the extent DHS fails to comply with its obligations, the Agreement expressly provides for injunctive relief. It would "be impossible to measure in money the damage that would be suffered if the parties fail[ed] to comply with" the Agreement. *Id.* § VI. "[I]n the event of any such failure, an aggrieved party [would] be irreparably damaged and [would] not have an adequate remedy at law." *Id.* "Any such party shall, therefore, be entitled (in addition to any other remedy to which it may be entitled in law or in equity) to injunctive relief, including specific performance, to enforce such obligations, and if any action should be brought in equity to enforce any of the provisions of this Agreement, none of the parties hereto shall raise the defense that there is an adequate remedy at law." *Id.*

The Agreement provides mechanisms by which it can be modified or terminated. *See id.* §§ XIV–XV. But neither Texas nor DHS has sought to modify or terminate the Agreement—and any attempt to do so would itself be governed by those mechanisms.

## II.   The January 20 Memorandum

On January 20, 2021, Acting Secretary of DHS David Pekoske issued a memorandum "directing an immediate pause on removals of any noncitizen with a final order of removal (except as noted below) for 100 days." Ex. B (Memo.) at 3 (footnote omitted).

The January 20 Memorandum includes only four narrow exceptions. "The pause on removals applies to any noncitizen present in the United States when [the memorandum] takes effect with a final order of removal except one who:

1.      According to a written finding by the Director of ICE, has engaged in or is suspected of terrorism or espionage, or otherwise poses a danger to the national security of the United States; or

2.      Was not physically present in the United States before November 1, 2020; or

3.      Has voluntarily agreed to waive any rights to remain in the United States, provided that he or she has been made fully aware of the consequences of waiver and has been given a meaningful opportunity to access counsel prior to signing the waiver; or

4.      For whom the Acting Director of ICE, following consultation with the General Counsel, makes an individualized determination that removal is required by law.

Ex. B at 3–4 (footnote omitted).

As a result, if the January 20 Memorandum goes into effect, it will prevent the vast majority of removals from taking place. Absent emergency relief from this Court, the January 20 Memorandum will "go into effect as soon as practical and no later than January 22, 2021." Ex. B at 3.

DHS did not follow the procedures outlined in the Agreement. *See* Ex. C. It neither notified Texas that it was considering such changes nor consulted with Texas about such changes. In issuing the January 20 Memorandum, DHS also failed to follow the APA's notice-and-comment procedures.

Perhaps because DHS did not solicit Texas's (or anyone else's) input, the January 20 Memorandum did not consider any of the significant harms that Texas

faces as a result of DHS suspending the removal of illegal aliens. Nor did it provide a reasoned explanation for the sudden change in DHS policy. *See* Ex. B at 3.

## LEGAL STANDARD

Texas seeks a temporary restraining order for the purpose "of preserving the status quo and preventing [the] irreparable harm" that will occur if Defendants are allowed to halt nearly all deportations of illegal aliens. *Granny Goose Foods, Inc. v. Bhd. of Teamsters & Auto Truck Drivers Local No. 70 of Alameda Cnty.*, 415 U.S. 423, 439 (1974).

To merit such relief, Texas, as the moving party, must show: (1) a substantial likelihood of success on the merits; (2) a substantial threat that failure to grant the injunction will result in irreparable injury to the moving party; (3) the threatened injury outweighs any damages the injunction may cause defendant; and (4) the injunction is in the public interest. *See Jackson Women's Health Org. v. Currier*, 760 F.3d 448, 452 (5th Cir. 2014); *Mayo Found. for Med. Educ. & Research v. BP Am. Prod. Co.*, 2:20-CV-34-Z, 2020 WL 759212, at *2 (N.D. Tex. Feb. 14, 2020) (applying same standard to temporary restraining order that governs preliminary injunction analysis).

"None of [these] four requirements has a fixed quantitative value." *Monumental Task Comm., Inc. v. Foxx*, 157 F. Supp. 3d 573, 582 (E.D. La. 2016) (citing *Texas v. Seatrain Int'l, S.A.*, 518 F.2d 175, 180 (5th Cir. 1975)). Instead, "a sliding scale is utilized, which takes into account the intensity of each in a given calculus." *Id.* Thus, in applying the four-part test, the Court must conduct "a delicate

balancing," which weighs "the probabilities of ultimate success at final hearing with the consequences of immediate irreparable injury that possibly could flow from the denial of preliminary relief." *Id.* Ultimately, whether to grant a request for a temporary restraining order "is left to the sound discretion" of the Court. *Nianga v. Wolfe*, 435 F. Supp. 3d 739, 743 (N.D. Tex. 2020).

