**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**VICTORIA DIVISION**

| | | |
|---|---|---|
| STATE OF TEXAS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | No. 6:21-cv-00003 |
| | ) | |
| UNITED STATES OF AMERICA, *et al.* | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES**
**IN OPPOSITION TO PLAINTIFFS' EMERGENCY APPLICATION**
**FOR A TEMPORARY RESTRAINING ORDER**

## TABLE OF CONTENTS

I.  INTRODUCTION ...................................................................................................1

II.  BACKGROUND ...................................................................................................2

III.  ARGUMENT .......................................................................................................3

    A.  Texas Cannot Demonstrate a Likelihood of Success on the Merits ............................3

        1.  The MOU is Invalid, Unenforceable, and Cannot Be the Basis of Relief for Texas .......................................................................................3

            *a.  The Previous Administration Purported to Enter into the MOU without Proper Authority* .................................................................3

            *b.  Texas Did Not Provide Requisite Consideration for the MOU.* .........5

            *c.  This Court Cannot Order Specific Performance of the MOU's Terms* ...............5

        2.  Texas's APA Claims Lack Merit. ............................................................7

            *a.  Texas's APA Claims Are Not Subject to Judicial Review.* ...............7

            *b.  The Acting Secretary's Memorandum is Not Final Agency Action.* .................8

            *c.  The Acting Secretary Has Not Violated 8 U.S.C. § 1231 or Acted Arbitrarily or Capriciously.* ...............9

            *d.  Texas Fails to State an Independent Claim under the Take Care Clause.* ...............11

        3.  Texas Fails to State an Independent Claim under the Take Care Clause. ...............11

    B.  Texas Cannot Establish Standing, Let Alone Irreparable Harm ................................11

    C.  A Temporary Restraining Order Would Harm Defendants and the Public Interest ...............13

    D.  Any Injunction Should Be Narrowly Drawn ...............14

IV.  CONCLUSION ...................................................................................................15

## TABLE OF AUTHORITIES

**CASES**

*Alabama Rural Fire Ins. Co. v. Naylor,*
 530 F.2d 1221 (5th Cir. 1976) .................................................................................5

*Arizona v. United States,*
 567 U.S. 387 (2012) ...........................................................................1, 2, 9, 14

*Biodiversity Assocs. v. Cables,*
 357 F.3d 1152 (10th Cir. 2004) ............................................................................3

*Chevron USA Inc. v. Nat. Res. Def. Council, Inc.,*
 467 U.S. 837 (1984) .............................................................................................14

*City of El Cenizo v. Texas,*
 890 F.3d 164 (5th Cir. 2018) ................................................................................5

*Conservation Nw. v. Sherman,*
 715 F.3d 1181 (9th Cir. 2013) ..............................................................................4

*Crane v. Johnson. See,*
 783 F.3d 244 (5th Cir. 2015) ...............................................................................11

*Davidson v. Glickman,*
 169 F.3d 996 (5th Cir. 1999) ................................................................................4

*DHS v. New York,*
 No. 19A785, 2020 WL 413786 (U.S. Jan. 27, 2020) .........................................15

*DHS v. Regents of the University of California,*
 140 S. Ct. 1891 (2020) ........................................................................................10

*Estate of Bogley v. Unites States,*
 514 F.2d 1027 (Ct. Cl. 1975) ................................................................................5

*Gill v. Whitford,*
 138 S. Ct. 1916 (2018) .........................................................................................14

*Gonzales & Gonzales Bonds & Ins. Agency, Inc. v. Dep't of Homeland Sec.,*
 490 F.3d 940 (Fed. Cir. 2007) ..............................................................................5

*Hamama v. Adducci,*
 946 F.3d 875 (6th Cir. 2020) ................................................................................7

*Hamama v. Adducci,*
 912 F.3d 869 (6th Cir. 2018) ................................................................................7

*Heckler v. Chaney,*
    470 U.S. 821 (1985) ...................................................................................... 7, 8

*Holmes v. United States,*
    657 F.3d 1303 (Fed. Cir. 2011) ............................................................................6

*Lane v. Pena,*
    518 U.S. 187 (1996) ............................................................................................5

*Lewis v. Casey,*
    518 U.S. 343 (1996) ..........................................................................................14

*Madsen v. Women's Health Ctr., Inc.,*
    512 U.S. 753 (1994) ..........................................................................................15

*Mississippi v. Johnson,*
    71 U.S. (4 Wall.) 475 (1867) .............................................................................11

*Quantum Entm't Ltd. v. U.S. Dep't of Interior, Bureau of Indian Affairs,*
    597 F. Supp. 2d 146 (D.D.C. 2009) ...................................................................10

*Raines v. Byrd,*
    521 U.S. 811 (1997) ..........................................................................................12

*Reno v. Am.-Arab Anti-Discrimination Comm.,*
    525 U.S. 471, (1999) ................................................................................... 2, 7, 9

