IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION

STATE OF TEXAS

        *Plaintiff*,

v.

UNITED STATES OF AMERICA, *et al.*,

        *Defendants*.

Case No. 6:21-cv-00003

**AMICUS BRIEF IN SUPPORT OF DEFENDANTS**

I. **THE "SAFE" AGREEMENT IS UNENFORCEABLE.**

After the last election, and days before the new Administration was inaugurated, the prior Administration signed an agreement with Texas purporting to bind the federal government to make no changes to immigration enforcement for six months unless Texas agreed to such changes. Texas asserts that injunctive relief (and only injunctive relief) is appropriate under the agreement. But the agreement is not enforceable in this Court or any other, because the doctrine of Sovereign Immunity categorically bars any such injunction.

"In order to hale the federal government into a court proceeding, a plaintiff must show that there has been a valid waiver of sovereign immunity." *Lewis v. Hunt*, 492 F.3d 565, 570 (5th Cir. 2007). "The absence of such a waiver is a jurisdictional defect." *Id.* "A waiver of the Federal Government's sovereign immunity must be unequivocally expressed in *statutory* text . . . and will not be implied." *Id.* (emphasis added) (quoting *Lane v. Pena*, 518 U.S. 187, 192 (1996)). "[A]greement . . . between parties and their counsel is not sufficient to constitute a waiver of sovereign immunity." *Id.*

There is no waiver of sovereign immunity for equitable enforcement of a contract with the United States, so this Court cannot entertain Texas's claims relating to the SAFE agreement. *See Robbins v. U.S. Bureau of Land Mgmt.*, 438 F.3d 1074, 1082 (10th Cir. 2006). As many circuits have held, "the Tucker and Little Tucker Acts 'impliedly forbid' federal courts from ordering declaratory or injunctive relief, at least in the form of specific performance, for contract claims against the government." *Id.* (collecting cases from the First, Second, Third, Ninth, and D.C. Circuits); *see also Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682, 704 (1949) ("There are the strongest reasons of public policy for the rule that such relief cannot be had against the sovereign. The Government as representative of the community as a whole,

cannot be stopped in its tracks by any plaintiff who presents a disputed question of property or contract right.").

Most critically here, the Fifth Circuit has expressly so held. *See Alabama Rural Fire Ins. Co. v. Naylor*, 530 F.2d 1221, 1229–30 (5th Cir. 1976). As the Circuit explained: "The gravamen of Alabama Rural's complaint is a claim for breach of contract . . . . Congress specifically waived sovereign immunity when it established the Court of Claims and vested in that court jurisdiction over actions ex contractu against the United States, but limited that waiver by giving that court jurisdiction only to award damages, deliberately withholding equitable powers from it." *Id*. (citation omitted). Thus, the Circuit refused to hold "that the district court had jurisdiction under the [Administrative Procedure Act] to exercise its equitable powers so as in effect to compel the United States to perform the disputed contract." *Id*. at 1230. That is precisely what Texas seeks.

There are numerous other reasons that the SAFE agreements are invalid and unenforceable. *See generally United States v. Winstar Corp.*, 518 U.S. 839 (1996) (addressing various doctrines that limit contracts which purport to constrain the future sovereign power of the government). Indeed, approving this agreement would set a deeply problematic precedent. If an outgoing DHS official can sign away the next administration's policymaking authority for six months, why not for four years? Or eight? If DHS can do so, why not the Environmental Protection Agency, the Department of Energy, and every other federal agency? And if they can contract with Texas, why not with an individual—or the ACLU? Our Constitution directs that presidential elections occur every four years, with the Executive authority transferring shortly thereafter. But on Texas's view, an outgoing administration need never yield power so long as it finds a willing contractor to lock in its policy preferences.

But the Court need not reach such weighty issues, or any of the other problems with the validity of the contract at issue here. As a matter of black letter law, the federal government has not waived sovereign immunity over Texas's effort to obtain injunctive relief based on a contract, and this Court therefore lacks subject matter jurisdiction.

