# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## VICTORIA DIVISION

| | | |
|---|---|---|
| **STATE OF TEXAS,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **Civil Action No. 6:21-cv-00003** |
| | § | |
| **The UNITED STATES OF AMERICA;** | § | |
| **DAVID PEKOSKE, Acting Secretary of** | § | |
| **The United States Department of Homeland** | § | |
| **Security, in his official capacity;** | § | |
| **UNITED STATES DEPARTMENT OF** | § | |
| **HOMELAND SECURITY; TROY** | § | |
| **MILLER, Senior Official Performing the** | § | |
| **Duties of the Commissioner of U.S. Customs** | § | |
| **and Border Protection, in his official** | § | |
| **capacity; U.S. CUSTOMS AND BORDER** | § | |
| **PROTECTION; TAE JOHNSON, Acting** | § | |
| **Director of U.S. Immigration and** | § | |
| **Customs Enforcement, in his official** | § | |
| **capacity; U.S. IMMIGRATION AND** | § | |
| **CUSTOMS ENFORCEMENT; TRACY** | § | |
| **RENAUD, Senior Official Performing the** | § | |
| **Duties of the Director of the U.S. Citizenship** | § | |
| **And Immigration Services, in her official** | § | |
| **capacity; and U.S. CITIZENSHIP** | § | |
| **AND IMMIGRATION SERVICES,** | § | |
| | § | |
| **Defendants.** | § | |

## ORDER GRANTING PLAINTIFF'S
## <u>EMERGENCY APPLICATION FOR A TEMPORARY RESTRAINING ORDER</u>

The State of Texas requests a Temporary Restraining Order ("TRO") to enjoin Defendants

from executing a 100-day pause on the removal of aliens already subject to a final Order of

Removal.[1]  The 100-day pause was set into motion through a recent Memorandum of the

---

[1]  "[I]n the deportation context, a 'final order of removal' is a final order concluding that the alien is deportable or ordering deportation." *Nasrallah v. Barr*, 140 S.Ct. 1683, 1690, 207 L.Ed.2d 111 (2020).

Department of Homeland Security on January 20, 2021 (the "January 20 Memorandum"). (Dkt. No. 2-2). In relevant part, the January 20 Memorandum directs "an immediate pause on removals of any noncitizen with a final order of removal . . . for 100 days."[2] (Dkt. No. 2-2 at 4–5). After reviewing Texas's Emergency Application, the arguments of Texas's and Defendants' counsel on January 22, 2021, the Defendants' Response filed on January 24, 2021, the brief of Amicus, the record, and the applicable law, the Court finds that Texas has satisfied the requirements for a TRO. Accordingly, Texas's Emergency Application for a TRO is **GRANTED**. In so doing, the Court makes clear that this Order is not based on the "Agreement Between Department of Homeland Security and the State of Texas" attached as Exhibit "A" to Plaintiff's Complaint. The issues implicated by that Agreement are of such gravity and constitutional import that they require further development of the record and briefing prior to addressing the merits. Rather, the Court finds that a TRO maintaining the status quo as it existed prior to the implementation of the January 20 Memorandum's 100-day pause is appropriate under the Administrative Procedures Act (the "APA"). Accordingly, and pursuant to Rule 65 of the Federal Rules of Civil Procedure, Defendants are enjoined from executing the 100-day pause on removals for 14 days for the reasons and in the manner described below.

---

[2] The January 20 Memorandum excludes from the 100-day pause any alien with a final removal order who:

1. According to a written finding by the Director of ICE, has engaged in or is suspected of terrorism or espionage, or otherwise poses a danger to the national security of the United States; or
2. Was not physically present in the United States before November 1, 2020; or
3. Has voluntarily agreed to waive any rights to remain in the United States, provided that he or she has been made fully aware of the consequences of waiver and has been given a meaningful opportunity to access counsel prior to signing the waiver; or
4. For whom the Acting Director of ICE, following consultation with the General Counsel, makes an individualized determination that removal is required by law.

(Dkt. No. 2-2 at 4–5 (footnote omitted)).

