**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION**

| | |
|---|---|
| STATE OF TEXAS | |
| *Plaintiff*, | |
| v. | Case No. 6:21-cv-00003 |
| UNITED STATES OF AMERICA, *et al.*, | |
| *Defendants*. | |

**PROPOSED INTERVENORS' EMERGENCY MOTION TO INTERVENE AND
INCORPORATED MEMORANDUM OF LAW**

# TABLE OF CONTENTS

**INTRODUCTION** ................................................................................................................ 1

**BACKGROUND** ................................................................................................................. 2

   I.    Background on the Immigration System ......................................................... 2

      A.  Final Orders of Removal ......................................................................... 2

      B.  Custodial Status for Those With Final Orders of Removal ............................. 4

  II.   The DHS Memorandum and Plaintiff's Lawsuit ................................................. 6

  III.  Proposed Intervenors ....................................................................................... 7

**SUMMARY OF THE ARGUMENT** ................................................................................... 8

**ARGUMENT** ................................................................................................................... 8

   I.    Proposed Intervenors Are Entitled to Intervene as of Right Under Rule 24(a)(2). ........... 8

      A.  Proposed Intervenors' Motion Is Timely. ...................................................... 8

      B.  Proposed Intervenors Have a Substantial Legal Interest in the Case. ............................ 9

      C.  Proposed Intervenors' Ability to Protect Their Interests May Be Impaired Absent Intervention. ......................................................................................... 12

      D.  Defendants May Inadequately Represent Proposed Intervenors' Interests. ................... 12

  II.   Alternatively, Proposed Intervenors Should Be Granted Permissive Intervention. .......... 14

   **CONCLUSION** .......................................................................................................... 16

## **TABLE OF AUTHORITIES**

**Cases**                                                                                      **Page(s)**

*Arizona v. United States*,
   567 U.S. 387 (2012)..................................................................................................2

*Brumfield v. Dodd*,
   749 F.3d 339 (5th Cir. 2014) ......................................................................1, 11, 12

*Caplin & Drysdale, Chartered v. United States*,
   491 U.S. 617 (1989)................................................................................................10

*Chaucer Corp. Capital, No. 2 Ltd. v. Azad*,
   No. CV H-10-180, 2011 WL 13249479 (S.D. Tex. Sept. 8, 2011) ........................16

*Cummings v. United States*,
   704 F.2d 437 (9th Cir. 1983) ...................................................................................9

*Entergy Gulf States Louisiana, L.L.C. v. U.S. E.P.A.*,
   817 F.3d 198 (5th Cir. 2016) .................................................................................12

*Fraihat v. U.S. Immigration & Customs Enf't*,
   445 F. Supp. 3d 709 (C.D. Cal. 2020), *order clarified*, No. 5:19-cv-01546-
   JGB-SHK, 2020 WL 6541994 (C.D. Cal. Oct. 7, 2020) ........................................5

*Franciscan All., Inc. v. Azar*,
   414 F. Supp. 3d 928 (N.D. Tex. 2019) ..................................................................15

*Guerrero-Lasprilla v. Barr*,
   140 S. Ct. 1062 (2020)............................................................................................3

*Kucana v. Holder*,
   558 U.S. 233 (2010)................................................................................................3

*Nken v. Holder*,
   556 U.S. 418 (2009)................................................................................................3

*NRDC v. Costle*,
   561 F.2d 904 (D.C. Cir. 1977)..............................................................................16

*Reno v. Am.-Arab Anti-Discrimination Comm.*,
   525 U.S. 471 (1999)................................................................................................4

*Ross v. Marshall*,
   426 F.3d 745 (5th Cir. 2005) ...............................................................................8, 9

*Sierra Club v. Espy*,
   18 F.3d 1202 (5th Cir. 1994) ........................................................................12

*Sierra Club v. Glickman*,
   82 F.3d 106 (5th Cir. 1996) ..........................................................................13

*Stallworth v. Monsanto Co.*,
   558 F.2d 257 (5th Cir. 1977) .......................................................................8, 9

*Texas v. United States*,
   802 F. Supp. 481 (D.D.C. 1992) ....................................................................9

*Texas v. United States*,
   805 F.3d 653 (5th Cir. 2015) ................................................................. *passim*

*Trbovich v. United Mine Workers of Am.*,
   404 U.S. 528 (1972) .......................................................................................12

*United States v. City of Los Angeles*,
   288 F.3d 391 (9th Cir. 2002) .........................................................................16

