UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS

| | |
|---|---|
| STATE OF TEXAS,<br><br>      Plaintiff,<br><br>v.<br><br>The UNITED STATES OF AMERICA; DAVID PEKOSKE, Acting Secretary of the United States Department of Homeland Security, in his official capacity; UNITED STATES DEPARTMENT OF HOMELAND SECURITY; TROY MILLER, Senior Official Performing the Duties of the Commissioner of U.S. Customs and Border Protection, in his official capacity; U.S. CUSTOMS AND BORDER PROTECTION; TAE JOHNSON, Acting Director of U.S. Immigration and Customs Enforcement, in his official capacity; U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; TRACY RENAUD, Senior Official Performing the Duties of the Director of the U.S. Citizenship and Immigration Services, in her official capacity; U.S. CITIZENSHIP AND IMMIGRATION SERVICES,<br><br>      Defendants. | Civ. Action No. 6:21-cv-00003 |

**DECLARATION OF ROBERT GUADIAN**

I, Robert Guadian, declare the following under 28 U.S.C. § 1746, and state that under penalty of perjury the following is true and correct to the best of my knowledge and belief:

**I.   Personal Background**

1.   I am the Acting Assistant Director (AD) for Field Operations, within the U.S. Department of Homeland Security (DHS), U.S. Immigration and Customs Enforcement (ICE), Enforcement and Removal Operations (ERO). I have been employed with ICE and its legacy

1

agency Immigration and Naturalization Service since 1997. Prior to my current position, I most recently held the position of Deputy Assistant Director for Domestic Operations East, and prior to that, was Field Office Director for the ERO Chicago Field Office, and Deputy Field Office Director for the ERO Dallas Field Office. I began my career as an Immigration Inspector in Laredo, Texas, and later worked as a Deportation Officer in Harlingen, Texas, and at Port Isabel Detention Center in Los Fresnos, Texas, and Supervisory Detention and Deportation Officer and Assistant Field Office Director for the ERO San Antonio Field Office.

2. In my current position as Acting AD for Field Operations I oversee, direct, and coordinate all ERO Field Operations activities throughout the nation's field offices and sub-offices in an effort to enhance national security and public safety while ensuring such activities further ERO goals and comply with policies and initiatives set forth by the DHS Secretary, ICE Director, and ICE Health Service Corps.

3. ERO's enforcement and removal efforts are conducted by its 24 national field offices. At Headquarters, the Field Operations Division (HQ Field Operations) provides guidance to and coordination among those offices. This direction is often in reference to the numerous programs and initiatives through which ERO identifies, arrests, pursues for prosecution, and removes priority aliens. HQ Field Operations is comprised of three divisions, all of which provide guidance, implement policy and procedures, and facilitate enhanced coordination between HQ and the field offices: (1) the Domestic Operations Division, which oversees, directs, and coordinates all ERO Field Operations activities throughout the nation's field offices and sub-offices in an effort to enhance national security, border security, and public safety through the enforcement of DHS's Civil Immigration Enforcement Priorities; (2) the Special Operations Division, which oversees and coordinates ERO's intelligence collection

efforts, firearms training and protective equipment procurement, various tactical programs and communications efforts, and oversees ERO operations that support the prevention, preparedness, response, and recovery plans for critical and significant incidents such as terrorist attacks, natural disasters, or other national emergencies or incidents; and (3) the Law Enforcement Systems and Analysis (LESA) Division, which is responsible for helping inform the development of ERO strategies and supporting continuous enhancement of ERO business processes to execute those strategies. Through data collection and analysis and technology and process improvements, LESA delivers tools, studies, and recommendations that assist ICE's decision-making and planning (strategic, business, and operational). LESA studies ICE's operations and resources (personnel, processes, technology, and infrastructure) to find areas for continuous improvement.

4. ICE is charged with enforcement of more than 400 federal statutes, and its mission is to protect the United States from the border-related crime and illegal immigration that threaten national security and public safety through enforcement of the federal laws governing border control, customs, trade, and immigration. To carry out this mission, ICE focuses on enforcing federal immigration laws, preventing terrorism, and combating transnational criminal threats. As an operational program of ICE, ERO is responsible for the planning, management, and direction of broad programs relating to the supervision, detention, and removal of aliens who are removable from the United States under the U.S. immigration laws.

