**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**VICTORIA DIVISION**

| | |
|---|---|
| STATE OF TEXAS,<br><br>       *Plaintiff,*<br><br>v.<br><br>The UNITED STATES OF AMERICA; DAVID PEKOSKE, Acting Secretary of the United States Department of Homeland Security, in his official capacity; UNITED STATES DEPARTMENT OF HOMELAND SECURITY; TROY MILLER, Senior Official Performing the Duties of the Commissioner of U.S. Customs and Border Protection, in his official capacity; U.S. CUSTOMS AND BORDER PROTECTION; TAE JOHNSON, Acting Director of U.S. Immigration and Customs Enforcement, in his official capacity; U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; TRACY RENAUD, Senior Official Performing the Duties of the Director of the U.S. Citizenship and Immigration Services, in her official capacity; U.S. CITIZENSHIP AND IMMIGRATION SERVICES,<br><br>       *Defendants*. | Civ. Action No. 6:21-cv-00003 |

**TEXAS'S MOTION FOR PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................................................... i

TABLE OF AUTHORITIES .......................................................................................... ii

INTRODUCTION ..................................................................................................... 1

STATEMENT OF FACTS ........................................................................................... 2

SUMMARY OF THE ARGUMENT ............................................................................... 5

ARGUMENT ........................................................................................................... 6

    I.    No procedural issue prevents this Court's review. ........................................ 6

        A.    The January 20 Memorandum is subject to judicial review. ..................... 6

        B.    The January 20 Memorandum is a final agency action. ............................ 9

        C.    Texas has standing to bring these claims. ............................................... 10

    II.    The January 20 Memorandum violates the Administrative Procedure Act. ................. 11

        A.    The January 20 Memorandum exceeds Defendants' statutory jurisdiction, authority, or limitation. ............................................................................. 11

        B.    The January 20 Memorandum is arbitrary and capricious. ....................... 13

        C.    The January 20 Memorandum was required to go through notice-and-comment rulemaking. ................................................................................. 16

    III.    Abdicating responsibility for removing illegal aliens is unconstitutional. ................... 17

    IV.    Defendant DHS violated the Agreement. ................................................... 19

    V.    The APA requires a final judgment setting aside the January 20 Memorandum. ........ 20

    VI.    Texas will suffer irreparable harm if an injunction is not granted .............................. 22

        A.    DHS admits Texas faces irreparable injury ............................................ 23

        B.    Texas Is Forced to Spend Money on Various Services for Illegal Aliens ............... 23

        C.    This Court has previously found this evidence sufficient to show irreparable injury 25

    VII.    An injunction would not harm defendants or the public .............................................. 26

    VIII.    The Court should postpone the January 20 Memorandum's Effective Date. ............. 26

CONCLUSION ....................................................................................................... 27

TABLE OF AUTHORITIES

Page(s)

**Cases**

*Am. Stewards of Liberty v. Dep't of Interior*,
  370 F. Supp. 3d 711 (W.D. Tex. 2019)...................................................................21

*AquAlliance v. U.S. Bureau of Reclamation*,
  312 F. Supp. 3d 878 (E.D. Cal. 2018)....................................................................21

*Arizona v. United States*
  567 U.S. 387 (2012).................................................................................................10

*Armstrong v. Exceptional Child Center, Inc.*,
  575 U.S. 320 (2015)............................................................................................1, 18

*Batalla Vidal v. Nielsen*,
  279 F. Supp. 3d 401 (E.D.N.Y. 2018) ...................................................................22

*Bennett v. Spear*,
  520 U.S. 154 (1997)...................................................................................................9

*Clark v. Martinez*,
  543 U.S. 371 (2005).................................................................................................11

*Dart v. United States*,
  848 F.2d 217 (D.C. Cir. 1988)................................................................................18

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*,
  140 S. Ct. 1891 (2020)..................................................................................8, 14, 15

*Dept. of Commerce v. New York*,
  139 S. Ct. 2551 (2019)............................................................................................23

*Green Valley Special Util. Dist. v. City of Schertz*,
  969 F.3d 460 (5th Cir. 2020) (en banc) .................................................................18

*Heckler v. Chaney*,
  470 U.S. 821 (1985)..........................................................................................5, 7, 8

*Humana, Inc. v. Avram A. Jacobson, M.D., P.A.*,
  804 F.2d 1390 (5th Cir. 1986) ...............................................................................22

*IHG Healthcare, Inc. v. Sebelius*,
  4:09-cv-3233, 2010 WL 11680368 (S.D. Tex. Apr. 1, 2010).................................27

*Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*,
  523 U.S. 26 (1998)...................................................................................................12

*Lincoln v. Vigil,*
    508 U.S. 182 (1993) ................................................................................................9

*Maine Cmty. Health Options v. United States,*
    140 S. Ct. 1308 (2020) ..........................................................................................12

*Massachusetts v. EPA,*
    549 U.S. 497 (2007) ..............................................................................................10

*Michigan v. EPA,*
    135 S. Ct. 2699 (2015) ..........................................................................................14

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,*
    463 U.S. 29 (1983) ................................................................................................15

*N.D. Family All. v. Bader,*
    361 F. Supp. 2d 1021 (D.N.D. 2005) ...................................................................20

*N.Y. Progress & Prot. PAC v. Walsh,*
    733 F.3d 483 (2d Cir. 2013) .................................................................................26

*Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs,*
    145 F.3d 1399 (D.C. Cir. 1998) ...........................................................................21

*Nio v. U.S. Dep't of Homeland Sec.,*
    385 F. Supp. 3d 44 (D.D.C. 2019) .......................................................................21

*Nken v. Holder,*
    556 U.S. 418 (2009) ..............................................................................................26

*PDK Labs Inc. v. Ashcroft,*
    338 F. Supp. 2d 1 (D.D.C. 2004) .........................................................................20

*Plyler v. Doe,*
    457 U.S. 202 (1982) .........................................................................................10, 25

*Prof'ls & Patients for Customized Care v. Shalala,*
    56 F.3d 592 (5th Cir. 1995) ...............................................................................6, 16

*Reno v. Am.-Arab Anti-Discrimination Comm.,*
    525 U.S. 471 (1999) ..............................................................................................26

*Safety Nat'l Cas. Corp. v. U.S. Dep't of Homeland Sec.,*
    4:05-cv-2159, 2005 WL 8168878 (S.D. Tex. Dec. 9, 2005) ................................27

*SEC v. Chenery Corp.,*
    318 U.S. 80 (1943) ................................................................................................16

*Simmat v. U.S. Bureau of Prisons*,
    413 F.3d 1225 (10th Cir. 2005) (McConnell, J.) ................................................. 18

*Sw. Elec. Power Co. v. EPA*,
    920 F.3d 999 (5th Cir. 2019) ............................................................................. 21

*Texas v. EPA*,
    829 F.3d 405 (5th Cir. 2016) ............................................................................. 26

*Texas v. United States*,
    106 F.3d 661 (5th Cir. 1997) ......................................................................... *passim*

*Texas v. United States*,
    106 F.3d 661 (5th Cir. 1997)) ............................................................................. 8

*Texas v. United States*,
    328 F. Supp. 3d 662 (S.D. Tex. 2018) .......................................................... *passim*

*Texas v. United States*,
    340 F. Supp. 3d 579 (N.D. Tex. 2018) ............................................................... 20

*Texas v. United States*,
    945 F.3d 355 (5th Cir. 2019) ............................................................................. 20

