IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION

| | |
|---|---|
| STATE OF TEXAS,<br><br>    *Plaintiff*,<br><br>v.<br><br>The UNITED STATES OF AMERICA; DAVID PEKOSKE, Acting Secretary of the United States Department of Homeland Security, in his official capacity; UNITED STATES DEPARTMENT OF HOMELAND SECURITY; TROY MILLER, Senior Official Performing the Duties of the Commissioner of U.S. Customs and Border Protection, in his official capacity; U.S. CUSTOMS AND BORDER PROTECTION; TAE JOHNSON, Acting Director of U.S. Immigration and Customs Enforcement, in his official capacity; U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; TRACY RENAUD, Senior Official Performing the Duties of the Director of the U.S. Citizenship and Immigration Services, in her official capacity; U.S. CITIZENSHIP AND IMMIGRATION SERVICES,<br><br>    *Defendants*. | Civ. Action No. 6:20-cv-00003 |

**APPENDIX IN SUPPORT OF
TEXAS'S MOTION FOR A PRELIMINARY INJUNCTION**

# EXHIBIT 6

**DECL. OF T. HOMAN**

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION

| | |
|---|---|
| STATE OF TEXAS,<br><br>*Plaintiff*,<br><br>v.<br><br>UNITED STATES OF AMERICA, *et al.*,<br><br>*Defendants*. | Civ. Action No. 6:20-cv-00003 |

## **DECLARATION OF THOMAS HOMAN**

*Education, Training and Experience*

1. My name is Thomas Homan and I am the former Acting Director of the U.S. Immigration and Customs Enforcement (ICE), U.S. Department of Homeland Security (DHS), a position I held from January 2017 to June 30, 2018.

2. I have over thirty-two years of experience working for ICE and its predecessor entity, the Immigration and Naturalization Service (INS).

3. I hold a Bachelor of Science degree in Criminal Justice from the State University of New York Polytechnic Institute (formerly SUNYIT) at Utica-Rome.

4. I am a 34-year veteran of law enforcement, having begun my career as a police officer in New York in 1983. In 1984, I became a U.S. Border Patrol Agent with the former Immigration and Naturalization Service (INS) in Campo, California. In 1988, I became an INS Special Agent in Phoenix, Arizona, and was later promoted to Supervisory Special Agent and Deputy Assistant Director for Investigations. In 1999, I became the Assistant District Director for Investigations (ADDI) in San Antonio, Texas, and three years later transferred to the ADDI position in Dallas, Texas.

5. The INS was abolished by the Homeland Security Act of 2002, and ICE was created to perform many of its former enforcement functions, along with the investigative functions of the former U.S. Customs Service. See 6 U.S.C. § 252(c); see also Reorganization Plan Modification for the Department of Homeland Security, H.R. Doc. No. 108-32, at 3-4 (2003) (set forth as a note to 6 U.S.C.A. § 542 (West 2018)).

6. Upon the creation of ICE in March 2003, I was named the Assistant Special Agent in Charge in Dallas, Texas. In August 2004, I was named the Deputy Special Agent in Charge (DSAC)

in that same office. As DSAC, I directed the day-to-day operations of seven local offices, with more than 200 special agents and support personnel, conducting investigations related to terrorism, export enforcement, illicit financing, money laundering, human trafficking, intellectual property rights violations, and cybercrimes.

7. In March of 2009, I became Enforcement and Removal Operations (ERO) Assistant Director for Enforcement at ICE Headquarters. In that position, I was responsible for ICE's enforcement initiatives and components through which ERO identifies and arrests removable aliens, including the Criminal Alien Program, the National Fugitive Operations Program, Field Training, the 287(g) Program, the Law Enforcement Support Center (LESC), the Fugitive Operations Support Center (now the National Criminal Analysis and Targeting Center (NCATC)), the Detainee Enforcement and Processing Offenders by Remote Technology Center, and the Interoperability Response Centers. In October of the following year, I was promoted to Deputy Executive Associate Director for ERO, and in May 2013, In 2015, I was given the Presidential Rank award from President Obama. I was promoted to Executive Associate Director for ERO, a position I held until January 2017.

