**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**VICTORIA DIVISION**

| | |
|---|---|
| STATE OF TEXAS,<br><br>        *Plaintiff*,<br><br>v.<br><br>The UNITED STATES OF AMERICA; DAVID PEKOSKE, Acting Secretary of the United States Department of Homeland Security, in his official capacity; UNITED STATES DEPARTMENT OF HOMELAND SECURITY; TROY MILLER, Senior Official Performing the Duties of the Commissioner of U.S. Customs and Border Protection, in his official capacity; U.S. CUSTOMS AND BORDER PROTECTION; TAE JOHNSON, Acting Director of U.S. Immigration and Customs Enforcement, in his official capacity; U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; TRACY RENAUD, Senior Official Performing the Duties of the Director of the U.S. Citizenship and Immigration Services, in her official capacity; U.S. CITIZENSHIP AND IMMIGRATION SERVICES,<br><br>        *Defendants*. | Civ. Action No. 6:20-cv-00003 |

**APPENDIX IN SUPPORT OF**
**TEXAS'S MOTION FOR A PRELIMINARY INJUNCTION**

# EXHIBIT 15

**DECL. OF R. VITIELLO**

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION**

| | |
|---|---|
| STATE OF TEXAS,<br><br>       *Plaintiff,*<br><br>v.<br><br>UNITED STATES OF AMERICA, *et al.*,<br><br>       *Defendants*. | Civ. Action No. 6:20-cv-00003 |

## <u>DECLARATION OF RONALD VITIELLO</u>

I, Ronald Vitiello, pursuant to 28 U.S.C. § 1746, testify that:

1. I make this declaration on the basis of my own personal and professional knowledge, as well as the information available to me in my positions in public service.

2. From 2018 to 2019, I was Acting Director of U.S. Immigration and Customs Enforcement (ICE).

3. From 2017 to 2018, I was Acting Deputy Commissioner at U.S. Customs and Border Protection (CBP).

4. From February 2017 to April 2017, I was Chief of the U.S. Border Patrol, a component of CBP within the Department of Homeland Security (DHS), having previously served as Acting Chief from 2015 to 2016. From 2010 until 2017, I was Deputy Chief. I served with Border Patrol beginning in 1985, starting my career as a Border Patrol Agent in Laredo I have held numerous other leadership positions, including Supervisory Border Patrol Agent; Special Operations Supervisor; Assistant Patrol Agent in Charge; Chief Patrol Agent for the Swanton (Vermont) and Rio Grande Valley Sectors; Assistant Chief Patrol Agent; and Senior Associate Chief.

5. In my leadership of ICE, I was responsible for overseeing an organization of approximately 19,000 employees with a budget of more than $7.5 billion. ICE is the lead federal agency responsible for enforcing federal laws related to immigration, border control, customs, and trade. In addition to enforcing our immigration laws, ICE's law enforcement responsibilities include investigating financial and cybercrimes as well as intellectual property and commercial fraud; human rights violations; weapons, narcotics, and human smuggling; transnational gang activity; and enforcing our export laws.

6. My responsibilities in leadership positions with Border Patrol and CBP extended to oversight of nearly 21,000 Border Patrol Agents.  CBP's mission includes facilitating the flow of legal immigration and trade while preventing the illegal trafficking of people and contraband.  Border Patrol is specifically responsible for patrolling nearly 6,000 miles of Mexican and Canadian international land borders and over 2,000 miles of coastal waters surrounding the Florida Peninsula, as well as the island of Puerto Rico.

7. I am familiar with the policies and procedures of CBP and Border Patrol that relate to the apprehension, processing, temporary detention, and removal of aliens.

8. One of the primary duties of a Border Patrol Agent, or a state or local law enforcement agent acting through a Memorandum of Agreement with DHS, is to apprehend individuals seeking to enter the country unlawfully.

9. When a Border Patrol Agent encounters an individual the Agent believes to be an illegal alien, the Agent will first establish alienage; once the initial questioning is completed in the field, the alien is brought to a Border Patrol station for further processing.

10. Once in custody, aliens' biographic information and biometrics are collected, and record checks are run through appropriate law enforcement systems.  In connection with processing, aliens are questioned individually by a Border Patrol Agent on issues related to their biographic and biometric results, ability to lawfully enter or remain in the United States, as well as any fear of returning to their country of origin.

