IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION

| | |
|---|---|
| STATE OF TEXAS,<br><br>*Plaintiff,*<br><br>v.<br><br>The UNITED STATES OF AMERICA, et al.,<br><br>*Defendants.* | Civil Action No. 6:21-cv-0003 |

**AMICUS BRIEF OF ADVOCATES FOR VICTIMS OF ILLEGAL ALIEN CRIME IN SUPPORT OF PLAINTIFF AND A PRELIMINARY INJUNCTION**

Without notice and comment, on January 20, 2021, the Biden Administration's Acting Secretary of the Department of Homeland Security ("DHS") issued a decree "directing an immediate pause on removals of any noncitizen with a final order of removal (except as noted below) for 100 days." The directive is in violation of a clear Congressional mandate, which is "when an alien is ordered removed, the Attorney General *shall* remove the alien from the United Stats within a period 90 days." 8 U.S.C. § 1231(a)(1)(A) (*emphasis added*). The key word "shall" is mandatory language that cannot be suspended even temporarily. There are two main issues with the DHS decree, each of which is redressable by injunctive relief.

The first issue with DHS's directive is its refusal to follow a clear congressional mandate, which DHS cannot ignore as a matter of policy or otherwise. Congress has directly addressed the issue of deportation of an alien (or non-citizen) by providing that the Attorney General shall deport an alien within ninety days of a final deportation order.

1

Policy disagreement notwithstanding, DHS cannot ignore that mandate. *In re Aiken Cnty*, 725 F.3d 255, 260 (2013) ("[T]he President and federal agencies may not ignore statutory mandates or prohibitions merely because of policy disagreement with Congress."). "If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *City of Arlington, Tex. v. F.C.C.*, 569 U.S. 290, 296 (2013).

Secondly, DHS's directive permits the Executive branch to abdicate its constitutional and statutory duty to enforce federal immigration laws. U.S. Const. art. II, § 3; 8 U.S.C. § 1103(a)(1). "Under Article II of the Constitution and relevant Supreme Court precedents, the President must follow statutory mandates so long as there is appropriated money available and the President has no constitutional objection to the statute." *In re Aiken Cnty.*, supra, at 259. Congress has already appropriated money for such immigration enforcement.

For any of these reasons, the Court should grant the State of Texas's request for a preliminary injunction.

### I. DHS ACTED IN VIOLATION OF A CLEAR CONGRESSIONAL MANDATE.

There is no doubt that DHS is violating a clear Congressional mandate. 8 U.S.C. § 1231(a)(1)(A) states: "except as otherwise provided in this section, when an alien is ordered removed, the Attorney General **shall remove** the alien from the United States within a period of 90 days (in this section referred to as the ""removal period"")." DHS cannot escape this reality.

When the intent of Congress is clear on the face of a statute, an agency is divested of authority to issue rules in contravention of that statute. *City of Arlington, Tex. v.*

*F.C.C.*, 569 U.S. 290, 296 (2013) ("If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress.") It follows that "federal agencies may not ignore statutory mandates or prohibitions merely because of policy disagreements with Congress." *In re Aiken Cnty.*, supra, at 260.

Congress possesses almost exclusive authority to establish immigration policy. *Galvan v. Press*, 347 U.S. 522, 530, (1954) ("The power of Congress over the admission of aliens and their right to remain is necessarily very broad, touching as it does basic aspects of national sovereignty, more particularly our foreign relations and the national security."); *Fiallo v. Bell*, 430 U.S. 787, 792 (1977) ("'over no conceivable subject is the legislative power of Congress more complete than it is over" the admission of aliens'"); *Lopez v. U.S. I.N.S.*, 758 F.2d 1390, 1392 (10th Cir. 1985) ("the United States Constitution confers on Congress the power to regulate matters relating to immigration."); *Hawaii v. Trump*, 878 F.3d 662, 685 (9th Cir. 2017), rev'd and remanded, 138 S.Ct. 2392, 201 L.Ed.2d 775 (2018) ("the Constitution gives Congress the primary, if not exclusive, authority to set immigration policy.") Empowered with this broad and exclusive authority, Section 1231(a)(1)(A) is clear, unequivocal, and mandatory, when a final order of deportation is issued, the Attorney General **shall** deport the alien within ninety days. A plain reading of the statute leaves no room to quibble over the import of Congress. *Ulysse v. Dep't of Homeland Sec.*, 291 F. Supp. 2d 1318, 1325 (M.D. Fla. 2003) ("Congress intended for inadmissible, excludable, or removable aliens to be deported within 90 days, if possible.")

