UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS

| | |
|---|---|
| STATE OF TEXAS,<br><br>       Plaintiff,<br><br>v.<br><br>The UNITED STATES OF AMERICA; DAVID PEKOSKE, Acting Secretary of the United States Department of Homeland Security, in his official capacity; UNITED STATES DEPARTMENT OF HOMELAND SECURITY; TROY MILLER, Senior Official Performing the Duties of the Commissioner of U.S. Customs and Border Protection, in his official capacity; U.S. CUSTOMS AND BORDER PROTECTION; TAE JOHNSON, Acting Director of U.S. Immigration and Customs Enforcement, in his official capacity; U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; TRACY RENAUD, Senior Official Performing the Duties of the Director of the U.S. Citizenship and Immigration Services, in her official capacity; U.S. CITIZENSHIP AND IMMIGRATION SERVICES,<br><br>       Defendants. | Civ. Action No. 6:21-cv-00003 |

**DECLARATION OF PETER B. BERG**

I, Peter B. Berg, declare the following under 28 U.S.C. § 1746, and state that under penalty of perjury the following is true and correct to the best of my knowledge and belief:

    **I.**    **Personal Background**

1. I am currently employed by the U.S. Department of Homeland Security (DHS), U.S. Immigration and Customs Enforcement (ICE), Enforcement and Removal Operations

1

(ERO) as the Acting Deputy Executive Associate Director. I have held this position since October 5, 2020. As Acting Deputy Executive Associate Director, I oversee the mission of ERO's seven Headquarters divisions: Enforcement, Removal, Custody Management, Field Operations, ICE Health Service Corp, Law Enforcement Systems and Analysis, and Operations Support.

2. Prior to this position, I served as the Assistant Director for Field Operations beginning on June 21, 2020 and I served in that role through October 4, 2020. In these capacities, I was responsible for the oversight, direction, and coordination of immigration enforcement activities, programs, and initiatives carried out by ERO's 24 Field Offices and 188 sub-offices. I further managed ERO's Field Operations Headquarters components, including Domestic Operations, Special Operations, and Law Enforcement Systems and Analysis.

3. I have been a career law enforcement officer since 1996, serving in various capacities with both ICE and the former Immigration and Naturalization Service (INS). Other leadership positions I have held within ICE include: Field Office Director and Deputy Field Office Director for the St. Paul Field Office, Acting Deputy Assistant Director for the ERO Headquarters Criminal Alien Division, and Acting Deputy Assistant Director for the ERO Headquarters Field Operations Division.

4. This declaration is based on my personal knowledge and experience as a law enforcement officer and on information provided to me in my official capacity.

II. **Overview of ERO**

5. Following the enactment of the Homeland Security Act of 2002, ICE was created from elements of several legacy agencies, including INS and the U.S. Customs Service. ICE is

    the principal investigative arm of DHS, and its primary mission is to promote homeland security and public safety through the criminal and civil enforcement of federal laws governing border control, customs, trade and immigration.  Within ICE, ERO oversees programs and conducts operations to identify and apprehend removable aliens, to detain these individuals when necessary, and to remove aliens with final orders of removal from the United States.  ERO manages and oversees all aspects of the removal process within ICE, including domestic transportation, detention, alternatives to detention programs, bond management, and supervised release, and removal to more than 170 countries around the world.  As part of the removal process, ERO manages a non-detained alien docket of more than 3.3 million cases, which is comprised of aliens currently in removal proceedings and those who have already received removal orders and are pending physical removal from the United States.

6. ERO's detention network includes over 200 detention facilities nationwide.  In normal conditions, ERO generally detains short-term cases apprehended at the border (for example, those who are detained pending credible fear interviews) near the border and transfers longer-term cases (for example, those who are detained for removal proceedings) into the interior.  ERO removes noncitizens from the United States who are subject to a final order of removal issued by an immigration court or following an administrative removability review. Removals can require a combination of significant resources and the process varies depending on the destination country. ERO must ensure that the noncitizen to be removed has the appropriate paperwork and/or travel documents required by the destination country; in some instances, this requires an in-person interview at the destination country's consulate.  To execute the removal, ERO contracts

or charters flights or uses commercial airlines for escorted and unescorted removals. ERO also conducts routine domestic transfer and removal missions utilizing a Commercial Aviation Services contract with an air charter provider commonly referred to as ICE Air. In addition to noncitizen removals by air, ERO also removes noncitizens via ground transportation to contiguous countries. This process involves planning and coordinating removals across the country and developing and implementing strategies to support the return of all removable noncitizens to their country of origin. At the onset of the COVID-19 pandemic, airport closures and commercial flight cancellations caused a significant reduction in the ability of ICE to utilize commercial flights for noncitizen removals. In addition, ERO set a nationwide goal to reduce the capacity usage of all dedicated ICE facilities to under 70% to help mitigate the impact of COVID-19. This goal went further than the CDC's guidance that congregate settings should be under 75% capacity.

