# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### VICTORIA DIVISION

STATE OF TEXAS,

        Plaintiff,

    v.

UNITED STATES OF AMERICA, *et al.,*

      Defendants.

*and* FIEL HOUSTON, *et al.,*

      Intervenor-Defendants.

Case No. 6:21-cv-00003

**BRIEF FOR AMICI CURIAE STATES OF NEW YORK, CALIFORNIA, CONNECTICUT, DELAWARE, THE DISTRICT OF COLUMBIA, ILLINOIS, MARYLAND, MASSACHUSETTS, NEVADA, NEW JERSEY, NEW MEXICO, OREGON, RHODE ISLAND, VERMONT, VIRGINIA, AND WASHINGTON IN SUPPORT OF DEFENDANTS**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES.................................................................ii

INTEREST OF AMICI CURIAE............................................1

ARGUMENT ........................................................................2

    A.   Amici States Will Be Harmed by Any Delay of the 100-Day Pause on Removals.............................................2

    B.   Texas Has Not Shown a Substantial Likelihood of Success on the Merits. .............................................6

CONCLUSION ....................................................................14

# TABLE OF AUTHORITIES

**Cases**                                                                    **Page(s)**

*Air All. Houston v. EPA,*
  906 F.3d 1049 (D.C. Cir. 2018) ...................................................... 10-11

*Arizona v. United States,*
  567 U.S. 387 (2012) ........................................................................ 6, 7

*Biodiversity Assocs. v. Cables,*
  357 F.3d 1152 (10th Cir. 2004) ............................................................ 8

*Casa de Maryland, Inc. v. Wolf,*
  No. 8:20-cv-2118, 2020 WL 5500165 (D. Md. Sept. 11, 2020) ............ 13

*Coronel v. Decker,*
  449 F. Supp. 3d 274 (S.D.N.Y. 2020) .................................................... 4

*D.A.M. v. Barr,*
  474 F. Supp. 3d 45 (D.D.C. 2020) ........................................................ 4

*Dep't of Homeland Sec. v. Regents of the Univ. of California,*
  140 S. Ct. 1891 (2020) ....................................................................... 10

*Dorsey v. United States,*
  567 U.S. 260 (2012) ........................................................................... 10

*Fong Haw Tan v. Phelan,*
  333 U.S. 6 (1948) ................................................................................ 8

*Hines v. Davidowitz,*
  312 U.S. 52 (1941) .............................................................................. 7

*Immigrant Legal Res. Ctr. v. Wolf,*
  No. 20-cv-5883, 2020 WL 5798269 (N.D. Cal. Sept 29, 2020) ............ 13

*L.M.-M. v. Cuccinelli,*
  442 F. Supp. 3d 1 (D.D.C. 2020) ........................................................ 12

| Cases | Page(s) |
|---|---|

*New York v. U.S. Immigration & Customs Enf't,*
466 F. Supp. 3d 439 (S.D.N.Y. 2020) .................................................. 11

*Plyler v. Doe,*
457 U.S. 202 (1982) ......................................................................... 12

*Reno v. Am.-Arab Anti-Discrimination Comm.,*
525 U.S. 471 (1999) ........................................................................... 7

*United States ex rel. Knauff v. Shaughnessy,*
338 U.S. 537 (1950) ........................................................................... 6

*United States v. Winstar Corp.,*
518 U.S. 839 (1996) ......................................................................... 10

**Laws**

8 U.S.C. § 1231(a)(3) .............................................................................. 7

8 C.F.R.
§ 1241.6(a) ...................................................................................... 7

**Miscellaneous Authorities**

Allison Abrams, *Damage of Separating Families,* Psychology
Today (June 22, 2018), https://tinyurl.com/yzqrz2om ......................... 5

Andy J. Semotiuk, U.S. Immigration Reform To Be A Biden
Priority, *Forbes* (Dec. 2020), https://tinyurl.com/zt6rjzhz .................. 9

