**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION**

STATE OF TEXAS

　　　　　　　　　　*Plaintiff*,

　v.　　　　　　　　　　　　　　　　　Case No. 6:21-cv-00003

UNITED STATES OF AMERICA, *et al*.,

　　　　　　　　　　*Defendants*,

*and*

FIEL HOUSTON, *et al.*,

　　　　　　　　　　*Intervenor-Defendants*.

**INTERVENOR-DEFENDANTS' OPPOSITION TO TEXAS'S MOTION FOR
PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

**INTRODUCTION**..................................................................................................... 1

**BACKGROUND** ..................................................................................................... 2

**SUMMARY OF ARGUMENT** ............................................................................ 6

**ARGUMENT** ......................................................................................................... 7

   I.   TEXAS IS NOT LIKELY TO SUCCEED ON THE MERITS. ......................... 7

     A.   Section 1231(a)(1)(A) Does Not Justify an Injunction of the Deportation Pause. .......... 7

       1.   Section 1231(a)(1)(A) does not override the discretion to stay removals. .................. 7

       2.   Any violation of § 1231(a)(1)(A) is insufficient to support the broad injunction Texas seeks. ...................................................................................................... 16

     B.   Texas's Agreement Is Unenforceable, Invalid, and Unconstitutional. ......................... 18

     C.   Texas's APA Claims Fail. ................................................................................. 25

       1.   Texas's arbitrary and capricious arguments lack merit. ............................................ 25

       2.   The deportation pause did not require notice and comment. ..................................... 29

  II.   TEXAS LACKS STANDING AND IRREPARABLE INJURY, AND THE BALANCE OF HARDSHIPS REQUIRES DENIAL OF RELIEF. .................................................... 31

  III.   SUMMARY JUDGMENT IS PREMATURE ................................................ 39

**CONCLUSION** ..................................................................................................... 40

i

# TABLE OF AUTHORITIES

**Cases**

*10 Ring Precision, Inc. v. Jones*,
   722 F.3d 711 (5th Cir. 2013) ................................................. 27

*Alabama Rural Fire Ins. Co. v. Naylor*,
   530 F.2d 1221 (5th Cir. 1976) ........................................... 19, 20

*Allied–Signal, Inc. v. United States Nuclear Regulatory Comm'n*,
   988 F.2d 146 (D.C. Cir. 1993) ............................................... 28

*Arizona v. United States*,
   567 U.S. 387 (2012) ....................................... 2, 21, 22, 23

*Arpaio v. Obama*,
   797 F.3d 11 (D.C. Cir. 2015) ............................................... 35

*Asika v. Ashcroft*,
   362 F.3d 264 (4th Cir. 2004) (per curiam) ............................... 9

*Batterton v. Marshall*,
   648 F.2d 694 (D.C. Cir. 1980) ............................................... 29

*Bowen v. Massachusetts*,
   487 U.S. 879 (1988) ............................................................. 19

*Califano v. Yamasaki*,
   442 U.S. 682 (1979) ............................................................. 16

*Cent. & S. W. Servs., Inc. v. EPA*,
   220 F.3d 683 (5th Cir. 2000) ............................................... 28

*Cheng v. INS*,
   392 U.S. 206 (1968) ............................................................. 12

*Chicago v. Morales*,
   527 U.S. 41 (1999) ................................................................. 9

*City of Seabrook v. Costle*,
   659 F.2d 1371 (5th Cir. Unit A 1981) ................................. 10

*Clapper v. Amnesty Int'l USA*,
   568 U.S. 398 (2013) ............................................................. 34

*Crane v. Johnson*,
   783 F.3d 244 (5th Cir. 2015) .................................................................. 35, 36

*Davis Cty. Solid Waste Mgmt. v. EPA*,
   108 F.3d 1454 (D.C. Cir. 1997) (per curiam) ........................................ 18

*Deal v. United States*,
   508 U.S. 129 (1993) ................................................................................. 9

*Dep't of Homeland Sec. v. Regents of the Univ. of California*,
   140 S. Ct. 1891 (2020) ............................................................................ 28

*Dept. of Commerce v. New York*,
   139 S. Ct. 2551 (2019) ............................................................................ 34

*Devitri v. Cronen*,
   290 F. Supp. 3d 86 (D. Mass. 2017) ....................................................... 13

*El Paso Cty., Texas v. Trump*,
   982 F.3d 332 (5th Cir. 2020) .................................................................. 33

*Fox Television Stations, Inc. v. FCC*,
   280 F.3d 1027 (D.C. Cir.) ....................................................................... 29

*Frew v. Hawkins*,
   540 U.S. 431 (2004) ................................................................................. 23

*Freytag v. Comm'r*,
   501 U.S. 868 (1991) ................................................................................. 23

*Gardner v. City of Dallas*,
   81 F.2d 425 (5th Cir. 1936) .................................................................... 22

*Golden Gate Rest. Ass'n v. San Francisco*,
   512 F.3d 1112 (9th Cir. 2008) ................................................................ 38

*Green Valley Special Util. Dist. v. City of Schertz, Texas*,
   969 F.3d 460 (5th Cir. 2020) (en banc) ............................................. 16, 17

*Hayward v. U.S. Dep't of Labor*,
   536 F.3d 376 (5th Cir. 2008) .................................................................. 27

*Heckler v. Chaney*,
   470 U.S. 821 (1985) ................................................................................. 15

*Hibbs v. Winn*,
    542 U.S. 88 (2004) ........................................................................................... 11

*Horne v. Flores*,
    557 U.S. 433 (2009) ................................................................................... 23, 24

*Ibrahim v. Acosta*,
    2018 WL 582520 (S.D. Fla. Jan. 26, 2018) ........................................... 14, 37

*Inmates of Attica Correctional Facility v. Rockefeller*,
    477 F.2d 375 (2d Cir. 1973) ........................................................................... 10

*INS v. Chadha*,
    462 U.S. 919 (1983) ........................................................................................ 23

*Int'l Eng'g Co., Div. of A-T-O v. Richardson*,
    512 F.2d 573 (D.C. Cir. 1975) ....................................................................... 20

*Int'l Union v. Chao*,
    361 F.3d 249 (3d Cir. 2004) ........................................................................... 27

*Int'l Union, United Mine Workers of Am. v. Fed. Mine Safety & Health Admin.*,
    920 F.2d 960 (D.C. Cir. 1990) ....................................................................... 28

*Janvey v. Alguire*,
    647 F.3d 585 (5th Cir. 2011) ......................................................................... 36

*John Doe #1 v. Veneman*,
    380 F.3d 807 (5th Cir. 2004) ................................................................... 16, 17

*Johns v. Dep't of Justice*,
    653 F.2d 884 (5th Cir. Aug. 1981) ................................................................ 12

*Kassama v. Dep't of Homeland Sec.*,
    553 F. Supp. 2d 301 (W.D.N.Y. 2008) ......................................................... 34

*Kessler v. FCC*,
    326 F.2d 673 (D.C. Cir. 1963) ................................................................. 29, 30

*Larson v. Domestic & Foreign Commerce Corp.*,
    337 U.S. 682 (1949) ........................................................................................ 19

*Leiva-Perez v. Holder*,
    640 F.3d 962 (9th Cir. 2011) ......................................................................... 37

*Lewis v. Hunt*,
  492 F.3d 565 (5th Cir. 2007) ................................................................. 20

*Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*,
  523 U.S. 26 (1998) ................................................................................ 10

*Local No. 93, Int'l Ass'n of Firefighters, AFL-CIO C.L.C. v. City of Cleveland*,
  478 U.S. 501 (1986) .............................................................................. 24

*M.G.U. v. Nielsen*,
  325 F. Supp. 3d 111 (D.D.C. 2018) ...................................................... 38

*Maine Cmty. Health Options v. United States*,
  140 S. Ct. 1308 (2020) ............................................................................ 9

*Maniglia v. Commander of the Guiseppe Verdi*,
  5 F.2d 680 (D. Mass. 1925) ................................................................... 12

*Matter of E-R-M- & L-R-M-*,
  25 I&N Dec. 520 (BIA 2011) .................................................................. 9

*Michigan v. EPA*,
  576 U.S. 743 (2015) ................................................................................ 12

*N. Am. Commercial Co. v. United States*,
  171 U.S. 110 (1898) ............................................................................... 21

*Naidoo v. INS*,
  39 F. Supp. 2d 755 (W.D. La. 1999) ....................................................... 8

*New York v. United States*,
  505 U.S. 144 (1992) ......................................................................... 23, 24

*Nken v. Holder*,
  556 U.S. 418 (2009) ................................................................................. 8

*Northwest Environment Advocates v. EPA*,
  340 F.3d 853 (9th Cir. 2003) ................................................................. 24

*OCA-Greater Houston v. Texas*,
  867 F.3d 604 (5th Cir. 2017) ................................................................. 17

*Osorio-Martinez v. Att'y Gen.*,
  893 F.3d 153 (3d Cir. 2018) .................................................................. 39

*Perry Capital LLC v. Mnuchin*,
    864 F.3d 591 (D.C. Cir. 2017) ............................................................ 20

*Plane v. Carr*,
    19 F.2d 470 (9th Cir. 1927) ............................................................... 12

*Powerex Corp. v. Reliant Energy Servs., Inc.*,
    551 U.S. 224 (2007) ........................................................................ 11

*Printz v. United States*,
    521 U.S. 898 (1997) ........................................................................ 23

*Ranger v. FCC*,
    294 F.2d 240 (D.C. Cir. 1961) ............................................................ 30

*Reno v. American-Arab Anti-Discrimination Committee*,
    525 U.S. 471 (1999) ................................................................. 7, 12, 15

*Robbins v. U.S. Bureau of Land Mgmt.*,
    438 F.3d 1074 (10th Cir. 2006) ...................................................... 19, 20

*Star Satellite, Inc. v. Biloxi*,
    779 F.2d 1074 (5th Cir. 1986) ........................................................... 37

*Stone v. Mississippi*,
    101 U.S. 814 (1879) .................................................................... 21, 22

*Tex. Health & Human Servs. Comm'n v. United States*,
    166 F. Supp. 3d 706 (N.D. Tex. 2016) .................................................. 36

*Texas v. United States*,
    86 F. Supp. 3d 591 (S.D. Tex. 2015) .................................................... 36

*Texas v. United States*,
    328 F. Supp. 3d 662 (S.D. Tex. 2018) ............................................. 31, 36

*Texas v. United States*,
    809 F.3d 134 (5th Cir. 2015) .................................................. 8, 31, 35, 36

*Town of Castle Rock v. Gonzales*,
    545 U.S. 748 (2005) ............................................................... 9, 10, 15

*Tran v. Mukasey*,
    515 F.3d 478 (5th Cir. 2008) ............................................................. 10

*U.S. Dep't of Labor v. Kast Metals Corp.*,
    744 F.2d 1145 (5th Cir. 1984) .................................................................... 29, 30, 31

*U.S. Tr. Co. of New York v. New Jersey*,
    431 U.S. 1 (1977) ........................................................................................... 21

*Ulysse v. Dep't of Homeland Sec.*,
    291 F. Supp. 2d 1318 (M.D. Fla. 2003) ...................................................... 14

*United States v. Winstar Corp.*,
    518 U.S. 839 (1996) ...................................................................................... 21