## ARGUMENT

### I.   **Texas is Likely to Prevail on the Merits of Its Claims**

Texas is likely to succeed on the merits of its challenges to the January 20 Memorandum. First, DHS issued the memorandum without providing notice or allowing consultation, despite the requirements of the Agreement. Second, delaying the removal of illegal aliens by 100 days violates the statutory command to remove illegal aliens within 90 days. Third, categorically refusing to remove the vast majority of illegal aliens subject to final orders of removal is an unconstitutional failure to take care that the laws be faithfully executed, not an exercise of legitimate enforcement discretion.

### A.   **Standard for Assessing Likelihood of Success**

"As long as the court cannot say there is no likelihood of prevailing on the merits but finds the factor of substantial likelihood of success present to some degree, then the party seeking the injunction has met its burden." *Family Rehab., Inc. v. Azar*, 3:17-cv-3008, 2018 WL 3155911, at *3 (N.D. Tex. June 28, 2018) (citing *Productos Carnic, S.A. v. Cent. Amer. Beef & Seafood Trading Co.*, 621 F.2d 683, 686 (5th Cir. 1980)).

Temporary relief is not appropriate "if there is no chance that the movant will eventually prevail on the merits." *State of Texas v. Seatrain Int'l, S.A.*, 518 F.2d 175, 180 (5th Cir. 1975). But "one appealing to the conscience of the chancellor to maintain the status quo . . . , although he carries a burden, is not required to prove to a moral certainty that his is the only correct position." *Id.* That the movant "is unable, in an abbreviated proceeding, to prove with certainty eventual success does not foreclose the possibility that temporary restraint may be appropriate." *Id.*; *see also* 7C Charles Alan Wright, *et al.*, Fed. Prac. & Proc. § 2948.3 (3d ed.) ("All courts agree that plaintiff must present a prima facie case but need not show a certainty of winning.").

"A preliminary injunction may issue . . . despite the existence of a plausible defense, as long as the movant demonstrates a substantial likelihood of success." *Dallas Cowboys Cheerleaders, Inc. v. Scoreboard Posters, Inc.*, 600 F.2d 1184, 1188 (5th Cir. 1979).

## B.    DHS Did Not Follow the Agreement

The Agreement requires DHS to notify and consult with Texas before "pausing or decreasing the number of returns or removals of removable or inadmissible aliens from the country." Ex. A § III.A.2.c. But DHS did not notify or consult with Texas before "directing an immediate pause on removals" in the January 20 Memorandum. Ex. B at 3. As a result, the January 20 Memorandum is invalid, and Texas is entitled to injunctive relief. *See* Ex. A § VI.

The January 20 Memorandum provides no explanation for its failure to follow the Agreement, nor any acknowledgement of it. (As discussed below, that is an independent problem under the APA. *See infra* Part I.C.2.) DHS's flagrant disregard

of the Agreement in the January 20 Memorandum is inconsistent with its earlier acknowledgement that the Agreement is "a binding and enforceable commitment between DHS and Texas." Ex. B § 2.[1]

### C.   The January 20 Memorandum Violates the APA

The January 20 Memorandum violates the APA. First, it is inconsistent with a congressionally-mandated 90-day deadline for removing illegal aliens. Second, DHS acted arbitrarily and capriciously in issuing the memorandum.

#### 1.   Violation of Section 1231

Federal immigration law requires that "when an alien is ordered removed, the Attorney General shall remove the alien from the United States within a period of 90 days." 8 U.S.C. § 1231(a)(1)(A). That obligation has been transferred to the Secretary of Homeland Security. *See Clark v. Martinez*, 543 U.S. 371, 375 n.1 (2005). Now, "DHS has a statutory duty to effect removal within the 90-day period, if possible." *Ulysse v. Dep't of Homeland Sec.*, 291 F. Supp. 2d 1318, 1325 (M.D. Fla. 2003).