*Return Mail, Inc. v. US Postal Service,*
    139 S. Ct. 1853 (2019) ........................................................................................6

*Sanders v. United States,*
    252 F.3d 1329 (Fed. Cir. 2001) ...........................................................................6

*Star Satellite, Inc. v. City of Biloxi,*
    779 F.2d 1074 (5th Cir. 1986) ...........................................................................13

*State of Tex. v. United States,*
    106 F.3d 661 (5th Cir. 1997) ........................................................................ 7, 11

*Stone v. Mississippi,*
    101 U.S. 814 (1880) ............................................................................................3

*Suburban Mortg. Assocs., Inc. v. U.S. Dep't of Hous. & Urban Dev.,*
    480 F.3d 1116 (Fed. Cir. 2007) ...........................................................................6

*Texas v. United States,*
    328 F. Supp. 3d 662, (S.D. Tex. 2018) .............................................................12

*Texas v. United States*,
809 F.3d 134 (5th Cir. 2015), *as revised* (Nov. 25, 2015) ............................................. 7, 12

*Tourus Records, Inc. v. Drug Enforcement Admin.*,
259 F.3d 731 (D.C. Cir. 2001) ................................................................................. 10

*Town of Castle Rock, Colo. v. Gonzales*,
545 U.S. 748 (2005) .................................................................................................. 8

*Town of Chester v. Laroe Estates, Inc.*,
137 S. Ct. 1645 (2017) ............................................................................................ 14

*Trauma Service Group v. United States*,
104 F.3d 1321 (Fed. Cir. 1997) ............................................................................... 3

*Trump v. Hawaii*,
138 S. Ct. 2392 (2018) ............................................................................................ 15

*U.S. Army Corps of Engineers v. Hawkes Co.*,
136 S. Ct. 1807 (2016) .............................................................................................. 8

*U.S. Telecom Ass'n v. F.C.C.*,
359 F.3d 554 (D.C. Cir. 2004) ................................................................................. 4

*United States Trust Co. v. New Jersey*,
431 U.S. 1 (1977) ....................................................................................................... 3

*United States v. Johnson*,
319 U.S. 302 (1943) ................................................................................................. 12

*United States v. Jones*,
131 U.S. 1 (1889) ....................................................................................................... 5

*United States v. Winstar Corp.*,
518 U.S. 839 (1996) .................................................................................................. 6

*Weinberger v. Romero-Barcelo*,
456 U.S. 305 (1982) ................................................................................................ 13

*Whitman v. Am. Trucking Ass'n*,
531 U.S. 457 (2001) .................................................................................................. 4

*Winter v. Nat. Res. Def. Council, Inc.*,
555 U.S. 7 (2008) ..................................................................................................... 11

*Zadvydas v. Davis*,
533 U.S. 678 (2001) .................................................................................................. 8

**STATUTES**

5 U.S.C. § 701 ............................................................................................................. 7, 8

5 U.S.C. § 704 ............................................................................................................. 6, 8

5 U.S.C. § 705 ................................................................................................................. 9

6 U.S.C. § 112 ................................................................................................................. 4

8 U.S.C. § 1101 *et seq.* .................................................................................................. 1

8 U.S.C. § 1103 ........................................................................................................... 4, 7

8 U.S.C. §§ 1221-1232 .................................................................................................... 7

8 U.S.C. § 1231 ....................................................................................................... 7, 8, 9

8 U.S.C. § 1252 ............................................................................................................... 7

8 U.S.C. § 1257 ............................................................................................................... 4

**REGULATIONS**

8 C.F.R. § 241.6 ......................................................................................................... 8, 9

**UNITED STATES CONSTITUTION**

U.S. Const. art. I, § 8 .................................................................................................. 1, 2

**OTHER AUTHORITIES**

Auth. of the United States to Enter Settlements Limiting the Future Exercise of Exec. Branch
    Discretion, 23 U.S. Op. Off. Legal Counsel 126 (1999) ........................................ 4

## I.     <u>INTRODUCTION</u>

Texas seeks extraordinary relief to enforce an invalid contract that illegitimately purports to assign to the State the federal government's plenary authority over immigration enforcement to states and counties. The Department of Homeland Security ("DHS") lacked authority to cede control over federal immigration policy to Texas, and Texas has no power to demand specific performance of that contract in the form of a nationwide temporary restraining order ("TRO").

The Executive Branch, and the Secretary of Homeland Security in particular, is vested with broad prosecutorial discretion to enforce federal immigration law—including determining whether and when to remove particular aliens. U.S. Const. art. I, § 8, cl. 4; 8 U.S.C. § 1101 *et seq.*; *see Arizona v. United States*, 567 U.S. 387, 395–97 (2012). On an emergency basis, Texas asks this Court to disregard this Executive authority and to enjoin a new Administration from temporarily pausing removals while it reviews DHS policies and priorities. Texas argues that, just 12 days before the transition to the current Administration, DHS delegated to Texas, through a memorandum of understanding ("MOU") (ECF No. 2-1), the authority to stay any substantive change to federal immigration law enforcement for 180 days if the State does not consent to the change. This Court should reject this attempt to eviscerate the federal government's plenary power with respect to immigration and should deny Texas's motion for a TRO.