## II. TEXAS LACKS STANDING AND CANNOT SHOW THE IRREPARABLE HARM REQUIRED FOR A TRO.

Without the invalid agreement, Texas's standing and irreparable harm arguments fall apart.

Texas has failed to demonstrate any cognizable injury, much less the kind of extraordinary and immediate harm required for a TRO. To have standing, a "plaintiff must establish a 'personal stake' in the dispute and that the injury is particularized to him. The injury cannot be one suffered by the citizens at large." *Donelon v. Louisiana Div. of Admin. Law ex rel. Wise,* 522 F.3d 564, 566 (5th Cir. 2008) (internal citations omitted). Moreover, a plaintiff's alleged future injuries cannot be "too speculative to satisfy the well-established requirement that threatened injury must be 'certainly impending.'" *Clapper v. Amnesty Intern. USA*, 568 U.S. 398, 401 (2013).

Texas fails by every measure. It has not shown that it will face any harm because certain people with orders of removal that became final by November 1, 2020, will remain in the United States during the 100-day pause. Instead, it offers only generalized evidence totally divorced from the particular DHS order and timeframe at issue here, and asks the court to simply *assume* that some unknown number of people who would be removed but for the pause will instead impose costs on Texas. But assumptions, speculation, and generalized statistics do not establish standing.

*Crane v. Johnson*, 783 F.3d 244, 252 (5th Cir. 2015), in which the Fifth Circuit held that the State of Mississippi lacked standing to challenge the Department of Homeland Security's deferred action program, is instructive here.  In that case, Mississippi asserted that it would be monetarily injured by the deferred action program because a 2006 study showed that undocumented people cost the state of Mississippi more than $25 million per year, and the deferred action program authorized some undocumented individuals to remain in the state. *Id.* The Fifth Circuit rejected this argument, holding that Mississippi had failed to "demonstrate that the state will incur costs *because of* the DACA program." *Id.* (emphasis added).  Mississippi did not provide any evidence, in that case, as to costs regarding DACA applicants in particular.  As a result, its "claim of injury [wa]s not supported by any facts" and was "purely speculative." *Id.*

The exact same is true here. The State of Texas cites only general statistics regarding the purported cost to the state of certain services—emergency medical care, the Family Violence program, perinatal care, and education—for undocumented individuals generally. *See* Motion for TRO at 16-17.  This is *precisely* the type of evidence the Fifth Circuit rejected in *Crane*.  It is not particularized in any way to the people affected by the January 20 memorandum.  Indeed, as the State conceded at argument, its declarations are from a prior lawsuit—*from 2018*—which was filed long before the current policy was established.  Standing is never dispensed as a matter of assumption and speculation; it certainly should not be here, where Texas seeks to halt a national initiative of a days-old Administration.

Finally, even if Texas's generalized statistics were enough for standing, they come nowhere near the showing of immediate, irreparable harm required for the extraordinary relief of a TRO without full briefing from the federal government.  *See California Ass'n of Private Postsecondary Sch. v. DeVos*, 344 F. Supp. 3d 158, 170 (D.D.C. 2018) ("A prospective injury

4

that is sufficient to establish standing, however, does not necessarily satisfy the more demanding burden of demonstrating irreparable injury."); *Hodgers-Durgin v. de la Vina*, 199 F.3d 1037, 1042 (9th Cir. 1999) (en banc) (similar).

### III. DHS HAS BROAD DISCRETION TO DEFER REMOVAL EVEN WHERE A FINAL REMOVAL ORDER HAS BEEN ISSUED.

Texas primarily bases its merits and harm arguments on the Agreement, which is straightforwardly unenforceable as explained. Nevertheless, its other claims also fail. While Amicus will not address each claim in this brief, given the constraints of time, we wish to briefly correct certain misstatements regarding immigration law expressed during the temporary restraining order argument that are particularly relevant to Texas's 8 U.S.C. § 1231(a) claim.