## I.   LEGAL STANDARD FOR A TEMPORARY RESTRAINING ORDER

The standard for issuing a TRO is the same as the standard for issuing a preliminary injunction. *See Clark v. Prichard*, 812 F.2d 991, 993 (5th Cir. 1987). Injunctive relief is "an extraordinary remedy" that may be awarded only upon "a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22, 129 S.Ct. 365, 376, 172 L.Ed.2d 249 (2008). "[S]uch extraordinary relief would issue only where (1) there is a substantial likelihood that the movant will prevail on the merits; (2) there is a substantial threat that irreparable harm will result if the injunction is not granted; (3) the threatened injury outweighs the threatened harm to the defendant; and (4) the granting of the preliminary injunction will not disserve the public interest." *Clark*, 812 F.2d at 993. "The party seeking such relief must satisfy a cumulative burden of proving each of the four elements enumerated before a temporary restraining order or preliminary injunction can be granted." *Id.* But "none of the four prerequisites has a fixed quantitative value." *State of Tex. v. Seatrain Int'l, S. A.*, 518 F.2d 175, 180 (5th Cir. 1975). "Rather, a sliding scale is utilized, which takes into account the intensity of each in a given calculus." *Id.* (citing *Siff v. State Democratic Exec. Comm.*, 500 F.2d 1307 (5th Cir. 1974)).

## II.   APPLICATION

In its Emergency Application, Texas argues it will likely succeed on the merits of its challenges to the January 20 Memorandum, there is a significant risk it would suffer imminent and irreparable harm if a TRO is not granted, and a TRO would not harm Defendants or the public. (Dkt. No. 2 at 7–19). The Court agrees.

Before addressing those elements, the Court pauses to note a temporary restraining order is meant only to "preserve, for a very brief time, the status quo, so as to avoid irreparable injury pending a hearing on the issuance of a preliminary injunction." *Norman Bridge Drug Co. v. Banner*, 529 F.2d 822, 829 (5th Cir. 1976). Importantly, "[i]f the currently existing status quo

itself is causing one of the parties irreparable injury, it is necessary to alter the situation so as to prevent the injury, . . . by, [*inter alia*,] returning to the *last uncontested status quo* between the parties." *Canal Auth. of State of Fla. v. Callaway*, 489 F.2d 567, 576 (5th Cir. 1974) (emphasis, ellipsis, and alteration added) (citation omitted); *see also United States v. FDIC*, 881 F.2d 207, 210 (5th Cir. 1989) ("[T]he district court has the equitable power to return the parties to their last uncontested status."). The Court finds that the "last uncontested status quo" here is the status of Defendants' removal policy prior to issuance of the January 20 Memorandum's 100-day pause on removals. *See Callaway*, 489 F.2d at 576.

A. SUBSTANTIAL LIKELIHOOD THAT TEXAS WILL PREVAIL ON THE MERITS

A TRO is appropriate only where the plaintiff shows that there is a substantial likelihood it will prevail on the merits. *Clark*, 812 F.2d at 993. Indeed, the Fifth Circuit has cautioned that "it is inequitable to temporarily enjoin a party from undertaking activity which he has a clear right to pursue." *Seatrain*, 518 F.2d at 180.

Texas has asserted six claims against Defendants in its Complaint. (Dkt. No. 1 at ¶¶ 38–72). At this early stage, the Court finds Texas has a substantial likelihood of success on *at least* two: (Count II) Texas's claim that the January 20 Memorandum's 100-day pause should be set aside pursuant to Section 706 of the APA because it violates 8 U.S.C. § 1231(a)(1)(A),[3] and (Count IV) Texas's claim that Defendants arbitrarily and capriciously departed from its previous policy without sufficient explanation. To succeed on its Application for a TRO, Texas need only demonstrate a likelihood of success on "at least one" claim. *See Texas v. United States*, 86 F. Supp. 3d 591, 672 (S.D. Tex.), *aff'd*, 809 F.3d 134 (5th Cir. 2015), as revised (Nov. 25, 2015).

---

[3] Section 1231 states: "Except as otherwise provided in this section, when an alien is ordered removed, the Attorney General shall remove the alien from the United States within a period of 90 days." 8 U.S.C. § 1231(a)(1)(A).

The Court defers ruling on the remaining Counts, which should not be construed as an indication of the Court's view of their merits.