*Wal-Mart Stores, Inc. v. Texas Alcoholic Beverage Comm'n*,
   834 F.3d 562 (5th Cir. 2016) .........................................................................10

**Statutes**

8 C.F.R. § 241.6 .........................................................................................................4

8 C.F.R. § 1003.38(b) ................................................................................................2

8 U.S.C. § 1101(a)(47)(B) .........................................................................................3

8 U.S.C. § 1225 .........................................................................................................4

8 U.S.C. § 1226 .........................................................................................................4

8 U.S.C. § 1229a ........................................................................................................2

8 U.S.C. § 1231 ......................................................................................................4, 5

8 U.S.C. § 1252(a)(1) ................................................................................................3

Immigration and Nationality Act § 240 ....................................................................2

Violence Against Women Act .....................................................................................4

**Other Authorities**

*Alternatives to Detention* 10-11 (Nov. 2014), http://tinyurl.com/jkfz3x4 ...................5

*Application for a Stay of Deportation or Removal*,
   https://www.ice.gov/doclib/forms/i246.pdf;.................................................................4

Exec. Order 13768, Sec. 5, 82 Fed. Reg. 8799 (Jan. 25, 2017)......................................6

Fed. R. Civ. P. 24............................................................................................... *passim*

## INTRODUCTION

Proposed Intervenors FIEL Houston and Refugee and Immigrant Center for Education and Legal Services ("RAICES") move to intervene in this action as defendants.  Plaintiff, the State of Texas, is seeking an injunction against a Department of Homeland Security ("DHS") memorandum that, among other things, establishes a temporary pause in deportations while DHS assesses its policies and priorities.  The implications of this suit are sweeping: Texas claims an effective veto on national immigration policy, and it seeks to upend a new Administration's first steps towards setting national immigration enforcement policy just days after it took office.  But this is not just a fight among governments over sovereign power; this case involves serious human stakes.  The injunction that Texas seeks will place noncitizens around the country at risk of deportation, even though many of them have paths to regularize their immigration status, claim humanitarian protection, or seek long-term grants of prosecutorial discretion in their favor. Their interests are acute and their perspectives are distinct from those of the parties.

Proposed Intervenors are two organizations whose members and clients include vulnerable noncitizens at risk of deportation and other serious adverse consequences if Texas is successful.  To protect their interests, provide the Court with the organizations' expertise regarding the immigration system, and share the perspective of directly impacted communities, Proposed Intervenors move to intervene in this action.  "Federal courts should allow intervention where no one would be hurt and the greater justice could be attained." *Texas v. United States*, 805 F.3d 653, 657 (5th Cir. 2015).  Fundamentally, the "purpose of intervention is to allow interested parties to air their views so that a court may consider them before making potentially adverse decisions." *Brumfield v. Dodd*, 749 F.3d 339, 344–45 (5th Cir. 2014).  The Court should

grant Proposed Intervenors' motion to intervene as of right, or, in the alternative, grant

permissive intervention.  Fed. R. Civ. P. 24.[1]

## BACKGROUND

### I.    BACKGROUND ON THE IMMIGRATION SYSTEM

As context for their interests in this case, Proposed Intervenors first provide some

background information that focuses on final orders of removal and custodial status for

individuals with such orders.

### A.    Final Orders of Removal

Immigration removal proceedings are a civil process primarily involving Executive

Branch officials.  *See Arizona v. United States*, 567 U.S. 387, 396 (2012).  The default procedure

for a removal case is set out in § 240 of the Immigration and Nationality Act ("INA"), 8 U.S.C.

§ 1229a.  An Immigration Judge, an Executive Branch official employed by the Department of

Justice ("DOJ"), Executive Office for Immigration Review, presides over those proceedings.

DHS files a charging document, called a "Notice to Appear," to initiate removal proceedings

against a noncitizen.  The noncitizen may contest that they are removable and raise various forms

of relief from removal, including humanitarian relief like asylum or the availability of lawful

permanent resident status (i.e. a "green card").

If the Immigration Judge finds the noncitizen removable and denies relief, they will enter

a removal order.  The noncitizen can then appeal the removal order to an administrative appellate

body, the Board of Immigration Appeals ("BIA"), which is also part of DOJ.  8 C.F.R.

---

[1] Undersigned counsel has conferred with the parties and cannot agree about the disposition of
this motion.  Plaintiff objects to the motion, and Defendants do not, at this time, take a position
on the request to intervene, at least until Defendants have reviewed the filed motion.