5. ERO's mission is to protect the homeland through the arrest and removal of aliens who undermine the safety of our communities and the integrity of our immigration laws. Field Operations is one of six ERO headquarters divisions.

## II.     Information on Releases from ICE Custody

6.      As a part of my official duties, I am familiar with the Minute Order in *Texas v. United States*, No. 6:21-cv-00003 (entered Jan. 25, 2021), instructing that the Court be advised of "the number of individuals in custody that were subject to an Order of Removal who have been released from custody in the United States since Friday, January 22, 2021, and the locations from which they were released." I submit this declaration in response to the Court's request. The information in this declaration is current and accurate as of the time I signed below.

7.      On January 24, 2021, Texas filed its Advisory Regarding Court's Questions, ECF 6, which referenced a media report discussing an ICE e-mail that purportedly instructed ICE personnel within Texas to "stop all [alien] removals" and to "release them all, immediately." *Id.* at 2. In response, Defendants filed Defendants' Response to Plaintiff's Advisory, ECF 9, which stated that "the released individuals [addressed in the e-mail] are part of a certified class in separate litigation in which an injunction requires class members with specified COVID risk factors to be released." *Id.* at 1.  That case is *Fraihat v. U.S. Immigration & Customs Enf't,* 445 F. Supp. 3d 709 (C.D. Cal. 2020), order clarified, No. EDCV191546JGBSHKX, 2020 WL 6541994 (C.D. Cal. Oct. 7, 2020).  That order requires ICE to provide sub-class members with individualized custody reviews based on the totality of circumstances, including those subject to mandatory detention.  The response also stated that "counsel have not been advised of any additional groups of noncitizens released by ICE or whether CBP has released any non-citizens." ECF 9 at 1 n.1.  The government further provided the Court with the email exchange referenced in the news report, which confirmed that the releases addressed related to the *Fraihat* case.  ECF 14-1.  ERO understood this response to be in reference to the releases discussed in the news report and this email.  The statement was made based on available data at that time.

4

8. To further comply with the Court's order in a timely manner, ERO LESA is able to pull data on releases from ICE custody nationwide, but the reporting database that ERO LESA uses to retrieve this information does not update in real time. There is approximately a 48- to 72-hour delay inherent in ICE's data pulls on release information. Further, ERO LESA's data is limited in its ability to explain the reasons for release from custody of each alien. A manual review of each alien's custody determination would be required to accurately and precisely provide the reason for each alien's release.

9. ICE detains a number of aliens during removal proceedings, including prior to final removal orders. There were approximately 14,209 individuals in ICE custody as of January 23, 2021. Between January 22, 2021, and January 25, 2021, ICE released approximately 176 aliens with final orders of removal from custody nationwide. These 176 individuals were released following a case-by-case custody reviews, of which approximately 105 aliens who had been flagged as sub-class members in *Fraihat*.[1]

10. The following is a breakdown by ICE ERO AOR of the approximate 176 releases that occurred between January 22, 2021 and January 25, 2021: Atlanta – 33; Boston – 2; Buffalo – 1; Chicago – 1; El Paso – 5; Houston – 18; Los Angeles – 5; Miami – 8; New Orleans – 27; New York City – 1; Newark – 2; Philadelphia – 6; Phoenix – 27; Salt Lake City – 3; San Antonio – 30; San Diego – 1; San Francisco – 1; Seattle – 1; St. Paul – 1; Washington – 3.

---

[1] While the court orders in *Fraihat* require ICE to provide individualized review of all sub-class members regardless of mandatory detention provisions, *Fraihat* membership does not automatically qualify its members for release. *Fraihat v. U.S. Immigration & Customs Enf't*, 445 F. Supp. 3d 709 (C.D. Cal. 2020), order clarified, No. EDCV191546JGBSHKX, 2020 WL 6541994 (C.D. Cal. Oct. 7, 2020).

This declaration is based upon my personal and professional knowledge, information obtained from other individuals employed by ICE, and information obtained from various records and systems maintained by DHS. I provide this declaration based on the best of my knowledge, information, belief, and reasonable inquiry for the above captioned case.

Signed on this 29 day of January 2021.

ROBERT GUADIAN JR.
Digitally signed by ROBERT GUADIAN JR.
Date: 2021.01.29 10:21:10 -05'00'
_____
Robert Guadian
Acting Assistant Director
Field Operations
Enforcement and Removal Operations
U.S. Immigration and Customs Enforcement