*Texas v. United States*,
    95 F. Supp. 3d 965 (N.D. Tex. 2015) ................................................................. 27

*Ulysse v. Dep't of Homeland Sec.*,
    291 F. Supp. 2d 1318 (M.D. Fla. 2003) ........................................................ 11, 12

*United States v. Juarez-Escobar*,
    25 F. Supp. 3d 774 (W.D. Pa. 2014) .................................................................. 18

*Zadvydas v. Davis*,
    533 U.S. 678 (2001) ...................................................................................... 4, 12

**Statutes**

5 U.S.C. § 551(4) ........................................................................................................ 16

5 U.S.C. § 553 ........................................................................................................... 16

5 U.S.C. § 701 ..................................................................................................... 8, 9, 18

5 U.S.C. § 701(a)(1) .................................................................................................... 6

5 U.S.C. § 701(a)(2) .................................................................................................... 7

5 U.S.C. § 705 ........................................................................................................... 26

5 U.S.C. § 706 ........................................................................................6, 17, 21

5 U.S.C. § 706(2)(A) ....................................................................................13, 21

5 U.S.C. § 706(2)(A), (D) .................................................................................20

8 U.S.C. §§ 1221–1232 ........................................................................................7

8 U.S.C. § 1231 ......................................................................................... *passim*

8 U.S.C. § 1231(a)(1)(A) ........................................................................5, 7, 11, 12

8 U.S.C. § 1231(a)(1)(C) ...................................................................................12

8 U.S.C. § 1231(a)(2) .....................................................................................3, 10

8 U.S.C. § 1231(h) .......................................................................................12, 13

42 U.S.C. § 1395dd ..........................................................................................10

Administrative Procedure Act ("APA"), 5 U.S.C. § 551, *et seq.* .......................... *passim*

Immigration and Nationality Act. 8 U.S.C. § 1101, *et seq.* ...............................5, 6, 7, 8

National Environmental Policy Act, 14 U.S.C. § 4321, *et seq.* ................................21

**Other Authorities**

42 C.F.R. § 440.225(c) ......................................................................................24

42 C.F.R. § 440.255 .........................................................................................10

Fed. R. Civ. P. 56(f) .........................................................................................20

Fed. R. Civ. P. 65(a)(2) .....................................................................................20

Memorandum from David Pekoske, Acting Director, U.S. Department of
   Homeland Security, Jan. 20. 2021 .....................................................................1

Memorandum of Understanding between Texas and the U.S. Department of
   Homeland Security, Dec. 30, 2020 ....................................................................1

U.S. Const. art. II, § 3 .............................................................................6, 17, 19

11A Wright & Miller, Fed. Prac. & Proc. Civ. § 2950 (3d ed.) ..................................20

**INTRODUCTION**

With the stroke of a pen, the Biden Administration granted at least temporary amnesty to tens of millions of illegal aliens. Ex. 1 (Memorandum from David Pekoske, Acting Director, U.S. Department of Homeland Security; hereinafter, the "January 20 Memorandum" or the "Memorandum"). In doing so, Defendants violated an express statutory command and their constitutional obligation to faithfully execute our Nation's laws. The rest of the country is due, at the very minimum, consideration of less-extreme policies as well as notice and the opportunity to comment before such a sweeping change can occur. Indeed, Defendants expressly agreed to give Texas (and other States) the right to provide input on something that so directly affects its citizens and time to adjust for such a change. *See* Ex. 2 (Memorandum of Understanding between Texas and the U.S. Department of Homeland Security, Dec. 30, 2020; hereinafter the "Agreement").

The Biden Administration met none of these requirements. Having provided nothing in an administrative record suggesting any consideration of the January 20 Memorandum whatsoever— let alone consideration of alternative possible policies—Defendants' actions are arbitrary and capricious as a matter of law. In an attempt to evade this self-evident result, Defendants now tell this Court that it lacks the power to even review those actions. But the law does not insulate Defendants' total abdication of their responsibility to enforce clear directives by Congress from this Court's review. Quite the opposite: this Court retains the historical power to review illegal executive actions by the federal government, including this one. *Armstrong v. Exceptional Child Center, Inc.*, 575 U.S. 320, 327–28 (2015). This Court should set aside the January 20 Memorandum and enjoin Defendants from implementing it in any way.

1

## STATEMENT OF FACTS

Defendants removed nearly 1,000,000 illegal aliens from the United States during the last three years for which total statistics are available. Ex. 3 (2019 Yearbook of Immigration Statistics, Table 39). In FY2019, just one of Defendants—U.S. Immigration and Customs Enforcement ("ICE")—removed another 267,258 unlawfully present aliens. Ex. 4 at 19 fig. 13 (ICE FY2019 ERO Report). More than 150,000 of those individuals had prior criminal convictions, and another 23,000 had pending criminal charges. *Id.* at 22 fig. 16. That includes more than 67,000 convicted criminals from the four ICE areas of operation in Texas, Ex. 5 at 5 (ERO FY2019 Local Statistics), and over 5,000 known or suspected gang members, Ex. 4 at 23 fig. 18. Over 91% of the removals of individuals arrested by ICE away from the border were of convicted criminals or had pending criminal charges (nearly 80,000 individuals in one year alone). *Id.* at 22 fig. 17.



Figure 17: FY 2017 – FY 2019 ICE Interior Removals by Criminality

Under the terms of the January 20 Memorandum, none of those tens of thousands of criminals would have been removed, except for the 58 known or suspected terrorists. *Id.* at 23 fig. 19; *see also* Ex. 6 ¶ 30 (Decl. of T. Homan).

In just the first four months of FY2021, ICE removed nearly 24,000 aliens, more than double the number that it released pursuant to some type of alternative to removal. Ex. 7, table "ICE Removals: FY2021 YTD" (FY2021 ICE Detention Statistics).[1] Based on these numbers, the 100-day pause called for in the January 20 Memorandum would result in tens of thousands of additional aliens remaining in the United States, many of whom would remain or move to Texas. *See also* Ex. 8 (ICE.gov Homepage) (showing 509 removals on average per day in FY2020).

Of those still in the United States, an average of approximately 15,000 illegal aliens were in ICE's custody each day of January 2021. Ex. 7, table "ICE Facilities Data, FY21 YTD." Over 8,000 of those who were in custody had prior convictions for criminal offenses and another 2,700 had criminal charges pending. *Id.* ICE housed over half of those unlawfully present aliens in its 26 facilities located in Texas, over 1,600 of whom had some level of prior criminality. *Id.*

During the 90-day period after entry of a final order of deportation, the Department of Homeland Security ("DHS") "shall detain the alien" unless the alien is removed. *See* 8 U.S.C. § 1231(a)(2). But that mandate loses its force after the removal period ends, to address the question the Court posed to the parties in ECF 51. *See also* RAICES Em. Mot. to Intervene at 5, ECF 28 ("After that period, [Section 1231] generally contemplates release of persons with final removal orders."). Under Section 1231(a)(3) and (a)(6), DHS must release an alien after the removal period ends unless the alien is "determined by the Attorney General to be a risk to the community or unlikely to comply with the order of removal." And even in light of such a determination, the statute leaves detention to Defendants' discretion. *Id.* (such an alien "may be detained beyond the removal period"). As such, the 100-day pause would run the clock out on any illegal alien's 90-

---

[1] A native Excel version of this exhibit can be found here: https://www.ice.gov/doclib/detention/FY21-detentionstats.xlsx

day removal period, meaning that ICE would, generally speaking, be forced to release illegal aliens both during and following the 100-day pause.