8. From November 2017 to 2018, I held the position of Deputy Director and Senior Official Performing the Duties of the Director, U.S. Immigration and Customs Enforcement, DHS. From January 2017 until June 30, 2018, I served as Acting Director of ICE. In both positions, I directly oversaw ICE's core operational programs, as well as the agency's managerial and administrative support functions. I also directed and oversaw ICE's day-to-day work of enforcing the nation's immigration and customs laws; investigating a wide range of domestic and international activities arising from the illegal movement of people and goods into, within, and outside of the United States and supporting the OHS litigators who prosecute exclusion, deportation, and removal proceedings, including against national security threats, criminal aliens, and other aliens posing a threat to public safety. ICE employs more than 20,000 federal civil servants and contract staff in more than 400 offices within the United States and 50 foreign countries.

9. I make this declaration on the basis of my own personal and professional knowledge and experience, as well as information available to me in my positions in public service.

### U.S. Immigration and Customs Enforcement (ICE) Programs

10. ICE is the largest investigative branch of the Office of Homeland Security and is charged with the enforcement of more than 400 federal statutes. ICE's mission is to protect America from the cross-border crime and illegal immigration that threaten national security and public safety through enforcement of the federal laws governing border control, customs, trade, and immigration to promote homeland security and public safety. To carry out that mission, ICE focuses on enforcing immigration law, preventing terrorism, and combating transnational criminal threats.

11. Homeland Security Investigations (HSI), one of ICE's core operational directorates, employs ICE's special agents, who are both immigration officers under 8 U.S.C. § 1357 and customs

officers under 19 U.S.C. § 1589a, charged with investigating criminal and civil violations of the federal customs and immigration laws.

12. HSI consists of more than 8,500 employees, of which more than 6,000 are special agents, assigned to more than 200 cities throughout the United States and 50 countries around the world.

13. In my final full year with ICE, fiscal year (FY) 2017, HSI made 32,958 criminal arrests; arrested 4,818 gang members, including 796 MS-13 members; seized $56 million in bulk cash; identified or rescued 904 child exploitation victims and 518 human trafficking victims; and seized 981,586 pounds of narcotics, including 2,370 pounds of fentanyl and 6,967 pounds of heroin. HSI operations in California alone accounted for 4,767 criminal arrests, identifications or rescues of 62 child exploitation victims and 204 human trafficking victims, and seizures of 238,224 pounds of narcotics, including 4,072 pounds of fentanyl and heroin.

14. HSI special agents handling national security and counterterrorism issues participate in Joint Terrorism Task Forces (JTTFs) throughout the country, working closely with federal, state, and local law enforcement agencies to investigate and eradicate terrorist networks. They also work with the U.S. Department of State to ensure that individuals who pose a security risk are not issued U.S. visas and to investigate those believed to have violated the terms of their admission to the United States. HSI also monitors schools, nonimmigrant students, and exchange visitors to ensure that legitimate students, researchers, and exchange visitors are welcomed while those who seek to harm the United States are excluded.

15. HSI works with other federal and foreign law enforcement agencies on investigations targeting transnational organized crime. HSI also conducts investigations related to bulk cash smuggling, commercial fraud, and other financial crimes, as well as worksite violations, immigrant document fraud, benefit fraud, and cybercrime.

16. Key to all HSI investigations is close collaboration with other federal, state, and local partners, from information-sharing to complex joint operations. A global law enforcement mission that spans so many investigative disciplines simply cannot be advanced without institutional partners.

17. ERO, another core ICE operational directorate, consists of more than 7,600 employees, including more than 5,700 deportation officers assigned to 24 ERO field offices and overseas locations in 19 countries. ERO deportation officers are immigration officers under 8 U.S.C. § 1357 and possess limited delegated customs officer authority under 19 U.S.C. § 1589a. It is the mission of ERO to identify, arrest, and remove aliens who present a danger to national security or are a risk to public safety, as well as those who enter the United States illegally- including those who cross the border illegally, a federal misdemeanor, 8 U.S.C. § 1325, and those who illegally reenter after having been removed, a federal felony, 8 U.S.C. § 1326 - or otherwise undermine the integrity of our immigration laws and our border control efforts.