11. Border Patrol stations are not designed for long-term care and detention.  Every effort is made to promptly process, transfer, or remove those in custody, including those who are apprehended as a family unit, as appropriate and as operationally feasible.  As such, Border Patrol seeks to process and transfer all aliens within 12 hours.

12. Border Patrol normally seeks to transfer all individuals in custody who cannot be immediately repatriated to ICE, rather than releasing individuals directly from its custody. ICE makes decisions on whether to continue to hold individuals in its custody or release them.

13. Based on my experience, the use of detention during the period necessary for removal proceedings has historically been effective at deterring aliens from entering the United States through the South Texas region.

14. ICE has established family-appropriate detention facilities to hold families apprehended at the border.  Prior to the establishment of these facilities, family units apprehended by Border Patrol, particularly those in the Rio Grande Valley, claimed that a principal motive for entering the United States was to take advantage of the "permisos" that the United States was granting to family units.  The term "permiso" in this context is used to refer to a Notice to Appear for removal proceedings that permitted aliens to depart the Border patrol station without any further detention.

15. Aliens who were apprehended by Border Patrol Agents in the Rio Grande Valley after the widespread availability of family unit detention by ICE in 2014 indicated that they learned from family members, media, and other means that the United States was no longer providing "permisos." Family units apprehended by Border Patrol indicated that others of whom they are aware in their home countries chose not to come to the United States because "permisos" were no longer being issued.

16. Family units who had been apprehended by Border Patrol Agents in the Rio Grande Valley in 2014 were under the impression that the United States was only going to issue "permisos" to individuals prior to some end date of June or July 2014. While this impression was incorrect, it demonstrates that signals of non-enforcement and the ability to be released factor strongly into their determination of whether and when to attempt to cross the border into the United States.

17. In 1989 there was a dramatic increase of Central American aliens illegally entering the United States. The predecessor agency to ICE, the Immigration and Naturalization Service (INS), detailed staff to South Texas, opened temporary detention camps, and instituted an expedited review of asylum applications, which dramatically reduced the average daily apprehensions of Central Americans along the Texas border.

18. In 2005, when the Rio Grande Valley was experiencing an influx of Brazilian nationals, the implementation of expedited removal with detention quickly and significantly reduced the number of Brazilian nationals illegally entering the United States.

19. I have reviewed the memorandum issued by current Acting DHS Secretary David Pekoske dated January 20, 2021. This memorandum directing a 100-day moratorium on removals of aliens will dramatically reduce the effort to stem the flow of illegal immigration. It creates confusion as to what immigration law allows and forbids, to both illegal aliens and to those enforcing those laws. It will signal to foreign nationals that this is an opportune time to attempt to cross the border into the United States, and to Agents in the field that their superiors will not support them if they attempt to enforce the statutory commands set by Congress in the Immigration and Nationality Act.

20. The January 20, 2021 memorandum also requires that the Director of ICE approve all civil immigration enforcement against individuals outside of federal, state, or local prisons or jails. Every arrest outside those areas will have to be pre-cleared by the Director. As a practical matter this would dramatically reduce enforcement. Clearing enforcement actions in Washington, DC sets a tone that Agents do not have the trust and confidence of their leadership at ICE HQ or DHS and possibly higher in the chain of command.

21. Because ICE Agents, and state and local law enforcement agents acting through Memorandums of Agreement with DHS, only have authority to detain aliens if there is a significant likelihood of removal in the foreseeable future. Any aliens in custody not subject to one of the limited exceptions during the 100-day moratorium on removals will have to be released into the community.

22. Under previous administrations–those of Presidents Donald J. Trump, Barack H. Obama, and George W. Bush–the Secretary of DHS and staff consulted with ICE and Border Patrol leadership prior to finalizing any changes in immigration enforcement policy.

23. I had no advanced notice from the new administration of the 100-day moratorium on removals and no opportunity to comment on such a significant shift. Had I been given that notice, I would have expressed serious concerns. I am not aware of any law enforcement officials being given advanced notice or the opportunity to comment before the issuance of the January 20, 2021 memorandum.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on February 4, 2021.

Ronald Vitiello