DHS cannot ignore Congress's mandate whether the basis is a disagreement with Congress or the immigration policies of the prior administration. *Lincoln v. Vigil*, 508 U.S 182, 193 (1993) ("[A]n agency is not free simply to disregard statutory responsibilities: Congress may always circumscribe agency discretion to allocate resources by putting restrictions in the operative statutes.") "Congress has entrusted the DHS with the duty to enforce these immigration laws. 8 U.S.C. §1103(a)(i). The DRS' duties to include guarding the border and removing illegal aliens present in the country. 8 U.S.C. §1103(a)(5), 1227". *Texas*, 86 F. Supp. 3d. at 624. The DHS is prohibited from legislating around the statutes via rule making or express policy differences by refusing to enforce a statute.

*In re Aiken County* is instructive on the issue. The District of Columbia Circuit Court issued an order of mandamus requiring the Nuclear Regulatory Commission to issue regulatory permits for Yucca Mountain because there was a clear congressional mandate. In that case, then Judge Kavanaugh, framed the issue before the Circuit Court as follows: "[t]his case raises significant questions about the scope of the Executive's authority to disregard federal statutes." *In re Aiken Cnty.*, at 257. This is the precise issue before this Court.

That case involved the Nuclear Waste Policy Act ("NWPA"), which Congress passed and became law in 1983. The law, 42 U.S.C. § 10134(d), provided that the Nuclear Regulatory Commission "**shall consider**" the Department of Energy's license application to store nuclear waste at Yucca Mountain and "**shall issue** a final decision approving or disapproving" the application within three years of its submission. In June 2008, the Department of Energy submitted a license application to the Nuclear Regulatory Commission. But the Commission refused to act on the application and the deadline for action

4

past. For its part, the Commission made no secret of the fact that it had no intention of complying with the NWPA and issuing the permit.

Several states, individuals, and groups sued the Commission to compel compliance with the law. The Commission raised several justifications for why it could ignore Congress's mandate. One justification was that the Commission was free to ignore the congressional mandate as a matter of policy. The Court resoundingly rejected this argument. Writing for the majority, Judge Kavanaugh, explained:

> "Congress sets the policy, not the Commission. And policy disagreement with Congress's decision about nuclear waste storage is not a lawful ground for the Commission to decline to continue the congressionally mandated licensing process. **To reiterate, the President and federal agencies may not ignore statutory mandates or prohibitions merely because of policy disagreement with Congress.**"

*Id.* at 260. (emphasis added) (citations omitted)

The *Aiken* Court also explained why prosecutorial discretion did not justify the Commission's conduct. The Court explained that prosecutorial discretion "encompasses the Executive's power to decide whether to initiate charges for legal wrongdoing and to seek punishment, penalties, or sanctions against individuals or entities who violate federal law." *Id.* at 266. It further explained that "[p]rosecutorial discretion does not include the power to disregard other statutory obligations that apply to the Executive Branch, such as statutory requirements to issue rules. . . or to pay benefits, or to implement or administer statutory projects or programs." *Id.*

Despite what DHS undoubtedly will argue, prosecutorial discretion does not apply here because DHS's policy simply does not state it will no longer bring enforcement actions against illegal aliens, rather because it applies to aliens who have already been ordered removed by an immigration court. It is the latter that triggers the Congressional

5

mandate to remove an alien within ninety days. And it is DHS's blatant refusal of that mandate that makes its action unlawful.