### III.    Information on Releases from ICE Custody

7. As a part of my official duties, I am familiar with the Scheduling Order in *Texas v. United States*, No. 6:21-cv-00003 (entered Jan. 30, 2021), instructing that the government produce data for six specific issues. I submit this declaration in response to the Court's request. The data provided in this declaration is the most current available and is accurate as of the time I signed below. It is important to note that "current" in the context of ICE data means that it is current as of the last update to the database, which occurs approximately every 72 hours and that due to this process, as well as the necessary data quality checks and validations, the data provided will be as of a date 48 to 72 hours prior. The information stored on ERO's system of record does not perfectly match the Court's

questions; analyzing the available data to answer the Court's questions therefore cannot be done instantaneously. Given these logistical difficulties, the data included in this declaration are as of January 30, 2021.

8. As of January 30, 2021, there are over 1.19 million noncitizens subject to administratively final orders of removal as part of ICE's detained and non-detained docket. Of those, 5,962 are in ICE custody and 1.18 million are part of ICE's non-detained docket. These final orders might include cases that are pending in federal court, cases where noncitizens have temporary stays of removal, or cases where noncitizens cannot be removed because some countries refuse to accept the return of their nationals.

9. Between January 20, 2021 and January 30, 2021, 511 individuals subject to a final order of removal have been released from ICE detention into the United States. Between January 20, 2019 and January 30, 2021, 22,712 individuals subject to a final order of removal have been released from ICE detention into the United States. These numbers only represent active cases. A case is closed and no longer active when the subject of the case is physically removed/returned from the United States, granted some form of legal status such as asylum, or proceedings are terminated.

10. Noncitizens with final orders of removal may be released under a variety of conditions. For instance, many noncitizens with final orders of removal are released from ICE custody under orders of supervision. The order of supervision contains specific provisions that the noncitizen must abide by while released from ICE custody. An order of supervision indicates that a noncitizen is released from ICE custody after receiving an administrative final order of removal with a personal obligation (e.g., signed form) to report to ICE offices when requested and cooperate with removal efforts. When

noncitizens are not subject to mandatory detention, ICE may exercise discretion to release noncitizens who do not pose a danger to the community or who are not considered a flight risk. ICE makes such discretionary custody decisions on a case-by-case basis, looking at such factors as an alien's criminal and immigration history, as well as humanitarian factors, with no single factor being determinative.

ICE currently requires noncitizens released under this condition, as well as released on an Order of Release on Recognizance (OREC) and parole, to report to the ICE Field Office in person for one year after release, or until removal or the individual is granted some form of relief. The minimum reporting requirements are established after considering the individual facts and circumstances of the case. Noncitizens with a criminal record are required to report once every two months; immigration violators without a criminal record are required to report once every four months; and asylum applicants are required to report once every six months. Field Offices are authorized to exercise discretion in establishing reporting requirements after one year of in-person reporting. After noncitizens released from ICE custody complete in-person report-ins for one year and adhere to the established reporting requirements, the Field Office Director, or his or her designee, may change the reporting frequency at his or her discretion after reviewing the noncitizen's case and adherence to the reporting requirements. For example, a Field Office Director may alter a noncitizen's reporting requirements during the duration of the COVID-19 pandemic if that subject has confirmed chronic care conditions.

11. ICE notes that of the noncitizens released from January 20, 2019 to the present (as of January 30, 2021), approximately 447 have so far failed to return to ICE and subsequently been classified as ICE fugitives.[1]

12. Of the noncitizens who became subject to a final order of removal from January 20, 2019 until January 30, 2021, approximately 17.73 percent have been removed. Those who have not been removed could include the following: final order cases that are pending in federal court, cases where individuals have temporary stays of removal, or cases where individuals cannot be removed because some countries refuse to accept the return of their nationals or because of border closures due to COVID-19 restrictions, as well as ICE fugitives referenced in the previous paragraph, and/or those who were not removed because of discretionary determinations.

This declaration is based upon my personal and professional knowledge, information obtained from other individuals employed by ICE, and information obtained from various records and systems maintained by DHS. I provide this declaration based on the best of my knowledge, information, belief, and reasonable inquiry for the above captioned case.

Signed on this 10th day of February, 2021.

PETER B BERG
Digitally signed by PETER B BERG
Date: 2021.02.10 22:31:10 -06'00'

Peter B. Berg
Acting Deputy Executive Associate Director
ICE Enforcement and Removal Operations

---

[1] An ICE Fugitive is a noncitizen who has failed to leave the United States based upon a final order of removal, deportation, or exclusion, or who has failed to report to ICE after receiving notice to do so.

7