Chris J. Macias, *Is the Food Supply Strong Enough to Weather
COVID-19?,* UCDavis.edu: Feeding a Growing Population
(June 25, 2020), https://tinyurl.com/y6uyy6nl ..................................... 3

Colleen K. Vesely, et al., *Immigrant Families Across the Life
Course: Policy Impacts on Physical and Mental Health,* 4
Nat'l Council on Family Relations Pol'y Br. 1 (July 2019),
https://tinyurl.com/pua8n860 ............................................................. 4

## Miscellaneous Authorities — Page(s)

Ctr. for Am. Progress, *The Facts on Immigration Today* (Apr. 2017), https://tinyurl.com/jju6x08n ..................................................... 2

Ctrs. for Disease Control & Prevention, *Using Telehealth Services* (June 10, 2020), https://tinyurl.com/yypvoba2 ....................... 3

Jorge Loweree et al., *The Impact of COVID-19 on Noncitizens and Across the U.S. Immigration System*, Am. Immigration Council (Sept. 2020), https://tinyurl.com/z75k9wad ........................... 5

Katherine Guyot & Isabel V. Sawhill, *Telecommuting Will Likely Continue Long After the Pandemic*, Brookings Inst. (Apr. 6, 2020), https://tinyurl.com/vmux6kh ....................................... 4

Lisa Christensen Gee, et al., Undocumented Immigrants' State & Local Tax Contributions, Inst. on Tax. and Pol'y (Mar. 2017), https://tinyurl.com/yc37mnyk ..................................... 3

Nicole Prchal Svajlenka, *Protecting Undocumented Workers on the Pandemic's Front Lines*, Ctr. for Am. Progress (Dec. 2020), https://tinyurl.com/1ntyyfab ....................................... 3

Silva Mathema, *Keeping Families Together: Why All Americans Should Care About What Happens to Unauthorized Immigrants*, Ctr. for Am. Progress (Mar. 2017), https://tinyurl.com/wrdj2jzh ................................................. 2

U.S. Government Accountability Office, *Matter of Department of Homeland Security—Legality of Service of Acting Secretary of Homeland Security and Service of Senior Official Performing the Duties of Deputy Secretary of Homeland Security* (Aug. 14, 2020)..................................................... 12

Yeganeh Torbati, *U.S. Denied Tens of Thousands More Visas in 2018 Due to Travel Ban: Data*, Reuters (Feb. 29, 2019), https://tinyurl.com/1t9aqmtq............................................... 5

## INTEREST OF AMICI CURIAE

The States of New York, California, Connecticut, Delaware, the District of Columbia, Illinois, Maryland, Massachusetts, Nevada, New Jersey, New Mexico, Oregon, Rhode Island, Vermont, Virginia, and Washington, file this brief as amici curiae to highlight the serious federalism interests that are undermined by Texas's extraordinary effort to affect federal immigration policy in other States based in part on a purported agreement that it signed only days before the end of the prior administration. Amici States have a direct interest in halting Texas's overreach. Texas seeks sweeping nationwide relief that would harm millions of residents in Amici States who are immigrants themselves or who count immigrants among their family members, neighbors, and colleagues. And Texas's reliance on the eleventh-hour agreement that it signed with the Department of Homeland Security (DHS) not only violates fundamental principles of federal law, but disrespects the sovereignty of its fellow States, who neither signed nor consented to the terms of this agreement. This Court should reject Texas's arguments and decline to issue a preliminary injunction here.