*Warner v. Cox*,
    487 F.2d 1301 (5th Cir. 1974) ..................................................................... 20

*Wyoming v. U.S. Dep't of Interior*,
    674 F.3d 1220 (10th Cir. 2012) ................................................................... 33

*Yoon v. INS*,
    538 F.2d 1211 (5th Cir. 1976) ..................................................................... 12

*Zadvydas v. Davis*,
    533 U.S. 678 (2001) ...................................................................................... 34

**Constitutional Provisions**

U.S. Const. art. I, § 10, cl. 1 ................................................................................ 21

U.S. Const. art. II, § 1, cl. 1. .............................................................................. 22

U.S. Const. art. II, § 3 ........................................................................................ 15

**Statutes**

5 U.S.C. § 553(b)(3)(A) ...................................................................................... 29

5 U.S.C. § 702(2) ................................................................................................ 20

5 U.S.C. § 706(2)(A) ........................................................................................... 25

8 U.S.C. § 1101(a)(47)(B) .................................................................................... 3

8 U.S.C. § 1225(b)(1) ........................................................................................... 4

8 U.S.C. § 1229a ................................................................................................... 2

8 U.S.C. § 1231(a)(1) ................................................................................................ passim

8 U.S.C. § 1231(a)(1)(A) ......................................................................................... passim

8 U.S.C. § 1231(a)(1)(B) ................................................................................................ 16

8 U.S.C. § 1231(a)(1)(C) ............................................................................................... 16

8 U.S.C. § 1231(a)(3) ......................................................................................... 15, 17, 33

8 U.S.C. § 1231(a)(5) ...................................................................................................... 4

8 U.S.C. § 1231(a)(6) .............................................................................................. 10, 33

8 U.S.C. § 1252(a)(1) ....................................................................................................... 3

8 U.S.C. § 1252(c) .......................................................................................................... 14

## Legislative History

H.R. Rep. No. 94–1656 (1976) ....................................................................................... 20

## Regulations

8 C.F.R. § 214.11(d)(1)(ii) ............................................................................................. 14

8 C.F.R. § 214.14(c)(1)(ii) ............................................................................................. 14

8 C.F.R. § 214.14(f)(2)(ii) .............................................................................................. 14

8 C.F.R. § 241.6(a) ........................................................................................................ 13

8 C.F.R. § 1241.1 ............................................................................................................. 3

8 C.F.R. § 1241.6(a) ...................................................................................................... 13

## Other Authorities

Ben Harrington, Cong. Research Serv., R45158, *An Overview of Discretionary Reprieves from Removal: Deferred Action, DACA, TPS, and Others* (Apr. 10, 2018) ..................................... 13

Dep't of Homeland Sec., *Privacy Impact Assessment for the Law Enforcement Information Sharing Service* (LEIS Service) (June 28, 2019) ...................................................................... 25

Emily Kassie & Barbara Marcolini, *"It Was Like a Time Bomb": How ICE Helped Spread the Coronavirus*, N.Y. Times, July 10, 2020 ............................................................................ 15

Exec. Order 12,711, Policy Implementation With Regard to Nationals of the People's Republic of China, 55 Fed. Reg. 13897 (Apr. 11, 1990) ......................................................... 13

ICE Detention and Removal Operations, *DRO Policy and Procedure Manual* (Mar. 27, 2006) ............................................................. 13

Julian Borger, *US to Send Asylum Seekers Home to Cameroon Despite "Death Plane" Warnings*, The Guardian, Nov, 9, 2020 ................................................................... 37

Letter from David Z. Seide to U.S. House of Representatives Comm. on Homeland Security, *et al.* (Feb. 1, 2021) ........................................................................................ 25

Memorandum from Doris Meissner, *Exercising Prosecutorial Discretion* (Nov. 17, 2000) ............................................................. 13

Presidential Memorandum of January 19, 2021: Deferred Enforced Departure for Certain Venezuelans, 86 Fed. Reg. 6,845 (Jan. 25, 2021) ..................................................... 13

## INTRODUCTION

Two days into a new presidential administration, Texas filed this suit asserting that the State effectively has the right to veto national immigration policy.  It asks this Court to enjoin temporary, limited policies that the new administration adopted while longer-term policies are developed—specifically, a pause on certain types of removals that prioritizes other removals and enforcement actions.  Accepting Texas's arguments would require the Court to annul the federal government's discretion to temporarily stay certain removals and determine immigration enforcement priorities, a power that has been routinely exercised by administration after administration throughout the history of federal immigration regulation.  These arguments are legally unfounded and should be rejected.

Texas's primary argument, based on 8 U.S.C. § 1231(a)(1)(A), is fundamentally flawed.  For removals, like other law enforcement actions, the Supreme Court has recognized that the Executive always has the discretion to stay its hand, and the statute does not override that longstanding power.  And even if Texas could establish a statutory violation, it would apply only to a tiny subset of people whose cases fall within the pause, in no way justifying the sweeping injunction that it seeks.  Nor can Texas rely on the unlawful Agreement, signed by an outgoing Department of Homeland Security ("DHS") official immediately before a transfer of power following a national election, which purports to give Texas various rights and guarantees regarding future administrations' immigration policy choices.

Texas's other merits arguments are equally flawed.  Most rely on fundamental misunderstandings of the immigration system and its interaction with the DHS Memorandum at issue.  Many of its arguments boil down to the mistaken view that DHS has stopped essentially *all* removals.  In reality, most removals including those of recent arrivals at the border—

1

including through summary procedures like expedited removal, long the majority of overall removals—can continue apace.  Indeed, the plain terms of the DHS Memorandum direct the continued removal of people who were not present in the United States as of November 1, 2020, along with other exceptions.  The DHS Memorandum thus prioritizes the *majority* of removals, including border removals, and pauses only a subset of removals of those who have been in the country longer and do not fall within another exception.

Finally, Texas gets the balance of hardships precisely backwards.  For its own alleged injuries, it has offered only rank speculation and inapposite statistics about undocumented people broadly, a much broader category mostly made up of people who are *not* subject to the pause; these general statistics are likewise completely disconnected from the brief, 100-day duration of the pause.  By contrast, every day an injunction is in place imposes grave harms on Intervenors, their members, and individuals and communities around the country.

## BACKGROUND

The Court is familiar with the DHS Memorandum, ECF No. 63-1; Texas's Agreement, ECF No. 63-2; and the earlier proceedings in this case.  Intervenors therefore limit themselves here to supplying background on the immigration system as context for the issues presented in this case.

Immigration removal (also commonly known as "deportation") is a civil system.  *See Arizona v. United States*, 567 U.S. 387, 396 (2012).  Regular removal proceedings under § 240 of the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1229a, are adversarial: an Immigration Judge (a Department of Justice official) presides, and an attorney from DHS prosecutes the case.  Declaration of Claudia Valenzuela, Exh. A, ("Valenzuela Decl.") ¶ 10.  A person is "charged" with one or more grounds of removability; in the vast majority of cases the

basis is a civil immigration violation such as lacking immigration status.  *Id.* ¶¶ 10, 14.  The

noncitizen also has the opportunity to seek certain forms of relief from removal, including

humanitarian protections and "cancellation" of removal for long-term residents.  *Id.* ¶ 12.

If the Immigration Judge finds that the noncitizen is removable and does not grant relief

from removal, then they issue an order of removal.  *Id.* ¶ 13.  The removal order may be

appealed to an administrative appellate body, the Board of Immigration Appeals ("BIA"), which

is also part of the Department of Justice.  8 C.F.R. § 1003.38(a).  A removal order is "final" on

the BIA's dismissal of appeal; waiver of appeal; or expiration of the time to appeal.  8 U.S.C.

§ 1101(a)(47)(B); 8 C.F.R. § 1241.1.

But this nomenclature is misleading: "Final order of removal" is a term of art meaning

that a removal order is administratively final for purposes of judicial review.  *See* ECF No. 28 at

2–4.  Such "final" orders are far from conclusive.  Valenzuela Decl. ¶¶ 17–20.  After an order is

final, the noncitizen may seek judicial review with the appropriate federal Court of Appeals, and

the "final order of removal" may be reversed in such a proceeding.  *Id.* ¶ 18; 8 U.S.C. §

1252(a)(1).  Final orders may also be reopened by the executive branch for such matters as lack

of a hearing notice for *in absentia* orders, new evidence of danger in the country where a person

would be removed, or new eligibility for a form of immigration relief.  Valenzuela Decl. ¶ 17;

Declaration of Peter B. Berg, ECF No. 78-1 ("Berg Decl.") ¶ 8.  Thus, individuals with "final"

orders arising from § 240 proceedings often remain in the country for months or years, with real

prospects of permanent immigration relief.  Valenzuela Decl. ¶ 19–20; Berg Decl. ¶ 12.

DHS also has recourse to other, summary removal procedures under certain

circumstances.  Summary removals make up the overwhelming majority of all removals.

Valenzuela Decl. ¶¶ 21, 26.  Expedited removal, established in 1996, permits the entry of a

removal order by a Customs and Border Protection ("CBP") officer, subject to a limited asylum screening conducted by a DHS asylum officer and reviewed by an Immigration Judge, without BIA review. *Id.* ¶¶ 22–23; 8 U.S.C. § 1225(b)(1). These orders quickly become final, and any judicial review is sharply circumscribed. Valenzuela Decl. ¶ 23. Recent arrivals at the border who lack visas or immigration status are typically placed into expedited removal, rather than regular removal proceedings, and often deported in a matter of days or weeks. *Id.* ¶ 24.

Another summary removal system is reinstatement of removal, applicable where an individual previously ordered removed reenters unlawfully, and also frequently used for recent arrivals at the border. *Id.* ¶ 25; 8 U.S.C. § 1231(a)(5). In that circumstance, DHS may reinstate and execute the prior removal order without a new hearing under the ordinary procedures, subject to limited humanitarian protections. Valenzuela Decl. ¶ 25. Reinstated removal orders are also typically executed very quickly. *Id.* Because the DHS Memorandum allows continued removals of recent arrivals and provides for increased processing capacity at the border, the application of accelerated summary procedures to recent arrivals at the border will continue despite the pause of other deportations. DHS Memorandum at 3.[1]

There are approximately 11 million individuals without regular immigration status in the United States—"undocumented" persons. Valenzuela Decl. ¶ 9. Of those, approximately 1.19 million have final removal orders. Berg Decl. ¶ 8. Through many administrations, there has been a substantial number of individuals with outstanding final removal orders. *Id.* ¶ 12 (only 17.73% of removal orders that became final since January 2019 have been executed); Valenzuela Decl. ¶¶ 17–20. There are many reasons for this: Some people are pursuing judicial review,

---

[1] Presently, in many cases CBP is conducting "expulsions," purportedly under the public health powers, in lieu of other summary procedures. Valenzuela Decl. ¶ 29. The result, however, is the same—the vast majority of all of DHS's physical relocation of noncitizens from the United States occurs via summary procedures for recent arrivals at the border.

4

others have been granted deferred action for various reasons, and others have simply not been a high priority.  Berg Decl. ¶ 8; Valenzuela Decl. ¶ 17.  By contrast, at any given time a tiny proportion of the overall numbers of removal orders have become final within the last 90 days— meaning a tiny proportion are within the removal period generally triggered by an order becoming final.  *See* 8 U.S.C. § 1231(a)(1).  Declaration of David Hausman, Exh. B ("Hausman Decl.") ¶ 18.  Thus, the vast majority of individuals currently subject to final orders of removal are outside of the removal period.