The 90-day limit is important to Congress. "Congress intended for inadmissible, excludable, or removable aliens to be deported within 90 days, if possible." *Id.* "This is evidenced not only by the clear language of the statute, but also by the change in statutory language in 1996." *Id.* In 1996, Congress "reduced the

---

[1] This defect also renders the January 20 Memorandum "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" and "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (D). For this reason, the APA requires the Court to "hold unlawful and set aside" the January 20 Memorandum. *Id.* § 706(2). In the alternative, the Court should enjoin the individual defendants from enforcing the January 20 Memorandum because such enforcement would be *ultra vires* and beyond the authority the agency defendants could delegate.

amount of time that the Attorney General has to deport an alien from six months to 90 days." *Id.* Of course, aliens may thwart DHS's efforts to remove them, so Congress "extended the removal period if the alien does not cooperate." *Id.*; *see* 8 U.S.C. § 1231(a)(1)(C).

Congress did not give DHS the option of disregarding the 90-day removal deadline. The statute uses mandatory language. DHS "shall"—not may—"remove the alien from the United States within a period of 90 days." 8 U.S.C. § 1231(a)(1)(A). Courts routinely interpret "shall" as creating a mandatory duty. *See, e.g.*, *Maine Cmty. Health Options v. United States*, 140 S. Ct. 1308, 1320 (2020) ("Unlike the word 'may,' which implies discretion, the word 'shall' usually connotes a requirement."); *Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26, 35 (1998) ("[T]he mandatory 'shall' . . . normally creates an obligation impervious to judicial discretion.").

The January 20 Memorandum is not designed to help DHS comply with this statutory mandate. Instead, it makes compliance impossible. By "pausing" removals for 100 days, DHS has ensured it cannot meet Congress's 90-day removal deadline for numerous illegal aliens, including both those already ordered removed and those to be ordered removed in the days to come.

### 2.   Arbitrary and Capricious Agency Action

The APA prohibits agency actions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The January 20 Memorandum is arbitrary and capricious because DHS disregarded

relevant factors, changed its position without explanation, and failed to consider more limited alternatives.

First, failing to consider important costs of a new policy renders that policy arbitrary and capricious. "[A]gency action is lawful only if it rests 'on a consideration of the relevant factors.'" *Michigan v. EPA*, 135 S. Ct. 2699, 2706 (2015). But DHS ignored the harms that pausing removals will cause. The January 20 Memorandum does not mention those costs at all. Considering such policy concerns "was the agency's job, but the agency failed to do it." *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1914 (2020). DHS's failure is particularly conspicuous because DHS has previously recognized the importance of removing illegal aliens subject to a final order of removal. *See, e.g.*, Ex. B § II.

Second, the Supreme Court has held that "an agency changing its course by rescinding a rule is obligated to supply a reasoned analysis for the change beyond that which may be required when an agency does not act in the first instance." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42 (1983). In this case, DHS did not even terminate the Agreement. *See* Ex. A § XV. Instead, it simply violated the Agreement without providing any "reasoned analysis for" doing so. *State Farm*, 463 U.S. at 42. Nor did DHS explain why it was abandoning its previous policy of "enforcing the immigration laws of the United States to prohibit the entry into, and promote the return or removal from, the United States of inadmissible and removable aliens." Ex. A § III.A.1.a.

DHS based its decision to "pause" removal for 100 days on "enhanc[ing] border security," "conduct[ing] immigration and asylum processing at the southwest border fairly and efficiently," and "comply[ing] with COVID-19 protocols." Ex. B at 3. But those are not new considerations, and DHS did not claim otherwise. Nor did DHS explain how formally stopping the vast majority of removals would address these needs. DHS also alluded to its "highest enforcement priorities" without explaining what those priorities are, how they had changed, or how pausing removals will help DHS achieve them. Ex. B at 3.

Third, the Supreme Court recently held that a DHS immigration action was arbitrary and capricious because it was issued "'without any consideration whatsoever' of a [more limited] policy." *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1912 (2020) (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 51 (1983)). The January 20 Memorandum also fails this requirement. It creates a default *against* removal, despite federal immigration law requiring removal. It does not explain how the several narrow categories to this sweeping default advance the stated interests that precipitated the Memorandum, nor does it explain why other exceptions—that is, additional enforcement of duly enacted immigration laws—would harm those interests. The Memorandum is wholly devoid of explanation as to why DHS has deemed enforcement categorically inappropriate, let alone why highly restricted enforcement is preferable to more limited restrictions. This, too, is arbitrary.

Because the January 20 Memorandum does not sufficiently justify itself, DHS acted arbitrarily and capriciously. Any new explanations that may be provided to this Court by DHS's counsel are irrelevant. "The grounds upon which an administrative order must be judged are those upon which the record discloses that its action was based." *SEC v. Chenery Corp.*, 318 U.S. 80, 87 (1943).