There are several additional defects in Texas's emergency application, including (1) the purported MOU's invalidity and unenforceability; (2) the lack of a waiver of sovereign immunity to seek specific performance of a contract, if one formed; (3) the non-reviewability of Plaintiff's APA claims, which also fail on the merits; (4) a lack of demonstrated standing; and (5) the absence of irreparable harm warranting the extraordinary relief of a TRO. Finally, the balance of harms and the public interest overwhelmingly favor denying the TRO.

Texas's eleventh-hour effort to control and impede the new Administration's immigration policies should be rejected.

## II.  **BACKGROUND**

The Supreme Court has held that "[t]he federal power to determine immigration policy is well settled." *Arizona*, 567 U.S. at 395 (noting how "[i]mmigration policy can affect trade, investment, tourism, and diplomatic relations for the entire Nation, as well as the perceptions and expectations of aliens in this country who seek the full protection of its laws"); *see also* U.S. Const. art. I, § 8, cl. 4. Accordingly, the Secretary of Homeland Security has broad statutory authority to "establish such regulations; . . . issue such instructions; and perform such other acts *as he deems necessary* for carrying out his authority" under the immigration law. 8 U.S.C. § 1103(a)(3) (emphasis added). As applicable to the pause on removals at issue here, this broad authority includes discretion for DHS not to remove an individual who is otherwise subject to a removal order. *See Arizona*, 567 U.S. at 396 ("A principal feature of the removal system is the broad discretion exercised by immigration officials."); *see also Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 484, (1999) (*AADC*) (recognizing longstanding "discretion" of the Executive to "decline to execute a final order of deportation").

Pursuant to these authorities, Acting Secretary David Pekoske issued a Memorandum providing a 100-day pause on removals of individuals who were in the United States prior to November 1, 2020. *See* Pekoske Memo (ECF No. 2-2). The Acting Secretary issued the Memorandum to facilitate agency review of "policies and practices" to address complex challenges, "including operational challenges at the southwest border as it is confronting the most serious global public health crisis in a century." *Id.* at 1.

Twelve days prior to the issuance of the Memorandum, the outgoing Administration entered into the MOU at issue here. *See* MOU. Therein, outgoing senior officials stated that the agency would "[c]onsult with Texas before taking *any action* or making *any decision* that could reduce immigration

enforcement, increase the number of removable or inadmissible aliens in the United States, or increase immigration benefits or eligibility for benefits for removable or inadmissible aliens." MOU at 3 (emphasis added). According to the MOU, a "consultation" involves DHS providing: "180 days' written notice" to Texas, "an opportunity [for Texas] to consult and comment on the proposed action," "consider[ation of] Texas's input," and "a detailed written explanation of the reasoning behind any decision to reject Texas's input before taking any action." MOU at 3.

## III.   ARGUMENT

### A.   Texas Cannot Demonstrate a Likelihood of Success on the Merits

#### 1.   The MOU is Invalid, Unenforceable, and Cannot Be the Basis of Relief for Texas

Texas has failed to establish that the MOU even meets two of the four essential elements to constitute a valid contract with the federal government: authority and consideration. *See Trauma Service Group v. United States*, 104 F.3d 1321, 1325 (Fed. Cir. 1997).

##### a.   *The Previous Administration Purported to Enter into the MOU without Proper Authority*

Texas asserts that DHS contracted away the sovereign's right to decide federal immigration policy by imposing a 180-day stay on federal action, pending Texas's response to that action. Such a promise to abstain from taking a wide range of immigration-related actions until a State has exercised a 180-day comment power lies beyond the power of contract. The federal government has plenary power over the enforcement of federal immigration law and an outgoing administration cannot contract away that power for an incoming administration. *See Biodiversity Assocs. v. Cables*, 357 F.3d 1152, 1172 (10th Cir. 2004) ("The executive branch does not have authority to contract away the enumerated constitutional powers of Congress or its own successors…."); *see also United States Trust Co. v. New Jersey*, 431 U.S. 1, 23 (1977) ("[T]he Contract Clause does not require a State to adhere to a contract that surrenders an essential attribute of its sovereignty"); *Stone v. Mississippi*, 101 U.S. 814, 817 (1880) ("[T]he legislature cannot bargain away the police power of a State.").