A removal order is not (like a court order) a directive to DHS to removal an individual. Rather, it is an administrative order which *permits* removal; a noncitizen cannot be removed until a final removal order is in place. But DHS has broad discretion regarding the decision whether to execute a final removal order at any given time. Indeed, a "principal feature of the removal system is the broad discretion exercised by immigration officials." *Arizona v. United States*, 567 U.S. 387, 396 (2012).

In fact, while Texas makes much of a provision establishing a 90-day "removal period" during which the government "shall detain the alien," 8 U.S.C. § 1231(a)(1), (2), longstanding regulations make perfectly clear that DHS "may grant a stay of removal or deportation" to "an alien under a final order of deportation or removal" "for such time and under such conditions as [the agency] may deem appropriate." 8 C.F.R. § 241.6; *see also* 8 C.F.R. § 1241.6(a) ("An alien under a final order of deportation or removal may seek a stay of deportation or removal from the Department of Homeland Security as provided in 8 CFR 241.6."); ICE Form 246, https://www.ice.gov/doclib/forms/i246.pdf ("A decision in a stay of deportation or removal

5

application is within the sole discretion of the Secretary of Homeland Security or his or her designee, including the Field Office director. You may not appeal his or her decision."). And in fact, DHS has previously provided, on a categorical basis, stays of removal for applicants for U visas (visas available to victims of qualifying crimes)—pursuant to its own discretionary authority to stay removals. *See, e.g.*, *United States v. Cisneros-Rodriguez*, 813 F.3d 748, 761 (9th Cir. 2015) (describing DHS's categorical exercise of discretion in staying removals for U visa applicants with final orders of removal).

In other words, "[o]nce an order of removal has become final, it may be executed at any time"—but it is still possible for "the Executive Branch to stay its own hand." *Nken v. Holder*, 556 U.S. 418, 439-40 (2009) (Alito, J., dissenting). The executive branch—including the Department of Homeland Security—has long exercised discretion in pausing or staying removal, including on a categorical basis. Section 1231 has never been understood to limit this longstanding feature of immigration law. *See* 8 U.S.C. § 1231(a)(3) (acknowledging that some aliens will "not [be] removed within the removal period"); *id.* § 1231(a)(6) (same); *see also Sierra Club v. Whitman*, 268 F.3d 898, 906 (9th Cir. 2001) (relying on *Escoe v. Zerbst*, 295 U.S. 490, 493-94 (1935) and holding that statutory language requiring that the EPA Administrator "shall issue an order requiring" compliance or "shall bring a civil action" "does not create mandatory enforcement duties"). Texas's TRO motion provides no basis to upend these features of our immigration system that have been in place for decades.

//

|  | Respectfully submitted, |
|---|---|
| Omar C. Jadwat | /s/ *Andre Segura* |
| Michael Tan | Andre Segura (Attorney-In-Charge) |
| AMERICAN CIVIL LIBERTIES UNION | (Tex. 24107112; S.D. Tex. 3123385) |
| FOUNDATION, IMMIGRANTS' RIGHTS PROJECT | Kathryn Huddleston |
| 125 Broad Street, 18th Floor | AMERICAN CIVIL LIBERTIES UNION |
| New York, NY 10004 | FOUNDATION OF TEXAS, INC. |
| (212) 549-2600 | 5225 Katy Fwy., Suite 350 |
| ojadwat@aclu.org | Houston, Texas 77007 |
| mtan@aclu.org | (713) 942-8146 |
|  | asegura@aclutx.org |
|  | khuddleston@aclutx.org |
| Cody Wofsy |  |
| Spencer E. Amdur |  |
| AMERICAN CIVIL LIBERTIES UNION |  |
| 39 Drumm Street |  |
| San Francisco, CA 94111 |  |
| Telephone: (415) 343-1198 |  |
| cwofsy@aclu.org |  |
| samdur@aclu.org |  |

## CERTIFICATE OF COMPLIANCE

The undersigned counsel certifies that the total number of words in the Amicus Brief, exclusive of the matters designated for omission, is 1,834 words as counted by Microsoft Word Software.

*/s/ Andre Segura*
Andre Segura