Before addressing Counts II and IV, the Court must briefly address an issue concerning its jurisdiction under Article III. Defendants contend Texas cannot establish standing for these claims since Texas has asserted only "fiscal harm." (Dkt. No. 8 at 17–18). The Court disagrees. The panel in *Texas v. United States*, addressing similar claims, held that the plaintiff-states had pleaded a sufficiently concrete injury by demonstrating the harm to "the states' fisc," such as "millions of dollars of losses in Texas alone." 809 F.3d 134, 150–61, 162–63 (5th Cir. 2015), *aff'd by an equally divided Court*, 136 S.Ct. 2271 (2016) (mem.). Thus, the Fifth Circuit distinguished its holding from its previous ruling in *Crane v. Johnson*, where the plaintiff-state had "waived" the harm-to-public-fisc theory the plaintiff-states advanced in *Texas*. 809 F.3d at 150 n.24. Here, Texas asserts and has provided evidence that the 100-day pause will result in millions of dollars of damage to its public fisc by causing it to increase its spending on public services to illegal aliens. (Dkt. No. 2 at 18; Dkt. Nos. 2-4, 2-5). The Court is therefore satisfied for now that Texas has established an injury-in-fact. The Court also finds, for now, that Texas's alleged injury is fairly traceable and redressable. *See Bennett v. Spear*, 520 U.S. 154, 167–71, 117 S.Ct. 1154, 1163–65, 137 L.Ed.2d 281 (1997).

1.    **Count II: Failure to Remove Illegal Aliens in Violation of 8 U.S.C. § 1231**

Texas claims that the 100-day pause violates 8 U.S.C. § 1231(a)(1)(A). (Dkt. No. 1 at ¶¶ 43–49). That section provides, "when an alien is ordered removed, the Attorney General *shall* remove the alien from the United States within a period of 90 days." 8 U.S.C. § 1231(a)(1)(A) (emphasis added). Texas contends that Defendants' alleged violation of § 1231(a)(1)(A) gives rise to a claim under the APA. (Dkt. No. 1 at ¶ 45). In relevant part, § 706 of the APA provides

that "a reviewing court shall hold unlawful and set aside agency action . . . found to be (A) . . . not in accordance with law" and "(C) in excess of statutory . . . authority." 5 U.S.C. § 706(2)(A), (C). Texas argues the 100-day pause on removals is not in accordance with law and in excess of the government's statutory authority under § 1231(a)(1)(A). (Dkt. No. 1 at ¶ 45). Further, Texas avers that Defendants' alleged violation of § 1231(a)(1)(A) causes Texas irreparable harm. (Dkt. No. 1 at ¶ 47).

Defendants respond that the 100-day pause does not violate § 1231(a)(1)(A) because that provision "does not mandate removal within the 90-day removal period." (Dkt. No. 8 at 15). Defendants also assert that Texas's claims are not subject to judicial review, that the January 20 Memorandum is not a "final agency action" as provided by 5 U.S.C. § 704, and that Texas's claims are barred by 8 U.S.C. § 1231(h). (*Id.* at 13–16).

The Court finds that, by ordering a 100-day pause on all removals of aliens already subject to a final order of removal, it appears that the January 20 Memorandum is clearly not in accordance with, or is in excess of, the authority accorded to the Attorney General pursuant to 8 U.S.C. § 1231(a)(1)(A). In other words, the Court disagrees with Defendants' argument that the 100-day pause does not violate § 1231(a)(1)(A). Defendants' argument rests upon an interpretation of § 1231(a)(1)(A) that contravenes the unambiguous text. Section 1231(a)(1)(A) provides that, "when an alien is ordered removed, the Attorney General *shall* remove the alien from the United States within a period of 90 days." 8 U.S.C. § 1231(a)(1)(A) (emphasis added). "[T]he word 'shall' usually connotes a requirement." *Me. Cmty. Health Options v. United States*, ___ U.S. ___, 140 S.Ct. 1308, 1320, 206 L.Ed.2d 764 (2020) (internal quotation omitted). Here, "shall" means *must*. *Tran v. Mukasey*, 515 F.3d 478, 481–82 (5th Cir. 2008) ("[W]hen a final order of removal has been entered against an alien, the government *must* facilitate that alien's removal from the

6

United States within ninety days, a period generally referred to as the removal period." (emphasis added) (citing 8 U.S.C. § 1231(a)(1)(A)).  This mandatory language of § 1231(a)(1)(A) is not neutered by the federal government's broad discretion in operating "the removal system" as a general matter, *see, e.g. Arizona v. United States*, 567 U.S. 387, 396–97, 132 S.Ct. 2492, 2499, 183 L.Ed.2d 351 (2012), the existence of statutes and caselaw outlining procedure in the event that practical circumstances prevent removal within 90 days, *see, e.g.* 8 U.S.C. § 1231(a)(1)(C); *Zadvydas v. Davis*, 533 U.S. 678, 701, 121 S.Ct. 2491, 2505, 150 L.Ed.2d 653 (2001), or regulations providing aliens an avenue to request a stay of deportation or removal, 8 C.F.R. § 241.6.  Where Congress uses specific language within its immigration statutes to direct the Attorney General toward a specific result, courts are not free to assume based on a matrix of principles, statutes, and regulations that the Attorney General's authority is simply "a matter of discretion." *Zadvydas*, 533 U.S. at 688, 121 S.Ct. at 2497–98.