§ 1003.38(b).  The removal order becomes "final," as that term is defined by statute, upon an affirmance by the BIA (or on expiration of the time to appeal).  8 U.S.C. § 1101(a)(47)(B).

A final order of removal does not mean that an individual will be removed immediately, in the near future, or even ever.  After an order of removal becomes "final," a noncitizen continues to have legal options to pursue relief from removal.  If the noncitizen is unsuccessful at the BIA, they may file a Petition for Review with the appropriate Circuit Court of Appeals.  8 U.S.C. § 1252(a)(1).  A stay of the final removal order is not automatic upon the filing of a Petition for Review, but may be granted by the court or by DHS in its own discretion.  *Nken v. Holder*, 556 U.S. 418, 425-27 (2009); *id*. at 440 (Alito, J., dissenting).

In parallel with or instead of this judicial review, a noncitizen may also file a motion to reopen their removal proceedings—arguing, for example, that changed country conditions make it unsafe for them to return to their country of origin.  *See Kucana v. Holder*, 558 U.S. 233, 242 (2010).  Such a motion may be brought shortly after a removal order becomes final or, in some instances, years later.  *See, e.g.*, *Guerrero-Lasprilla v. Barr*, 140 S. Ct. 1062, 1064 (2020).  There is often significant delay in filing motions to reopen removal orders that were entered *in absentia*; such orders are routinely reopened because the noncitizen did not receive effective notice of hearing dates.

Additionally, people with final orders of removal can nevertheless affirmatively seek permanent status in certain circumstances.[2]  Victims of qualifying crimes can petition for (apply for) U-visas; victims of trafficking can petition for T-visas; victims of domestic violence can

---

[2] Moreover, individuals may be placed in removal proceedings even though they have already filed applications that would result in their obtaining a lawful immigration status.

petition for a visa pursuant to the Violence Against Women Act; individuals with qualifying family members can petition for family-based visas.

For noncitizens in such situations—and in fact *any* noncitizen with a final order of removal—DHS has long possessed and used its discretionary authority to grant a stay of removal, as provided in regulation and routinized in DHS practice.  *See, e.g.*, 8 C.F.R. § 241.6; U.S. Immigration and Customs Enforcement ("ICE"), Form I-246, *Application for a Stay of Deportation or Removal*, https://www.ice.gov/doclib/forms/i246.pdf; *see also Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 483 (1999) (explaining that "the Executive has discretion to abandon" execution of removal orders).

Thus, "final" is a term of art in this context which simply signals that a removal order is administratively final for purposes of judicial review.  A "final" removal order is far from practically conclusive.  They are frequently vacated by courts and reopened by the agency.  And the vast majority of individuals with final removal orders who are in the United States today are in one of the postures described above—those whom DHS chose not to remove in prior years, or who are seeking judicial review or reopening, or were never informed of an *in absentia* removal order.  By contrast, relatively few removal orders become "final" during any given month.

## B.    Custodial Status for Those With Final Orders of Removal

Noncitizens in removal proceedings may or may not be detained during removal proceedings or following a final order of removal.  An array of statutes govern the detention of noncitizens, depending on the immigration procedures applied to them and the posture of their cases.  *See* 8 U.S.C. §§ 1225, 1226, 1231.  Notably, Congress provided that during the initial 90-day "removal period" after an order becomes final DHS shall "[u]nder no circumstance" release certain individuals, limiting that provision to those deemed removable based on certain terrorist

or criminal activities, for example.  8 U.S.C. § 1231(a)(2).  After that period, the statute

generally contemplates release of persons with final removal orders.  *Id*. § 1231(a)(3).

Indeed, for any number of reasons, DHS may choose to release an individual with a final

removal order pending decisions on matters described above, such as a motion to reopen

proceedings, or as an exercise of prosecutorial discretion.  When a noncitizen is released, they

may (depending on the mechanism and circumstances) be placed on an electronic ankle monitor;

enrolled in the "Intensive Supervision Appearance Program" ("ISAP"); required to pay a cash

bond and report to ICE for regular supervision check-ins; or subject to other conditions.

Alternatives to detention are extremely effective in ensuring that noncitizens continue to report

to check-in appointments and hearings as required.  *See* U.S. Gov't Accountability Office, GAO-

15-26, *Alternatives to Detention* 10-11 (Nov. 2014), http://tinyurl.com/jkfz3x4.

In addition, courts sometimes order release or order the agency to consider release

notwithstanding statutory provisions that would otherwise mandate detention.  Thus, for

example, in the *Fraihat* litigation, a district court has ordered ICE, on substantive due process

grounds, to conduct custody determinations for members of a certified nationwide class of

individuals vulnerable, because of their health conditions, to a heightened risk of severe illness or

death if they contract COVID.  *See Fraihat v. U.S. Immigration & Customs Enf't*, 445 F. Supp.