But even if such an alien is detained, the detention cannot go on indefinitely. An alien must be released if there is not a "significant likelihood of removal in the foreseeable future," commonly referred to as "SLRFF." *See Zadvydas v. Davis*, 533 U.S. 678, at 699–700 (2001). The 100-day deportation pause would not only illegally *delay* removals for the vast majority of illegal aliens, it would make removals for many more difficult or impossible—including for the thousands of convicted criminals currently in ICE's custody. The ICE officer in charge of the Houston Field Office understood the significance of that pause: "Per the [Deputy Field Office Director], all cases are to be considered NO SLRFF." ECF 14.1. While the Field Office Director ordered that directive rescinded, he or she did not provide any other meaningful guidance—and did not say that the Deputy was incorrect. Thus, should the blanket pause on removals in the January 20 Memorandum take effect, ICE could lose control of criminals who are in this country illegally and who have already been located, apprehended, and convicted. *See* Ex. 6 ¶ 32–34. These convicted criminals are particularly unlikely to comply with future removal orders and further present a heightened risk to Texas and Texans.

Additionally, the ICE-specific custody statistics do not account for illegal aliens who are in the custody of state and local law enforcement. According to Defendants' own estimate, 90 percent of incarcerated aliens are subject to state or local detentions. Ex. 9 at 2 (DHS Alien Incarceration Report, Fiscal Year 2017). In one fiscal year alone, the Texas Department of Criminal Justice housed nearly 9,000 illegal alien criminals. Ex. 10 ¶ 6 (Decl. of R. Waltz). Should ICE no longer be able to remove those unlawfully present criminals, they would be released into

Texas's communities, where they are likely to commit additional crimes. Ex. 11 (Decl. of B. Waybourn).

Without considering costs like these, the Biden Administration issued the January 20 Memorandum on its very first day in office. Federal law requires that Defendants' action be set aside and further enjoined pending the Court's final consideration.

SUMMARY OF THE ARGUMENT

No procedural hurdle prevented this Court from ruling on Texas's application for a temporary restraining order, and none forecloses its consideration of the merits of this case. The 100-day pause on almost all removals is "so extreme as to amount to an abdication of [Defendants'] statutory responsibilities," *Heckler v. Chaney*, 470 U.S. 821, 833 n.4 (1985), so it cannot be committed to agency discretion by law. The 100-day pause is "sufficiently final and immediate" to constitute final agency action, and Defendants "have disregarded their previous legal 'obligations' and adjudication of the aliens' 'rights'" in violation of Section 1231's mandate. ECF 16 at 8–9. Additionally, Texas has already "provided evidence that the 100-day pause will result in millions of dollars of damage to its public fisc," *id.* at 12, and that evidence is expanded upon in this motion and the attached exhibits.

On the merits, Texas agrees with this Court's preliminary analysis that the 100-day pause "is clearly not in accordance with, or is in excess of, the authority accorded to" Defendants under 8 U.S.C. § 1231(a)(1)(A). ECF 16 at 6. Likewise, the "January 20 Memorandum not only fails to consider potential policies more limited in scope and time, but it also fails to provide any concrete, reasonable justification for a 100-day pause on deportations." *Id.* at 10. The non-existent administrative record confirms the Court's suspicions: Defendants plainly failed to consider *any* alternative policy to the one they announced, including one which would not violate section

5

1231(a)(1)(A). Indeed, Defendants failed to consider their obligations under the INA in the first place. Additionally, such a change that imposes "rights and obligations" is required to first go through notice-and-comment rulemaking. *Prof'ls & Patients for Customized Care v. Shalala*, 56 F.3d 592, 595 (5th Cir. 1995). Finally, not only did the January 20 Memorandum violate the Administrative Procedure Act ("APA"), it violated Defendants' obligations to Texas as well as their duty to "take Care that the Laws be faithfully executed." U.S. Const. art. II, § 3.

In their most recent filing with the Court, Defendants twice say that "Texas's claims represent pure legal issues." ECF 30 at 6; *see also id.* ("[T]hey present purely legal issues."). They do not appear to dispute any of the facts Texas has presented above. And nothing in the administrative record provides a basis to justify Defendants' radical departure from their statutory obligations. As a result, Texas respectfully requests that this Court enjoin the implementation or enforcement of the January 20 Memorandum and set it aside pursuant to 5 U.S.C. § 706.

ARGUMENT

**I.    No procedural issue prevents this Court's review**.

The Biden Administration cannot hide its complete refusal to enforce this Nation's immigration laws behind any procedural bars to this Court's review.

A.    <u>The January 20 Memorandum is subject to judicial review.</u>

Defendants argue that the January 20 Memorandum is not reviewable, *see* ECF 8 at 7–8 (citing 5 U.S.C. § 701), but this Court properly rejected that argument, *see* ECF 16 at 7–8.

First, no "statutes preclude judicial review." 5 U.S.C. § 701(a)(1). Defendants rely on Section 1252(g) and Section 1252(f), *see* ECF 8 at 7, but neither provision applies here. Section 1252(g) prevents courts from hearing aliens' challenges to final orders of removal, not Texas's challenge to the January 20 Memorandum. It provides that "no court shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action by the Attorney

6

General to commence proceedings, adjudicate cases, or execute removal orders against any alien under" the Immigration and Nationality Act. 8 U.S.C. § 1252(g). As this Court has already held, "Texas is not an alien. Nor does Texas bring this action 'on behalf of' any alien." ECF 16 at 7. As a result, "§ 1252(g) does not apply to this Court's review." *Id.* (citing *Texas*, 809 F.3d at 164). Moreover, Texas's claim does not "aris[e] from the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any alien." 8 U.S.C. § 1252(g). On the contrary, Texas's claim arises from Defendants' announcement that they would not execute removal orders. *See Texas*, 809 F.3d at 164 (holding that DAPA was reviewable).

Section 1252(f) is likewise irrelevant. According to Defendants, "§ 1252(f) provides that only the Supreme Court has authority to enjoin operation of 8 U.S.C. §§ 1221–1232, other than cases brought by individuals," ECF 8 at 7, but Texas is not seeking to enjoin operation of those statutory sections. Far from it; Texas seeks an injunction against a memorandum functionally suspending Section 1231.

Second, granting blanket amnesty to millions of illegal aliens is not "committed to agency discretion by law." 5 U.S.C. § 701(a)(2). As this Court found, "§ 1231(a)(1)(A) clearly accords no discretion to the Attorney General to blatantly disregard the 90-day removal rule without finding that an enumerated exception applies." ECF 16 at 8.

The case cited by Defendants for the "classic exercise of prosecutorial discretion," ECF 8 at 7, shows why the class-wide grant of amnesty is *not* committed to agency discretion by law. *See Heckler,* 470 U.S. 821. That case dealt with individual instances of prosecutorial discretion, which the Supreme Court ruled were not reviewable. But the Court expressly distinguished "a situation where it could justifiably be found that the agency has 'consciously and expressly adopted a general policy' that is so extreme as to amount to an abdication of its statutory responsibilities."

*Id.* at 833 n.4 (citing *Adams v. Richardson*, 480 F.2d 1159 (D.C. Cir. 1973) (en banc)). That is exactly what the January 20 Memorandum did.