18. While ERO has significant assets near the border, the majority of its immigration enforcement operations take place in the interior of the country. ERO manages all logistical aspects of the

removal process by identifying, apprehending, and, when appropriate, detaining removable aliens during the course of immigration proceedings and pending physical removal from the United States. This includes locating and taking into custody fugitive aliens and at-large criminal aliens, as well as identifying aliens in federal, state, and local prisons and jails and working with those authorities to transfer them to ICE custody without releasing them into the community. When aliens are ordered removed, ERO is responsible for safely repatriating them, or otherwise overseeing their departure from the United States.

19. To accomplish ICE's immigration enforcement objectives, ERO coordinates closely with law enforcement partners within the United States and around the world. One of the most notable law enforcement coordination and partnership efforts within ERO is the 287(g) Program, which involves the identification of aliens who are incarcerated within state and local prisons and jails. This program enables a state or local law enforcement entity to receive delegated immigration officer authority, training, and technology resources for immigration enforcement under the oversight and direction of ICE.

20. ERO enhances multi-agency task forces through its authority to administratively arrest removable aliens who threaten public safety and national security

21. Acting principally through ERO (both through the PERC and its 24 field offices across the country), ICE issues immigration detainers to federal, state, and local law enforcement agencies to provide notice of its intent to assume custody, at the time of their release from state or local custody, of aliens detained in these agencies' custody, based on their violation of federal immigration law. In 2017, in California alone, ICE issued over 35,000 detainers which request that the law enforcement agency in whose custody the alien is currently held: provide advance notification of the alien's release to allow for an orderly transfer of the individual into ICE custody; and maintain custody of the alien for up to 48 hours after the time he or she would otherwise have been released, so that ICE may respond to the prison or jail and assume custody. That number is a significant percentage of the 142,356 detainers issued by ICE nationwide during the same time period.

22. In FY 2017, ERO conducted 143,470 administrative arrests, 105,736 of which were of aliens with at least one known criminal conviction and 22,256 of which were for aliens with a pending criminal charge at the time of arrest. Of these arrests, 40,666 were conducted at-large, meaning that the arrest did not occur in a custodial setting such as a prison or jail.

### *The January 20, 2021 Memorandum*

23. I have reviewed the memorandum issued by current Acting Secretary David Pekoske dated January 20, 2021. It appears the memorandum was issued on the same day that President Biden was sworn in as President. Other than the memorandum itself, I have seen no description for why the policy described in the memorandum that suspended the removal of illegal aliens was issued and no indication that any opportunity for notice and comment was provided. Had I had the opportunity to comment on the substance of the January 20, 2021 memorandum, I would have conveyed my concerns about such a sweeping change. Many of those concerns are described in this declaration. Additionally, I am not personally aware of any members of ICE

or any other law enforcement agents being consulted about the memorandum before it was issued.

24. In my view, the 100 day pause on deportations is a policy that would have disastrous consequences. It would cause near total cessation of removals of aliens who have already been through the adjudication process and deemed subject to deportation. The pause would also severely disrupt ICE operations.

25. The January 20, 2021 memorandum directs DHS staff to review policies concerning immigration enforcement and sets a 100-day pause on removals of any noncitizen, even those where a final order of removal has been issued, except in narrowly defined circumstances. This includes noncitizens who have already been accorded due process and were ordered to be removed by an immigration judge following a hearing.

26. The memorandum effectively ordered a halt on nearly all deportations of illegal aliens, including those whose removal was ordered following a full hearing and those who do not claim to be entitled to further immigration benefits. The cessation of removals applies to any noncitizen present in the United States with a final order of removal except one who falls under one of four narrow exceptions:

> 1. According to a written finding by the Director of ICE, has engaged in or is suspected of terrorism or espionage, or otherwise poses a danger to the national security of the United States; or
>
> 2. Was not physically present in the United States before November 1, 2020; or
>
> 3. Has voluntarily agreed to waive any rights to remain in the United States, provided that he or she has been made fully aware of the consequences of waiver and has been given a meaningful opportunity to access counsel prior to signing the waiver; or
>
> 4. For whom the Acting Director of ICE, following consultation with the General Counsel, makes an individualized determination that removal is required by law.