## II. DHS IS ABDICATING ITS STATUTORY AND CONSTITUTIONAL DUTIES.

Under Article II, § 3 of the Constitution, the President has an affirmative duty "to take Care that the Laws be faithfully executed." U.S. Const. art. II, § 3. "Under Article II of the Constitution and relevant Supreme Court precedents, the President must follow statutory mandates so long as there is appropriated money available and the President has no constitutional objection to the statute." *In re Aiken Cnty.*, 725 F.3d at 259. Congress has appropriated money for DHS and therefore the monies must be used to enforce immigration laws, including deporting illegal aliens with orders of removal. "Those basic constitutional principles apply to the President and subordinate executive agencies." *In re Aiken Cnty.*, 725 F.3d at 259. DHS has a statutory obligation to enforce our nation's immigration laws, which Congress assigned to it.

> "The Secretary of **Homeland Security shall be charged with** the administration and **enforcement of** this chapter and **all other laws relating to the immigration and naturalization of aliens**, except insofar as this chapter or such laws relate to the powers, functions, and duties conferred upon the President, Attorney General, the Secretary of State, the officers of the Department of State, or diplomatic or consular officers: Provided, however, That determination and ruling by the Attorney General with respect to all questions of law shall be controlling."

8 U.S.C.A. § 1103(a)(1).

In *Texas v. U.S.*, this Court held that DHS had abdicated its duty to enforce immigration laws when it established the Deferred Action for Parents of Americans ("DAPA") policy. *Texas*, 86 F. Supp. 3d at 638. It held that when DHS announced DAPA it was announcing that it would not enforce the nation's immigration law, which DAPA

6

contradicted. *Id.* Like the DHS non-deportation policy at issue here, DAPA also prohibited deportation of certain individuals.

Congress sets immigration policy, not DHS. And DHS cannot cherry pick which congressional mandates to follow and which to ignore. Congress enacted federal immigration laws for the protection of U.S. citizens and legal residents. Failure to enforce congressional mandates harms the American people, including Texans. DHS is congressionally mandated to collaborate with federal agencies and the states to ensure the safety and well-being of our communities, and to address the threats posed by the opioid crisis, narcotics, human smuggling networks, and violent gangs operating across the country. https://www.ice.gov/history. Human trafficking is modern day slavery. Humans are exploited for child and adult sex industries, forced labor, and organ harvesting. DHS's anti-borders policy increases such crimes.

By DHS's own statistics over 300,000 illegal aliens, whom **DHS had previously identified as being in the country illegally**, committed crimes, including major felonies, in the State of Texas between June 1, 2011 and January 31, 2021. According to the Texas Department of Public Safety:

> "According to DHS status indicators, over 334,000 criminal aliens have been booked into local Texas jails between June 1, 2011 and January 31, 2021, of which over 228,000 were classified as illegal aliens by DHS. [b]etween June 1, 2011 and January 31, 2021, these 228,000 illegal aliens were charged with more than 368,000 criminal offenses which included arrests for 681 homicide charges; 42,698 assault charges; 6,950 burglary charges; 45,557 drug charges; 590 kidnapping charges; 18,662 theft charges; 28,892 obstructing police charges; 2,050 robbery charges; 4,505 sexual assault charges; 5,651 sexual offense charges; and 3,871 weapon charges."

Texas Criminal Illegal Alien Crime Data, https://www.dps.texas.gov/section/crime-records-service/texas-criminal-illegal-alien-data.

While these statistics are staggering enough, they likely underreport the true number of crimes illegal aliens commit in the State of Texas each year. The Department of Public Safety's statistics count only those illegal aliens that "had an encounter with DHS that resulted in their fingerprints being entered into the DHS IDENT database." *Id.* As the report notes, "[f]oreign nationals who enter the country illegally and avoid detection by DHS, but are later arrested by local or state law enforcement for a state offense will not have a DHS response in regard to their lawful status and do not appear in these counts." *Id.* The statistics also only count state level offense committed by illegal aliens not federal crimes.