## ARGUMENT

**A.    Amici States Will Be Harmed by Any Delay
of the 100-Day Pause on Removals.**

The federal government's 100-day pause on removals temporarily stops one of the most devastating tools of immigration enforcement. Amici States will be greatly harmed if, as Texas demands, removals must continue, before the new administration has had the opportunity to put in place its own policies and priorities concerning removal. Amici States are home to a significant share of the over eleven million undocumented immigrants in the United States, who are at greatest risk of being subject to removal.[1] Immigrants are important and highly valued members of their communities and are relied on by family members, friends, and colleagues, including many who are American citizens.[2]

Immigrants provide significant economic, social, cultural and political contributions to the States that would be lost if they were

---

[1] Ctr. for Am. Progress, *The Facts on Immigration Today* (Apr. 2017), https://tinyurl.com/jju6x08n.

[2] Silva Mathema, *Keeping Families Together: Why All Americans Should Care About What Happens to Unauthorized Immigrants*, Ctr. for Am. Progress (Mar. 2017), https://tinyurl.com/wrdj2jzh.

removed. For example, undocumented immigrants boost the states' fiscs, contributing approximately $11.74 billion in state and local taxes nationwide annually.[3] Immigrants—both with and without documentation—are also critically needed employees in essential sectors. For instance, nearly 1 million undocumented immigrants work in accommodation and food services, approximately 8.4 percent of all workers in the industry.[4] Nearly 30 percent of agricultural workers are undocumented.[5]

The COVID-19 pandemic has heightened awareness that many of these immigrants provide essential services, from telehealth,[6] to delivery of goods and food,[7] to technological and human resources support for

---

[3] Lisa Christensen Gee, et al., Undocumented Immigrants' State & Local Tax Contributions, Inst. on Tax. and Pol'y (Mar. 2017), https://tinyurl.com/yc37mnyk.

[4] Nicole Prchal Svajlenka, *Protecting Undocumented Workers on the Pandemic's Front Lines*, Ctr. for Am. Progress (Dec. 2020), https://tinyurl.com/1ntyyfab.

[5] *See id.*

[6] Ctrs. for Disease Control & Prevention, *Using Telehealth Services* (June 10, 2020), https://tinyurl.com/yypvoba2.

[7] Chris J. Macias, *Is the Food Supply Strong Enough to Weather COVID-19?*, UCDavis.edu: Feeding a Growing Population (June 25, 2020), https://tinyurl.com/y6uyy6nl.

telecommuting as up to half the United States workforce works from home during the pandemic.[8] And the pandemic itself makes removal riskier for both immigrants themselves and the personnel who play a role in the removal process. *See D.A.M. v. Barr*, 474 F. Supp. 3d 45, 67 (D.D.C. 2020) (finding that it is in the public interest to "avoid or reduce" the risk associated with effectuating removal during the COVID-19 pandemic); *see Coronel v. Decker*, 449 F. Supp. 3d 274, 288 (S.D.N.Y. 2020).

Continuing the removal process would threaten the health and welfare of Amici States' residents. Separating family members from each other harms their health, leading to (1) mental and behavioral health issues, which can lower academic achievement among children; (2) severe stress, which can delay brain development and cause cognitive impairment; and (3) symptoms of post-traumatic stress disorder.[9] Separation

---

[8] Katherine Guyot & Isabel V. Sawhill, *Telecommuting Will Likely Continue Long After the Pandemic*, Brookings Inst. (Apr. 6, 2020), https://tinyurl.com/vmux6kh.

[9] *See* Colleen K. Vesely, et al., *Immigrant Families Across the Life Course: Policy Impacts on Physical and Mental Health*, 4 Nat'l Council on Family Relations Pol'y Br. 1, 2-4 (July 2019), https://tinyurl.com/pua8n860.

can be particularly traumatizing to children, resulting in a greater risk of developing both physical disorders and mental health disorders such as depression, anxiety, and attention deficit hyperactivity disorder.[10] Spousal separation can also cause fear, anxiety, and depression.[11] And continuing removals will make it more difficult for many immigrants to prepare an adequate defense in their immigration proceedings, including those with viable asylum claims.