Texas suggests that the removal pause will require mass releases because those (relatively few) individuals will remain in the country past the end of the removal period absent an injunction.  But, in fact, DHS maintains discretion to release or detain after the 90-day removal period.  Berg Decl. ¶ 8; Valenzuela Decl. ¶ 32.  Nor will constitutional rules, which deem detention for *six months* after a removal order presumptively reasonable, and involve a case-specific analysis after that, require mass releases.  *See* Valenzuela Decl. ¶¶ 33–34; *infra* Part II.  Texas's further assumption that any individuals released during the pause will abscond is belied by the actual data showing otherwise.  Berg Decl. ¶¶ 9, 11 (98% compliance with terms of supervision).  Texas also expresses concerns about the pause's impact on public safety.  But the crime statistics it cites are overwhelmingly made up of minor offenses or immigration "status" crimes like driving without a license, which undocumented people are often ineligible to obtain.  Valenzuela Decl. ¶ 14.b.  And Texas's broader suggestions that noncitizens increase crime are flatly contrary to all available empirical evidence.  Declaration of Bradley Bartos, *et al.*, Exh. C, ¶¶ 6–11.

## SUMMARY OF ARGUMENT

Texas is unlikely to succeed on the merits.  Supreme Court precedent, background principles applicable to law enforcement, the statutory text and context, and longstanding agency practice all demonstrate that Congress maintained DHS's discretion to defer removals, and nothing in 8 U.S.C. § 1231(a)(1) overrides that discretion.  In any event, Texas is certainly not entitled to an injunction of the entire deportation pause: Texas claims the deportation pause violates the 90-day "removal period," but the vast majority of those to whom the pause applies are *not* within that period.

The Agreement on which Texas relies throughout its briefing is unenforceable, invalid, and unconstitutional.  Binding precedent establishes that sovereign immunity bars this attempt to enforce a private contract with the federal government.  Moreover, agreements like this one, to barter away an essential attribute of sovereignty, are invalid under the reserved powers doctrine.  And this Agreement is deeply unconstitutional: It both purports to give the Executive's authority away to Texas, and—given its incredible timing and clear indicia of collusion—threatens to seriously undermine the bedrock rules of democracy.

Texas's Administrative Procedure Act ("APA") claims fail as well.  It asserts that DHS failed to explain its decision or consider alternatives, but its arguments are ultimately bottomed on a serious misunderstanding of the DHS Memorandum and the immigration system.  With a complete view of that system—and in particular the huge proportion of removals that are executed through summary procedures against recent arrivals, and that can continue unabated under the DHS Memorandum—Texas's complaints fall apart.  Nor is the deportation pause, a very short-term policy about the allocation of agency resources, subject to notice and comment procedures.

Finally, the equities strongly militate against any injunction or other relief.  Indeed, Texas has failed to establish standing at all, much less irreparable injury.  It has offered only inapposite data along with suppositions and inaccuracies to support its standing theory—including its incorrect claims that the deportation pause will force ICE to release large numbers of people from custody.  By contrast, every day the pause remains enjoined, individuals, families, and communities around the country are at risk of being torn apart, losing pathways to normalized immigration status, and other harms, and continue to live under a cloud of anxiety and fear.

## ARGUMENT

## I.      TEXAS IS NOT LIKELY TO SUCCEED ON THE MERITS.

### A. Section 1231(a)(1)(A) Does Not Justify an Injunction of the Deportation Pause.

#### 1.   Section 1231(a)(1)(A) does not override the discretion to stay removals.

Texas argues that the DHS Memorandum is inconsistent with 8 U.S.C. § 1231(a)(1), which provides that the federal government "shall remove" noncitizens with final removal orders within the 90-day "removal period."  But the Supreme Court has explained that the Executive has the authority to prioritize removals and stay its own hand as it sees fit. Nothing in § 1231(a)(1) overrides that discretion, as confirmed by the statutory text, context, and past agency practice.  In fact, such categorical suspensions of removals have been routine, including under the last administration.

The statutory provision on which Texas relies was enacted in 1996.  Three years later, *Reno v. American-Arab Anti-Discrimination Committee*, 525 U.S. 471, 484 (1999) ("*AADC*"), directly addressed the role of discretion in immigration enforcement and its relationship to the 1996 statute which contained that new provision.  As Justice Scalia explained for the Court, "execut[ing] removal orders" is "prosecution of [a] stage[] in the deportation process," and "[a]t

each stage the Executive has discretion to abandon the endeavor." *Id.* at 483 (first alteration in original). Thus, the Court made clear, executive branch authorities "may . . . decline to execute a final order of deportation." *Id.* at 484. The Court further noted that the 1996 amendments were enacted against the backdrop of the executive branch's prior "regular practice . . . of exercising that discretion for humanitarian reasons or simply for its own convenience." *Id.* at 483–84. Far from doing away with the discretion to stay removals, Congress enacted other provisions in the 1996 law that sought "to give some measure of protection to" such "discretionary determinations," including—specifically—determinations regarding deferred action (an executive branch decision to decline to enforce certain removal orders). *Id.* at 485.

In other words, the Supreme Court has already recognized that under the very statute on which Texas relies, the executive branch retains its longstanding discretion to stay removal. *See also Nken v. Holder*, 556 U.S. 418, 439–40 (2009) (Alito, J., dissenting) ("Once an order of removal has become final, it may be executed at any time"—but "the Executive Branch" may still "stay its own hand."). The Fifth Circuit has likewise affirmed this principle. *Texas v. United States*, 809 F.3d 134, 167–68 & n.105 (5th Cir. 2015) (quoting *AADC*); *see also Naidoo v. INS*, 39 F. Supp. 2d 755, 761 (W.D. La. 1999) ("Requests for stays . . . are committed to the discretion of the" executive branch).

Texas does not grapple with *AADC* and its progeny. Instead, it focuses on a single word in § 1231(a)(1)(A)—"shall"—contending that Congress thus eliminated the executive branch's longstanding discretion to stay removal for those in the removal period. But it is a "fundamental principle of statutory construction (and, indeed, of language itself) that the meaning of a word cannot be determined in isolation, but must be drawn from the context in which it is used." *Deal*

*v. United States*, 508 U.S. 129, 132 (1993).  Here, the text and context of § 1231(a)(1)(A) rebut Texas's efforts to transform it into an enforceable, inflexible command.

First, Texas is simply wrong that "shall" establishes "a mandatory duty" under these circumstances.  PI Mot. 12.  The Supreme Court has been clear that in law enforcement contexts statutes providing that an agency "shall" engage in an enforcement action generally do *not* create mandatory, enforceable duties.  *See Town of Castle Rock v. Gonzales*, 545 U.S. 748, 760 (2005) ("A well established tradition of police discretion has long coexisted with apparently mandatory arrest statutes.").  As the Court has explained, "[t]he deep-rooted nature of law-enforcement discretion" means that officers continue to have discretion not to take enforcement actions "even in the presence of seemingly mandatory commands."  *Id.* at 761; *see also Chicago v. Morales*, 527 U.S. 41, 62 n.32 (1999).

The same is true in the immigration context.  The BIA has explained that "[i]t is common for the term 'shall' to mean 'may' when it relates to decisions made by the Executive Branch" that pertain to "DHS's exercise of its prosecutorial discretion."  *Matter of E-R-M- & L-R-M-*, 25 I&N Dec. 520, 522 (BIA 2011).  This is specifically true with respect to removal.  *See Asika v. Ashcroft*, 362 F.3d 264, 268 n.5 (4th Cir. 2004) (per curiam) (quoting a post-1996 executive branch memorandum explaining that "a statute directing that the INS 'shall' remove removable aliens would not be construed by itself to limit prosecutorial discretion," confirming that immigration authorities "commonly interpret[]" "shall" permissively, and explaining that this "practice has been sanctioned by courts in both the immigration and criminal context").

The cases Texas cites, which have nothing to do with law enforcement discretion, are inapposite.  *See Maine Cmty. Health Options v. United States*, 140 S. Ct. 1308, 1320 (2020) (interpreting "shall" in context of government's duty to pay unprofitable medical providers in the

Affordable Care Act); *Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26, 35 (1998) (interpreting "shall" as used in procedural directive in statute governing multidistrict litigation). As the Fifth Circuit explained even before *Castle Rock*, while "the word 'shall'" is sometimes "interpreted to impose a mandatory duty" in *other* contexts, the use of that word imposes no such mandate "when duties within the traditional realm of prosecutorial discretion are involved." *City of Seabrook v. Costle*, 659 F.2d 1371, 1374 n.3 (5th Cir. Unit A 1981); *see also, e.g.*, *Inmates of Attica Correctional Facility v. Rockefeller*, 477 F.2d 375, 381 (2d Cir. 1973).[2]

This principle is rooted in the fact that "enforcement agencies have only limited resources at their command," and they "are duty-bound to allocate those resources in the interest of the general public as they perceive it, not in the causes deemed most important by" third parties. *Costle*, 659 F.2d at 1375. That is exactly what DHS has done here, by temporarily focusing its resources on border processing and public health measures, instead of interior removals. Where enforcement tradeoffs like that are concerned, "shall" statutes are often understood to simply encourage enforcement action where warranted, not to disturb an agency's prosecutorial discretion. *See, e.g.*, *Castle Rock*, 545 U.S. at 759–62 & n.6.

That background principle is enough to rebut Texas's argument. But there is also further textual evidence that Congress did not seek to override discretion in § 1231(a)(1)(A). In other

---

[2] Nor does *Tran v. Mukasey*, 515 F.3d 478 (5th Cir. 2008), hold otherwise. That case had no occasion to interpret the discretionary power to stay removal during the removal period, and its statement that "the government must facilitate" removal during that period is dicta and does not speak to the *Castle Rock* presumption. *Id.* at 481. Moreover, contrary to this Court's suggestion, TRO at 8, *Tran* did not hold that 8 U.S.C. § 1231(a)(6) is an "explicitly defined exception[]" that proves the otherwise mandatory nature of the "shall remove" language in § 1231(a)(1)(A). Section 1231(a)(6) simply provides discretionary *detention* authority for those who are not removed during the removal period, and is properly read as an exception to 8 U.S.C. § 1231(a)(3), which provides for release on supervision once the removal period ends. *See Tran*, 515 F.3d at 481 ("Detention beyond the removal period is authorized under 8 U.S.C. § 1231(a)(6) . . . .").

parts of the very same statutory section, § 1231, Congress used the word "shall" in a way that is *inconsistent* with it being a mandatory command. "A standard principle of statutory construction provides that identical words and phrases within the same statute should normally be given the same meaning." *Powerex Corp. v. Reliant Energy Servs., Inc.*, 551 U.S. 224, 232 (2007). "That maxim is doubly appropriate here," as the various uses of "shall" were adopted "at the same time," *id*., as part of the 1996 immigration amendments.