### D.   Abdicating Responsibility for Removing Illegal Aliens Is Unconstitutional

The President and those who work for him in the Executive Branch are obligated to "take Care that the Laws be faithfully executed." U.S. Const. art. II, § 3. The January 20 Memorandum violates that constitutional obligation.

First, the January 20 Memorandum contradicts 8 U.S.C. § 1231. Violating a statute is the opposite of ensuring that it is faithfully executed. Of course, the Court can address DHS's violation of Section 1231 under the APA, as discussed above. But if the Court were to conclude that the APA did not provide a proper cause of action in this case, this constitutional claim would present the same merits question. Federal courts have long exercised the power to enjoin federal officers from violating the Constitution. *See Armstrong v. Exceptional Child Center, Inc.*, 575 U.S. 320, 327–28 (2015) (discussing "a long history of judicial review of illegal executive action, tracing back to England").

Second, the January 20 Memorandum does not provide for individualized consideration typical of prosecutorial discretion. Indeed, it provides precisely the opposite: rather than an exercise of prosecutorial discretion, where an executive actor acknowledges the obligation to enforce a law generally but elects not to do so in a

specific case, the memorandum abdicates the responsibility to enforce federal immigration laws and authorizes specific officials to make individualized determinations to enforce those laws against specific illegal aliens. Indeed, the memorandum does not prevent the initiation of removal proceedings—instead, it creates sweeping categorical rules preventing implementation of final orders of removal. No executive has the discretion to categorically refuse to enforce a duly enacted law; the Constitution does not provide the President or his subordinates with that discretion. U.S. Const. art. II, § 3.

Third, DHS cannot justify stopping removals as an example of prosecutorial discretion based on a new set of priorities. True, the January 20 Memorandum elsewhere directs DHS employees to allocate resources to three enumerated priorities that will go into effect on February 1, 2021. Ex. A at 3. But it clarifies that "nothing in this memorandum prohibits the apprehension or detention of individuals unlawfully in the United States who are not identified as priorities herein." *Id.* When it addresses the removal of illegal aliens, by contrast, the January 20 Memorandum creates categorical prohibitions. Rather than discuss the relative importance of different enforcement priorities, it simply stops removals. And rather than tie that decision to new enforcement priorities, the memorandum orders the ceasing of removals before DHS's new priorities even take effect.

## II. Texas will Suffer Irreparable Harm if an Injunction is not Granted

"To show irreparable injury if threatened action is not enjoined, it is not necessary to demonstrate that harm is inevitable and irreparable." *Humana, Inc. v. Avram A. Jacobson, M.D., P.A.*, 804 F.2d 1390, 1394 (5th Cir. 1986). Instead, "[t]he

plaintiff need show only a significant threat of injury from the impending action, that the injury is imminent, and that money damages would not fully repair the harm." *Id.* (footnote omitted).

Texas makes that showing in two ways. First, DHS admitted that Texas policies like the January 20 Memorandum irreparably injure Texas. Second, Texas submits declarations quantifying some of the unrecoverable financial costs of providing federally-mandated welfare benefits to illegal aliens. By increasing those costs, the January 20 Memorandum will irreparably harm Texas.

## A. DHS Admits Texas Faces Irreparable Injury

DHS has already acknowledged that policies like the January 20 Memorandum cause Texas significant harm. "Texas, like other States, is directly and concretely affected by changes to DHS rules and policies that have the effect of easing, relaxing, or limiting immigration enforcement. Such changes can impact Texas's law enforcement, housing, education, employment, commerce, and healthcare needs and budgets." Ex. A § II.

Indeed, DHS has specifically admitted that "a decrease or pause on returns or removals of removable or inadmissible aliens" would "result in concrete injuries to Texas." Ex. A § II.

Texas faces particular harm because the rushed implementation of the January 20 Memorandum deprived Texas of the option of adjusting its policies in light of the federal shift. As DHS itself has acknowledged, "[t]he harm to Texas is particularly acute where its budget has been set months or years in advance and it has no time to adjust its budget to respond to DHS policy changes." Ex. A § II.