-3-

Further, Texas fails to identify any permissible statutory authority that contemplates DHS entering into a contract to grant states the power to delay and review agency policy decisions, and for good reason. It runs afoul of the non-delegation doctrine. *U.S. Telecom Ass'n v. F.C.C.*, 359 F.3d 554, 565 (D.C. Cir. 2004) ("subdelegations to outside parties are assumed to be improper absent an affirmative showing of congressional authorization"). Indeed, all applicable statutes preserve federal prerogatives.  For example, the Homeland Security Act vests the Secretary with responsibility for all functions of the Department, and provides that she may delegate those functions only to "any officer, employee, or organizational unit of the Department." 6 U.S.C. § 112(b)(1). Delegations of functions to Texas, to include the power to delay DHS policies related to enforcement of federal immigration law, as the purported contract appears to provide by vesting Texas with a 180-day period to comment before an agency decision takes effect, violate this statutory limitation. The INA sets forth numerous provisions governing federal-state relations with respect to the immigration laws, *see, e.g.*, 8 U.S.C. §§ 1103(a)(10), 1257(g), but none contemplates such extraordinary MOUs.  Had Congress intended to authorize such extraordinary agreements, it certainly would have done so expressly with unmistakable clarity.  *See, e.g., Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001). The MOU is therefore unauthorized by statute.

Moreover, an agency cannot use its contracting authority to circumvent the constraints of the Administrative Procedure Act (APA) by constraining the agency from making future changes to immigration policy.  Any such constraint would be a legislative rule that binds an agency, and would be subject to the requirements of the APA. *See, e.g., Davidson v. Glickman*, 169 F.3d 996, 999 (5th Cir. 1999). Indeed, even in the context of settlement, the Attorney General's settlement powers are limited when it comes to limiting the exercise of agency discretion. *See Auth. of the United States to Enter Settlements Limiting the Future Exercise of Exec. Branch Discretion*, 23 U.S. Op. Off. Legal Counsel 126 (1999); *see also Conservation Nw. v. Sherman*, 715 F.3d 1181, 1187 (9th Cir. 2013).

b.   *Texas Did Not Provide Requisite Consideration for the MOU.*

The contract is also invalid because Texas did not provide any consideration in exchange for its asserted control over federal immigration policy. Here, the purported agreement appears to require DHS to consult with Texas before "taking any action, adopting or modifying a policy or procedure, or making any decision" that could affect various aspects of immigration enforcement, Exhibit A, at 2–3, and provides Texas with 180 days to comment on any proposed change. *Id.* at 3. In exchange for this opportunity to comment, and to delay Federal policy changes, Texas agrees only to "[s]upport DHS's immigration enforcement by honoring "detainer requests" or "requests to hold" issued to Texas by ICE or CBP, and honoring DHS requests for records or information from the Texas Department of Motor Vehicles." Exhibit A at 4. But Texas does not claim that it had to begin performing these tasks due to the MOU. *See, e.g., City of El Cenizo v. Texas*, 890 F.3d 164, 173 (5th Cir. 2018). Accordingly, Texas has failed to provide the United States with any consideration for the promises extracted in this agreement. *Estate of Bogley v. Unites States*, 514 F.2d 1027, 1033 (Ct. Cl. 1975) ("a promise to do what one is required by law or contract to do is not a valuable consideration").

c.   *This Court Cannot Order Specific Performance of the MOU's Terms*

Texas's claim for injunctive relief based on the MOU also fails because the United States has not waived sovereign immunity for such claims. A waiver of sovereign immunity must be enacted by statute, must be strictly construed in the Government's favor and must unambiguously extend to the type of relief sought. *Lane v. Pena*, 518 U.S. 187, 192 (1996). Circuit courts have consistently recognized that the United States has not waived sovereign immunity for contract claims seeking specific performance. *See generally Gonzales & Gonzales Bonds & Ins. Agency, Inc. v. Dep't of Homeland Sec.*, 490 F.3d 940, 945 (Fed. Cir. 2007); *Ala. Rural Fire Ins. Co. v. Naylor*, 530 F.2d 1221, 1229–30 (5th Cir. 1976); *see also United States v. Jones*, 131 U.S. 1, 18 (1889) (Tucker Act did not authorize specific performance against the federal government).

Monetary damages are the only relief available for any breach of contract by the federal government because government officials must always have the discretion to breach if the public interest so requires.  For example, the Supreme Court has recognized that, even in the case of powerful exclusive property interests like patents, a patent owner who thinks the government has infringed his patent can sue for just compensation but not for an injunction, even though injunctions are the usual remedy for infringement in the private sector. *See Return Mail, Inc. v. U.S. Postal Serv.,* 139 S. Ct. 1853, 1859 (2019). The government must always have the discretion, even in the patent context, to infringe and pay compensation (i.e., to "take" a license for public use). At the very minimum, the new Administration should have that prerogative here (even assuming *dubitante* that this contract is valid).