Defendants' arguments that judicial review of the January 20 Memorandum is improper also fail.  To this end, Defendants advance two arguments.  First, Defendants contend that 5 U.S.C. § 701(a)(1), which bars judicial review where a "statute[] preclude[s] judicial review," applies here in light of 8 U.S.C § 1252(g).  (Dkt. No. 8 at 13).  The Court disagrees.  In relevant part, § 1252(g) prevents courts from exercising jurisdiction over claims arising from the government's decision or action to execute removal orders brought "by or on behalf of any alien."  8 U.S.C § 1252(g).  Texas is not an alien.  Nor does Texas bring this action "on behalf of" any alien.  Therefore, § 1252(g) does not apply to this Court's review.  *See Texas*, 809 F.3d at 164.  Second, Defendants contend that 5 U.S.C. § 701(a)(2), which precludes judicial review where "agency action is committed to agency discretion by law," applies here in light of Defendants' prosecutorial discretion in matters of immigration law generally and executing removal orders in particular.  (Dkt. No. 8 at 13–14).

Here again, the Court disagrees. As explained above, § 1231(a)(1)(A) clearly accords no discretion to the Attorney General to blatantly disregard the 90-day removal rule without finding that an enumerated exception applies. *See, e.g.*, *Tran*, 515 F.3d at 481–82 (discussing narrow and explicitly defined exceptions to the mandatory 90-day removal rule in 8 U.S.C.§ 1231(a)(6)); *Heckler v. Chaney*, 470 U.S. 821, 832–34, 105 S.Ct. 1649, 1656–57, 84 L.Ed.2d 714 (1985) (finding that the normal presumption that the Executive's nonenforcement of a statute is unreviewable is rebuttable where "the substantive statute has provided guidelines for the agency to follow in exercising its enforcement powers"). *Cf.* Brief for the Petitioners at *26–28, *Reno v. Ma* (*Zadvydas v. Davis*), 533 U.S. 678, 121 S.Ct. 2491 (No. 00-38) (2000 WL 1784982) (arguing *on behalf of the Attorney General* that the language of 8 U.S.C. § 1231(a)(2) is mandatory and that § 1231(a)(6)'s provision of discretionary authority is exceptional). Thus, Defendants do not have discretion to completely disregard § 1231(a)(1)(A) and their January 20 Memorandum appearing to do so is reviewable.

Defendants' argument that the January 20 Memorandum is not a "final agency action" subject to review under 5 U.S.C. § 704 also fails. In *Bennett v. Spear*, the Supreme Court explained that an agency's actions are sufficiently "final" to satisfy § 704 where (1) the action marks the "consummation" of the agency's decision-making process and (2) the action is one by which "rights or obligations have been determined." 520 U.S. 154, 177–78, 117 S.Ct. 1154, 1168, 137 L.Ed.2d 281 (1997). Here, the January 20 Memorandum's order "directing an immediate pause on removals of any noncitizen with a final order of removal" is sufficiently final and immediate to denote the consummation of the agency's decision as it relates to a pause in removals. (Dkt. No. 2-2 at 4). As well, it seems clear that Defendants, through the January 20 Memorandum's 100-day pause, have disregarded their previous legal "obligations" and adjudication of the aliens'

"rights" by inexplicably ordering a reassessment of *all* previous orders for removal and plainly ignoring the statutory mandate of § 1231(a)(1)(A) to remove aliens within 90 days. (Dkt. No. 2-2 at 4-5).

Finally, Defendants contend Texas is barred from suing by 8 U.S.C. § 1231(h). That section states that "nothing" in all of § 1231 "shall be construed to create any substantive or procedural right or benefit that is legally enforceable by any party against" the government. 8 U.S.C. § 1231(h). Defendants' reliance on 8 U.S.C. § 1231(h) overstates the scope of that subsection's limitations. The Supreme Court in *Zadvydas* explained that, although § 1231(h) "forbids courts to construe that section 'to create any . . . procedural right or benefit that is legally enforceable," it in no way "deprive[s] an alien of the right to rely on 28 U.S.C. § 2241 to challenge detention that is without statutory authority." 533 U.S. at 678–88, 121 S.Ct. at 2497. Similarly, here, § 1231(h) does not preclude Texas from challenging § 1231(a)(1)(A) under 5 U.S.C. § 706.