3d 709 (C.D. Cal. 2020), *order clarified*, No. 5:19-cv-01546-JGB-SHK, 2020 WL 6541994

(C.D. Cal. Oct. 7, 2020); ECF No. 9 at 1; *see also* ECF No. 14-1 at 1 (explaining that "HRD"

means "High risk detainees" for purposes of the *Fraihat* litigation, i.e. that these individuals are

at high risk of serious illness or death if infected with COVID).

Releases from custody happen every day, for all sorts of reasons.  An individual's case

might be reopened or relief granted, leading to release; a court might order release; DHS could

make a determination that detention is unnecessary and other mechanisms are sufficient to ensure the government's interests; an Immigration Judge can grant bond; or DHS can make decisions about priorities and practicalities (including COVID) leading to release.  Indeed, such releases have been routine under every administration.  Many people with final orders of removal are not detained and instead subject to supervision conditions, such as reporting to ICE regularly—in many instances, for years.  *See* Declaration of Cesar Espinosa (Ex. 1) ¶¶ 8-9.  Nevertheless, many others remain detained, sometimes for years, both before and after their removal orders become administratively final.

## II.    THE DHS MEMORANDUM AND PLAINTIFF'S LAWSUIT

Shortly after the new Administration took office, Acting DHS Secretary David Pekoske issued a memorandum to senior leadership directing an enforcement policy review and setting interim policy.  Dkt. 2-2 ("DHS Memo").  Among other interim measures, the DHS Memo established a 100-day pause on removals of individuals present in the United States with final removal orders on January 20, 2021, subject to certain exceptions.  *Id.* at 3-4.  For "the further implementation of this removal pause," the memorandum also directed that the Acting Director of ICE issue operational guidance no later than February 1, 2021, including an individualized review process to assess alternatives to removal.  *Id.* at 4.  The process will consider such possibilities as: "staying or reopening cases, alternative forms of detention, custodial detention, whether to grant temporary deferred action, or other appropriate action."  *Id*.

Like an executive order issued by the prior Administration shortly after its inauguration, *see* Exec. Order 13768, Sec. 5, 82 Fed. Reg. 8799 (Jan. 25, 2017), the DHS Memo also set new enforcement priorities, to remain in effect until superseded by revised priorities pursuant to DHS's policy review, DHS Memo at 3.  These interim enforcement priorities apply to agency

decisions as to whether to place someone in removal proceedings and to "a broad range of other discretionary enforcement decisions," such as "whom to stop, question, and arrest; whom to detain or release; whether to settle, dismiss, appeal, or join in a motion on a case; and whether to grant deferred action or parole." *Id.* at 2. Finally, the DHS Memo rescinds and supersedes six DHS memoranda issued during the last administration. *Id.* at 1, 5.

Texas brought this suit, seeking to enjoin the deportation pause and more generally the entire DHS Memo. *See* Complaint, Prayer for Relief, ECF No. 1, at 15.

## III.    PROPOSED INTERVENORS

FIEL Houston is a non-profit, immigrant-led civil rights organization based in Houston, Texas. Its mission includes empowering immigrant youth and their families through civic engagement, access to higher education, and advocacy for more just immigration policies. FIEL provides a variety of legal, advocacy, and education services for its members. FIEL has approximately 11,000 members, all based in the greater Houston area. Of those, about 7,000 members are undocumented. Many of its members have final orders of removal and would be exposed to the risk of deportation and other enforcement actions—and an immediate impact on their mental and psychological well-being—if the DHS Memo is enjoined. Espinosa Decl. ¶¶ 1-2, 8-9, 11-12.

Refugee and Immigrant Center for Education and Legal Services ("RAICES") is a nonprofit, nonpartisan organization headquartered in San Antonio, Texas. Its mission is to defend the rights of immigrants and refugees; empower individuals, families, and communities of immigrants and refugees; and advocate for liberty and justice. RAICES provides free and low-cost immigration legal services to underserved immigrant children, families, and individuals, as well as bond assistance and advocacy work. RAICES has clients who are at risk

of removal and other enforcement actions if the DHS Memo is enjoined.  Declaration of

Michelle Garza (Ex. 2) ¶¶ 3-8, 10, 19, 23.