Additionally, *Heckler v. Chaney* recognized that any presumption of unreviewability for individualized enforcement decisions "may be rebutted where the substantive statute has provided guidelines for the agency to follow in exercising its enforcement powers." *Id.* at 833. "Congress did not set agencies free to disregard legislative direction in the statutory scheme that the agency administers. Congress may limit an agency's exercise of enforcement power if it wishes, either by setting substantive priorities, or by otherwise circumscribing an agency's power to discriminate among issues or cases it will pursue." *Id.* That is exactly what Congress did in Section 1231.

Defendants also point to the Fifth Circuit's note that "section 1103 places no substantive limits on the Attorney General and commits enforcement of the INA to her discretion." ECF 8 at 7–8 (quoting *Texas v. United States*, 106 F.3d 661, 667 (5th Cir. 1997)). But in this case, Texas's claim is not based on Section 1103. That one provision may not set an enforceable limit on Defendants' discretion says nothing about whether another does. *See Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1914 (2020) (Thomas, J., concurring in the judgment in part and dissenting in part) (noting that Section 1103 "must be read alongside the express limits contained within the statute"). Moreover, that case turned on the lack of a "workable standard against which to judge the agency's exercise of discretion." *Texas*, 106 F.3d at 667. Here, there is a workable standard: A 100-day "pause" in removals will necessarily cause Defendants to violate Section 1231's 90-day deadline.

Defendants' reviewability argument fails for the reasons explained above. But even if Defendants were right about reviewability under Section 701, it would not preclude the Court from considering Counts I and V (based on the Agreement), Count III (based on the Take Care Clause),

or Count IV (based on the lack of notice-and-comment rulemaking). Texas's claims based on the Agreement and the Constitution are properly before the Court even without the APA, so Section 701 is not an obstacle. And Texas's arguments that Defendants were obligated to consider less-restrictive policies before implementing the Memorandum and that Defendants were "required to abide by the familiar notice-and-comment rulemaking provisions of the APA" presents a procedural claim "quite apart from the matter of substantive reviewability." *Lincoln v. Vigil*, 508 U.S. 182, 195 (1993) (considering whether the agency should have used notice-and-comment rulemaking after holding that the substance of the agency's decision was discretionary and unreviewable).

    B.    <u>The January 20 Memorandum is a final agency action.</u>

An agency's action is "final" for the purposes of judicial review if two conditions are met: "First, the action must mark the 'consummation' of the agency's decision making process—it must not be of a merely tentative or interlocutory nature. And second, the action must be one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997).

The January 20 Memorandum "direct[s] an immediate pause on removals of any noncitizen with a final order of removal." Ex. 1 at 3. That is not tentative. It would have the immediate effect of determining rights and obligations: federal officials are obliged not to remove almost all illegal aliens. RAICES Em. Mot. to Intervene Ex. 2 ¶ 15, ECF 28-2 ("The memo's temporary relief from the possibility or being removed thus provides a significant benefit for our clients with final orders . . . ."). And Texas will be obliged to provide social services to those aliens. *See Texas v. United States*, 328 F. Supp. 3d 662, 737 (S.D. Tex. 2018).

In addition, the January 20 Memorandum causes "legal consequences" like increasing Defendants' ability to release illegal aliens from custody. "During the removal period, the Attorney

General shall detain the alien." 8 U.S.C. § 1231(a)(2). But once Defendants' 100-day pause extends an alien's custody beyond the removal period, the alien can be "subject to supervision" (i.e., released from custody). *Id.* § 1231(a)(3); *see also* ECF 51. And again, the release into, and continued illegal presence of, illegal aliens in Texas will require the State to provide those aliens with social services—another legal consequence flowing from the Memorandum.

      C.     <u>Texas has standing to bring these claims.</u>

      States, such as Texas, "bear[] many of the consequences of unlawful immigration." *Arizona v. United States* 567 U.S. 387, 397 (2012). Texas will suffer a concrete injury should the 100-day pause take effect. Once a concrete injury is shown, the magnitude of that injury is irrelevant to the standing inquiry. *See, e.g.*, *Massachusetts v. EPA*, 549 U.S. 497, 525–26 (2007). Texas, as a State, also receives "special solicitude" in the standing analysis. *Id.* at 520; *see also Texas*, 809 F.3d at 151. Although Plaintiff does not need special solicitude to establish standing on any of the grounds covered above, special solicitude under *Massachusetts* makes standing an especially easy question here.

      Texas has already been harmed and faces additional immediate injury by the rushed implementation of the January 20 Memorandum. The Memorandum has already deprived Texas of the option of adjusting its policies in light of the federal shift. As DHS itself has acknowledged, "[t]he harm to Texas is particularly acute where its budget has been set months or years in advance and it has no time to adjust its budget to respond to DHS policy changes." Ex. 2 § II.

      Indeed, Texas is required by federal law to incur some of these costs. For example, the Supreme Court has held that States are constitutionally obligated to provide free education to unlawfully present aliens. *Plyler v. Doe*, 457 U.S. 202 (1982). Similarly, Medicaid requires provision of emergency services, regardless of immigration status, as a condition of participation. *See* 42 U.S.C. § 1395dd; 42 C.F.R. § 440.255. Texas expends funds to provide these services to

illegal immigrants each year and must account for those anticipated expenditures in its budget. Ex. 7 (Decl. of L. Lopez) & Ex. 8 (Decl. of L. Kalakanis). Additionally, in one year alone, Texas housed 8,951 undocumented criminal aliens for a total of 2,439,110 days. Ex. 10 ¶ 6. Texas's estimated cost to do so was $152,054,117, of which only $14,657,739 was reimbursed by the federal government. *Id.* ¶¶ 6 & 7; *see also* Ex. 14 (DPS Texas Criminal Illegal Alien Data) (detailing the tens of thousands of illegal aliens arrested by Texas law enforcement over the past decade). Those amounts will increase should DHS halt nearly all removals from Texas. As the Court has already found, "the 100-day pause will result in millions of dollars of damage to its public fisc by causing it to increase its spending on public services to illegal aliens." ECF 16 at 5.

## II.    The January 20 Memorandum violates the Administrative Procedure Act.

The January 20 Memorandum violates the Administrative Procedure Act in multiple ways, any one of which is sufficient to set aside the unlawful agency action.

### A.    The January 20 Memorandum exceeds Defendants' statutory jurisdiction, authority, or limitation.

Federal immigration law requires that "when an alien is ordered removed, the Attorney General shall remove the alien from the United States within a period of 90 days." 8 U.S.C. § 1231(a)(1)(A). That obligation has been transferred to the Secretary of Homeland Security. *See Clark v. Martinez*, 543 U.S. 371, 375 n.1 (2005). Now, "DHS has a statutory duty to effect removal within the 90-day period, if possible." *Ulysse v. Dep't of Homeland Sec*., 291 F. Supp. 2d 1318, 1325 (M.D. Fla. 2003).

The 90-day limit is important to Congress. "Congress intended for inadmissible, excludable, or removable aliens to be deported within 90 days, if possible." *Id.* "This is evidenced not only by the clear language of the statute, but also by the change in statutory language in 1996." *Id.* In 1996, Congress "reduced the amount of time that the Attorney General has to deport an alien

from six months to 90 days." *Id.* Of course, aliens may thwart DHS's efforts to remove them, so Congress "extended the removal period if the alien does not cooperate." *Id.*; *see* 8 U.S.C. § 1231(a)(1)(C).