27. The list of exceptions contained in the memorandum is extremely narrow. Aliens that have engaged in or are suspected of terrorism or espionage make up only a small fraction of criminal offenses committed by illegal aliens typically subject to a removal order. Additionally, the November 1, 2020 time frame contained in the memorandum prevents final deportations of most aliens subject to final removal orders. Additionally, in my experience few illegal immigrants subject to a final deportation order voluntarily agree to waive their rights to remain in the United States. Finally, with hundreds of thousands of deportations occurring each year in the United States, there are few cases that can reasonably be addressed through an "individualized determination" by both the Acting Director of ICE and General Counsel of ICE. Thus, the exceptions provided in the memorandum do little to counteract the sweeping pause on deportations of illegal immigrants with final orders of deportation.

28. Notably absent from the narrow list of exceptions contained in the memorandum are aliens who have been issued a final order of removal and have been charged or convicted of a serious misdemeanor or felony. As a result of this omission, aliens who may have served their sentence

or term of confinement in jail or prison could not be removed during the DHS pause in enforcement, except in the rare circumstances.

29. Based on data that is maintained on the DHS website and publicly available, in FY 2019 alone, ICE removed 267,258 unlawfully present aliens from the United States. In fact, more than 150,000 of those individuals had prior criminal convictions, and another 23,000 had pending criminal charges.

30. Contained within that group were over 5,000 known or suspected gang members, *id.* at 23 fig. 18, and over 91% of the removals of individuals arrested by ICE away from the border were of convicted criminals or had pending criminal charges (nearly 80,000 individuals in one year alone). *Id.* at 22 fig. 17. Under the terms of the January 20, 2021 Memorandum, it appears that none of those tens of thousands of criminals would have been removed during the 100-day period, except for the 58 known or suspected terrorists. *Id.* at 23 fig. 19.

31. In short, according to the data, in FY 2019, on average, approximately 476 individuals with either pending criminal charges or prior criminal records were removed each day.

32. Based on my experience and review of the data, it is my opinion that the removal pause contained within the January 20, 2021 memorandum will not only delay deportations but, will almost certainly result in the release of aliens who have been charged or convicted of crimes from ICE custody.

33. Section 1231 requires ICE to detain illegal aliens for up to 90 days after the entry of a final order of removal. 8 U.S.C. § 1231(a)(2). However, after that 90 days has elapsed, Section 1231(a)(6) says that the alien "may" be detained, and only if he or she is "determined by the Attorney General to be a risk to the community or unlikely to comply with the order of removal."

34. Additionally, detentions cannot go on indefinitely. In fact, generally an alien must be released if there is not a "significant likelihood of removal in the foreseeable future," commonly referred to as "SLRFF." My concern is that the 100-day deportation pause would call into question the likelihood of removal for the vast majority of illegal aliens, including the thousands of convicted criminals currently in ICE's custody.

35. In addition, the January 20, 2021 memorandum in my view, has also caused significant confusion among the rank and file ICE officers. I have viewed ECF 14-1, which was an email exhibit provided to the Court by the Department of Justice related to communications involving ICE officials. In the email, the ICE officer in charge of the Houston Field Office clearly understood the significance of that pause: "Per the [Deputy Field Office Director], all cases are to be considered NO SLRFF."

36. While the Field Office Director, in a subsequent email, appears to have rescinded the email directive, the Field Office director did not provide in his email any meaningful guidance nor did he indicate the Deputy was incorrect. In my view, the email reveals immediate recognition

by ICE employees that should the blanket pause on removals in the January 20, 2021 memorandum take effect, ICE could be deprived of jurisdiction over criminals who are in this country illegally and who have already been located, apprehended, and convicted.

37. In my view, the Biden Administration's January 20, 2021 memorandum directing a 100-day moratorium on removals of aliens will dramatically reduce efforts to stem the flow of illegal immigration. It creates confusion as to what immigration law applies to both illegal aliens and to those enforcing those laws. It is also my view that this memorandum will have the effect of communicating to illegal immigrants that the United States does not intend to proceed in earnest with immigration efforts or enforce its attempt to cross the border. It also communicates information to ICE enforcement agents that is contrary statutory commands set by Congress in the Immigration and Nationality Act.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 4 day of February, 2021.

Thomas Homan