What happens when our immigration laws are not enforced? In 2012, in Texas, Antonio Miranda Cota, assaulted an American citizen and was removed. Yet Cota returned to Texas, and this time assaulted a law enforcement officer who required surgery paid for by worker's compensation. But Cota was not finished. In 2019, Cota violently assaulted a construction worker and family man named Guston Smith, with a hammer (the claw end), striking him in the head four times and rendering him permanently disfigured and disabled. Mr. Smith, a U.S. citizen, was almost killed, remained in a coma for several days after the attack, and is now unable to work or pay for basic expenses and is unsure of his future. He also lost his family since he could not financially support them. Cota is currently serving time in a correctional institute. http://caseinfo.nvsupremecourt.us/public/caseView.do?csIID=56321

In a "head on" car crash on December 29, 2018, a 22-year old American citizen named Pierce Kennedy Corcoran was killed by an unlicensed, uninsured and intoxicated illegal alien, Francisco Eduardo Franco-Cambrany, who crossed a double-yellow

centerline causing the multi-vehicle crash. On May 6, 2019 the grand jury returned and upheld the Criminally Negligent Homicide charge but Cambrany was deported. He again returned illegally at the end of April 2019. A warrant for his arrest was issued. To date, Cambrany remains at large. https://www.aviac.us/victims-of-alien-crime/pierce-kennedy-corcoran/

In another instance, previously deported criminal alien, Joel Velasquez, spent Thanksgiving eve getting drunk at a bar he worked at (illegally). The next morning still drunk and driving without a license, he ran two reds lights and struck and killed Amanda Ferguson-Weyant, who was walking across a street, throwing her some 60 feet. He never stopped to try to render aid. She died on the scene with her legs broken in eight places, ten broken ribs puncturing her lungs, and five skull fractures. https://www.aviac.us/victims-of-alien-crime. How many more American lives must be upended?

These crimes would not have happened if these individuals were not in the country illegally. ICE statistics show enforcement of our immigration laws works. In FY 2020, there were 185,884 removals, a 30 percent decrease from FY 2019. https://www.ice.gov/remove/statistics. This "decrease primarily resulted from a sharp decline in CBP apprehensions at the Southwest Border due to the use of authority under 42 U.S.C. §§ 265 and 268 to expel aliens from the United States to prevent the introduction of COVID19, though it was also impacted by a decline in ICE ERO interior arrests." *Id.* The vast majority of interior removals had criminal convictions or pending criminal charges. *Id.* ICE also assisted the border patrol with "17,000 air charter

9

expulsions under Title 42, and also saw increases in removals to several countries that were previously uncooperative with removal efforts." *Id.*

DHS's abdication of its duties will surely make these crime statistics increase and Texas will be left picking up the pieces. The State of Texas and her citizens pay the price for these crimes in the form of the victim's emotional toll and the tax dollars spent processing the accused through the justice system and ultimately incarcerating them in Texas' prisons. These are crimes that would not have occurred if these individuals were not in the country.

## CONCLUSION

For the foregoing reasons, a preliminary injunction should be granted.

Date: February 8, 2021

Respectfully submitted,

By:*/s/ Walter S. Zimolong, Esq.*
    Walter S. Zimolong, Esquire
    Zimolong, LLC
    P.O. Box 552
    Villanova, PA 19085
    (215) 665-0842
    wally@zimolonglaw.com

*/s/ Lorraine G. Woodwark, Esq.*
Lorraine G. Woodwark, Esquire
Attorneys United for a Secure America (AUSA)
25 Massachusetts Avenue NW, Ste 335
Washington, D.C. 20001
(202) 591-0962
LWoodwark@IRLI.org

*Attorneys for Amicus Curiae Advocates for Victims of Illegal Alien Crime (AVIAC).*

11