On the other side of the ledger, Texas's claims of harm from the 100-day pause are overblown—particularly its concern that this pause will increase the level of unauthorized immigration. As a practical matter, travel restrictions, the suspension of consular services, and the ongoing COVID-19 pandemic have greatly curtailed immigration of all forms.[12]

---

[10] Allison Abrams, *Damage of Separating Families*, Psychology Today (June 22, 2018), https://tinyurl.com/yzqrz2om.

[11] *See* Yeganeh Torbati, *U.S. Denied Tens of Thousands More Visas in 2018 Due to Travel Ban: Data*, Reuters (Feb. 29, 2019), https://tinyurl.com/1t9aqmtq (describing a U.S. citizen's plight to obtain a visa for his wife, and that their separation was causing them both to "break down psychologically").

[12] Jorge Loweree et al., *The Impact of COVID-19 on Noncitizens and Across the U.S. Immigration System*, Am. Immigration Council (Sept. 2020), https://tinyurl.com/z75k9wad.

And the federal government's temporary pause in removals by its own terms applies only to immigrants who were present in the country as of November 1, 2020. Thus, any unauthorized immigration happening now is not affected by the 100-day pause. The balance of the equities thus weighs heavily against the preliminary injunction that Texas requests here.

## B.   Texas Has Not Shown a Substantial Likelihood of Success on the Merits.

Texas is also not likely to succeed on the merits. Its arguments for a nationwide preliminary injunction based on the agreement that it signed with DHS suffer from multiple overlapping flaws.

*First*, Texas's attempt to leverage its invalid agreement to force DHS to deport more people nationwide conflicts with the federal government's statutory and regulatory discretion to defer removal. "A principal feature of the removal system is the broad discretion exercised by immigration officials." *Arizona v. United States*, 567 U.S. 387, 396 (2012); *see also United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 543 (1950) ("flexibility and the adaptation of the congressional policy to infinitely variable conditions constitute the essence of the program"

6

(quotation marks omitted)). It has long been recognized that the Executive Branch has the discretion to "decline to execute a final order of deportation." *Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 484, (1999)—a step further, even, than the mere temporary pause on removals ordered here. Such discretion is expressly recognized by federal law, such as 8 C.F.R. § 1241.6(a), which provides DHS with discretion to stay removal "for such time and under such conditions as [the agency] may deem appropriate." *See also* 8 U.S.C. § 1231(a)(3) (recognizing circumstances in which the executive branch does not remove an individual within 90-days of the order of removal); 8 C.F.R. § 1241.6(a).

This "[d]iscretion in the enforcement of immigration law embraces immediate human concerns"—namely, the severe harms and disruptions that removals cause to immigrants, their families, and their communities. *Arizona*, 567 U.S. at 396. The long history of Executive Branch decisions to desist from removals is also sensible given that such enforcement inevitably harms foreign nationals, whose treatment within this country is "[o]ne of the most important and delicate of all international relationships," *Hines v. Davidowitz*, 312 U.S. 52, 64 (1941).

No principle of law supports Texas's attempt to handcuff the federal government's exercise of its well-established discretion to temporarily pause removals. Although the States unquestionably have the authority to regulate immigrants who are present within our jurisdictions, the federal government is charged with determining whether its limited resources for immigration enforcement should be expended on the "drastic measure" of removals, *Fong Haw Tan v. Phelan*, 333 U.S. 6, 10 (1948), especially given the human and foreign-policy costs of deportations. As the federal government has correctly argued here, these well-established principles bar Texas from demanding the resumption of removal proceedings that the Executive Branch in its discretion has declined to pursue. And they also confirm the prior administration's lack of authority to delegate the Executive Branch's inherent discretion in this area to a single State. *See Biodiversity Assocs. v. Cables*, 357 F.3d 1152, 1172 (10th Cir. 2004).

*Second*, Texas's highly unusual agreement here goes well beyond traditional and well-established contractual enforcement, and instead represents its improper effort to collaborate with an outgoing

presidential administration to handcuff a new administration's discretion to adopt national policies reflecting the will of the voters.