Section 1231(a)(2) provides: "During the removal period, the Attorney General shall detain the alien. Under no circumstances during the removal period shall the Attorney General release an alien who has" been ordered removed on certain grounds. The second sentence ("Under no circumstances . . . release") would be superfluous if "shall detain" in the first sentence meant "must detain without discretion." *See Hibbs v. Winn*, 542 U.S. 88, 101 (2004) (explaining that "[a] statute should be construed so that effect is given to all its provisions"). Similarly, § 1231(d)(2) provides that for a stowaway, the transportation company "shall detain the alien on board the vessel or aircraft, or at such place as the Attorney General shall designate," and then goes on to provide that the company "may not permit the stowaway to land in the United States, except" for certain purposes. The second portion of the provision barring landing in the United States would be superfluous if "shall detain . . . on board the vessel or aircraft" or at a designated location were an inexorable command. Thus, when Congress wanted to override prosecutorial discretion with a mandate in § 1231, it did not use the term "shall" alone. Rather, that term retained its ordinary consistency with background executive-branch discretion, and where Congress wanted to foreclose such discretion, it made that clear through explicit limitations.

Congress thus did not intend to end the long and unbroken tradition of prosecutorial discretion when it enacted § 1231(a)(1).  *See AADC*, 525 U.S. at 483–84; *cf. Michigan v. EPA*, 576 U.S. 743, 753 (2015) (rejecting interpretation in part based on "the backdrop of this established administrative practice").  The executive branch has *always* maintained prosecutorial discretion to decline to enforce deportation orders, and the federal courts have consistently blessed this practice.  *See, e.g.*, *Maniglia v. Commander of the Guiseppe Verdi*, 5 F.2d 680 (D. Mass. 1925) ("[T]he local immigration authorities at Ellis Island . . . may stay deportation and request permission to reopen the case . . . . Such application would be addressed entirely to the discretion of the department charged with the duty of administering the immigration laws."); *Plane v. Carr*, 19 F.2d 470, 471 (9th Cir. 1927) (describing executive stay of deportation). Courts have repeatedly and uniformly noted the regular practice that "discretionary relief may be requested *after* termination of the deportation proceeding" and that, for those with "a final administrative order," the executive branch "in [its] discretion" may grant a stay.  *Cheng v. INS*, 392 U.S. 206, 209 (1968) (emphasis added).

The Fifth Circuit is no exception, and has explained that the executive branch "is given discretion . . . to ameliorate the rigidity of the deportation laws" and "as the result of implied authority . . . exercises discretion nowhere granted expressly."  *Johns v. Dep't of Justice*, 653 F.2d 884, 890–91 (5th Cir. Aug. 1981).  This means that "even after a final order of deportation has been entered," the executive branch "determines whether . . . to stay the order of deportation," and "the length of and reason for the stay lie entirely within the discretion of" the executive branch official.  *Id.* at 890; *see also Yoon v. INS*, 538 F.2d 1211, 1213 (5th Cir. 1976). Notably, the Supreme Court relied on *Johns* in *AADC*, which, as noted, was decided after the enactment of the statutory provision on which Texas relies.  525 U.S. at 484.

Agency policies and actions, before and after the 1996 amendments, further confirm this longstanding discretion.  *See generally* Ben Harrington, Cong. Research Serv., R45158, *An Overview of Discretionary Reprieves from Removal: Deferred Action, DACA, TPS, and Others* (Apr. 10, 2018) (providing overview of the historical and contemporary practice of staying removal "for reasons that may range from administrative convenience to humanitarian concerns").  Contemporary DHS regulations and policies make clear that the agency has the authority to "grant a stay of removal or deportation" to "an alien under a final order" "for such time and under such conditions as [the agency] may deem appropriate."  8 C.F.R. § 241.6(a).[3]

This discretion encompasses categorical reprieves from removal, which are regularly granted by Presidential Order or by the agency's discretion—including for periods of time well beyond 100 days.  *See, e.g.*, Presidential Memorandum of January 19, 2021: Deferred Enforced Departure for Certain Venezuelans, 86 Fed. Reg. 6,845 (Jan. 25, 2021) (directive issued by prior administration directing deferral of removal of Venezuelans for 18 months); Exec. Order 12,711, Policy Implementation With Regard to Nationals of the People's Republic of China, 55 Fed. Reg. 13897 (Apr. 11, 1990) (deferring removal of Chinese nationals as response to the Tiananmen Square protests); *Devitri v. Cronen*, 290 F. Supp. 3d 86, 89 (D. Mass. 2017) (approximately 100 Indonesian Christians with final orders of removal granted annual stays of removal routinely for seven years); *Ibrahim v. Acosta*, 2018 WL 582520 at *1 (S.D. Fla. Jan. 26,

---

[3] *See also id.* § 1241.6(a); ICE Form 246, https://www.ice.gov/doclib/forms/i246.pdf.  Further authority abounds, throughout written policies issued after 1996.  *See* ICE Detention and Removal Operations, *DRO Policy and Procedure Manual* (Mar. 27, 2006), *available at* https://www.ice.gov/doclib/foia/dro_policy_memos/09684drofieldpolicymanual.pdf ("[a] stay of deportation or removal . . . may be granted . . . when the only remaining step in a case is the physical removal of the alien."); Memorandum from Doris Meissner, *Exercising Prosecutorial Discretion* at 6 (Nov. 17, 2000), *available at* https://www.aila.org/infonet/ins-memo-on-prosecutorial-discretion ("officers are not only authorized by law but expected to exercise discretion in a judicious manner at all stages of the enforcement process," including "enforcing final orders.").

2018) (similar, for approximately 4,800 Somali nationals with final removal orders).  And the agency has developed special procedures to stay the removal of certain categories of individuals on humanitarian and law enforcement grounds, such as applicants for visas for victims of trafficking or certain crimes.  8 C.F.R. § 214.11(d)(1)(ii) (T-visa applicants); *id.* § 214.11(k)(2)(ii) (qualifying family members of T-visa applicants); *id.* § 214.14(c)(1)(ii) (U-visa applicants); *id.* § 214.14(f)(2)(ii) (qualifying family members of U-visa applicants).

Texas does not mention this century of Supreme and Circuit Court precedent and consistent governmental practice.  Instead, it relies almost exclusively on a single, out-of-circuit district court decision that addresses a different question.  *See* PI Mot. 11 (*citing Ulysse v. Dep't of Homeland Sec.*, 291 F. Supp. 2d 1318 (M.D. Fla. 2003)).  In *Ulysse*, the relevant question was *when* the removal period, and more specifically the detention authority that accompanies the removal period, began.  291 F. Supp. 2d at 1325.  The court's twin holdings, consistent with the statutory text, were, first, that the removal period began on the date the removal order became final and not on the date that an individual was detained for removal; and, second, that no extension of the detention authority accompanying the removal period was warranted.  *Id.* at 1324–25.  Any suggestion as to the scope of the agency's discretion to stay or otherwise delay removal is pure dicta.

Texas relies on *Ulysse*'s observation that the removal period used to be six months, and was shortened by the 1996 law.  PI Mot. 11–12.  But it misunderstands the import of that change.  In 1996, Congress changed the *detention* rules—detention was entirely discretionary under former law, *see* 8 U.S.C. 1252(c) (1994), but under the 1996 change there would be a presumption (and sometimes mandate) of detention.  Given that Congress envisioned many noncitizens would be detained during the removal period after 1996, it makes sense that it

14

limited the duration of that period to limit the associated detention.  *See also* 8 U.S.C. §
1231(a)(3) (presumption of release after removal period).  Nothing in the change supports the
idea that Congress eliminated the executive branch's longstanding discretion to defer removal,
whether during or after the removal period; a vague and unsupported story about Congress's
supposed purpose is not sufficient to overcome that discretion.  *See Castle Rock*, 545 U.S. at
759–62 & n.6.

Texas's statutory claim thus fails, as does its duplicative Take Care Clause claim.  PI
Mot. 17–19.  Moreover, contrary to Texas's telling, the DHS Memorandum does *not* pause *all*
removals.  Rather, it temporarily pauses removal only for those physically present in the United
States before November 1, 2020, and even then subject to additional exceptions.  DHS
Memorandum 3–4.  It does so in order to "prioritize[]" DHS's "limited resources" for two
purposes: the provision of "sufficient staff and resources" to address needs at the southwest
border and "compl[iance] with COVID-19 protocols."  *Id.* at 3.[4]  These rationales fall well
within the agency's discretionary authority to prioritize resources and temporarily stay removals,
including for categories of people, as it has long done.  *AADC*, 525 U.S. at 484 (describing
executive exercise of discretion "for humanitarian reasons or simply for its own convenience").
And the Take Care Clause, far from *eliminating* that discretion, as Texas suggests, has long been
understood as a constitutional reflection of the "special province of the Executive Branch" in
prosecutorial discretion.  *Heckler v. Chaney*, 470 U.S. 821, 832 (1985) (citing U.S. Const., art. II,
§ 3).

---

[4] Notably, in the past year, ICE has removed numerous COVID-positive individuals, including people
reportedly exhibiting symptoms of COVID, to other countries.  *See, e.g.*, Emily Kassie & Barbara
Marcolini, *"It Was Like a Time Bomb": How ICE Helped Spread the Coronavirus*, N.Y. Times, July 10,
2020, https://www.nytimes.com/2020/07/10/us/ice-coronavirus-deportation.html.

**2.   Any violation of § 1231(a)(1)(A) is insufficient to support the broad injunction Texas seeks.**

Even if the Court concludes that DHS is required to remove individuals with recent removal orders during the 90-day removal period under 8 U.S.C. § 1231(a)(1)(A), that statutory provision cannot support the relief Texas is seeking.  For the vast majority of individuals subject to the deportation pause, their removal orders became final over 90 days ago—often months or years before.  Hausman Decl. ¶ 18; Berg Decl. ¶ 8.  In other words, even if Texas were right about the statute, its claim only reaches a tiny proportion of the 1.19 million outstanding removal orders.  *See* Hausman Decl. ¶ 18 (estimating that on any given day removal orders issued through regular removal proceedings that are currently in the removal period represent just .84% of all outstanding removal orders); *but see* PI Mot. 17 (claiming the statutory violation relates to "millions of cases").  The Court cannot and should not enjoin the entire pause based on a legal claim that at most impacts a small subset of people to whom the pause applies.

"[T]he scope of injunctive relief is dictated by the extent of the violation established." *John Doe #1 v. Veneman*, 380 F.3d 807, 818 (5th Cir. 2004) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979)).  "The district court must narrowly tailor an injunction to remedy the specific action which gives rise to the order" and "the extent of the violation established."  *Id.* at 818, 19; *see Green Valley Special Util. Dist. v. City of Schertz, Texas*, 969 F.3d 460, 478 n.39 (5th Cir. 2020) (en banc) (same).  An overbroad injunction is an abuse of discretion.  *John Doe #1*, 380 F.3d at 819; *see Green Valley*, 969 F.3d at 478 n.39.

Even if the Court holds that § 1231(a)(1) overrides the government's discretion to stay removals, by the plain terms of the statute that duty could only apply during the "removal period"—generally the 90 days after an order becomes final.  *See* 8 U.S.C. § 1231(a)(1)(A), (B); *see also id.* § 1231(a)(1)(C) (limited exception).  Texas does not, and could not, offer any

16

argument that the government is under a statutory obligation to remove individuals who are outside the removal period within a specific period of time.  Indeed, Texas acknowledges, PI Mot. 10, that the statute contemplates a significant change after the end of the removal period: "If the alien does not leave or is not removed within the removal period, the alien, pending removal, shall be subject to supervision . . . ."  8 U.S.C. § 1231(a)(3).  And the anticipation of supervised release during this period makes clear that Congress understood that removals would not necessarily happen immediately or indeed on any particular timeframe.  The statute leaves the timing of such post-removal-period action to the discretion of DHS, and nothing in the pause even arguably violates it.