15

**B.      Texas Is Forced to Spend Money on Various Services for Illegal Aliens**

The State of Texas spends hundreds of millions of dollars per year providing services to illegal aliens, including social services, education, healthcare, and other services broadly available in Texas. By increasing the number of illegal aliens present in Texas, the January 20 Memorandum will necessarily increase these costs. Likewise, the categorical refusal to remove aliens ordered removable will encourage additional illegal immigration into Texas, which will further exacerbate these costs. The United States Supreme Court has already concluded that the predictable acts of illegal aliens in response to governmental enforcement efforts can injure a State. *Dept. of Commerce v. New York*, 139 S. Ct. 2551, 2565-66 (2019). Just so here. And these increased financial expenditures will irreparably harm the State because it cannot recover those costs from the federal government. *See Texas v. United States*, 328 F. Supp. 3d 662, 737 (S.D. Tex. 2018) (explaining that the State's financial injury was irreparable because "there is no source of recompense").

**1.      If Defendants Cease Removing Illegal Aliens, Texas Will Have to Spend More Money on Social Programs**

The State funds three healthcare programs that cover illegal aliens. First, federal law requires Texas to include illegal aliens in its Emergency Medicaid program. *See* 42 C.F.R. § 440.225(c). That costs the State tens of millions of dollars annually. *See* Ex. D ¶ 8 (estimating costs between $62 million and $90 million for various years). Second, the Family Violence Program spends more than a million dollars per year providing services to illegal aliens. *See* Ex. D ¶ 9 (estimating costs between $1 million and $1.4 million for various years). Third, Texas's Children's

Health Insurance Program spends tens of millions of dollars each year on perinatal coverage for illegal aliens. *See* Ex. D ¶ 10 (estimating costs between $30 million and $38 million for various years).

In addition to the cost of these social services, Texas faces the costs of uncompensated care provided by state public hospital districts to illegal aliens. Between 2006 and 2008, these costs ranged from $597 million to $717 million. *See* Ex. D ¶ 11. In light of the increasing cost of medical care, these numbers are likely higher now.

The Chief Data and Analytics Officer at Texas's Health and Human Services Commission "believe[s] that the total costs to the State of providing such services and benefits to undocumented immigrants will continue to reflect trends to the extent that the number of undocumented immigrants residing in Texas increases or decreases each year." Ex. D ¶ 12.

The State also provides public education to illegal aliens, as the Supreme Court required in *Plyler v. Doe*, 457 U.S. 202, 230 (1982). The cost of educating unaccompanied alien children, which is only a subset of illegal aliens eligible for public education, is tens of millions of dollars per year. *See* Ex. E ¶ 4 (estimating costs between $31 million and $63 million for various years).

The Chief School Finance Officer at the Texas Education Agency "anticipate[s] that the total costs to the State of providing public education to [unaccompanied alien children] will rise in the future to the extent that the number of [unaccompanied alien children] enrolled in the State's public school system increases." Ex. E ¶ 8.

## 2. This Court Has Previously Found this Evidence Sufficient to Show Irreparable Injury

In *Texas v. United States*, 328 F. Supp. 3d 662 (S.D. Tex. 2018), the court considered these same declarations in the context of Texas's challenge to DACA. The court held that the evidence established standing.

The Court recognized that Texas "bears hundreds of millions of dollars in costs providing emergency Medicaid services to illegal aliens," for example. *Id.* at 702. Because Texas "bear[s] the costs of providing these social services required by federal law," a federal program that "increases the volume of individuals to whom [Texas] must provide these services" necessarily injures the State. *Id.* at 700.

The same is true here. By preventing the removal of illegal aliens, the January 20 Memorandum necessarily increases the number of illegal aliens to whom Texas must provide costly social services. That is a significant injury to the State.

Indeed, under Judge Hanen's analysis, Texas's evidence "would otherwise be sufficient proof of irreparable damage" for purposes of a preliminary injunction. *Id.* at 740. The Court refused to find irreparable injury only because the State had "delay[ed] in pursuing the claims" challenging DACA. *Id.*

In this case, Texas has the same evidence of irreparable injury and has not delayed at all. The State is filing suit—and seeking emergency relief—two days after DHS issued the challenged memorandum. The harm the State faces is therefore irreparable.

### III.   A TRO Would Not Harm Defendants or the Public

Defendants face no harm from a TRO. They have no legitimate interest in the implementation of an unlawful memorandum. *See N.Y. Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 488 (2d Cir. 2013) (recognizing that government officials "do[] not have an interest in the enforcement of an unconstitutional law").