Texas cannot rely on the APA to circumvent this basic principle. For agency action to be subject to APA review, there must be "no other adequate remedy in a court." 5 U.S.C. § 704. Here, to the extent the MOU is enforceable at all, the Tucker Act supplies the proper remedy in the Court of Federal Claims. *See Suburban Mortg. Assocs., Inc. v. U.S. Dep't of Hous. & Urban Dev.*, 480 F.3d 1116, 1128 (Fed. Cir. 2007). At most, if there were a valid contract, Texas might possess a contract claim for money damages. Such a claim is consistent with federal case law that "damages are always the default remedy for breach of contract." *Sanders v. United States*, 252 F.3d 1329, 1334 (Fed. Cir. 2001) (quoting *United States v. Winstar Corp.*, 518 U.S. 839, 885 (1996) (plurality opinion)); *accord Holmes v. United States*, 657 F.3d 1303, 1314 (Fed. Cir. 2011).

Moreover, notwithstanding representations to the contrary, *see* Mot. 4, Texas is capable of tracking any incurred costs resulting from any alleged breach and may seek to recover those costs in an appropriate forum, at an appropriate time, assuming it has a valid claim. *See* Mot. 16–17.

2. <u>Texas's APA Claims Lack Merit.</u>

Texas also advances two APA claims, urging that the Memorandum (1) violates 8 U.S.C. § 1231 by not requiring DHS to remove individuals within the 90-day removal period, and (2) was arbitrary and capricious. Mot. at 9–13. These claims are meritless.

a. *Texas's APA Claims Are Not Subject to Judicial Review.*

First, Texas's APA claims are precluded by 5 U.S.C. § 701. Congress has precluded judicial review of "any cause or claim by or on behalf of any alien arising from the decision or action … to commence proceedings, adjudicate cases, or execute removal orders against any alien under this chapter." 8 U.S.C. § 1252(g).  "Section 1252(g) was directed against a particular evil: attempts to impose judicial constraints upon prosecutorial discretion." *AADC*, 525 U.S. at 485 n.9; *Texas v. United States*, 809 F.3d 134, 165 (5th Cir. 2015), *as revised* (Nov. 25, 2015) (§ 1252(g) "codified the Secretary's discretion to decline 'the initiation or prosecution of various stages in the deportation process'"). Further, § 1252(f) provides that only the Supreme Court has authority to enjoin operation of 8 U.S.C. §§ 1221–1232, other than cases brought by individuals. 8 U.S.C. § 1252(f); *see Hamama v. Adducci*, 946 F.3d 875, 877–78 (6th Cir. 2020); *Hamama v. Adducci*, 912 F.3d 869, 877–80 (6th Cir. 2018)

Texas's claims also fail because the decision to place a pause on certain removals is a classic exercise of prosecutorial discretion committed to agency discretion. *See Heckler v. Chaney*, 470 U.S. 821, 832 (1985) (holding that an agency's decision not to exercise its enforcement authority, or to exercise it in a particular way, is "presumed" to be "immune from judicial review under § 701(a)(2)" of the APA); 5 U.S.C. § 701(a)(2) (no APA review for actions committed to agency discretion). Through the INA, Congress has authorized the Secretary to "establish such regulations; . . . issue such instructions; and perform such other acts *as he deems necessary* for carrying out his authority" under the statute. 8 U.S.C. § 1103(a)(3) (emphasis added); *see also id.* § 1103(a)(1); *Texas*, 106 F.3d at 667 (5th Cir. 1997) ("[S]ection 1103 places no substantive limits on the Attorney General and commits enforcement of

-7-

the INA to her discretion."). Under *Heckler* and its progeny, Texas's challenge to the pause on removals is not judicially reviewable.

Texas suggests that § 701(a)(2) does not apply to 8 U.S.C. § 1231 because of the statute's use of the word "shall." Mot. at 10. But the Supreme Court has rejected the argument that a putatively mandatory statutory obligation alters an agency's unreviewable prosecutorial discretion. *Town of Castle Rock, Colo. v. Gonzales*, 545 U.S. 748, 764–65 (2005) (even mandatory statutory scheme does not give "an entitlement to *enforcement* of the mandate"); *see also Chaney*, 470 U.S. at 835 (finding the language of the statute "permissive" in the exercise of prosecutorial discretion notwithstanding that the statutory scheme included the word "shall"). Although Texas cites two cases in which the Supreme Court found the use of word "shall" to be mandatory in the context of those cases, Mot. at 10, neither involved prosecutorial discretion or 5 U.S.C. § 701(a)(2). In any event, § 1231 itself recognizes that there will be instances where aliens are *not* removed within 90 days. *See* 8 U.S.C. § 1231(a)(1)(C) ("The removal period shall be extended beyond a period of 90 days . . ."); *id.* § 1231(a)(3) ("Supervision after 90-day period. If the alien does not leave or is not removed within the removal period, the alien, pending removal, shall be subject to supervision . . ."); *Zadvydas v. Davis*, 533 U.S. 678, 701 (2001) ("While an argument can be made for confining any presumption to 90 days, we doubt that when Congress shortened the removal period to 90 days in 1996 it believed that all reasonably foreseeable removals could be accomplished in that time."). So too, DHS regulations allow for "a stay of removal or deportation" to "an alien under a final order of deportation or removal." 8 C.F.R. § 241.6.