The Court therefore finds Texas has demonstrated a substantial likelihood of success on its claim that the January 20 Memorandum's 100-day pause on removals violates 8 U.S.C. § 1231(a)(1)(A).

### 2.  Count IV: Arbitrary and Capricious

Texas argues that the January 20 Memorandum is arbitrary and capricious because it was issued "without any consideration whatsoever of a [more limited] policy." (Dkt. No. 2 at 12 (quoting *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S.Ct. 1891, 1912, 207 L.Ed.2d 353 (2020)). Defendants disagree, contending DHS "not only considered but enacted a specifically limited interim policy," the January 20 Memorandum's terms are "limited in both scope and time, and [they exempt] four classes of aliens from the pause on removal." (Dkt. No. 8 at 16). The Court agrees with Texas and finds Defendants' assertions unpersuasive.

The APA prohibits agency actions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Federal administrative agencies are required to engage in "reasoned decision-making." *Allentown Mack Sales & Serv., Inc. v. NLRB*, 522 U.S. 359, 374, 118 S.Ct. 818, 826, 139 L.Ed.2d 797 (1998) (internal quotation omitted). "Not only must an agency's decreed result be within the scope of its lawful authority, but the process by which it reaches that result must be logical and rational." *Id.* Put differently, "agency action is lawful only if it rests 'on a consideration of the relevant factors.'" *Michigan v. EPA*, 576 U.S. 743, 750, 135 S.Ct. 2699, 2706, 192 L.Ed.2d 674 (2015) (quoting *Motor Vehicle Mfrs. Assn. of United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 2866–67, 77 L.Ed.2d 443 (1983)).

Here, the January 20 Memorandum not only fails to consider potential policies more limited in scope and time, but it also fails to provide any concrete, reasonable justification for a 100-day pause on deportations. The January 20 Memorandum states that the 100-day pause is required to assess immigration policies because of the "unique circumstances" present with respect to immigration, including "significant operational challenges at the southwest border as [the United States] is confronting the most serious global public health crisis in a century." (Dkt. No. 2-2 at 2). DHS specifically cites to its apparent (1) need for a comprehensive review of enforcement policies, (2) need for interim civil enforcement guidelines, and (3) "limited resources" that would necessitate a pause in executing removal orders. (*Id.* at 2–5). Additionally, the January 20 Memorandum states that the 100-day pause in deportations is necessary to "(1) provide sufficient staff and resources to enhance border security and conduct immigration and asylum processing at the southwest border fairly and efficiently; and (2) comply with COVID-19 protocols to protect the health and safety of DHS personnel and those members of the public with whom

DHS personnel interact." (*Id.* at 3). The January 20 Memorandum also provides that DHS "must ensure that [the agency's] removal resources are directed to the Department's highest enforcement priorities." (*Id.*). DHS, however, never explains how the pause in removals helps accomplish these goals. It remains unknown why a 100-day pause is needed given the allegedly "unique circumstances" to which the January 20 Memorandum alludes. Indeed, despite such unique circumstances, DHS did not state or explain why 100 days *specifically* is needed to accomplish these goals. The silence of the January 20 Memorandum on these questions indicates that the terms provided for in the Memorandum were not a result of "reasoned decision-making." *Allentown Mack Sales*, 522 U.S. at 374, 118 S.Ct. at 826.

The Court recognizes that the TRO process is expedited, and the record and briefing are abbreviated at this point. With an eye towards the preliminary injunction stage, Defendants will have an opportunity to supplement the record.[4]

Accordingly, the Court finds that Texas has established a substantial likelihood that it will prevail on the merits of at least these two claims.

## B. SUBSTANTIAL THREAT OF IRREPARABLE HARM

In addition to showing a likelihood of success on the merits of a claim, Texas is required to demonstrate "a substantial threat of irreparable injury if the injunction is not issued." *Texas*, 809 F.3d at 150. To meet this requirement, Texas's injury "need not have already been inflicted or be certain to occur; a strong threat of irreparable injury before a trial on the merits is adequate." *Texas v. United States*, 328 F. Supp. 3d 662, 736 (S.D. Tex. 2018) (Hanen, J.).

---

[4] The Court notes, however, that "the grounds upon which an administrative order must be judged are those upon which the record discloses that its action was based." *SEC v. Chenery Corp.*, 318 U.S. 80, 87, 63 S.Ct. 454, 459, 87 L.Ed. 626 (1943).