<u>SUMMARY OF THE ARGUMENT</u>

Proposed Intervenors are entitled to intervention as of right under Rule 24(a).  Their

motion is timely.  They seek to protect numerous concrete interests, and absent intervention their

ability to protect those interests will be impaired.  Defendants may be inadequate in representing

Proposed Intervenors' distinct interests.  Alternatively, permissive intervention is warranted.

<u>ARGUMENT</u>

**I.   PROPOSED INTERVENORS ARE ENTITLED TO INTERVENE AS OF RIGHT UNDER RULE 24(A)(2).**

A non-party has the right to intervene in an action when: (1) the application for

intervention is timely; (2) the proposed intervenors "have an interest relating to" the subject

matter of the action; (3) the proposed intervenors are "so situated that the disposition of the

action may, as a practical matter, impair or impede their ability to protect that interest"; and

(4) the proposed intervenors' interests are "inadequately represented by the existing parties to the

suit." Fed. R. Civ. P. 24(a)(2).  Proposed Intervenors satisfy each of these elements.

**A.  Proposed Intervenors' Motion Is Timely.**

In the intervention context, courts "evaluate timeliness in the context of all relevant

circumstances." *Ross v. Marshall*, 426 F.3d 745, 754 (5th Cir. 2005).  The Fifth Circuit has

articulated four factors for determining the timeliness of a motion to intervene, all of which

counsel in favor of allowing intervention here: (1) how long intervenors know of their interest in

the case; (2) prejudice existing parties may suffer as a result of any delay; (3) prejudice that

intervenors would suffer; and (4) any "unusual circumstances" regarding timeliness. *Stallworth*

*v. Monsanto Co.*, 558 F.2d 257, 264-66 (5th Cir. 1977).

There has been no delay here.  This suit was filed on January 22, 2021.  This motion is being filed days later.  Briefing has yet to begin on Plaintiff's request for a Preliminary Injunction.  This motion is thus timely by any measure.  Nor would the parties be prejudiced by intervention at this early stage.  By contrast, as discussed immediately below, Proposed Intervenors, and their clients and members, would suffer significant prejudice if intervention were denied and Plaintiff prevails.  *See Stallworth*, 558 F.2d at 264-66.  Intervention is thus timely and appropriate.  *See Texas v. United States*, 802 F. Supp. 481, 482 n.1 (D.D.C. 1992); *Cummings v. United States*, 704 F.2d 437, 441 (9th Cir. 1983).

### B.  Proposed Intervenors Have a Substantial Legal Interest in the Case.

A substantial legal interest is "an interest that is concrete, personalized, and legally protectable."  *Texas*, 805 F.3d at 658.  The interest need not be "an enforceable legal entitlement," and an individual or entity may intervene even absent "standing to pursue [their] own claim."  *Id.* at 659.  The Fifth Circuit applies a non-stringent, "practical [approach] to disposing of lawsuits by involving as many apparently concerned persons as is compatible with efficiency and due process."  *Ross v. Marshall*, 426 F.3d 745, 757 (5th Cir. 2005) (internal citations and quotation marks omitted).

Here, Proposed Intervenors easily clear this threshold.  First, the organizations' members and clients are individuals who are covered by and benefit from the DHS Memo.  For those clients and members, the injunction Texas seeks means risk of deportation, arrest, and other enforcement actions, and the emotional and psychological toll that risk and uncertainty will cause for them.  Such interests are plainly sufficient to warrant intervention.

Proposed Intervenor FIEL, for example, is a membership organization that includes 7,000 undocumented members, many of whom have final orders of removal—in many cases, that are

years old.  Espinosa Decl. ¶¶ 2, 8.  These members face the risk of deportation and other

enforcement actions if the DHS Memo is enjoined.  *See id.* ¶¶ 8-10.  If they are subjected to such

actions, the results will be wrenching—a severe emotional toll due to separation of families,

including children from parents, and financial hardship.  *Id.* ¶ 11; Garza Decl. ¶¶ 14-17.  The

harm from the *possibility* of detention and deportation is also omnipresent for FIEL's

undocumented members—fear of an encounter with a police officer or immigration official,

through an event otherwise as routine as a speeding ticket, is mentally and psychologically

damaging.  Espinosa Decl. ¶¶ 11-12.  Much the same is true of the clients of Proposed Intervenor

RAICES.  It has clients at risk of deportation absent the 100-day pause, and at risk of being

adversely affected in similar ways by an injunction of the other portions of the DHS Memo.

Garza Decl. ¶¶ 10, 14-17, 23-26.