Congress did not give DHS the option of disregarding the 90-day removal deadline. The statute uses mandatory language. DHS "shall"—not may—"remove the alien from the United States within a period of 90 days." 8 U.S.C. § 1231(a)(1)(A). Courts routinely interpret "shall" as creating a mandatory duty. *See, e.g.*, *Maine Cmty. Health Options v. United States*, 140 S. Ct. 1308, 1320 (2020) ("Unlike the word 'may,' which implies discretion, the word 'shall' usually connotes a requirement."); *Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26, 35 (1998) ("[T]he mandatory 'shall' . . . normally creates an obligation impervious to judicial discretion."). This Court has done the same. "Here, 'shall' means *must*." ECF 16 at 6.

The exceptions cited by Defendants do not apply. First, they point to 8 U.S.C. § 1231(a)(1)(C) as providing "extensions beyond 90 days," but as Texas explained in its Application for a Temporary Restraining Order, that provision is about "extend[ing] the removal period if the alien does not cooperate." ECF 2 at 10 (quoting *Ulysse*, 291 F. Supp. 2d at 1325). That case specifically held that "DHS has a statutory duty to effect removal within the 90-day period, if possible." *Id.* Likewise, Section 1231(a)(3) provides for supervision after the 90-day removal period, but that is not surprising as Congress expressly recognized that aliens might delay their own removals. That is no excuse for Defendants to delay those removals themselves. And Defendants "overstate[] the scope of [8 U.S.C. § 1231(h)'s] limitations." ECF 16 at 9. That subsection simply means that Section 1231 does not create a substantive right that would be enforceable through an implied cause of action. It does not matter here, where the APA allows suits to challenge agency action that violates a statute. *See Zadvydas v. Davis*, 533 U.S. 678, 687–

88 (2001) (holding that Section 1231(h) "does not deprive an alien of the right to rely on [a different statute] to challenge detention that is without statutory authority").

Finally, Defendants suggest that one of the January 20 Memorandum's exceptions forecloses any claim that the Memorandum violates the law. The fourth exception applies when "the Acting Director of ICE, following consultation with the General Counsel, makes an individualized determination that removal is required by law." But as their briefing demonstrates, Defendants do not agree with Texas that Section 1231 requires removals to occur within 90 days. If they did, then the fourth exception would swallow the rule, and there would have been no reason to issue the Memorandum in the first place.

B.    The January 20 Memorandum is arbitrary and capricious.

The APA prohibits agency actions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The January 20 Memorandum is arbitrary and capricious because it "not only fails to consider potential policies more limited in scope and time, but it also fails to provide any concrete, reasonable justification for a 100-day pause on deportations." ECF 16 at 10. Defendants have now filed the administrative record. *See* ECF 59. There is nothing in it to change the Court's analysis. Indeed, there is nothing in the *six pages* that constitute the whole of the record at all except for the January 20 Memorandum and a contemporaneous executive order from President Biden, which does not speak to any of the Court's concerns. ECF 59.1.

Defendants claim the Biden Administration needs time to reevaluate immigration policies and procedures. But they never say why that evaluation cannot occur while they proceed with removals as Congress directed. There is no explanation for what resources Defendants are diverting from the removals, why diverting those resources is sensible, or why diverting resources from some other aspect of their activities would not be better. Former directors of ICE (who were

13

career federal immigration employees) were not consulted about the potential implications with such a shift in immigration enforcement, as prior administrations had. Ex. 6; Ex. 15 ¶ 22–23 (Decl. of R. Vitiello). And Defendants cannot plausibly argue that figuring out which removals to prioritize requires stopping all removals.

Failing to consider important costs of a new policy renders that policy arbitrary and capricious. "[A]gency action is lawful only if it rests 'on a consideration of the relevant factors.'" *Michigan v. EPA*, 135 S. Ct. 2699, 2706 (2015). But DHS ignored the harms that pausing removals will cause. The January 20 Memorandum does not mention those costs at all. Considering such policy concerns "was the agency's job, but the agency failed to do it." *Regents of the Univ. of Cal.*, 140 S. Ct. at 1914. DHS's failure is particularly conspicuous because DHS has previously recognized the importance of removing illegal aliens subject to a final order of removal. *See, e.g.*, Ex. 2 § II.

DHS based its decision to "pause" removal for 100 days on "enhanc[ing] border security," "conduct[ing] immigration and asylum processing at the southwest border fairly and efficiently," and "comply[ing] with COVID-19 protocols." Ex. 1 at 3. But those are not new considerations, and DHS did not claim otherwise. Nor did DHS explain how formally stopping the vast majority of removals would address these needs. DHS also alluded to its "highest enforcement priorities" without explaining what those priorities are, how they had changed, or how pausing removals will help DHS achieve them. Ex. 1 at 3. And this Court has already seen evidence of the confusion that the Biden Administration caused on its very first day in office. *See* ECF 14.1.

The Supreme Court recently held that a DHS immigration action was arbitrary and capricious because it was issued "'without any consideration whatsoever' of a [more limited] policy." *Regents of the Univ. of Cal.*, 140 S. Ct. at 1912 (quoting *Motor Vehicle Mfrs. Ass'n of*

14

*U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29. 51 (1983)). The January 20 Memorandum also fails this requirement. It creates a default rule *against* removal, despite federal immigration law *requiring* removal. It does not explain how the several narrow exceptions to this sweeping change advance the stated interests that precipitated the Memorandum, nor does it explain why other exceptions—that is, additional enforcement of duly enacted immigration laws—would harm those interests. The Memorandum is wholly devoid of explanation as to why DHS has deemed enforcement categorically inappropriate, let alone why highly restricted enforcement is preferable to more limited restrictions. This, too, is arbitrary.

Additionally, the Supreme Court has held that "an agency changing its course by rescinding a rule is obligated to supply a reasoned analysis for the change beyond that which may be required when an agency does not act in the first instance." *State Farm*, 463 U.S. at 42. In this case, DHS did not even terminate the Agreement. *See* Ex. 2 § XV. Instead, it simply violated the Agreement without providing any "reasoned analysis for" doing so.  *Id.* Nor did DHS explain why it was abandoning its previous policy of "enforcing the immigration laws of the United States to prohibit the entry into, and promote the return or removal from, the United States of inadmissible and removable aliens." Ex. 2 § III.A.1.a.

To be sure, after litigation began, DHS purported to terminate the Agreement (albeit without following the Agreement's termination provision), *see* Ex. 16 (2.2.2021 DHS letter to Texas), but that simply highlights the problem. DHS is supposed to consider factors like the Agreement *before* making decisions. Any new defenses of the January 20 Memorandum based on DHS's later attempt to terminate the Agreement are "impermissible *post hoc* rationalizations." *Regents of the Univ. of Cal.*, 140 S. Ct. at 1909. Indeed, because the administrative record lacks *any* evidence of *any* pre-Memorandum considerations, by definition any justification Defendants

could give is necessarily a *post hoc* rationalization for a decision they have already illegally made. Because the January 20 Memorandum is not sufficiently justified, DHS acted arbitrarily and capriciously. Any new explanations that may be provided to this Court by DHS's counsel are irrelevant. "The grounds upon which an administrative order must be judged are those upon which the record discloses that its action was based." *SEC v. Chenery Corp.*, 318 U.S. 80, 87 (1943). As the record provides no such grounds, the Memorandum is arbitrary and capricious as a matter of law.