There are many unique features that distinguish Texas's agreement from traditional contracts, including legitimate contracts between the States and federal government. As the federal government correctly argues, Texas offered no meaningful consideration to DHS; the agreement did not result from any litigation or other dispute between Texas and the prior administration; and the agreement was signed by DHS only days before the start of the current administration, which had already begun articulating its immigration policy preferences.[13] The agreement also unusually purports to give Texas a say over an entire area of federal policy; and it does so for a broad range of future immigration policies, including those that have not yet been contemplated, let alone litigated and found to be unlawful or unreasonable.

This unusual agreement thus bears no similarity to the types of contracts that ordinarily would bind the federal government. Instead, it marks a transparent effort to impose obstacles on the current

---

[13] *See e.g.,* Andy J. Semotiuk, U.S. Immigration Reform To Be A Biden Priority, *Forbes* (Dec. 2020), https://tinyurl.com/zt6rjzhz.

administration's authority to exercise its discretion over removal policy in a different way than the prior administration did. But the Supreme Court has repeatedly rejected attempts to restrain a newly elected Executive Branch from exercising the discretion that Congress has delegated to it. *See, e.g.*, *Dorsey v. United States*, 567 U.S. 260, 274 (2012) ("one legislature cannot abridge the powers of a succeeding legislature"); *United States v. Winstar Corp.*, 518 U.S. 839, 878 (1996) ("a contract with a sovereign government will not be read to include an unstated term exempting the other contracting party from the application of a subsequent sovereign act").

To be sure, Amici States recognize that procedural and substantive requirements often apply to policy changes to ensure agencies engage in reasoned decision-making. *See, e.g.*, *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 140 S. Ct. 1891, 1913 (2020); *Air All. Houston v. EPA*, 906 F.3d 1049, 1053 (D.C. Cir. 2018). But the unprecedented agreement that Texas seeks to enforce is categorically different from these other requirements. Most strikingly, unlike neutral requirements for reasoned decision-making, the agreement here transparently seeks to preserve the prior administration's substantive policy of maximizing

immigration enforcement, often without regard to legal limitations. *See, e.g.*, *New York v. U.S. Immigration & Customs Enf't*, 466 F. Supp. 3d 439, 442 (S.D.N.Y. 2020). The agreement applies only to policy changes "that have the effect of easing, relaxing, or limiting immigration enforcement." (ECF No. 2-1 at 2.) And the agreement, which gives Texas the ability to delay or veto changes in immigration policy, was made with a State that sought to prevent changes relaxing immigration enforcement.

*Third*, Texas has not demonstrated any basis for affecting immigration enforcement in other States, including the Amici States. The agreement itself identifies only injuries to Texas's local interests. (ECF No. 62 at 23 (claiming harms to "Texas's law enforcement, housing, education, employment, commerce, and healthcare needs and budgets").) And Texas has never explained why these local interests will be harmed if the federal government exercises its discretion over removals differently in other States.

Absent such a showing, there is no basis or need for this Court to issue relief that would affect federal immigration enforcement in the Amici States. As explained above, Amici States recognize that the overwhelming majority of undocumented immigrants are otherwise law-

abiding, fully contributing members of society: they work and pay taxes (including contributions to Social Security and Medicare); they establish families and raise children; and, whatever their current status, "many will remain [in the United States] permanently and . . . some indeterminate number will eventually become citizens." *Plyler v. Doe*, 457 U.S. 202, 222 n.20, 228 (1982). Texas has failed to demonstrate that the local harms it has identified require that these valuable residents of Amici States be harmed by continuing removals.