Because no injunction can be issued beyond the extent of "the violation established," the most that Texas's § 1231 claim could support—if it were correct—would be an injunction suspending the 100-day pause as to those who are still within the 90-day removal period but whose removal would be delayed by the pause beyond the removal period.  *John Doe #1*, 380 F.3d at 818.  That group represents a tiny minority of the overall category of individuals with final removal orders, Hausman Decl. ¶ 18; Berg Decl. ¶ 8; an injunction of the entire pause is thus "necessarily overbroad," *John Doe #1*, 380 F.3d at 819 (holding injunction "overbroad because it exceeds the legal basis for the lawsuit"); *see also Green Valley*, 969 F.3d at 478 n.39 (explaining that "any injunctive relief" based on a statutory provision "must be narrowly tailored to" the limits of that provision); *OCA-Greater Houston v. Texas*, 867 F.3d 604, 616 (5th Cir. 2017) (same, vacating overbroad injunction that extended beyond the statutory provision at issue).  This conclusion is not altered by the fact that Texas seeks to vacate the DHS Memorandum under the APA.  PI Mot. 20-21. Even if this Court were to eventually determine that vacatur is warranted based on § 1231(a)(1)(A), that would be vacatur only as applied to

17

those within the removal period.  *See Davis Cty. Solid Waste Mgmt. v. EPA*, 108 F.3d 1454, 1460

(D.C. Cir. 1997) (per curiam) (vacating standards "only as they apply to" small waste combustor

units but not large units, even though the standards did not formally draw that distinction).

**B.  Texas's Agreement Is Unenforceable, Invalid, and Unconstitutional.**

Texas seeks to enforce a sweeping Agreement signed by a former DHS official,

purportedly on behalf of the agency, just days before the end of the previous administration.  The

Agreement is breathtaking in scope.  It promises that DHS will indefinitely continue the prior

administration's immigration policies "to the maximum extent possible," including on issues as

varied as limiting asylum and prioritizing detention over alternatives.  Agreement III.A.1.  It also

purports to grant Texas a 180-day veto period over essentially every policy change the new

administration might adopt, including "in any way modifying immigration enforcement";

decreasing officer deployments, removals, or arrests; "changing the quantity or quality of

immigration benefits" for noncitizens; and so forth.  Agreement III.A.2, 3.  As a remedy, the

Agreement contemplates Texas suing for "injunctive relief, including specific performance."

Agreement VI.

This unprecedented Agreement is not and cannot be legal.  If it were, an outgoing

administration could completely disable the next from exercising its constitutional and statutory

power to set policy.  Every single agency could lock in all of its chosen policies simply by

finding a willing partner to sign an agreement.  The agreements could last for four years, or

eight, or indefinitely.  The People would lose their ability to vote out unpopular policies by

electing new administrations.  To Intervenors' knowledge, no outgoing administration has ever

made such a blatant attempt to hobble its successor with this kind of "contract."

Perhaps recognizing these fatal problems, Texas devotes little space to its explicit argument for specific performance.  PI Mot. 19-20.  But nearly every aspect of its case seeks to leverage this Agreement and repackage its contract claim through the APA.  *See id.* at 10, 14, 15, 20 & n.3, 23, 26.  The Court should reject any reliance on this invalid Agreement.  While it is illegal and unenforceable for numerous reasons, Intervenors will focus on just three, each of which ultimately boils down to the same principle: An officer cannot sign away the government's sovereign power to make policy in a private contract.

1.  There is no waiver of the federal government's sovereign immunity for claims seeking equitable relief under a contract (including specific performance), so this Court has no jurisdiction to hear any such claim.  For over 70 years, it has been "settled that sovereign immunity bars a suit against the United States for specific performance of a contract."  *Bowen v. Massachusetts*, 487 U.S. 879, 921 (1988) (Scalia, J., dissenting) (citing *Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682, 704 (1949)).  This rule serves to ensure that the federal government remains responsive to the People: "The Government as representative of the community as a whole, cannot be stopped in its tracks by any plaintiff who presents a disputed question of property or contract right."  *Larson*, 337 U.S. at 704.

The APA incorporates this bar on the equitable enforcement of contracts, as the Fifth Circuit and every other Circuit to consider the issue has held.  *See Alabama Rural Fire Ins. Co. v. Naylor*, 530 F.2d 1221, 1226 (5th Cir. 1976) (sovereign immunity bars claim whose "object" is "to compel [the government] to specifically perform a contract"); *Robbins v. U.S. Bureau of Land Mgmt.*, 438 F.3d 1074, 1082 (10th Cir. 2006) (collecting cases from the First, Second, Third, Ninth, and D.C. Circuits).  The APA's waiver of sovereign immunity does not apply where another statute "expressly or impliedly forbids the relief which is sought."  5 U.S.C.

19

§ 702(2).  Here, the Tucker Act waives sovereign immunity in the Court of Federal Claims for contract claims seeking damages, but not claims seeking equitable relief; that limitation in the Tucker Act impliedly bars contract claims from being brought under the APA.  *Alabama Rural*, 530 F.2d at 1227–30; *Robbins*, 438 F.3d at 1082–83.  Indeed, in amending § 702 of the APA, Congress specifically noted that it was not disturbing the preexisting bar on the equitable enforcement of contracts.  *Robbins*, 438 F.3d at 1083 (citing H.R. Rep. No. 94–1656, at 12–13 (1976)).  Though this flaw was briefed at the TRO stage, Texas offers no response except to cite language in the Agreement itself, PI Mot. 20—which cannot waive sovereign immunity.  *Lewis v. Hunt*, 492 F.3d 565, 570 (5th Cir. 2007).

Nor can Texas evade this rule by dressing its claim in the garb of the APA.  *See* PI Mot. 15, 20 n.3.  In *Int'l Eng'g Co., Div. of A-T-O v. Richardson*, for example, the plaintiff challenged the government's conduct in connection with a contract as unlawful agency action under the APA, but the D.C. Circuit cut through such "plumage" to determine that at essence the case was a contract dispute.  512 F.2d 573, 576, 580 n.10 (D.C. Cir. 1975); *see Perry Capital LLC v. Mnuchin*, 864 F.3d 591, 619 (D.C. Cir. 2017) (APA does not allow "a disguised contract action" where the contract provides "the source of the rights" the plaintiff seeks to enforce) (internal quotation marks omitted).  The same is true here.  Indeed, if this contract dispute can be litigated through the APA, then every claim involving a government contract can.  But the Fifth Circuit has explicitly rejected that result.  *See Alabama Rural*, 530 F.2d at 1229; *Warner v. Cox*, 487 F.2d 1301, 1306 (5th Cir. 1974).  Where, as here, the "gravamen" of a claim is "breach of contract," invoking the standards of the APA does not evade the bar on equitable enforcement.  *Alabama Rural*, 530 F.2d at 1229–30.

2.   The Agreement is also substantively invalid because it impermissibly purports to sign away an enormous swath of the federal government's immigration power.  The "reserved powers" doctrine imposes a common-sense rule: A government may not "enter into an agreement that limits its power to act in the future" where the agreement "surrenders an essential attribute of its sovereignty."  *U.S. Tr. Co. of New York v. New Jersey*, 431 U.S. 1, 23 & n.20 (1977).  As the Supreme Court explained in *Stone v. Mississippi*, "the power of governing is a trust committed by the people to the government, no part of which can be granted away."  101 U.S. 814, 820 (1879).  Thus, "agencies can govern according to their discretion . . . while in power; but they cannot give away nor sell the discretion of those that are to come after them." *Id*.  Even the states, which are constitutionally bound not to impair the obligation of contracts, cannot be held to a promise to give away sovereign authority.  *Id.*at 819-20; *see* U.S. Const. art. I, § 10, cl. 1.  All the more so for the federal government, which is not subject to the Contracts Clause.  *See, e.g.*, *United States v. Winstar Corp.*, 518 U.S. 839, 888–89 (1996) (plurality opinion) (assuming the federal government "may not contract away an essential attribute of its sovereignty") (internal quotation marks omitted); *id.* at 922–23 (Scalia, J., concurring in the judgment) ("certain core governmental powers cannot be surrendered"); *N. Am. Commercial Co. v. United States*, 171 U.S. 110, 137 (1898) (the federal government's "exercise of power as a sovereign . . . cannot be contracted away").

The Agreement at issue here plainly violates that principle.  It purports to give Texas a veto over "the National Government's constitutional power" to regulate immigration, implicating the "inherent power as sovereign to control and conduct relations with foreign nations."  *Arizona*, 567 U.S. at 394–95.  That kind of sovereign function lies at the core of the powers that may not be contracted away under the reserved powers doctrine.  *Cf. U.S. Trust Co.*, 431 U.S. at 254

(explaining that certain "purely financial" contracts fall outside the doctrine). If a state cannot contract away its power to regulate lotteries, *Stone*, 101 U.S. at 817–19, or garbage disposal, *Gardner v. City of Dallas*, 81 F.2d 425, 426 (5th Cir. 1936), clearly the federal government cannot give away its ability to exercise executive "[d]iscretion in the enforcement of immigration law," *Arizona*, 567 U.S. at 396–97.

*Gardner* is instructive, as it also addressed a change in administration. There, Dallas entered into a long-term contract for garbage collection with the plaintiff. 81 F.2d at 425. After the plaintiff built a processing plant, a "new administration repudiated and declined to perform the contract," and the plaintiff's trustee sued. *Id.* The Fifth Circuit refused to enforce the contract's regulatory promises, holding that the city's promise to maintain prior garbage-collection policies, "being in derogation of the city's police power, is void as against public policy." *Id.* at 426. Under the reserved powers doctrine, "the city could not lawfully commit itself to the continued enforcement of such existing [policies]." *Id.*[5] The same reasoning applies here.

3. Most fundamentally, Texas's Agreement directly and severely threatens the basic principles of our constitutional system. *See* Temporary Restraining Order, ECF No. 16 ("TRO") at 2 (noting the "gravity and constitutional import" of issues raised by the Agreement). The Constitution provides that the "executive Power" is "vested in [the] President." Const. art. II, § 1, cl. 1. But the Agreement Texas invokes would divest the President of that authority in significant ways.

Bartering away the powers vested by our constitutional system is not permissible merely because the officeholders who wield that power in a given moment wish to do so. The Supreme

---

[5] The Court enforced aspects of the contract that were essentially a commercial service agreement to dispose of garbage. *Id.* at 426–28.