But even if Defendants had a legitimate interest in the January 20 Memorandum, they face no substantial prejudice from a delayed implementation. "A temporary restraining order is a 'stay put,' equitable remedy that has as its essential purpose the preservation of the status quo while the merits of the cause are explored through litigation." *Foreman v. Dallas County*, 193 F.3d 314, 323 (5th Cir. 1999), *abrogated on other grounds*, *Davis v. Abbott*, 781 F.3d 207, 214 (5th Cir. 2015). DHS has already recognized that any costs from delaying new policies is outweighed by the benefits of consultation and more reasoned decision making. *See* Ex. A § 2.

### IV.   The Court Should Postpone the January 20 Memorandum's Effective Date

The APA empowers a "reviewing court" to "issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings." 5 U.S.C. § 705. A stay of the effective date should issue "to the extent necessary to prevent irreparable injury" and "[o]n such conditions as may be required." *Id.*; *see also Texas v. EPA*, 829 F.3d 405, 435 (5th Cir. 2016) (staying an EPA action pending review).

When considering "whether to stay an agency action pending judicial review," district courts apply the same test used for temporary restraining orders and

preliminary injunctions. *Texas v. United States*, 95 F. Supp. 3d 965, 973 (N.D. Tex. 2015); *see also IHG Healthcare, Inc. v. Sebelius*, 4:09-cv-3233, 2010 WL 11680368, at *1 (S.D. Tex. Apr. 1, 2010); *Safety Nat'l Cas. Corp. v. U.S. Dep't of Homeland Sec.*, 4:05-cv-2159, 2005 WL 8168878, at *2 (S.D. Tex. Dec. 9, 2005). Thus, for the reasons explained above, Texas has made the showing necessary for a stay.

Postponing the effective date of the January 20 Memorandum differs from a TRO in one important respect. While a standard TRO expires after 14 days, *see* Fed. R. Civ. P. 65(b)(2), the APA empowers the Court to postpone the effective date as long as necessary "to preserve status or rights pending conclusion of the review proceedings." 5 U.S.C. § 705. As a result, a stay of the memorandum's effective date would allow the Court to maintain the status quo pending a preliminary injunction hearing regardless of the schedule the Court chooses.

## CONCLUSION

The State of Texas respectfully requests that the Court either enter a TRO preventing Defendants from implementing the January 20 Memorandum or postpone the memorandum's effective date.

Respectfully submitted this the 22nd day of January, 2021,

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

PATRICK K. SWEETEN
Associate Deputy Attorney General for
Special Litigation

/s/ William T. Thompson
WILLIAM T. THOMPSON
Special Counsel
Special Litigation Unit
*Attorney-in-Charge*
Texas Bar No. 24088531
Southern District of Texas Bar No. 3053077

Special Litigation Division
P.O. Box 12548
Austin, Texas 78711-2548
Phone: (512) 936-2567
Fax: (512) 936-0545
Patrick.Sweeten@oag.texas.gov
Will.Thompson@oag.texas.gov

*Counsel for the State of Texas*

**CERTIFICATE OF SERVICE**

I certify that a true and accurate copy of the foregoing document was filed electronically (via CM/ECF) on January 22, 2021. A true and accurate copy of the foregoing document was also sent to the following addresses:

    ogcexecsec@hq.dhs.gov;
    ogc@hq.dhs.gov;
    david.palmer@hq.dhs.gov;
    stephen.mccleary@hq.dhs.gov;
    sharmistha.das@hq.dhs.go;
    Tae.D.Johnson@ice.dhs.gov;
    TracyL.Renaud@uscis.DHS.gov;
    Tracy.Renaud@uscis.DHS.gov;
    Robert.E.perez@cbp.DHS.gov; and
    USATXS.CivilNotice@usdoj.gov

                  /s/ William T. Thompson
                  WILLIAM T. THOMPSON

**CERTIFICATE OF CONFERENCE**

I certify that, on January 22, 2021, I attempted to confer with Defendants about the substance of this application and their availability for a hearing on this matter by emailing the following addresses:

    ogcexecsec@hq.dhs.gov;
    ogc@hq.dhs.gov;
    david.palmer@hq.dhs.gov;
    stephen.mccleary@hq.dhs.gov;
    sharmistha.das@hq.dhs.go;
    Tae.D.Johnson@ice.dhs.gov;
    TracyL.Renaud@uscis.DHS.gov;
    Tracy.Renaud@uscis.DHS.gov;
    Robert.E.perez@cbp.DHS.gov; and
    USATXS.CivilNotice@usdoj.gov

                  /s/ Patrick K. Sweeten
                  PATRICK K. SWEETEN