### b. The Acting Secretary's Memorandum is Not Final Agency Action.

Even if Texas's claims were not subject to the bar of § 701, they would fail because the memorandum is not a final agency action. *See* 5 U.S.C. § 704. No rights or obligations have been determined, nor do "direct and appreciable legal consequences" flow from the Memorandum. *See U.S. Army Corps of Eng'rs v. Hawkes Co.*, 136 S. Ct. 1807, 1813–14 (2016) (requiring that for an action to be

final, "the action must be one by which rights or obligations have been determined, or from which legal consequences will flow"). Rather, by its very essence, the Memorandum reflects the Administration's effort to conduct a "review of policies and practices" *before* deciding how to proceed. Pekoske Memo at 1. The Memorandum thus merely maintains the status quo for individuals who have been in the United States since before to November 1, 2020, and, *inter alia*, who do not pose a threat to national security. *Id.* at 2–3. Whether these individuals will be removed will be determined at a later date. Accordingly, even putting aside the other nonreviewability arguments, the agency's actions cannot be subject to review until, at the very least, legal consequences actually flow from the agency's internal review of how to proceed with immigration enforcement.

   *c.* *The Acting Secretary Has Not Violated 8 U.S.C. § 1231 or Acted Arbitrarily or Capriciously.*

  Neither of Texas's APA claims has merit. *See* Mot. 9–13. Nor should the Court countenance Texas's request for a stay of the Memorandum under 5 U.S.C. § 705. Even if it was applicable, notwithstanding that the100-day pause went into effect on January, 22, 2021, Texas admits the burden for a § 705 stay tracks that of a TRO, *see* Mot. at 19–20. Here, both APA claims misperceive immigration law.

  <u>First</u>, contrary to Texas' assertion, *id.* at 9–10, and as explained *supra* in Part III.2.a., 8 U.S.C. § 1231 does not mandate removal within the 90-day removal period. Rather, the statute contemplates, and DHS's own regulations allow for, a "grant a stay of removal or deportation" to "an alien under a final order of deportation or removal." 8 C.F.R. § 241.6; 8 U.S.C. § 1231(a)(1)(C) (extensions beyond 90 days); *id.* § 1231(a)(3) (post-90-day removal period supervision); *see also Arizona*, 567 U.S. at 396 (recognizing broad discretion provided to DHS regarding processing removals); *AADC*, 525 U.S. at 484. In any event, Congress explicitly provided in 8 U.S.C. § 1231 that: "Nothing in this section shall be construed to create any substantive or procedural right or benefit that is legally enforceable by any party against the United States or its agencies or officers or any other person." 8 U.S.C. § 1231(h).

Regardless, the Memorandum specifically provides that the pause does not apply to individuals for whom DHS has determined "removal is required by law." *See* Pekoske Memo at 3–4. Texas's statutory claim must be rejected.

Second, Texas ignores the entire premise and language of the Memorandum in arguing that DHS failed to consider relevant factors or provide reasoned decision-making. *See* Mot. at 10–13. In fact, the Acting Secretary explained that the point of the pause was to *allow* for the new Administration to "conduct a review of policies and practices concerning immigration enforcement"—particularly in the context of unique circumstances such as "DHS's limited resources," the need to "provide sufficient staff and resources to enhance border security," and "compl[iance] with COVID-19 protocols." Pekoske Memo at 1, 3. That review includes an opportunity for "each component [to] develop recommendations to address aspects of immigration enforcement." *Id.* at 2. The Acting Secretary more than adequately explained the basis for the Memorandum. *See Quantum Entm't Ltd. v. U.S. Dep't of the Interior, Bureau of Indian Affairs*, 597 F. Supp. 2d 146, 152 (D.D.C. 2009) ("Nothing more than a 'brief statement' is necessary [under the APA], as long as the agency explains 'why it chose to do what it did.'") (quoting *Tourus Records, Inc. v. Drug Enforcement Admin.*, 259 F.3d 731, 737 (D.C. Cir. 2001)); *see also id.* ("This requirement is not particularly demanding.").

Similarly, Texas's argument that DHS failed to consider a more limited policy also fails. Mot. at 12 (citing *DHS v. Regents of the Univ. of California*, 140 S. Ct. 1891, 1914 (2020)). DHS not only considered but enacted a specifically limited interim policy. The Memorandum by its terms is limited in both scope and time, and it exempts four classes of aliens from the pause on removal. Pekoske Memo 3–4. Unlike in *Regents*, where the Government rescinded the DACA Memorandum in full without considering a forbearance-only policy, DHS considered *and enacted* a limited alternative to a full pause of removals that reflected the agency's priorities. Other than repeating their misunderstanding that immigration law requires removal of an unspecified category of individuals,

-10-

Texas does not identify any other less restrictive policy that DHS failed to consider. *Regents* does not require more.