In this case, Texas has presented evidence it would suffer injuries for various reasons if an injunction is not entered. First, Texas demonstrates that it pays millions of dollars annually to provide social services and uncompensated healthcare expenses and other state-provided benefits to illegal aliens such as the Emergency Medicaid program, the Family Violence Program, and the Texas Children's Health Insurance Program. (Dkt. No. 2 at 16–17). Additionally, Texas has presented evidence that it would incur increased educational costs. (Dkt. No. 2 at 17). Texas asserts that these expenses will grow because of the January 20 Memorandum. (Dkt. No. 2 at 16). The January 20 Memorandum expressly states that the Acting Director of ICE "shall provide for alternatives to removal" for those who have already been ordered to be removed, including but not limited to "whether to grant temporary deferred action." (Dkt. No. 2-2). In light of this mandatory reassessment for "alternatives to removal," Texas anticipates suffering financial harm from which it cannot recover by suing the federal government. *See Texas,* 328 F. Supp. 3d at 737 (citing *Texas v. United States*, 106 F.3d 661, 662 (5th Cir. 1997)).

Further, Texas argues that "the categorical refusal to remove aliens ordered removable will encourage additional illegal immigration into Texas," thereby exacerbating its public service costs. (Dkt. No. 2 at 17). During the January 22, 2021 hearing, Texas argued that the January 20 Memorandum's pause on removals increases its fiscal burden not only because of those aliens illegally present in Texas, but also because of those who may find their way to Texas from other states in the near future. Such injury is not, as a legal matter, purely speculative. The Fifth Circuit has expressly found that injuries to one state can flow from the fact that illegal aliens are "free to move among states." *Texas*, 809 F.3d at 188.

The Court finds that the foregoing establishes a substantial risk of imminent and irreparable harm to Texas. As a result, Texas has satisfied this element for a TRO as well.

## C. SUBSTANTIAL INJURY TO TEXAS OUTWEIGHS HARM TO DEFENDANTS AND WILL NOT UNDERMINE THE PUBLIC INTEREST

Texas is next required to establish that that the threatened injury outweighs any harm that may result from the injunction to the non-movant and will not undermine the public interest. *Valley v. Rapides Parish Sch. Bd.,* 118 F.3d 1047, 1051 (5th Cir. 1997).

Texas argues that Defendants cannot be harmed by the TRO because "[t]hey have no legitimate interest in the implementation of an unlawful memorandum." (Dkt. No. 2 at 19). Defendants disagree and assert that there is a public interest in "measured and considered assessments of immigration policies by an incoming Administration." (Dkt. No. 8 at 13). Defendants further argue that "an injunction here would disrupt the Administration's careful calibration of how to conduct a necessary review." (*Id.*).

The Court finds Defendants' arguments unpersuasive. Defendants are free to conduct a "measured and considered assessment" of immigration policies regardless of the existence of the January 20 Memorandum's 100-day pause. Furthermore, the Fifth Circuit explained in *Texas* that "any inefficiency" suffered by federal immigration authorities caused by an immediate injunction is outweighed by the losses a plaintiff State would face. 809 F.3d at 187 (emphasis added).

Indeed, courts have recognized that the public interest is served by the execution of removal orders. *See Nken v. Holder*, 556 U.S. 418, 436, 129 S.Ct. 1749, 1762, 173 L.Ed.2d 550 (2009) ("There is *always* a public interest in prompt execution of removal orders." (emphasis added)); *see also Blackie's House of Beef, Inc. v. Castillo*, 659 F.2d. 1211, 1221 (D.C. Cir. 1981) (collecting cases to support the proposition that "the public interest in enforcement of the immigration *laws* is significant" (emphasis added)). To this end, one of Texas's claims involves an allegation that the January 20 Memorandum's *100-day pause* contravenes § 1231(a)(1)(A)'s mandate that aliens

subject to an order of removal be removed *within 90 days*. (Dkt. No. 2 at 10). The public's interest

is not disserved by temporarily enjoining this policy.

In light of the foregoing, the Court finds that the threat of injury to Texas outweighs any

potential harm to Defendants and the public interest is served and protected by the issuance of this

TRO. The Court therefore finds that Texas has met its burden to satisfy these elements for a TRO.

\* \* \*

In summary, Texas has thus far satisfactorily demonstrated it is entitled to immediate and

temporary relief from the January 20 Memorandum's 100-day pause on removals. The scope of

this relief warrants additional attention.