These organizational members' and clients' "interest in avoiding deportation"—and their

similar interest in avoiding other enforcement actions like arrest—are precisely the sort of

"concrete, personalized interest" that suffices for intervention as of right, even absent a "legal

entitlement" or Article III standing.  *Texas*, 805 F.3d at 660.  Intervention in such circumstances,

to protect an interest at stake in government activity, is commonplace.  *See Wal-Mart Stores, Inc.

v. Texas Alcoholic Beverage Comm'n*, 834 F.3d 562, 568-69 (5th Cir. 2016); *Texas*, 805 F.3d at

660-61.  And the Fifth Circuit has routinely recognized intervention as of right for membership

organizations on behalf of their members.  *E.g.*, *Wal-Mart*, 834 F.3d 562 (relying on harm to

members of organization).  For similar reasons, organizations can intervene based on the

interests of their clients.  *Cf. Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617, 624

n.3 (1989) ("The attorney-client relationship . . . is one of special consequence").

Proposed Intervenors both also have a "concrete, personalized, legally protectable

interest" in the DHS Memo in their own right.  *Texas*, 805 F.3d at 660-61.  After four years of severe immigration policies, the DHS Memo allows each of these organizations to shift its resources and focus away from urgent deportation defense strategies and other similar steps to protect clients and members from immigration enforcement.  Espinosa Decl. ¶¶ 13-14; Garza Decl. ¶¶ 27-30.  RAICES can instead focus on strategies to help clients affirmatively obtain regularized immigration protections, such as DACA applications and citizenship naturalization applications.  Garza Decl. ¶ 32.  FIEL can likewise focus on such strategies in its legal services and can focus on its community COVID-19 relief efforts, including eviction advocacy, and its access to education and civic engagement work.  Espinosa Decl. ¶¶ 3, 14-18.  Each faces a dramatic alteration in its work and priorities if the Memo is enjoined: Rather than being able to focus on pursuing long-term, durable relief for clients and members, these organizations anticipate instead being required to focus on the constant emergencies of attempting to stop individual deportations and otherwise responding to enforcement actions.  Espinoza Decl. ¶¶ 14-18; Garza Decl. ¶¶ 27-30, 32.  The organizations also anticipate increased inquiries due to concerns and worries from clients and members; the organizations' advice and counseling in response to this fear and confusion will likewise take up staff time and resources.  Espinoza Decl. ¶ 16; Garza Decl. ¶ 31.

Finally, the public interest in this case tips the balance in favor of intervention as of right.  "The interest requirement may be judged by a more lenient standard if the case involves a public interest question or is brought by a public interest group."  *Brumfield*, 749 F.3d at 344 (internal quotation marks omitted); *see id.* (explaining that the range of qualifying interests in such a case "is arguably broader than are the protectable interests recognized in other contexts").  This suit involves public interest questions of the highest order, and Proposed Intervenors are public

interest organizations.

**C.   Proposed Intervenors' Ability to Protect Their Interests May Be Impaired Absent Intervention.**

Proposed Intervenors also meet the "minimal" burden to show that "the disposition of the action 'may' impair or impede their ability to protect their interests." *Id*.  Under the DHS Memo, the organizations' members and clients will, for example, be at least temporarily safe from deportation.  The organizations themselves will be able to direct their resources to affirmative efforts to secure durable long-term status for their members and clients and to other organizational initiatives.  Texas is seeking to enjoin that Memo.  Thus, the order Texas seeks clearly *may* impair Proposed Intervenors' ability to protect their interests.  *See Brumfield*, 749 F.3d at 344 (finding requirement satisfied where, "[i]f the desegregation order is modified to require prior court approval of the Program's implementation, then some parents are at risk of losing vouchers or their full range of school choices").

**D.      Defendants May Inadequately Represent Proposed Intervenors' Interests.**

Finally, the Proposed Intervenors' interests may be inadequately represented by existing parties. Fed. R. Civ. P. 24(a)(2).  A proposed intervenor need not show that the representation by existing parties *will* be inadequate.  *Entergy Gulf States Louisiana*, *L.L.C. v. U.S. E.P.A*., 817 F.3d 198, 203 (5th Cir. 2016).  All that is required is the "minimal" burden of showing that the representation "may be" inadequate.  *Trbovich v. United Mine Workers of Am.*, 404 U.S. 528, 538 n. 10 (1972).