C.   The January 20 Memorandum was required to go through notice-and-comment rulemaking.

The January 20 Memorandum is a substantive or legislative rule[2] that required notice-and-comment rulemaking under the APA. *See* 5 U.S.C. § 553. Neither of the two narrow exceptions in Section 553 apply, so the notice-and-comment procedures must be adhered to "scrupulously." *Prof'ls & Patients for Customized Care,* 56 F.3d 592 at 595.

As opposed to general statements of policy, substantive rules are those that (1) impose rights and obligations; and (2) do not leave the agency and its decisionmakers free to exercise discretion. *Texas*, 809 F.3d at 171. As Judge Hanen held in ruling that DACA was a substantive rule that required notice-and-comment rulemaking: "These factors are not treated like different elements of a cause of action, both of which must be proved; but instead a 'matter of judgment is involved in distinguishing between rules however discretionary in form, that effectively

---

[2] 5 U.S.C. § 551(4) ("'[R]ule' means the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency and includes the approval or prescription for the future of rates, wages, corporate or financial structures or reorganizations thereof, prices, facilities, appliances, services or allowances therefor or of valuations, costs, or accounting, or practices bearing on any of the foregoing[.]").

circumscribe administrative choice.'" *Texas*, 328 F. Supp. 3d at 731 (citing *Am. Bus Ass'n v. United States,* 627 F.2d 525, 530 (D.C. Cir. 1980)).

On its face, the January 20 Memorandum would immediately "circumscribe administrative choice" by halting all but a tiny fraction of removals. No discretion would be left to the individual immigration officers, as an alien could be removed only by approval from the acting director of ICE. And in ruling that the January 20 Memorandum is a final agency action, this Court has already determined that "rights or obligations have been determined." ECF 16 at 8; *see also* RAICES Em. Mot. to Intervene Ex. 2 ¶ 15, ECF 28-2 ("The memo's temporary relief from the possibility or being removed thus provides a significant benefit for our clients with final orders . . . ."). As such, the APA affords Texas and the rest of the country the bare minimum of the notice-and-comment rulemaking procedure before DHS can affect such a sweeping change to the Nation's immigration policy.

## III. Abdicating responsibility for removing illegal aliens is unconstitutional.

The President and those who work for him in the Executive Branch are obligated to "take Care that the Laws be faithfully executed." U.S. Const. art. II, § 3. The January 20 Memorandum violates that constitutional obligation.

First, the January 20 Memorandum contradicts 8 U.S.C. § 1231. Systematically violating a statute across millions of cases is the opposite of ensuring that such statute is faithfully executed. Of course, the Court can address Defendants' violation of Section 1231 under the APA, as discussed above. And a violation of the Constitution is also a violation of the APA—indeed, the Take Care Clause provides an independent basis that the Memorandum is contrary to law. See 5 U.S.C. § 706. But if the Court were to conclude that the APA did not provide a proper cause of action in this case, Texas's constitutional claim would present the same merits question on its own.

Federal courts have long exercised the power to enjoin federal officers from violating the Constitution. *See Armstrong*, 575 U.S. at 327–28 (discussing "a long history of judicial review of illegal executive action, tracing back to England"). Texas has a cause of action "at equity." *Green Valley Special Util. Dist. v. City of Schertz*, 969 F.3d 460, 475 (5th Cir. 2020) (en banc). "Equity thus provides the basis for relief—the cause of action, so to speak"—when a plaintiff seeks prospective relief for a constitutional violation committed by a federal official. *Simmat v. U.S. Bureau of Prisons*, 413 F.3d 1225, 1232 (10th Cir. 2005) (McConnell, J.). As a result, even if the Court disagreed with Texas's arguments above, *see supra* Part I.A–B, it would not affect Texas's right to relief on its constitutional claim. *See Dart v. United States*, 848 F.2d 217, 224 (D.C. Cir. 1988) (explaining that the APA's reviewability limitation in Section 701 "serves only to take away what the APA has otherwise given—namely, the APA's own guarantee of judicial review"—, "not repeal the review of *ultra vires* actions that was recognized long before" the  APA); *Simmat*, 413 F.3d at 1233 n.9 (allowing the plaintiff's constitutional claim to proceed even though he "appear[ed] to concede that his claim does not satisfy the APA's requirement of 'final agency action'").

Second, the January 20 Memorandum does not provide for individualized consideration typical of prosecutorial discretion. Indeed, it provides precisely the opposite: rather than an exercise of prosecutorial discretion, where an executive actor acknowledges the obligation to enforce a law generally but elects not to do so in a specific case, the Memorandum abdicates the responsibility to enforce federal immigration laws and authorizes specific officials to make individualized determinations to enforce those laws against specific illegal aliens. The Memorandum does not prevent the initiation of removal proceedings—instead, it creates sweeping categorical rules preventing implementation of final orders of removal. *See United States v.*

*Juarez-Escobar*, 25 F. Supp. 3d 774, 787 (W.D. Pa. 2014) (holding that "Executive Action goes beyond prosecutorial discretion because . . . it provides for a systematic and rigid process by which a broad group of individuals will be treated differently than others based upon arbitrary classifications, rather than case-by-case examination"). No executive has the discretion to categorically refuse to enforce a duly enacted law; the Constitution does not provide the President or his subordinates with that discretion. *See* U.S. Const. art. II, § 3.

Third, DHS cannot justify stopping removals as an example of prosecutorial discretion based on a new set of priorities. True, the January 20 Memorandum elsewhere directs DHS employees to allocate resources to three enumerated priorities that will go into effect on February 1, 2021. Ex. 1 at 2-3. But it clarifies that "nothing in this memorandum prohibits the apprehension or detention of individuals unlawfully in the United States who are not identified as priorities herein." *Id.* at 3. When it addresses the removal of illegal aliens, by contrast, the January 20 Memorandum creates categorical prohibitions. Rather than discuss the relative importance of different enforcement priorities, it simply stops removals. And rather than tie that decision to new enforcement priorities, the Memorandum orders the ceasing of removals before DHS's new priorities even take effect.

## IV.    Defendant DHS violated the Agreement.

The Agreement requires DHS to notify and consult with Texas before "pausing or decreasing the number of returns or removals of removable or inadmissible aliens from the country." Ex. 2 § III.A.2.c. But DHS did not notify or consult with Texas before "directing an immediate pause on removals" in the January 20 Memorandum. Ex. 1 at 3. As a result, the January 20 Memorandum is invalid, and Texas is entitled to injunctive relief. *See* Ex. 2 § VI.

The January 20 Memorandum provides no explanation for its failure to follow the Agreement, nor any acknowledgement of it. (As discussed above, that is an independent problem

19

under the APA. *See supra* Part II.B.) DHS's flagrant disregard of the Agreement in the January 20 Memorandum is inconsistent with its earlier acknowledgement that the Agreement is "a binding and enforceable commitment between DHS and Texas." Ex. 2 § II.[3]

## V.   The APA requires a final judgment setting aside the January 20 Memorandum.

Based on the clear unlawfulness of the January 20 Memorandum, this case is ready for a final judgment. The Court may do so after notice and an opportunity to respond. *See* Fed. R. Civ. P. 56(f). And the Court may do so based on solely the record developed in its consideration of Texas's motion for a preliminary injunction. *Id.* 65(a)(2) (district courts may consolidate a preliminary injunction hearing with a trial on the merits); 11A Wright & Miller, Fed. Prac. & Proc. Civ. § 2950 (3d ed.); *see, e.g.*, *Texas v. United States*, 340 F. Supp. 3d 579, 592 (N.D. Tex. 2018) (O'Connor, J.), *aff'd in part, vacated in part, remanded*, 945 F.3d 355 (5th Cir. 2019), *cert. granted sub nom Texas v. California*, No. 19-1019 (argued Nov. 10, 2020); *N.D. Family All. v. Bader*, 361 F. Supp. 2d 1021, 1030 (D.N.D. 2005) (converting a preliminary-injunction into a summary-judgment motion); *PDK Labs Inc. v. Ashcroft*, 338 F. Supp. 2d 1, 6 (D.D.C. 2004) (granting summary judgment based on a preliminary-injunction motion).