*Finally*, the agreement here was not validly executed by DHS, because it was signed on behalf of the federal government only by Kenneth T. Cuccinelli II, who at the time was unlawfully acting as Senior Official Performing the Duties of the Deputy Secretary. (ECF No. 2-1 at 9.) Courts and the Government Accountability Office have concluded that Cuccinelli was not properly appointed to this position and thus had no authority to act on behalf of DHS. *See L.M.-M. v. Cuccinelli*, 442 F. Supp. 3d 1, 29 (D.D.C. 2020), *appeal dismissed,* No. 20-5141, 2020 WL 5358686 (D.C. Cir. Aug. 25, 2020); U.S. Government Accountability Office, *Matter of Department of Homeland Security—Legality of Service of Acting Secretary of Homeland Security and Service of Senior Official Performing*

*the Duties of Deputy Secretary of Homeland Security* 2, 5, 10-11 (Aug. 14, 2020). The basic defect is that no valid order of succession—i.e., one that complied with both the Federal Vacancies Reform Act and the Homeland Security Act—allowed Cuccinelli to serve in his current capacity or to act on behalf of DHS. *See Casa de Maryland, Inc. v. Wolf*, No. 8:20-cv-2118, 2020 WL 5500165, at *23 (D. Md. Sept. 11, 2020); *Immigrant Legal Res. Ctr. v. Wolf*, No. 20-cv-5883, 2020 WL 5798269, at *8 (N.D. Cal. Sept 29, 2020). Accordingly, any actions taken by Cuccinelli on behalf of DHS, including his execution of the agreement with Texas here, are in excess of statutory authority and without force or effect.

## CONCLUSION

This Court should deny the motion for a preliminary injunction.

Dated:  New York, New York
        February 12, 2021

                              Respectfully submitted,

                              LETITIA JAMES
                                *Attorney General of New York*
                              Attorney for Amici States


                        By:   */s/ Morenike Fajana*
                              Morenike Fajana
                              Special Counsel

                              28 Liberty Street
BARBARA D. UNDERWOOD           New York, NY 10005
  *Solicitor General*          (212) 416-6134
STEVEN C. WU
  *Deputy Solicitor General*
MORENIKE FAJANA
  *Special Counsel*
      *of Counsel*

(*Counsel list continues on next page.*)

14

XAVIER BECERRA
*Attorney General of California*
1515 Clay Street, Suite 2000
Oakland, CA 94612

WILLIAM TONG
*Attorney General of Connecticut*
165 Capitol Avenue
Hartford, CT 06106

KATHLEEN JENNINGS
*Attorney General of Delaware*
Carvel State Building
820 N. French Street
Wilmington, DE 19801

KARL A. RACINE
*Attorney General for the*
*District of Columbia*
One Judiciary Square
441 4th Street, N.W.
Washington, DC 20001

KWAME RAOUL
*Attorney General of Illinois*
100 West Randolph Street
Chicago, IL 60601

BRIAN E. FROSH
*Attorney General of Maryland*
200 Saint Paul Place
Baltimore, MD 21202

MAURA HEALEY
*Attorney General of Massachusetts*
One Ashburton Place
Boston, MA  02108

AARON D. FORD
*Attorney General of Nevada*
100 North Carson Street
Carson City, NV 89701

GURBIR S. GREWAL
*Attorney General of New Jersey*
25 Market Street
Trenton, NJ 08625

HECTOR BALDERAS
*Attorney General of New Mexico*
408 Galisteo Street
Santa Fe, NM 87501

ELLEN F. ROSENBLUM
*Attorney General of Oregon*
1162 Court Street, NE
Salem, OR 97301

PETER F. NERONHA
*Attorney General of Rhode Island*
150 South Main Street
Providence, RI 02903

THOMAS J. DONOVAN, JR.
*Attorney General of Vermont*
109 State Street
Montpelier, VT 05609

MARK R. HERRING
*Attorney General of Virginia*
202 North 9th Street
Richmond, VA 23219

15

ROBERT W. FERGUSON
*Attorney General of Washington*
P.O. Box 40100
Olympia, WA 98504