Court has consistently rejected attempts by the President or agencies to give away authority that the Constitution or statutes vest in the Executive.  *See, e.g.*, *New York v. United States*, 505 U.S. 144, 181–82 (1992) (a "governmental unit," including "the Executive Branch," cannot choose to expand another's "constitutional authority" and "narrow[]" its own); *Freytag v. Comm'r*, 501 U.S. 868, 880 (1991) ("Neither Congress nor the Executive can agree to waive this structural protection."); *Printz v. United States*, 521 U.S. 898, 922–23 (1997) (explaining that "[t]he Constitution does not leave to speculation who is to administer the laws enacted by Congress[:] the President," and that Congress and the President cannot "transfer[] this responsibility"); *INS v. Chadha*, 462 U.S. 919, 942 n.13, 959 (1983) (explaining that "[t]he assent of the Executive" cannot validate a diminution of executive power).  On Texas's telling, however, DHS has done just that: In the predominantly federal arena of immigration law, *Arizona*, 567 U.S at 394–96, Texas claims the Agreement contracted away the President's power, authorizing "one state to make policy decisions for other states," Br. of Kentucky, Texas, *et al.*, *Montana v. Washington*, No. 22O152 (U.S. filed Mar. 24, 2020), 2020 WL 4450467, at *2, and the nation as a whole.

That would be serious enough, but this case presents an even graver constitutional problem.  The Agreement's surrender of authority—just as power was set to change hands— strikes at the most basic principle at the heart of our constitutional system: democratic governance.  Mechanisms that "bind . . . officials to the policy preferences of their predecessors," as the Agreement transparently seeks to do, "may thereby 'improperly deprive future officials of their designated legislative and executive powers.'"  *Horne v. Flores*, 557 U.S. 433, 449 (2009) (quoting *Frew v. Hawkins*, 540 U.S. 431, 441 (2004)).  As the Supreme Court has recognized, tying the hands of future administrations in this way constrains "their ability to fulfill their duties as *democratically-elected* officials."  *Horne*, 557 U.S. at 449 (emphasis added).  And,

conversely, it deprives the People of their basic ability to bring about change by voting for officials who promise to change policy. The Agreement thus cannot be squared with the bedrock principle that "federal officials" must "remain accountable to the people." *New York*, 505 U.S. at 168.

Two aspects of this Agreement make the democratic threat it poses particularly severe. First, the timing of the Agreement is absolutely damning. It was signed by a politically appointed official of the prior administration on January 8: over two months after the presidential election; two days after Congress certified the results; and just 12 days before the new administration was to be inaugurated. There is no reasonable explanation for this timing except that the very *purpose* of the agreement was to "bind" new administration officials "to the policy preferences of their predecessors," and thus "improperly deprive [them] of their designated . . . executive powers." *Horne*, 557 U.S. at 449 (internal quotation marks omitted).

Second, the Agreement has all the hallmarks of collusion, rather than arms-length negotiation. *See id.* (warning against agreements that represent "collusion between advocacy groups and executive officials who *want* to bind the hands of future policymakers") (emphasis added) (citing *Northwest Environment Advocates v. EPA*, 340 F.3d 853, 855 (9th Cir. 2003) (Kleinfeld, J., dissenting)).[6] Texas appears to have given up nothing—or virtually nothing—in exchange for near-total control over federal immigration policy. State law already mandated one of the promises Texas made, complying with "detainer" requests. *Compare* Agreement III.B

---

[6] *Horne* addressed consent decrees, which the Court emphasized are often critical to "vigilantly enforce federal law." 557 U.S. at 450. Importantly, such decrees are subject to various checks that guard against the kind of abusive Agreement presented in this case. *See Frew*, 540 U.S. at 437. Courts must consider and approve (or disapprove) them, including by hearing objections from third parties. *Local No. 93, Int'l Ass'n of Firefighters, AFL-CIO C.L.C. v. City of Cleveland*, 478 U.S. 501, 525–26, 528–29 (1986). For all the reasons explained above, and others, if this Agreement were offered to a court as a proposed consent decree, it would doubtless be rejected.

*with* Tex. Code Crim. Proc. art. 2.251).  And Texas likewise already shares its DMV data with ICE.[7]  Yet in "exchange," DHS supposedly signed away the enormous power to decide whether to keep policies favored by *both* the outgoing administration *and* Texas, just days before everyone involved knew that power would pass to a new administration.[8]

It is not an overstatement to say that the enforcement of this kind of Agreement is incompatible with democracy.  It cannot be that an administration can disempower its successors in this way simply by finding sympathetic states or organizations or individuals willing to countersign.[9]  For all these reasons, the Agreement is not and cannot be valid or enforceable; the Court should reject all reliance on it.

### C.  Texas's APA Claims Fail.

#### 1.  Texas's arbitrary and capricious arguments lack merit.

Texas asserts that the deportation pause is arbitrary and capricious.  PI Mot. 13–16; *see also* 5 U.S.C. § 706(2)(A).  But its arguments are predicated on a fundamental misunderstanding of the policy at issue and the reasons DHS gave for its temporary exercise of discretion here.  Understood in context, Texas's case falls apart.  In any event, no injunction or vacatur is warranted.

---

[7] *See, e.g.*, Dep't of Homeland Sec., *Privacy Impact Assessment for the Law Enforcement Information Sharing Service* (LEIS Service) 23 (June 28, 2019) (explaining that DHS, including ICE, has "two-way query capability" with Texas's TDEx database),
https://www.dhs.gov/sites/default/files/publications/privacy-pia-ice-leiss-july2019_0.pdf.

[8] This lack of real exchange means the agreement is independently invalid under ordinary contract principles, in part because Texas provided no consideration.

[9] A recent whistleblower report made public that the same DHS official also signed agreements with the union representing ICE officers giving it a similar power to veto immigration policy changes.  Letter from David Z. Seide to U.S. House of Representatives Comm. on Homeland Security, *et al.* (Feb. 1, 2021), https://bit.ly/3oMLUlb.  Those agreements were signed on January 19, 2021—the last full day of the prior administration.  *Id.*

1. DHS concluded that it faces "significant operational challenges at the southwest border" in light of a "serious global public health crisis" and that these circumstances and its "limited resources" require it to reallocate enforcement resources in order to "prioritize" "threats to national security, public safety, and border security" and direct "removal resources to [its] highest enforcement priorities."  DHS Memorandum 1, 3.  DHS further explained that to effectuate these priorities it will temporarily prioritize its resources to provide "sufficient staff and resources" to "fairly and efficiently" conduct processing at the border while minimizing health and safety risks to the public and personnel.  *Id.* at 3.

Texas' basic response is that the government "cannot plausibly argue that figuring out which removals to prioritize requires stopping all removals."  PI Mot. 14.  But the pause does *not* stop "all removals."  The majority of removals result from rapid, summary procedures applied to recent arrivals at the border—generally expedited removal and reinstatement of removal. Valenzuela Decl. ¶ 27.  Indeed, while Texas emphasizes the removal of "nearly 1,000,000" people from FY2017 to FY2019, PI Mot. 2, 82.7% of those were expedited or reinstated removals, *id.* ¶ 26.  The DHS Memorandum does not pause removals of people who arrived after November 1, 2020.  DHS Memorandum 3.  In fact, the DHS Memorandum directs resources to border processing and in doing so, *prioritizes* the removals of recent arrivals over the removal of people who have been in the United States longer.  Thus, understood in the context of the *entire* immigration removal system, DHS has simply chosen to prioritize certain removals over others.

This basic misunderstanding of the system and the policy pervades Texas's arguments.  It accuses DHS of creating "a default rule *against* removal."  PI Mot. 15.  It calls the exceptions to the pause "narrow."  *Id.*  And it accuses DHS of failing to explain why it "deemed enforcement categorically inappropriate."  *Id.*  All of this is illogical and inaccurate once one understands the

actual policy and the scale of removal of recent arrivals, which DHS has decided to prioritize for a brief period of time while it determines its long-term priorities. When read in this context, DHS explains "how the pause in removals helps accomplish [DHS's] goals," TRO at 11: It frees up resources from interior removals and redirects them, especially to the agency's identified priorities of border processing, border removals, and public health protection, while the agency determines its longer-term policies and priorities.

To be sure, Texas may disagree with the policy choices DHS is making under a new administration. But Texas fails to demonstrate that there is no "rational connection" between the circumstances DHS identified and its choice to prioritize, among other things, processing and, as appropriate, removals of recent arrivals at the border. *Hayward v. U.S. Dep't of Labor*, 536 F.3d 376, 380 (5th Cir. 2008) (cleaned up). Texas cannot use the APA to force implementation of its own preferred priorities (or, rather, lack of priorities) based on a misunderstanding of the nature of both the policy at issue and the immigration system as a whole. *Cf. Int'l Union v. Chao*, 361 F.3d 249, 256 (3d Cir. 2004) (rejecting challenge to agency decision to "direct [its] scant resources" towards regulating especially harmful chemical agents).

Nor can Texas force implementation of its own preferences by merely identifying some different choice the agency could have made, particularly where such alternatives are likewise grounded in a misunderstanding of the immigration system. "In deciding a course of action, agencies are not required to consider all potential alternatives." *10 Ring Precision, Inc. v. Jones*, 722 F.3d 711, 724 (5th Cir. 2013). Texas's proposal of maintaining existing enforcement *without* the new priorities directly contradicts DHS's stated objectives. *See 10 Ring Precision*, 722 F.3d at 724 (agency need only consider "significant," "viable," and "obvious" alternatives) (internal quotation marks omitted). And vague suggestions that DHS could have "narrowed the

scope" of its policy are not enough. *Id.*[10] Likewise, its contention that DHS allegedly "ignored the harms that pausing removals will cause," is, again, predicated on Texas's misunderstanding that the DHS Memorandum pauses "the vast majority of removals," PI Mot. 14, when in fact DHS is *prioritizing* the majority of removals, particularly those of recent arrivals at the border, *see also infra* Part II (explaining that Texas's asserted harms are inaccurate and speculative).

2. Even if the Court finds DHS's explanation is unclear or incomplete, it should not halt the pause. Remanding to the agency *without* vacating a policy "is generally appropriate when there is at least a serious possibility that the agency will be able to substantiate its decision given an opportunity to do so, and when vacating would be disruptive." *Cent. & S. W. Servs., Inc. v. EPA*, 220 F.3d 683, 692 (5th Cir. 2000) (indirectly citing *Allied–Signal, Inc. v. United States Nuclear Regulatory Comm'n*, 988 F.2d 146, 151 (D.C. Cir. 1993)) (cleaned up); *see also Int'l Union, United Mine Workers of Am. v. Fed. Mine Safety & Health Admin.*, 920 F.2d 960, 966–67 (D.C. Cir. 1990) ("We have commonly remanded without vacating an agency's rule or order where the failure lay in lack of reasoned decisionmaking" or "was otherwise arbitrary and capricious" under the *Allied–Signal* analysis).

DHS certainly could expand on its explanation to address any questions the Court may still have, particularly with respect to its choice to briefly stay its hand in some instances to ensure the prioritization of other cases. *See* TRO at 11 (questioning "why 100 days *specifically* is needed"); *Cent. & S. W. Servs.*, 220 F.3d at 692 (agency "may well be able to justify its decision" on remand). And there can be little doubt that continuing to enjoin the pause will be

---

[10] By contrast, in *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 140 S. Ct. 1891 (2020), there was an obvious alternative policy: Rather than rescinding DACA altogether, DHS could have rescinded its benefits without rescinding its discretionary forbearance. *Id.* at 1913. Here there is no such obvious subset of the policy to consider—indeed, the deportation pause is similar to DACA's forbearance aspect, but extremely limited in duration.