>    3.   Texas Fails to State an Independent Claim under the Take Care Clause.

Texas cannot state a separate cause of action under the Take Care Clause, because the Take Care Clause is not judicially enforceable. The Supreme Court has recognized that "the duty of the President in the exercise of the power to see that the laws are faithfully executed" "is purely executive and political," and not subject to judicial direction. *Mississippi v. Johnson*, 71 U.S. (4 Wall.) 475, 499 (1867). Moreover, the Fifth Circuit has previously rejected a claim by Texas that a purported failure to enforce immigration law constitutes an abdication of statutory duty. *State of Tex. v. United States*, 106 F.3d 661, 667 (5th Cir. 1997).

**B.    Texas Cannot Establish Standing, Let Alone Irreparable Harm**

Texas has also failed to demonstrate that it will be harmed by the moratorium at *all*, let alone irreparably. *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). Nor has it shown any significant harm that would arise during the few weeks it would take to resolve a motion for preliminary injunction.

As an initial matter, the Memorandum preserves the status quo by ensuring that individuals who were in the United States prior to November 1, 2020, can remain in the United States while the DHS reviews its policies and practices to allow for an orderly and just immigration system; the Memorandum does not affect the Memorandum does not affect removals at the border for those who entered the United States on or after November 1, 2020. *See* Pekoske Memo. By asking this Court to enjoin the Memorandum, Texas is presumably seeking an order requiring DHS unspecified individuals present in this country, thereby *disrupting* the status quo.

Moreover, Texas's allegations of fiscal harm mirror those that the Fifth Circuit found insufficient to establish standing in *Crane v. Johnson. See* 783 F.3d 244, 252 (5th Cir. 2015). There,

-11-

Mississippi claimed a general budgetary loss as a result of illegal immigration. *Id.* at 249. But Mississippi failed to demonstrate costs incurred because of DACA. *Id.* at 252. Here, Texas does not even *attempt* to connect costs to the 100-day pause in removals. *See* Compl. ¶ 5 (making only generalized fiscal claim from a "higher number of illegal aliens in Texas"). As in *Crane*, Texas lacks standing here. And without standing, Texas cannot demonstrate irreparable injury.

Texas's only evidence comes via recycled declarations from *other* litigation concerning *other* immigration actions. *See* Mot. at 18. But that evidence fails to establish a "'personal stake' in the alleged dispute" over the Memorandum, *Raines v. Byrd*, 521 U.S. 811, 819 (1997), because the two recycled declarations do not even purport to connect the 100-day pause in removals with an increase in costs. And even if Texas could demonstrate an increase in costs sufficient to confer standing, such monetary harm would fail to constitute the requisite irreparable injury to support a TRO.

Plaintiff's reliance on *Texas v. United States*, 328 F. Supp. 3d 662, (S.D. Tex. 2018), is misplaced. Mot. 16, 18. There, an expert opined that DACA would encourage over twenty percent of recipients who would otherwise have left the country to remain in the United States. *Texas*, 328 F. Supp. 3d at 702–03. The district court believed that evidence distinguished the case from *Crane*. Here, plaintiffs have made no such showing. Indeed, in the DAPA case, the Fifth Circuit specifically contrasted Texas's driver's license expenses at issue in that case with the general financial grievances advanced by Mississippi in *Crane*. *Texas*, 809 F.3d at 150 n.24, 157–58. There is no such specificity in the present matter. *Crane* controls.

Finally, Texas cannot rely on the MOU as a basis for standing. Injury is a jurisdictional requirement, which must be established as a matter of fact; standing cannot be manufactured via *ipse dixit*. *See United States v. Johnson*, 319 U.S. 302, 304–05 (1943). Regardless, Texas identifies no injury that arises from any decision by DHS not to consult as laid out in the MOU, other than, as in *Crane*, an alleged grievance about budgetary concerns. Compl. ¶ 5.

-12-

**C.      A Temporary Restraining Order Would Harm Defendants and the Public Interest**

Finally, Texas has failed to demonstrate that the threatened irreparable injury outweighs the threatened harm that the injunction would cause Defendants and the public interest, and that granting the injunction would not "be adverse to public interest." *Star Satellite, Inc. v. City of Biloxi*, 779 F.2d 1074, 1079 (5th Cir. 1986). Courts should "pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312–13 (1982) (citation omitted). Here, the balance of the equities and the public interest weigh overwhelmingly against Texas and its unsupported request for a temporary restraining order. Texas's claimed MOU-based interest in delay, presented without *any* showing of harm to Texas, pales in comparison to the public interest in, *inter alia*, measured and considered assessments of immigration policies by an incoming Administration.