**D.     SCOPE OF RELIEF**

Nationwide injunctions[5] of executive action are a topic of fierce and ongoing debate in both

the courts and the legal academy. *Compare, e.g.*, *DHS v. New York*, 140 S.Ct. 599, 599–601, 206

L.Ed.2d 115 (2020) (mem.) (Gorsuch, J., concurring) (articulating a common flaw in "injunctions

of 'nationwide,' 'universal," or 'cosmic' scope'); *Trump v. Hawaii*, 138 S.Ct. 2392, 2424–2429,

201 L.Ed.2d 775 (2018) (Thomas, J., concurring) (calling the practice of nationwide or "universal"

injunctions "legally and historically dubious"); Samuel Bray, *Multiple Chancellors: Reforming the*

*National Injunction*, 131 HARV. L. REV. 417, 461 (2017) (arguing "[n]ational injunctions interfere

with good decisionmaking by the federal judiciary"); *with East Bay Sanctuary Covenant v. Barr*,

964 F.3d 832, 857 (9th Cir. 2020) (calling nationwide injunctions "uniquely appropriate in

immigration cases"); Alan M. Trammell, *The Constitutionality of Nationwide Injunctions*, 91 U.

---

[5]     The term "nationwide injunction" is infamously wrought with imprecision. *See* Alan M.
Trammel, *Demystifying Nationwide Injunctions*, 98 TEX. L. REV. 67, 72 n.23 (2019) (collecting sources
and listing alternatives commonly used, such as "national injunction," "defendant-oriented injunction," and
"universal injunction"). One scholar employs the term "nationwide injunctions," despite it being a "deeply
imperfect term," because it appears to be the "most familiar." *Id.* at 72. With the same qualification and
rationale, the Court does so here.

COLO. L. REV. 977, 980–89 (2020) (arguing nationwide injunctions do not transgress Article III); Amanda Frost, *In Defense of Nationwide Injunctions*, 93 N.Y.U. L. REV. 1065, 1080–1103 (2018) (arguing nationwide injunctions are appropriate as a constitutional *and* prudential matter); *see also* Alan M. Trammel, *Demystifying Nationwide Injunctions*, 98 TEX. L. REV. 67, 103–116 (2019) (proposing a "preclusion-based theory of nationwide injunctions"); Jonathan Remy Nash, *State Standing for Nationwide Injunctions Against the Federal Government*, 94 NOTRE DAME L. REV. 1985, 2012 (2019) (discussing at length the interplay between standing doctrine and nationwide injunctions where states seek relief against the federal government and concluding narrowly that "special solicitude should make nationwide injunctions potentially available in cases where plaintiff states can allege standing but other (nonstate) plaintiffs cannot").

This Court is likewise concerned about the issuance of nationwide injunctions by a district court. Notwithstanding its concerns, as a district court, this Court is duty bound to faithfully apply the precedents of its Circuit. The Fifth Circuit has addressed the propriety of a nationwide injunction in the immigration context. In *Texas*, the Fifth Circuit held that "[i]t is not beyond the power of a court, in appropriate circumstances, to issue a nationwide injunction." 809 F.3d. at 188. The "appropriate circumstances" warranting a nationwide injunction in *Texas* itself included a need for "uniformity" in immigration policies as prescribed by the Constitution, federal statutes, and Supreme Court precedent. *Id.* at 187–88 (citing U.S. CONST. art. I, § 8, cl. 4; Immigration Reform and Control Act of 1986, Pub. L. No. 99–603, § 115(1), 100 Stat. 3359, 3384; *Arizona*, 567 U.S. at 401, 132 S.Ct. at 2502). The Fifth Circuit in *Texas* also reasoned that "partial implementation" of the agency action being enjoined would detract from the "integrated scheme of regulation created by Congress." *Id.* at 188 (internal quotation omitted). And lastly, the panel

found there was "a substantial likelihood that a geographically-limited injunction would be ineffective because [illegal aliens] would be free to move among states." *Id.*

The Fifth Circuit's rationale in affirming a nationwide injunction in *Texas* applies with equal force here. The January 20 Memorandum's 100-day pause plainly affects national immigration policy, which demands "uniformity." *Id.* at 187–88; *see also East Bay Sanctuary Covenant*, 964 F.3d at 857 (citing *Texas*, 809 F.3d at 187–88). Because the January 20 Memorandum's 100-day pause impacts numerous statutes and agency regulations concerning removals and detention periods, its partial implementation would inevitably detract from Congress's "integrated scheme of regulation."[6] *Id.* at 188. Lastly, a geographically limited injunction of the January 20 Memorandum's 100-day pause on removals would not effectively protect Texas's interests because of the free flow of movement among the states. In other words, many individuals who are subject to an order of removal in other states whose removal is delayed or ultimately deferred may migrate to Texas. As described above, Texas has persuasively