The federal Defendants may not fully represent Proposed Intervenors' interests.  As government entities and officials, they must "represent the broad public interest."  *Sierra Club v. Espy*, 18 F.3d 1202, 1208 (5th Cir. 1994).  Accordingly, institutional constraints are likely to shape Defendants' defense such that it will not be fully aligned with the interests of Proposed

Intervenors. *Sierra Club v. Glickman*, 82 F.3d 106, 110 (5th Cir. 1996) (concluding that interests of government and proposed intervenor "will not necessarily coincide, even though, at this point, they share common ground").

For example, much of Plaintiff's suit is premised on a purported agreement between Texas and DHS. *See* ECF No. 2 at 2-4, 8-9, 11, 15, 19. The federal government has properly contested the validity of that agreement, noting, *inter alia*, that "Texas fails to identify any permissible statutory authority that contemplates DHS entering into a contract to grant states the power to delay and review agency policy decisions." ECF No. 8 at 4. But Texas presumably will eventually point to some statute it claims authorizes the agreement. When it does, the federal government may well be faced with goals in tension with each other: Establishing the invalidity of this argument, and not otherwise constraining the authority of DHS to enter into other agreements. Proposed Intervenors have no such competing concern, and are prepared to argue for narrow interpretations of any purported statutory authority. *Cf. Texas*, 805 F.3d at 663.

Proposed Intervenors may well have additional interests and arguments that diverge from those the federal government will offer. Indeed, Proposed Intervenors have already introduced a necessary perspective into this litigation. Proposed Intervenors are the first in this litigation to shed light on the sweeping implications for undocumented individuals of Plaintiff's requested injunction of the *entire* DHS Memo. Espinosa Decl. ¶¶ 10-12; Garza Decl. ¶¶ 21-26. They are specifically attuned to these effects because of their members' and clients' experiences living with undocumented status, being detained, and challenging orders of removal. Espinosa Decl. ¶¶ 2, 11-12; Garza Decl. ¶¶ 10-16, 18, 22-23, 25.

For example, the federal government is less likely to vigorously press arguments that an injunction would *cause* irreparable harm by creating a risk of deportation and other enforcement

actions and the resulting fear among noncitizens of being separated from family and, in some

instances, removed to danger and possibly torture and death. *See* Garza Decl. ¶¶ 11-16, 23, 26;

Espinosa Decl. ¶¶ 11-12. The government may hesitate to make such arguments because it is

ultimately the federal government carrying out immigration enforcement actions. In *Texas*, the

government's interests "in securing an expansive interpretation of executive authority [and]

efficiently enforcing the immigration laws" were at odds with those of the intervenor

noncitizens. 805 F.3d at 663. The same is true here, and intervention is similarly warranted.

## II. ALTERNATIVELY, PROPOSED INTERVENORS SHOULD BE GRANTED PERMISSIVE INTERVENTION.

In the alternative, the Court should grant Proposed Intervenors permissive intervention.

The Court may permit intervention by a proposed intervenor who files a timely motion and "has

a claim or defense that shares with the main action a common question of law or fact." Fed. R.

Civ. P. 24(b)(1)(B). The Court should permit intervention where it "will [not] unduly delay or

prejudice the adjudication of the original parties' rights." Fed. R. Civ. P. 24(b)(3).

Proposed Intervenors' defenses would raise many common questions of law and fact with

those of Defendants. These include the validity and enforceability of Texas's purported

agreement with DHS; the standing of Plaintiff to pursue this litigation; the authority of

Defendants to implement a pause on removals; whether injunctive relief is appropriate; and

many others. Resolution of these questions is central to both the original parties' dispute and

Proposed Intervenors' defenses. And intervention will not unduly delay or prejudice the original

parties' rights. Indeed, the fact that this case is in its very earliest stages means that, if

intervention is granted, Proposed Intervenors can seamlessly adhere to the relevant briefing

schedules, and are prepared to do so without seeking any delay.

There are, moreover, good reasons to grant intervention as an exercise of the Court's

discretion.  As noted above, the Fifth Circuit has been quite clear: "Federal courts should allow intervention where no one would be hurt and the greater justice could be attained."  *Texas*, 805 F.3d at 657 (quoting *Sierra Club*, 18 F.3d at 1205).  And permissive intervention is appropriate where the Proposed Intervenors' "arguments will significantly contribute to the development of the issues."  *Franciscan All., Inc. v. Azar*, 414 F. Supp. 3d 928, 940 (N.D. Tex. 2019) (citation and internal quotation marks omitted).  Here, intervention would significantly assist the Court in the just resolution of this case.