In their most recent filing with the Court, Defendants twice say that "Texas's claims represent pure legal issues." ECF 30 at 6; *see also id.* ("[T]hey present purely legal issues."). Defendants have produced a six-page administrative record with absolutely no documents indicating any consideration whatsoever of the costs of the Memorandum or other, narrower policies prior to the Memorandum's issuance. No additional discovery is needed. There are no

---

[3] This defect also renders the January 20 Memorandum "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" and "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (D). For this reason, the APA requires the Court to "hold unlawful and set aside" the January 20 Memorandum. *Id.* § 706(2). The Court should also enjoin the individual defendants from enforcing the January 20 Memorandum because such enforcement would be *ultra vires* and beyond the authority the agency defendants could delegate.

genuine disputes as to any material facts because the administrative record provides no basis for upholding the Memorandum. This case is ripe for final resolution on the merits.

The remedy for Defendants' unlawful action is clear—it must be set aside. Under Section 706 of the APA, 5 U.S.C. § 706, when a reviewing court finds that an agency rule violates the APA, it "'shall'—not may—'hold unlawful and set aside' the agency action." *Sw. Elec. Power Co. v. EPA*, 920 F.3d 999, 1022 (5th Cir. 2019) (citing *Checkosky v. SEC*, 23 F.3d 452, 491 (D.C. Cir. 1994)). When a court "hold[s] unlawful and set[s] aside" agency rules that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), "the ordinary result is that the rules are vacated." *Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1409 (D.C. Cir. 1998) (citation omitted).

Section 706 is not limited to appellate courts; district courts have a duty to vacate unlawful agency actions as well. *See Nio v. U.S. Dep't of Homeland Sec.*, 385 F. Supp. 3d 44, 68–69 (D.D.C. 2019) (vacating arbitrary and capricious Department of Defense requirements rather than issuing a permanent injunction, and stating that "[g]enerally, when a court finds that a challenged action is arbitrary and capricious, the remedy is vacatur"); *Am. Stewards of Liberty v. Dep't of Interior*, 370 F. Supp. 3d 711, 728 (W.D. Tex. 2019) (vacating a Department of the Interior conclusion that did not follow Congress's set standard, and noting that "courts retain a role, and an important one, in ensuring that agencies have engaged in reasoned decisionmaking") (quoting *Judulang v. Holder*, 565 U.S. 42, 53 (2011)); *AquAlliance v. U.S. Bureau of Reclamation*, 312 F. Supp. 3d 878, 880 (E.D. Cal. 2018) (vacating an agency report that violated the National Environmental Policy Act and stating that vacatur is the "presumptive remedy" for unlawful agency action).

And Defendants must be permanently enjoined nationwide from implementing or enforcing this unlawful Memorandum. As this Court has already stated, the "January 20 Memorandum's 100-day pause plainly affects national immigration policy, which demands

'uniformity.'" ECF 16 at 16*; see also Texas*, 328 F. Supp. 3d at 682 (holding that the "requirement that immigration policy be uniform" must inform the remedial analysis). Setting aside the January 20 Memorandum is consistent with "strong federal interest in the uniformity of federal immigration law." *Batalla Vidal v. Nielsen*, 279 F. Supp. 3d 401, 438 (E.D.N.Y. 2018) (citing U.S. Const. art. I, § 8, cl. 4). And because the January 20 Memorandum "impacts numerous statutes and agency regulations concerning removals and detention periods, its partial implementation would inevitably detract from Congress's "integrated scheme of regulation." ECF 16 at 16 (quoting *Texas*, 809 F.3d at 188). Finally, "a geographically limited injunction of the January 20 Memorandum's 100-day pause on removals would not effectively protect Texas's interests because of the free flow of movement among the states." *Id.*; *see also Texas*, 809 F.3d at 188; Ex. 17 (Gone to Texas); Ex. 18 (Texas Foreign Born Immigration).

**VI.    Texas will suffer irreparable harm if an injunction is not granted.**

"To show irreparable injury if threatened action is not enjoined, it is not necessary to demonstrate that harm is inevitable and irreparable." *Humana, Inc. v. Avram A. Jacobson, M.D., P.A.*, 804 F.2d 1390, 1394 (5th Cir. 1986). Instead, "[t]he plaintiff need show only a significant threat of injury from the impending action, that the injury is imminent, and that money damages would not fully repair the harm." *Id.* (footnote omitted).

Texas makes that showing in two ways. First, DHS admitted that Texas policies like the January 20 Memorandum irreparably injure Texas. Second, Texas submits declarations quantifying some of the unrecoverable financial costs of providing federally mandated welfare benefits the tens of thousands of unlawfully present aliens who would otherwise be removed during the 100-day "pause." By increasing those costs, the January 20 Memorandum will irreparably harm Texas.

A.   <u>DHS admits Texas faces irreparable injury.</u>

DHS has already acknowledged that policies like the January 20 Memorandum cause Texas significant harm. "Texas, like other States, is directly and concretely affected by changes to DHS rules and policies that have the effect of easing, relaxing, or limiting immigration enforcement. Such changes can impact Texas's law enforcement, housing, education, employment, commerce, and healthcare needs and budgets." Ex. 2 § II.

Indeed, DHS has specifically admitted that "a decrease or pause on returns or removals of removable or inadmissible aliens" would "result in concrete injuries to Texas." Ex. 2 § II, II(3).

Texas faces particular harm because the rushed implementation of the January 20 Memorandum deprived Texas of the option of adjusting its policies in light of the federal shift. As DHS itself has acknowledged, "[t]he harm to Texas is particularly acute where its budget has been set months or years in advance and it has no time to adjust its budget to respond to DHS policy changes." Ex. 2 § II.

B.   <u>Texas Is Forced to Spend Money on Various Services for Illegal Aliens.</u>

"Texas has presented evidence it would suffer injuries for various reasons if an injunction is not entered." ECF 16 at 12. Texas spends hundreds of millions of dollars per year providing services to illegal aliens, including social services, education, healthcare, and other services broadly available in Texas. By increasing the number of illegal aliens present in Texas, the January 20 Memorandum will necessarily increase these costs. Likewise, the categorical refusal to remove aliens ordered removable will encourage additional illegal immigration into Texas, which will further exacerbate these costs. The United States Supreme Court has already concluded that the predictable acts of illegal aliens in response to governmental enforcement efforts can injure a State. *Dept. of Commerce v. New York*, 139 S. Ct. 2551, 2565–66 (2019). Just so here. And these increased financial expenditures will irreparably harm the State because it cannot recover those

costs from the federal government. *See Texas v. United States*, 328 F. Supp. 3d 662, 737 (S.D. Tex. 2018) (explaining that the State's financial injury was irreparable because "there is no source of recompense").

In one year alone, Texas housed 8,951 undocumented criminal aliens for a total of 2,439,110 days. Ex. 10 ¶ 6. Texas's estimated cost to do so was $152,054,117, of which only $14,657,739 was reimbursed by the federal government. *Id.* ¶¶ 6 & 7. Those amounts will increase should DHS halt nearly all of the removals from Texas.