"disruptive" of the new administration's early efforts to implement its own immigration policies and priorities, and for families and communities around the country.  Here "the probability [DHS] will be able to justify" the pause "is sufficiently high" that halting the policy is "not appropriate."  *Fox Television Stations, Inc. v. FCC*, 280 F.3d 1027, 1049 (D.C. Cir.), *opinion modified on reh'g*, 293 F.3d 537 (D.C. Cir. 2002).

### 2.   The deportation pause did not require notice and comment.

Texas additionally claims that the 100-day pause was subject to notice-and-comment rulemaking because it is a substantive rule that "circumscribe[s] administrative choice."  PI Mot. 17.  This argument, too, lacks merit.

The APA distinguishes between "substantive rules," which are subject to notice-and-comment rulemaking, and "interpretive rules, general statements of policy, or rules of agency organization, procedure, or practice," which are exempt.  *U.S. Dep't of Labor v. Kast Metals Corp.*, 744 F.2d 1145, 1152 (5th Cir. 1984) (citation omitted); *see also* 5 U.S.C. § 553(b)(3)(A). The deportation pause and prioritization falls in the latter category, because it is "primarily directed toward improving the efficient and effective operations of an agency."  *Batterton v. Marshall*, 648 F.2d 694, 702 n. 34 (D.C. Cir. 1980).  It does not bar anyone's eventual removal, but instead briefly prioritizes some removals over others while the agency sorts out its long-term enforcement policies.  It would make no sense for an agency to go through months of notice and comment just to decide whether to pause certain agency activity for 100 days while it sets new policy.  That would defeat the purpose of all such pauses, which agencies routinely employ.

Indeed, courts have rejected notice-and-comment claims in this context and "declined to upset freezes on" agency activity "pending completion of" longer-term policymaking.  *Kessler v. FCC*, 326 F.2d 673, 680–81 (D.C. Cir. 1963) (collecting cases).  In *Kessler*, for instance, the

court held that notice and comment was not required for a policy temporarily pausing decisions on broadcast permit applications so that the agency could promulgate new substantive criteria for deciding applications. *Id.* It explained that the pause was procedural because it did not create new evaluation standards but was "primarily concerned with the effective functioning" of agency processes. *Id.* at 681. The Court agreed that "a temporary limited halt" in regulatory action "was a necessary adjunct to any efficient and effective" policymaking process. *Id.* at 680–81. ("temporary suspension" was required "until the outmoded and unsatisfactory old rules could be reexamined") (internal quotation marks omitted).

The same is true here. The deportation pause is a temporary measure that allows DHS to manage its resources and ensure that its removals and other enforcement actions conform to its priorities. As explained, most removals that would typically be executed during this period are unhindered by the pause. And for people to whom it does apply, the pause does not dictate that they will or will not be deported after those 100 days, it simply postpones a decision. Notice and comment is not required for a policy like this that simply "funnel[s] . . . agency [enforcement] resources" and does not decide the ultimate "rights and obligations" of regulated parties. *Kast Metals*, 744 F.2d at 1155.

Notably, the fact that a policy includes temporary "instructions to agency officers" does not mean it must go through notice and comment. *Kast Metals*, 744 F.2d at 1152 n.13 (collecting cases). Nor does it matter that the pause has a brief effect on some people's removal—just like the policies described in *Kessler* that temporarily affected substantive applications. "[A]ll procedural requirements may and do occasionally affect substantive rights, but this possibility does not make a procedural regulation a substantive one." *Ranger v. FCC*, 294 F.2d 240, 244 (D.C. Cir. 1961) (regulation establishing cut-off date whereby late

applications would not receive favorable consideration was not substantive rule, even if "failure to observe it might cause loss of substantive rights"); *see also Kast Metals*, 744 F.2d at 1150 ("All agency rules will in some way affect those within the agency's grasp" but that does not convert them into substantive rules.); *id*. at 1155–56 (upholding new policy even though it might result in an inspection that would not have occurred under the previous policy).

Texas's reliance on cases involving DAPA and DACA is mistaken.  PI Mot. 16–17. Those cases held that DAPA and DACA "modifie[d] [the] substantive rights and interests" of applicants by conferring lawful presence on beneficiaries and making them eligible for driver's licenses and work authorization.  *Texas v. United States*, 809 F.3d 134, 176 (5th Cir. 2015) ("*Texas I*"), *as revised* (Nov. 25, 2015); *see also Texas v. United States*, 328 F. Supp. 3d 662, 728 (S.D. Tex. 2018).  And the policies conferred those benefits for years with the option of renewal.  Thus, the courts held, they changed the "substantive standards by which the [agency] evaluates *applications which seek a benefit* that the agency has the power to provide."  *Texas I*, 809 F.3d at 176–77 (quotation and citation omitted) (emphasis added).  Regardless of the validity of those holdings, the deportation pause does no such thing.

## II.    TEXAS LACKS STANDING AND IRREPARABLE INJURY, AND THE BALANCE OF HARDSHIPS REQUIRES DENIAL OF RELIEF.

Finally, even if any of Texas's merits claims were likely to succeed, an injunction is unwarranted.  Texas has offered only a hodgepodge of assertions and statistics that have nothing to do with the actual deportation pause it is challenging.  That is not enough to establish standing—and certainly not enough to warrant an injunction.  And on the other side of the ledger, the relief it seeks is imposing serious and concrete harms on people around the country every day.

31

1.  Texas's case for standing is a house of cards.  It offers *no* evidence that the deferral of any removals under the pause—which lasts only 100 days—will impose any costs on the State.

Texas asserts that the pause will require the State to spend money providing services—like school for children and emergency medical care—for those who are not removed because of the deportation pause.  But, even assuming such costs are cognizable, its evidence does nothing to tie these costs to people with final removal orders—those actually covered by the 100-day pause, ECF Nos. 63-7, 63–9-14, 63–17-18.  The evidence Texas offers is about undocumented people *generally*, including those the federal government has not placed in removal proceedings—not the smaller group of people with final removal orders not within an exception to the 100-day pause.  *See, e.g.*, ECF No. 63-10 ("undocumented criminal aliens"); ECF No. 63-13 ("undocumented immigrants"); ECF No. 63-14 ("unlawfully present"); *see also* ECF No. 63-12 ("unaccompanied minors"); Valenzuela Decl. ¶ 9; Berg Decl. ¶ 8.  Indeed, when the federal defendants specifically requested evidence showing harms attributable to noncitizens *with final removal orders*, Texas offered nothing responsive—only claims about undocumented people.  *See* Texas's Response to United States' First Set of Discovery Requests, Exh. D, Interrogatory No. 2.

Thus, for example, Texas leans on the number of individuals who lack legal status in Texas jails and prisons.  PI Mot. 3-5.  But it offers no information about whether those individuals have final removal orders; often, individuals identified as potentially removable while in local jails are at the *beginning* of the removal proceedings described above, with hearings, appeals, and judicial review still before them.  Valenzuela Decl. ¶ 15.c.  The pause on removals for those with final orders has no impact on such ongoing proceedings.  It bears repeating: Texas has sued to enjoin a pause of removals of those *with final removal orders*, but

*none* of the evidence it cites to substantiate its alleged fiscal harms is specific to those with final orders of removal. *See, e.g.*, ECF Nos. 63-10, 63-12–14. Statistics about the much larger undocumented population are irrelevant. *Cf. Wyoming v. U.S. Dep't of Interior*, 674 F.3d 1220, 1232–1233 (10th Cir. 2012) (rejecting similar logical leap in a state's asserted standing).

Even for those who have final removal orders, the pause only delays removals for 100 days. Texas offers no evidence whatsoever that anyone with a final removal order (1) would be deported but for the pause *and* (2) will instead impose costs on Texas during the 100 day pause (or otherwise traceable to the pause). It is completely speculative that *both* of those conditions will be satisfied for anyone covered by this short-term policy. *Cf. El Paso Cty., Texas v. Trump*, 982 F.3d 332, 341–42 (5th Cir. 2020) (no standing where it was speculative whether benefit to plaintiff would occur even if court granted the requested relief).

Instead, Texas's efforts to demonstrate harm rely on its assumption that those individuals will *never* be removed. It asserts, for example, that the pause represents a "categorical refusal to remove." PI Mot. 23. But that is, again, simply not what this policy does. DHS has stayed *some* removals—but not, for example, for recent arrivals—and, even then, *only for 100 days*.[11]

Because it cannot substantiate any costs in that brief window, Texas has spun out a series of suppositions and inaccuracies to suggest the pause is actually a long-term policy. It argues that (1) DHS will "be forced to release" those who are no longer in the removal period and (2) they will then abscond. PI Mot. 3–4. But Texas admits that by statute DHS does not need to release individuals after the removal period if they are "unlikely to comply with the order of removal." *Id.* at 3 (citing 8 U.S.C. § 1231(a)(3) and (a)(6)); *see* Berg Decl. ¶ 10 (describing

---

[11] Moreover, as previously explained, Texas's central statutory argument regarding § 1231 applies to a tiny subset of those with removal orders—namely, those who fall within the 90-day removal period. Texas also offers no evidence tying the 100-day deferral of removal for anyone in *that* much smaller group of people to the fiscal harms it alleges.

"case-by-case" detention analysis).  Nor has Texas come close to showing that constitutional principles will require mass releases.  PI Mot. 4.  Detention pending removal is presumptively *reasonable* for six months (longer than the pause), *Zadvydas v. Davis*, 533 U.S. 678, 701 (2001), and even after that period whether removal is reasonably foreseeable is a complex, case-specific question, *see* Valenzuela Decl. ¶ 33; *see also, e.g.*, *Kassama v. Dep't of Homeland Sec.*, 553 F. Supp. 2d 301, 306 (W.D.N.Y. 2008) (denying release to individual detained 21 months).  A discretionary 100-day pause will not mandate release, Valenzuela Decl. ¶ 35, and officers can continue making preparations for removal even during that period.

Texas claims—again without evidence—that individuals with criminal convictions are "particularly unlikely to comply" with removal orders, PI Mot. 4; but the vast majority of convictions for people with removal orders are "status" violations or otherwise minor. Valenzuela Decl. ¶ 14.a.  Moreover, as noted, if particular individuals are unlikely to comply with an order, DHS can detain them on just that basis.  Indeed, DHS frequently detains people for months or years *after* the end of the removal period.  Valenzuela Decl. ¶ 34.  And DHS has available alternatives to detention that are effective in ensuring appearances, *id*. at ¶ 39; DHS's data demonstrate that 98% of people on supervised release check in as directed, Berg Decl. ¶ 11. In other words, Texas offers only speculation piled upon speculation in its effort to generate standing by transmuting an extremely brief policy into something entirely different.  *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 (2013) (noting Court's "reluctance to endorse standing theories that rest on speculation about the decisions of independent actors").[12]

---

[12] In *Dept. of Commerce v. New York*, on which Texas relies, extensive evidence "established that noncitizen households have historically responded to the census at lower rates than other groups."  139 S. Ct. 2551, 2566 (2019).  Here, by contrast, Texas's causal chain rests "on mere speculation about the decisions of third parties."  *Id.*

Texas also offers only speculation that the pause will "encourage additional illegal immigration into Texas."  PI Mot. 23; *see* ECF No. 63-17 (data on all relocations to Texas, including U.S. citizens); ECF No. 63-18 (data on general foreign-born population in Texas).  As explained above, DHS has prioritized the removal of, among others, recent arrivals at the border. Given the policy's explicit focus on border removals and Texas's status as a border state—with the longest border of any state in the country, of over 1,200 miles—the net effect of the reprioritization could as easily be *fewer* undocumented immigrants in the State.  *See Texas*, 809 F.3d at 155 (noting that standing analysis will consider "offsetting benefits that are of the same type").  What evidence does Texas provide that DHS's choice will mean more undocumented people in Texas?  Again, none.  *See* Texas's Response to United States' First Set of Discovery Requests, Exh. D, Interrogatory No. 3. (acknowledging it was unable to provide any information about the impact of the pause on its budget expenditures, noting any response on that issue would be "speculation" and "not . . . based on any empirical knowledge"); *Arpaio v. Obama*, 797 F.3d 11, 19 (D.C. Cir. 2015) (rejecting similar theory as speculative).