At its core, Texas's extraordinary request for injunctive relief would undermine 230 years of federal immigration law repeatedly reaffirmed by the Supreme Court. The Acting Secretary issued the Memorandum in an effort for the new Administration to review "policies and practices" to address complex challenges in light of limited resources, "including operational challenges at the southwest border as it is confronting the most serious global public health crisis in a century." *See* Pekoske Memo at 1 ("In light of those unique circumstances, the Department must surge resources to the border in order to ensure safe, legal and orderly processing, to rebuild fair and effective asylum procedures that respect human rights and due process, to adopt appropriate public health guidelines and protocols, and to prioritize responding to threats to national security, public safety, and border security."). Rather than allowing the new Administration to confront those challenges, an injunction here would disrupt the Administration's careful calibration of how to conduct a necessary review. An "agency to which Congress has delegated policy-making responsibilities may, within the limits of that delegation,

properly rely upon the incumbent administration's views of wise policy to inform its judgments." *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 865 (1984).

Further, Texas's demand has serious consequences on third parties not before the Court. Texas insists that DHS resume removals, meaning individuals not before the Court would be removed from this country before the new Administration assesses whether such removal is consistent with its immigration priorities. The Supreme Court has recognized the humanitarian component of immigration enforcement, and the government should be able to make this assessment before executing removal orders. Imposing a requirement to carry out removals without regard to this assessment squarely contradicts the immigration system whereby the political branches are charged with exercising this authority. *See Arizona*, 567 U.S. at 396 ("Discretion in the enforcement of immigration law embraces immediate human concerns.").

This Court should reject Texas's efforts to make its manufactured delay-for-comment interests supreme, while ignoring the disruptive effect it seeks to impose on both the federal government and third parties.

**D.     Any Injunction Should Be Narrowly Drawn**

Any injunctive relief, if granted, should be limited to Texas. Nationwide relief that would affect those who are not parties to this case would exceed this Court's authority under Article III and violate longstanding equitable doctrine. "Article III of the Constitution limits the exercise of the judicial power to 'Cases' and 'Controversies.'" *Town of Chester v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1650 (2017) (citation omitted). A federal court may entertain a suit only by a plaintiff who has suffered a concrete "injury in fact," and the court may grant relief only to remedy "the inadequacy that produced [the plaintiff's] injury." *Gill v. Whitford*, 138 S. Ct. 1916, 1930 (2018) (citations omitted). Neither standing nor remedies are "dispensed in gross." *Lewis v. Casey*, 518 U.S. 343, 358 n.6 (1996).

Equitable principles similarly require that an injunction "be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994) (citation omitted); *see also DHS v. New York*, No. 19A785, 2020 WL 413786, at *1 (U.S. Jan. 27, 2020) (Gorsuch, J., concurring) (criticizing "increasingly common practice of trial courts ordering relief that transcends the cases before them" as "flaw[ed]" because "they direct how the defendant must act toward persons who are not parties to the case"); *Trump v. Hawaii*, 138 S. Ct. 2392, 2429 (2018) (Thomas, J., concurring) (nationwide injunctions "are legally and historically dubious").

## IV.   <u>CONCLUSION</u>

This Court should deny Plaintiff's emergency application for a temporary restraining order.

Dated: January 24, 2021

Respectfully submitted,

BRIAN M. BOYNTON
Acting Assistant Attorney General

AUGUST FLENTJE
Special Counsel

BRIGHAM J. BOWEN
Assistant Branch Director

<u>/s/ Adam D. Kirschner</u>
ADAM D. KIRSCHNER
IL Bar. No. 6286601
Senior Trial Counsel
BRIAN C. ROSEN-SHAUD
ME Bar No. 006018
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
Tel: (202) 353-9265
Fax: (202) 616-8460
Email: Adam.Kirschner@usdoj.gov
        Brian.C.Rosen-Shaud@usdoj.gov

<u>Mailing Address:</u>

-15-

Post Office Box 883
Washington, D.C. 20044

<u>Courier Address</u>
1100 L Street NW, Room 11020
Washington, D.C. 20005
*Attorneys for Defendants*


DANIEL DAVID HU
Assistant United States Attorney
Chief, Civil Division
State Bar No. 10131415
S.D. I.D. 7959
Southern District of Texas
1000 Louisiana, Suite 2300 Houston, TX 77002
Tel: (713) 567-9000
Fax: (713) 718-3300
Daniel.Hu@usdoj.gov

*Local Counsel*

**Certificate of Word Count**

Undersigned counsel certifies that the total number of words in Defendants' Memorandum, exclusive of those sections designated for omission, is 4,993 words, as registered by Microsoft Word.

/s/  Adam D. Kirschner
ADAM D. KIRSCHNER