---

[6] In addition, nationwide injunctions have been found to be appropriate when plaintiffs present claims alleging that defendant federal agencies have violated the APA. *See, e.g., Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1407–08 (D.C. Cir. 1998) (invalidating an agency rule and affirming the nationwide injunction); *Harmon v. Thornburgh*, 878 F.2d 484, 495 n.21 (D.C. Cir. 1989) ("When a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated—not that their application to the individual petitioners is proscribed."). Indeed, other district courts have noted that a geographically restricted injunction issued to remedy "likely unlawful agency actions" meant to be "appl[ied] universally" would, among other things, "invite[] arbitrary enforcement" on the part of the federal agency "and create[] more questions than it answers." *Make the Rd. New York v. Pompeo*, 475 F. Supp. 3d 232, 271 (S.D.N.Y. 2020); *see also New York v. United States Dep't of Homeland Sec.*, 408 F. Supp. 3d 334, 352 (S.D.N.Y. 2019), *aff'd as modified*, 969 F.3d 42 (2d Cir. 2020). ("A geographically limited injunction that would result in inconsistent applications of [immigration policy in the context of public charge determinations] . . . is inimical to [the] need for uniformity in immigration enforcement."). By contrast, a sister Circuit, presiding over a challenge to certain rules stemming from the implementation of the Affordable Care Act, vacated the scope of a nationwide injunction "when an injunction that applies only to the plaintiff states *would provide complete relief*" to the plaintiffs. *California v. Azar*, 911 F.3d 558, 584 (9th Cir. 2018) (emphasis added). As explained in this section, the Court's injunction is consistent with *Azar*'s aim of providing "complete relief" to the plaintiff.

demonstrated a substantial risk of irreparable harm in part because of the potential increased flow

of illegal aliens from other states.

Accordingly, the Court finds that, under the circumstances here, Defendants must be

enjoined from executing the January 20 Memorandum's 100-day pause on the removal of aliens

in *every* place Defendants would have jurisdiction to implement it.

That said, the Court notes that the scope of this injunction is something it is willing to

revisit after the parties fully brief and argue the issue for purposes of the upcoming motion for

preliminary injunction.  Though the scope of this TRO is broad, it is not necessarily permanent.

## III.    CONCLUSION

For the foregoing reasons, the Court **GRANTS** Texas's Emergency Application.  (Dkt. No.

2).  Therefore, it is hereby **ORDERED** that:

1.    Defendants and all their respective officers, agents, servants, employees, attorneys, and other persons who are in active concert or participation with them are hereby ENJOINED and RESTRAINED from enforcing and implementing the policies described in the January 20 Memorandum in Section C entitled "Immediate 100-Day Pause on Removals."[7]  (Dkt. No. 2-2 at 4–5).

2.    This TRO is granted on a nationwide basis and prohibits enforcement and implementation of the policies described in the January 20 Memorandum in Section C entitled "Immediate100-Day Pause on Removals" in every place Defendants have jurisdiction to enforce and implement the January 20 Memorandum.

3.    No security bond is required under Federal Rule of Civil Procedure 65(c).

4.    Finally, the Court ORDERS the parties to propose a briefing schedule no later than Thursday, January 28, 2021 at 12:00 p.m. with respect Texas's Request for Preliminary Injunction in its Complaint.  The parties should also address whether expedited discovery is necessary and the contours and scheduling for same.  The

---

[7]    This Order does not in any way limit Defendants' efforts to carry out or adhere to the January 20 Memorandum's other sections, entitled "A. Comprehensive Review of Enforcement Policies and Priorities," (Dkt. No. 2-2 at 3), "B. Interim Civil Enforcement Guidelines," (*id*.), or "D. No Private Right Statement," (*id*. at 5).  This injunction is effective for 14 days as prescribed by Rule 65 of the Federal Rules of Civil Procedure.

Court will promptly schedule a hearing on the Motion for Preliminary Injunction, if requested and necessary.

It is SO ORDERED.

SIGNED this January 26, 2021.

**DREW B. TIPTON**
**UNITED STATES DISTRICT JUDGE**