The addition of Proposed Intervenors will further the litigation due to their perspective and expertise on the issues at stake, informed by pragmatic experience.  For example, Proposed Intervenors are intimately familiar with both immigration law and the specifics of the removal process, which may well aid the court in resolving this case.  Garza Decl. ¶¶ 3-8; Espinosa Decl. ¶¶ 3-4, 9.  During the two hearings held in relation to Plaintiff's Motion for a Temporary Restraining Order, there appeared to be some uncertainty regarding the process by which individuals obtain a final removal order, the typical circumstances of an individual with a final removal order, and whether that person would be detained.  Proposed Intervenors are well positioned to explain the practical and legal realities of the immigration system and thus to significantly facilitate this Court's resolution of the issues in this case.  *See, e.g.*, *supra* Background, Part I.

Moreover, Proposed Intervenors are positioned to bring to this litigation an understanding of and focus on the people whose lives will be impacted by the injunction Texas seeks.  *Cf. Texas*, 805 F.3d at 663 (contrasting the federal government's broad interests with the concrete concerns of individual intervenors who would be impacted by the litigation).  Proposed Intervenors' members and clients have an entirely different perspective on this dispute than

15

either Texas or the federal government. As described above, Proposed Intervenors are deeply familiar with the ways in which deportation may harm both those removed from the United States—some of whom would have had paths to immigration relief had they been able to remain—and their families. This perspective will provide additional insight into the effects of enjoining the DHS Memo, or any specific portion of it.

Courts routinely grant permissive intervention where, as here, the interests and perspectives of affected communities would otherwise be absent. *See*, *e.g.*, *NRDC v. Costle*, 561 F.2d 904, 912-13 (D.C. Cir. 1977) (finding chemical companies' intervention would be a helpful supplement to the EPA's defense, because they offered knowledge of the policy's "impact . . . upon their operations"). "[T]he idea of 'streamlining' the litigation . . . should not be accomplished at the risk of marginalizing those—such as the [Proposed Intervenors, their members, and their clients]—who have some of the strongest interests in the outcome." *United States v. City of Los Angeles*, 288 F.3d 391, 404 (9th Cir. 2002).[3]

## CONCLUSION

For the foregoing reasons, the Court should grant Proposed Intervenors' motion.

//

---

[3] Federal Rule of Civil Procedure 24(c) requires the filing of a "pleading" along with a motion to intervene. While the Fifth Circuit "favor[s] 'a permissive interpretation' of Rule 24(c)," *Chaucer Corp. Capital, No. 2 Ltd. v. Azad*, No. CV H-10-180, 2011 WL 13249479, at *1 (S.D. Tex. Sept. 8, 2011), and an Answer is premature at this early stage, in an abundance of caution Proposed Intervenors are lodging a proposed Answer. Proposed Intervenors respectfully suggest that, should intervention be granted, the Answer not be filed; or, in the alternative, that they be permitted to file a Motion to Dismiss and amend their Answer as appropriate if such actions would not unduly delay this case.

Respectfully submitted,

Omar C. Jadwat*                                     /s/ Andre Segura
Michael Tan*                                        Andre Segura (Attorney-In-Charge)
Anand Balakrishnan*                                 (Tex. 24107112; S.D. Tex. 3123385)
Noor Zafar*                                         Kathryn Huddleston*
AMERICAN CIVIL LIBERTIES UNION                      AMERICAN CIVIL LIBERTIES UNION
FOUNDATION, IMMIGRANTS' RIGHTS PROJECT              FOUNDATION OF TEXAS, INC.
125 Broad Street, 18th Floor                        5225 Katy Fwy., Suite 350
New York, NY 10004                                  Houston, Texas 77007
(212) 549-2600                                      (713) 942-8146
ojadwat@aclu.org                                    asegura@aclutx.org
mtan@aclu.org                                       khuddleston@aclutx.org
abalakrishnan@aclu.org
nzafar@acutx.org

                                                    *pro hac vice forthcoming
Cody Wofsy*
Spencer E. Amdur*
AMERICAN CIVIL LIBERTIES UNION
39 Drumm Street
San Francisco, CA 94111
Telephone: (415) 343-1198
cwofsy@aclu.org
samdur@aclu.org


## CERTIFICATE OF SERVICE

I hereby certify that I served a copy of the foregoing motion via the Court's ECF

filing system.

                         /s/ Andre Segura
                        Andre Segura


## CERTIFICATE OF COMPLIANCE

The undersigned counsel certifies that the total number of words in this motion, exclusive

of the matters designated for omission, is 4,869 words as counted by Microsoft Word Software.

                        /s/ Andre Segura
                        Andre Segura

17