Additionally, the State funds three healthcare programs that cover illegal aliens. First, federal law requires Texas to include illegal aliens in its Emergency Medicaid program. *See* 42 C.F.R. § 440.225(c). That costs the State tens of millions of dollars annually. *See* Ex. 13 ¶ 9 (estimating costs between $62 million and $90 million for various years). Second, the Family Violence Program spends more than a million dollars per year providing services to illegal aliens. *Id.* ¶ 10 (estimating costs between $1 million and $1.4 million for various years). Third, Texas's Children's Health Insurance Program spends tens of millions of dollars each year on perinatal coverage for illegal aliens. *Id.* ¶ 11 (estimating costs between $30 million and $38 million for various years).

In addition to the cost of these social services, Texas faces the costs of uncompensated care provided by state public hospital districts to illegal aliens. Between 2006 and 2008, these costs ranged from $597 million to $717 million. *Id.* ¶ 11. In light of the increasing cost of medical care, these numbers are likely higher now.

The Chief Data and Analytics Officer at Texas's Health and Human Services Commission "believe[s] that the total costs to the State of providing such services and benefits to undocumented

immigrants will continue to reflect trends to the extent that the number of undocumented immigrants residing in Texas increases or decreases each year." *Id.* ¶ 13.

The State also provides public education to illegal aliens, as the Supreme Court required in *Plyler v. Doe*, 457 U.S. 202, 230 (1982). The cost of educating unaccompanied alien children, which is only a subset of illegal aliens eligible for public education, is tens of millions of dollars per year. *See* Ex. 12 ¶ 4 (estimating costs between $31 million and $63 million for various years).

The Chief School Finance Officer at the Texas Education Agency "anticipate[s] that the total costs to the State of providing public education to [unaccompanied alien children] will rise in the future to the extent that the number of [unaccompanied alien children] enrolled in the State's public school system increases." Ex. 12 ¶ 8.

C.   This Court has previously found this evidence sufficient to show irreparable injury.

In granting Texas's application for a temporary restraining order, this Court ruled "the foregoing establishes a substantial risk of imminent and irreparable harm to Texas." ECF 16 at 12. It was not the first time a court in this district found such evidence support Texas's injuries in the immigration context. In *Texas*, 328 F. Supp. 3d 662, the court considered similar declarations in the context of Texas's challenge to DACA. The court held that the evidence not only established standing but also "would otherwise be sufficient proof of irreparable damage" for purposes of a preliminary injunction. *Id.* at 740. The Court refused to find irreparable injury only because the State had "delay[ed] in pursuing the claims" challenging DACA. *Id.*

In this case, Texas has the same evidence of irreparable injury and has not delayed at all. The State filed suit—and sought emergency relief—two days after DHS issued the challenged Memorandum. The harm the State faces is therefore irreparable.

## VII.   An injunction would not harm defendants or the public.

As this Court has already recognized, "the threat of injury to Texas outweighs any potential harm to Defendants." ECF 16 at 14. In fact, Defendants face no harm from a preliminary injunction. They have no legitimate interest in the implementation of an unlawful memorandum. *See N.Y. Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 488 (2d Cir. 2013) (recognizing that government officials "do[] not have an interest in the enforcement of an unconstitutional law"). But even if Defendants had a legitimate interest in the January 20 Memorandum, they face no substantial prejudice from a delayed implementation. DHS has already recognized that any costs from delaying new policies is outweighed by the benefits of consultation and more reasoned decision making. *See* Ex. 2 § II.

Further, the public interest strongly favors Plaintiff. In this case, "the public interest is served and protected by the issuance of" relief. ECF 16 at 14. "There is always a public interest in prompt execution of removal orders." *Nken v. Holder*, 556 U.S. 418, 436 (2009). Defendants cannot claim that the public interest now favors refusing to enforce so many final orders of removal, "the consequence [of which] is to permit and prolong a continuing violation of United States law." *Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 490 (1999).

## VIII.   The Court should postpone the January 20 Memorandum's Effective Date.

In the event this Court is not prepared to set aside the January 20 Memorandum and permanently enjoin its implementation or enforcement, the APA empowers a "reviewing court" to "issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings." 5 U.S.C. § 705. A stay of the effective date should issue "to the extent necessary to prevent irreparable injury" and "[o]n such conditions as may be required." *Id.*; *see also Texas v. EPA*, 829 F.3d 405, 435 (5th Cir. 2016) (staying an EPA action pending review).

When considering "whether to stay an agency action pending judicial review," district courts apply the same test used for preliminary injunctions. *Texas v. United States*, 95 F. Supp. 3d 965, 973 (N.D. Tex. 2015); *see also IHG Healthcare, Inc. v. Sebelius*, 4:09-cv-3233, 2010 WL 11680368, at *1 (S.D. Tex. Apr. 1, 2010); *Safety Nat'l Cas. Corp. v. U.S. Dep't of Homeland Sec.*, 4:05-cv-2159, 2005 WL 8168878, at *2 (S.D. Tex. Dec. 9, 2005). Thus, for the reasons explained above, Texas has made the showing necessary for a stay.

## CONCLUSION

The State of Texas respectfully requests that the Court preliminarily enjoin Defendants from implementing the January 20 Memorandum and hold the Memorandum unlawful and set it aside.

Respectfully submitted this the 5th day of February, 2021,

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

PATRICK K. SWEETEN
Associate Deputy Attorney General for
Special Litigation

*/s/ Todd Lawrence Disher*
TODD LAWRENCE DISHER
Deputy Chief, Special Litigation Unit
*Attorney-in-Charge*
Texas Bar No. 24081854
Southern District of Texas Bar No. 2985472

WILLIAM T. THOMPSON
Special Counsel
Special Litigation Unit
Texas Bar No. 24088531
Southern District of Texas Bar No. 3053077

RYAN D. WALTERS
Special Counsel
Special Litigation Unit
Texas Bar No. 24105085
Southern District of Texas Bar No. 3369185

Special Litigation Unit
P.O. Box 12548
Austin, Texas 78711-2548
Phone: (512) 936-2567
Fax: (512) 936-0545
Patrick.Sweeten@oag.texas.gov
Todd.Disher@oag.texas.gov
Will.Thompson@oag.texas.gov
Ryan.Walters@oag.texas.gov

*Counsel for the State of Texas*

## CERTIFICATE OF WORD COUNT

I hereby certify that the total number of words in Plaintiff's Motion for Preliminary Injunction, exclusive of those sections designated for omission, is 8,532 words, as registered by Microsoft Word. I further certify that the Motion for Preliminary Injunction, exclusive of those sections designated for omission for word limit purposes, is 27 pages and does not exceed 40 pages pursuant to the Scheduling Order dated January 30, 2021. ECF 44.

*/s/ Todd Lawrence Disher*
TODD LAWRENCE DISHER

## CERTIFICATE OF SERVICE

I certify that on February 5, 2021, a true and accurate copy of the foregoing document was filed electronically (via CM/ECF) and served on all counsel of record.

*/s/ Todd Lawrence Disher*
TODD LAWRENCE DISHER

## CERTIFICATE OF CONFERENCE

I certify that, on February 4–5, 2021, I conferred with Defendants' counsel, who represented that Defendants oppose this motion.

*/s/ Todd Lawrence Disher*
TODD LAWRENCE DISHER