Ultimately, Texas asks the Court to simply *assume* that a very short-term pause will lead to numerous people being released, and then refusing to appear, and then remaining after the end of the pause, and then at some point using Texas public services as a result of the pause.  Such rank speculation is inadequate.  *Crane v. Johnson*, 783 F.3d 244, 252 (5th Cir. 2015), rejected Mississippi's alleged fiscal injury as "purely speculative" because "there was no concrete evidence" that the State's costs would increase as a result of DACA.  *Id.*  Similar to Texas here, Mississippi only provided generalized evidence that "the state provides social benefits to" undocumented people writ large, not that any costs incurred were "fairly traceable" to DACA recipients specifically.  *Id.*  The Fifth Circuit concluded: "Mississippi's claim of injury is not

supported by any facts." *Id.* Texas bears the "burden to establish standing," *id.*, and its evidence

here is, if anything, even weaker.

By contrast, in *Texas*, the Fifth Circuit's standing holding was narrowly focused on the

provision of driver's licenses to DAPA beneficiaries, 809 F.3d at 150–61. The court relied on

evidence that *because of the challenged program* nearly half a million Texans would become

eligible for driver's licenses, and concluded most beneficiaries would actually seek licenses. *Id.*

at 155–56. And it distinguished *Crane* as to that specific standing theory (which *Crane* had held

was waived). *Id.* at 150 n.24; *but see* TRO at 5 (incorrectly suggesting a broader waiver in

*Crane*). Texas offers nothing remotely comparable here. Nor could it, given that the pause is

only in effect for 100 days and confers no such benefit.[13] Indeed, if Texas can use generalized

evidence about the purported costs of undocumented immigrants to establish standing to

challenge this short term policy applicable only to a particular set of people, then it, and

presumably every other state, can sue anytime the government withholds deportation, or any

number of other enforcement or regulatory actions—perhaps even in individual cases.

2. Even if it could show standing, Texas has demonstrated no irreparable harm. Texas "must

demonstrate that the harm is 'real, imminent, and significant—not merely speculative or

potential—with admissible evidence and a clear likelihood of success." *Tex. Health & Human

Servs. Comm'n v. United States*, 166 F. Supp. 3d 706, 710 (N.D. Tex. 2016) (cleaned up); *Janvey

v. Alguire*, 647 F.3d 585, 601 (5th Cir. 2011) (similar). Texas has failed to carry this burden.

---

[13] Indeed, the district court in *Texas* held that that any damages to states due to increased expenditures on
state services for those who might otherwise be deported were "too speculative to be relied upon." *Texas
v. United States*, 86 F. Supp. 3d 591, 635 (S.D. Tex. 2015). In later proceedings, the district court
affirmed this holding; it concluded that the State had subsequently offered evidence "directly" linking
costs to the specific population at issue. 328 F. Supp. 3d at 736-37. Again, here there is no such
evidence.

3. By contrast, any further delay of the removal pause will severely impact individuals, families, and communities around the country. The burden is on Texas to demonstrate that a preliminary injunction would not be adverse to the public interest, and it has failed to do so. *Star Satellite, Inc. v. Biloxi*, 779 F.2d 1074, 1079 (5th Cir. 1986). Were an injunction put in place, the harm to those facing deportation and to their families and loved ones would be acute and irreparable.

Those facing the prospect of removal absent the pause will experience severe harm. Many have pathways to durable status in this country that they will lose if removed. *See, e.g.*, Declaration of Michelle Garza, ECF No. 28-2 ("Garza Decl.") ¶ 19. Others face danger of persecution, torture or other harm if they are removed. *Id.* ¶ 23. Lifting the pause and putting these individuals at risk of removal—particularly those with a pathway to humanitarian relief if they remain pursuant to the pause—is squarely contrary to "the public's interest in ensuring that we do not deliver aliens into the hands of their persecutors." *Leiva-Perez v. Holder*, 640 F.3d 962, 971 (9th Cir. 2011). For example, ICE deported asylum seekers to Cameroon in Fall 2020 even though some had pending motions to reopen their cases and potentially obtain relief. Reportedly, the people who were deported were detained on arrival and some are now missing.[14] Still others face harms due to recent upheaval in their countries of origin, such as Hondurans at risk of homelessness due to the devastation wrought by two recent hurricanes. Garza Decl. ¶ 12; *see also, e.g.*, *Ibrahim*, 2018 WL 582520 at *1 (explaining the long-standing practice of declining to deport people to Somalia due to political turmoil).

---

[14] Julian Borger, *US to Send Asylum Seekers Home to Cameroon Despite "Death Plane" Warnings*, The Guardian, Nov, 9, 2020, https://www.theguardian.com/us-news/2020/nov/09/us-to-send-asylum-seekers-home-to-cameroon-despite-death-plane-warnings.

And the harms of such unwarranted deportations reach far beyond the individual who is removed—families, loved ones, and friends are also separated.  For parents and children that are split apart, "the harm . . . is obvious and intense."  *M.G.U. v. Nielsen*, 325 F. Supp. 3d 111, 123 (D.D.C. 2018).  For example, Alain Cisneros, Campaign Coordinator for FIEL, describes how one woman, deported after a routine traffic stop, was separated from her children and was unable to visit her son in the United States as he developed cancer and eventually died.  Declaration of Alain Cisneros, Exh. E ("Cisneros Decl.") ¶ 10.  RAICES has had cases in which, after a parent's deportation, children express suicidal ideations.  Garza Decl. ¶ 13.  "Every additional day of separation causes irreparable harm."  *M.G.U.*, 325 F. Supp. at 123; *see also Golden Gate Rest. Ass'n v. San Francisco*, 512 F.3d 1112, 1126 (9th Cir. 2008) (public interest analysis includes "the hardship to all individuals" directly affected "as well as the indirect hardship to their friends and family members").  These harms pervade communities throughout our country, injuring U.S. citizens and non-citizens alike.  Indeed, more than three quarters of FIEL's members are in families where some family members are U.S. citizens or have immigration status while others are undocumented.  Declaration of Cesar Espinosa, ECF No. 28-1 ¶ 2; Cisneros Decl. ¶¶ 7, 8, 9 (citing examples of mixed-status families).  The same is true for many of RAICES' clients. Garza Decl. ¶ 13.

The psychological toll of fear of deportation is severe.  Indeed, even for those who are not themselves eventually subject to deportation or other enforcement action under an injunction, the order Texas seeks will exacerbate the daily fear and anxiety created by the omnipresent danger of such action.  "Parents with final removal orders describe the constant fear that any minor infraction, such as a traffic ticket, could lead to long-term family separation and completely upend their children's lives."  Cisneros Decl. ¶ 4.  For example, one person, the

primary caretaker of his two U.S. citizen nieces, fears "that if he is deported, the girls will be placed in the foster care system and possibly split up," a worry that "clouds his future and causes him constant anxiety."  *Id.* ¶ 8; *see also* Garza Decl. ¶ 16.  The pause offered temporary peace of mind, but every day it is enjoined creates uncertainty, fear, and pain.  Cisneros Decl. ¶ 5.

Addressing the public interest, Texas invokes *Nken v. Holder*, 556 U.S. 418 (2009), but that case militates against an injunction.  *Nken* emphasized that there can be important public interests *against* executing final removal orders such as the "public interest in preventing aliens from being wrongfully removed, particularly to countries where they are likely to face substantial harm."  *Id.* at 436.  As explained, many of the individuals subject to removal would be seriously harmed by removal or the threat of removal.  And that harm is multiplied for those who have spent years in this country raising families and building their communities.  *Cf. Osorio-Martinez v. Att'y Gen.*, 893 F.3d 153, 179 (3d Cir. 2018) ("the fact that the Government has not—until now—sought to remove" certain noncitizens "undermines" the public interest in the removal order's execution).

### III.   SUMMARY JUDGMENT IS PREMATURE

Finally, Texas's suggestion that the Court enter summary judgment is premature.  PI Mot. 20–21.  To the extent the Court is inclined to rely on the Agreement, summary judgment is plainly not warranted.  As noted above, there are strong reasons to believe that this Agreement was collusive, and to the extent any arguments that rely on it remain after a motion to dismiss, Intervenors intend to seek discovery on the circumstances surrounding the Agreement.  As for the remaining claims, while they—like the reliance on the Agreement—fail as a matter of law, the proceedings in this case have been highly expedited.  The more prudent course would be to defer final judgment pending further proceedings and possible guidance on appeal.

Should the Court disagree, none of Texas's arguments warrant the vacatur relief it seeks. PI Mot. 21–22.  As explained above, at the absolute most the Court should limit any such relief to a remand without vacatur (for Texas's arbitrary and capricious claim) or vacatur limited to individuals in the removal period (for Texas's statutory claim).  Moreover, as Texas's claims are all aimed at the deportation pause, any relief should be clearly limited to avoid impeding the other portions of the DHS Memorandum or the agency's pre-existing discretion in individual cases.  *See* TRO at 17 & n.7.

## CONCLUSION

The Court should deny the motion.

Dated: February 12, 2021

Andre Segura
(Tex. 24107112; S.D. Tex. 3123385)
Kathryn Huddleston**
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF TEXAS, INC.
5225 Katy Fwy., Suite 350
Houston, Texas 77007
(713) 942-8146
asegura@aclutx.org
khuddleston@aclutx.org


*pro hac vice forthcoming
**admitted pro hac vice

Respectfully submitted,

/s/ *Cody Wofsy*
Cody Wofsy**
Spencer E. Amdur**
AMERICAN CIVIL LIBERTIES UNION
39 Drumm Street
San Francisco, CA 94111
Telephone: (415) 343-1198
cwofsy@aclu.org
samdur@aclu.org

Omar C. Jadwat*
Michael K.T. Tan**
Anand Balakrishnan*
Noor Zafar**
David Chen*
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION, IMMIGRANTS' RIGHTS PROJECT
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2600
ojadwat@aclu.org
mtan@aclu.org
abalakrishnan@aclu.org
nzafar@aclu.org
dchen@aclu.org

**CERTIFICATE OF COMPLIANCE**

The undersigned counsel certifies that the total number of pages in this brief, exclusive of

the matters designated for omission, is 40 pages as counted by Microsoft Word Software.

_/s/ Cody Wofsy_
Cody Wofsy


**CERTIFICATE OF SERVICE**

I hereby certify that I served a copy of the foregoing brief via the Court's ECF filing

system.

_/s/ Cody Wofsy_
Cody Wofsy