Exhibit A

**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**

| | |
|---|---|
| STATE OF TEXAS, | ) |
| | ) |
|    Plaintiff, | )   Civ. Action No. 6:21-cv-00003 |
| | ) |
|      v. | ) |
| | ) |
| UNITED STATES OF AMERICA; | ) |
| DAVID PEKOSKE, Acting Secretary of | ) |
| the United States Department of | ) |
| Homeland Security, in his official | ) |
| capacity; U.S. DEPARTMENT OF | ) |
| HOMELAND SECURITY; TROY | ) |
| MILLER, Senior Official Performing the | ) |
| Duties of the Commissioner of U.S. | ) |
| Customs and Border Protection, in his | ) |
| Official capacity; U.S. CUSTOMS AND | ) |
| BORDER PROTECTION; TAE | ) |
| JOHNSON, Acting Director of U.S. | ) |
| Immigration and Customs Enforcement, | ) |
| in his official capacity; U.S. | ) |
| IMMIGRATION AND CUSTOMS | ) |
| ENFORCEMENT; TRACY RENAUD, | ) |
| Senior Official Performing the Duties of | ) |
| the Director of the U.S. Citizenship and | ) |
| Immigration Services, in her official | ) |
| capacity; U.S. CITIZENSHIP AND | ) |
| IMMIGRATION SERVICES, | ) |
| | ) |
|    Defendants. | ) |
| | ) |

**Declaration of Claudia Valenzuela**

I, Claudia Valenzuela, make the following declaration based on my personal knowledge and

declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 as follows:

     1.     I am an attorney with the American Immigration Council (Council), licensed

to practice in the State of Illinois. In my capacity at the Council, I work primarily on

transparency and accountability issues in the immigration context. I also provide technical

assistance to attorneys around the country on a variety of immigration-related legal issues, including substantive and procedural issues arising in removal proceedings.

2.      The Council is a non-profit organization located in Washington, D.C, that employs policy advocacy, litigation, research, and communications to push for sensible and humane immigration policies and laws that reflect U.S. values, fundamental rights, justice, and fairness.

3.      Prior to joining the Council in February of 2019, I served as the Detention Project Director at the National Immigrant Justice Center (NIJC), a program of Heartland Alliance, a position I had held since approximately 2013. I began working with individuals in Department of Homeland Security (DHS) custody in approximately 2002 and have worked with detained individuals and on issues impacting this population for over 18 years.

4.      In my role as Detention Project Director at NIJC, I oversaw the provision of legal services to individuals confined in immigration detention centers throughout the Midwest and around the country. NIJC's services to detained individuals include the provision of legal rights presentations, legal advice, and legal representation in matters ranging from bond to applications for relief before the immigration courts, administrative appeals before the Board of Immigration Appeals (BIA), challenges to detention via habeas petitions before the federal district courts, and challenges to removal orders via petitions for review before the courts of appeals.

5.      Throughout the course of my tenure at NIJC, I primarily either directly represented individuals in applications for parole, bond, and/or relief in removal proceedings or supervised and/or co-counseled with junior attorneys, legal interns, and *pro bono* counsel

in representing individuals seeking release and defending against deportation while in DHS
custody.

6.      In my current position at the Council, I continue to provide technical support
to attorneys handling matters for detained individuals, including parole, bond, and habeas
challenges. Further, the Council is part of the Immigration Justice Campaign (IJC), a
collaboration whose mission is to fight for due process and justice for detained immigrants.
In my current position, I continue to be apprised of trends in immigration detention and
removal proceedings.

7.      I have also served as an adjunct professor at DePaul University College of
Law and Loyola University School of Law and as an instructor in the immigration program
for the National Institute for Trial Advocacy (NITA).

8.      I estimate that I have provided direct representation to approximately 200
detained individuals. Additionally, I have directly supervised approximately 300 cases for
detained individuals. This number does not include individuals who have attended legal
rights presentations that I have given at detention facilities, whom I did not ultimately
represent.

### I.   The Removal System

9.      There are approximately 11 million people without regular immigration status
in the United States— also known as "undocumented" people. *See* Migration Policy Institute,
*Profile of Unauthorized Population: United States* (2018), https://bit.ly/3rN7d7N.
Approximately 1.19 million of those individuals have final removal orders. Declaration of
Peter R. Berg, ECF No. 78-1, ¶ 8.

10.     Except for summary removal procedures described below, by default, whether a noncitizen may be removed from the United States is determined by an Immigration Judge in a civil proceeding conducted under Section 240 of the Immigration and Nationality Act (INA), sometimes referred to as "240 proceedings." *See* 8 U.S.C. § 1229a. To initiate these proceedings, DHS files a charging document, the Notice to Appear (NTA), alleging the basis for removal, and a DHS attorney prosecutes the case. The immigration judge must resolve at least two key questions: whether the noncitizen is subject to removal, *see* 8 U.S.C. § 1229a(a)(1), and if the noncitizen is subject to removal, whether he or she should be granted a form of relief from removal, *see* 8 U.S.C. § 1229a(c)(4).

11.     For noncitizens arrested within the United States, the government bears the initial burden of establishing "alienage." 8 C.F.R. § 1240.8(c). If the government establishes alienage and charges the noncitizen as being present without lawful admission or parole, the noncitizen bears the burden of establishing lawful presence based on a prior admission to the U.S. or, alternatively, a basis for admission (authorization to enter or remain in the United States). *See* 8 U.S.C. § 1229a(c)(2); 8 C.F.R. § 1240.8(c). For a noncitizen who has been admitted to the U.S., such as a lawful permanent resident (or "green card" holder), the burden remains on the government to demonstrate that the individual is subject to removability. *See* 8 U.S.C. § 1229a(c)(3); 8 C.F.R. § 1240.8(a).

12.     Once an individual is deemed "removable," the Immigration Judge will assess and decide any applications for relief from removal. U.S. immigration law provides for various forms of relief from removal. Of the 200 detained individuals that I have represented, the majority were eligible for relief from removal including the following common forms of relief or protection.

4

a.  *Cancellation of Removal.* One form of relief, known as cancellation of removal, requires a noncitizen to establish physical presence in the United States for a certain number of years and thus is only available to non-recent arrivals. *See* 8 U.S.C. § 1229b. Different eligibility rules apply depending on whether the applicant is a lawful permanent resident or not. Because of a recent Supreme Court decision and a currently pending Supreme Court case, more noncitizens have viable claims for cancellation of removal under this provision than in the recent past. *See generally* American Immigration Council and the Catholic Legal Immigration Network, Inc. (CLINIC), *Strategies and Consideration in the Wake of* Pereira v. Sessions (Dec. 21, 2018), https://bit.ly/3tKKyuD; Brief for Petitioner, *Niz-Chavez v. Wilkinson*, No. 19-863 (Aug. 6, 2020).

b.  *Asylum.* Asylum is available to noncitizens who have a well-founded fear of persecution if returned to their country of origin. 8 U.S.C. § 1158(b)(1)(A); 8 C.F.R. § 208.13; *see also* American Immigration Council, *Asylum in the United States* (June 11, 2020), https://bit.ly/3d2Wylz. If the noncitizen establishes that she merits asylum and no bars to asylum apply, the government "shall not remove" the noncitizen to her country of origin. 8 U.S.C. § 1158(c)(1)(A). She becomes eligible for a green card after one year. 8 C.F.R. § 209.2(a)(1).

c.  *Withholding of Removal.* Even if a noncitizen does not qualify for asylum protection, the government still "may not remove" a noncitizen to a country where that noncitizen's "life or freedom would be threatened . . . because of the [noncitizen's] race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1231(b)(3)(A). This form of relief from removal

5

is known as "withholding of removal." Unlike asylum, withholding of removal does not provide a pathway to permanent residence or citizenship, but it does prevent the government from executing a removal order to the proposed country of removal. *Id.*; *see also* American Immigration Council and National Immigration Justice Center, *The Difference Between Asylum and Withholding of Removal*, 2 (Oct. 2020), https://bit.ly/3jyusQ2.

d.  *Convention Against Torture Protection.* Those noncitizens who may not be able to establish eligibility for withholding of removal, can still have their removal withheld or deferred under the Convention Against Torture (CAT). To qualify for relief under CAT, the noncitizen must establish that "it is more likely than not that he or she would be tortured if removed to the proposed country of removal." 8 C.F.R. § 1208.16(c). Like withholding of removal under 8 U.S.C. § 1231(b)(3), if an individual meets the legal standard for withholding or deferral of removal under CAT, the Attorney General may not remove the individual to that country. Neither withholding of removal relief nor CAT relief prevent the government from removing a noncitizen to a third country. *See* 8 C.F.R. §§ 208.16(f); 1208.16(f). However, in practice, the government rarely exercises third-country removals. In FY 2017, the government removed just 1.6 percent of the total number of people granted withholding of removal to third countries. *See The Difference Between Asylum and Withholding of Removal*, at 7, https://bit.ly/3jHpIIg.

13.  If the immigration judge finds an individual removable, denies relief from removal, and issues a removal order at the end of the proceeding, that decision may be

appealed to the Board of Immigration Appeals (BIA). *See* 8 C.F.R. § 1003.38. Generally, a removal order is not considered final until: (1) the time to file an appeal has run; (2) the noncitizen waives the right to appeal; or (3) the BIA dismisses the appeal or otherwise affirms the removal order. *See* 8 C.F.R. § 1241.1; 8 U.S.C. § 1101(a)(47)(B). For *in absentia* removal orders (where the noncitizen does not appear at the immigration hearing), the order becomes final immediately upon entry. 8 C.F.R. § 1241.1(e). If a person has been granted voluntary departure (meaning they must leave the United States on their own within a specified period and avoid a formal removal order and its consequences) and overstays the time ordered to leave the country, the order becomes final at that time. *Id.* § 1241.1(f). A removal order's finality typically triggers the start of the "removal period," addressed below. 8 U.S.C. § 1231(a)(1)(B).

## II. The Intersection of Criminal Law and the Removal System

14.     Civil removal proceedings are distinct from the criminal judicial system. While some criminal convictions can be grounds for removal, *see* 8 U.S.C. §§ 1182(a)(2), 1227(a)(2) (listing criminal grounds of removal), the vast majority of individuals in removal proceedings face deportation due to civil immigration infractions, such as not having a visa or other immigration status. *See* TRAC Immigration, *New Deportation Proceedings Filed in Immigration Court* (Dec. 2020), https://bit.ly/3cUjeEf. In Fiscal Year 2019, only 1.7 percent of new removal proceedings were based on criminal grounds of removal, while 94.9 percent were grounded in civil immigration violations (with the great majority due to entry without inspection). *Id.*

a. Where removal proceedings are initiated based on a criminal conviction, the underlying conviction is nonviolent or minor in the majority of cases. The misnomer "aggravated felony"—a ground of removal at 8 U.S.C. § 1227(a)(2)(A)(iii)—in fact covers a wide range of offenses that are neither aggravated nor felonies, such as misdemeanor theft of a video game with a one-year suspended sentence and selling $10 worth of marijuana. *See* Kathy Brady, Immigrant Legal Resource Center, *Practice Advisory: Aggravated Felonies* (April 2017), https://bit.ly/2MWyUwj. Minor offenses such as public transportation fare evasion or shoplifting are "crimes involving moral turpitude" (CIMTs) that can render a noncitizen removable under 8 U.S.C. § 1227(a)(2)(A)(i)-(ii) or 8 U.S.C. § 1182(a)(2)(A)(i)(I). *See, e.g.*, *Santos-Gonzalez v. Reno*, 93 F. Supp. 2d 286, 288 n.2 (E.D.N.Y. 2000) (observing that "turnstile jumping" is a CIMT); *Matter of Diaz-Lizarraga*, 26 I. & N. Dec. 847, 854-55 (BIA 2016) (holding that shoplifting is a CIMT).

b. For many removable individuals, criminal convictions are closely tied to their immigration status (rather than separate conduct). For example, of those noncitizens deported with criminal convictions, by far the most common offense is misdemeanor illegal entry into the United States under 8 U.S.C. § 1325. In FY2019, U.S. Immigration and Customs Enforcement (ICE) deported 48,969 individuals whose most serious offense was illegal entry. TRAC Immigration, *Latest Data: Immigration and Customs Enforcement Removals FY 2019* (Feb. 2020), https://bit.ly/3cYcOUK. Other common offenses include illegal re-entry under 8 U.S.C. § 1326 (11,246 people), and traffic offenses (6,573 people), *id.*—

8

such as people driving without a license because they are ineligible for a driver's

license due to their immigration status. Also in Fiscal Year 2019, ICE deported

4,687 people whose most serious offense was marijuana possession, a public

order offense, disorderly conduct, or trespassing. *Id.* Through February of

FY2020, misdemeanor illegal entry remained the top offense (15,496 people),

with illegal re-entry a distant second (5,336 people). TRAC Immigration, *Latest*

*Data: Immigration and Customs Enforcement Removals FY 2020* (Feb. 2020),

https://bit.ly/3aOk2rM.

15.     Removal is not a foregone conclusion for a noncitizen with a criminal

conviction. Except as discussed below, before the government can deport a noncitizen with a

criminal conviction, the noncitizen is entitled to full and fair proceedings before an

immigration judge, as described above. *See* 8 U.S.C. § 1229a.

    a.  These proceedings are not a mere formality. For a noncitizen with a criminal

        conviction, determining whether the individual is subject to removal and, if so,

        whether he is eligible for relief, involves the complex intersection of criminal and

        immigration law. The Supreme Court has repeatedly reiterated that the

        government is bound by strict legal limitations when determining the immigration

        consequences of criminal convictions. *See, e.g.*, *Esquivel-Quintana v. Sessions*,

        137 S. Ct. 1562 (2017); *Moncrieffe v. Holder*, 569 U.S. 184 (2013). Because of

        the nature of these legal limitations, which (among other things) involve complex

        comparisons across criminal law and federal immigration statutes, immigration

        law is constantly evolving regarding whether certain criminal offenses make a

        person removable or preclude the person from applying for immigration relief.

Consequently, an immigration judge sometimes determines that a criminal offense does not in fact sustain a charge of removability and terminates removal proceedings on that basis.

b. Moreover, there are multiple forms of relief from removal and other forms of protection that may remain available to noncitizens with criminal convictions, including cancellation of removal for certain long-term lawful permanent residents under 8 U.S.C. § 1229b(a) and a waiver of certain criminal grounds of inadmissibility and removability to allow for adjustment of status to lawful permanent residence under 8 U.S.C. § 1182(h) (available to certain spouses, parents, and children of U.S. citizens and legal permanent residents who would suffer hardship if the noncitizen were deported). Depending on the nature of the conviction, a noncitizen may still be eligible for asylum, or withholding of removal and is still eligible for deferral of removal under CAT (which has no criminal bars to eligibility).

c. While most noncitizens with criminal convictions who are placed in removal proceedings start those proceedings following the completion of any sentence, in relatively rare circumstances the government will conduct removal proceedings while an individual is serving a criminal sentence through the Institutional Hearing Program (IHP). *See* American Immigration Council, *The Institutional Hearing Program: An Overview* (July 17, 2019), https://bit.ly/3cYaJZ4. In 2019, 3,021 individuals completed removal proceedings through the IHP. Ingrid Eagly & Steven Shafer, *The Institutional Hearing Program: A Study of Prison-Based Immigration Courts in the United States*, 54 L. & Soc'y Rev. 788, 809 (2020).

10

Under such circumstances, the "removal period" begins when the individual is released from jail or prison. *See* 8 U.S.C. § 1231(a)(1)(B)(iii).

16.     Another intersection of removal and criminal judicial systems relates to how individuals are placed into removal proceedings. For years, ICE has largely relied on the criminal legal system to identify and apprehend individuals in state and local jails. Under the Secure Communities information-sharing program, the fingerprints of essentially every individual arrested by state or local law enforcement are relayed to DHS for potential immigration enforcement. *See Gonzalez v. United States Immigration & Customs Enf't*, 975 F.3d 788, 799 (9th Cir. 2020). In part, relying on this information about who is in state and local prisons and jails, ICE issues requests for information, as well as requests to extend the detention of individuals in state and local custody (called "immigration detainers"), to jails around the country. *See id.*; American Immigration Council, *Immigration Detainers: An Overview* (Mar. 21, 2017), http://bit.ly/2LHlcgd. Frequently, ICE then takes action against noncitizens identified this way by filing a Notice to Appear, initiating removal proceedings.

### III. Avenues for Relief From Removal After a Removal Order Is Issued

17.     In my experience, entry of a final order of removal does not ensure that the final order will be executed at all, and it certainly does not ensure that the removal order will be executed quickly. This is because U.S. immigration law allows for administrative or judicial review of final orders of removal issued in 240 proceedings.

a.  First, there are administrative avenues for re-visiting removal orders. The INA ensures the right to file one motion to reopen immigration proceedings after receiving a final order of removal. *See* 8 U.S.C. § 1229a(c)(7)(A). A motion to

11

reopen may be filed either with the immigration judge or with the BIA and is a procedural mechanism that allows a noncitizen to present the court with new facts in support of her case, including in support of relief from removal. *See id.*; *see also* American Immigration Council, *The Basics of Motions to Reopen EOIR-Issued Removal Orders*, at 1 (Feb. 7, 2018), https://bit.ly/36XIgyq ("*Basics of Motions to Reopen*"). Once a case is reopened, the existing removal order is vacated. *See Basics of Motions to Reopen* at 1.

b. Typically, a motion to reopen must be filed within 90 days of the final removal order. 8 U.S.C. § 1229a(c)(7)(C)(i). However, motions to reopen are adjudicated even if filed after 90 days if the case merits equitable tolling. *See Basics of Motions to Reopen* at 2. Equitable tolling is a principle that allows for extending non-jurisdictional requirements, such as filing deadlines, if the individual asking for the extension "act[ed] diligently in pursuing their rights but [was] nonetheless prevented from timely filing by some extraordinary circumstances." *See id.* Some circuit courts also have held that more than one motion to reopen may sometimes be filed in a given case, also because of equitable tolling. *See id.* at 4.

c. Moreover, in some cases, there is no deadline for filing a motion to reopen. For example, there is no deadline to file a motion to reopen to seek asylum relief based on changed country conditions, where a person was not found to be in danger of persecution when the final order of removal was entered but, due to political and social changes in their country of origin, has new evidence supporting her claim of persecution after entry of the order of removal. *See* 8 U.S.C. § 1229a(c)(7)(C)(ii).

d.  In addition, there is no deadline to file a motion to reopen if a noncitizen was
    ordered removed for failing to appear at a hearing (commonly referred to as an *in
    absentia* removal order), if the noncitizen can establish that she did not receive
    notice of the hearing, as required by statute. *See* 8 U.S.C. § 1229a(b)(5)(C)(ii).
    From 2008 to 2018, courts rescinded final removal orders in approximately 84
    percent of cases in which a noncitizen challenged her *in absentia* removal order
    via a motion to reopen. *See* Ingrid Eagly and Steven Shafer, American
    Immigration Council, *Measuring In Absentia Removal in Immigration Court*, 12
    n.42 (January 2021), https://bit.ly/2NcqJeS.

e.  Another potential ground for a motion to reopen is where U.S. Citizenship and
    Immigration Services (USCIS)—the DHS component that adjudicates various
    immigration benefits—grants a visa or other immigration relief *after* a removal
    order is entered. For example, a victim of certain crimes, such as domestic
    violence or a felony assault, may receive a "U" visa. This is a visa reserved for
    immigrant victims of crime who are helpful to law enforcement. 8 U.S.C.
    § 1101(a)(15)(U); 8 C.F.R. § 214.14. Another example is "T" visas for trafficking
    victims. *See* 8 U.S.C. § 1101(a)(15)(T); 8 C.F.R. § 214.11. When USCIS grants a
    visa or benefit to an individual with a final removal order, a usual next step
    towards becoming a lawful permanent resident for such individuals is to file a
    motion to reopen and seek to terminate removal proceedings, canceling the
    removal order. *See, e.g.*, 8 C.F.R. § 214.14(c)(5)(i); 8 C.F.R. § 214.11(d)(9)(ii).

f.  ICE may also refrain from removing an individual based on certain applications
    for relief or forbearance. For example, if an individual qualifies for Deferred

Action for Childhood Arrivals (DACA), ICE may defer her removal for two years

at a time. *See* Dep't of Homeland Security, *Update: Deferred Action for*

*Childhood Arrivals* (Dec. 7, 2020), https://bit.ly/3q9zSU8. DACA affords

recipients a temporary reprieve from deportation and enforcement actions.

Individuals from particular countries may also qualify for Deferred Enforcement

Departure (DED) or Temporary Protected Status (TPS). *See* Congressional

Research Service, *An Overview of Discretionary Reprieves from Removal:*

*Deferred Action, DACA, TPS, and Others* (Apr. 10, 2018),

https://bit.ly/2MKVhox.

18.     Further, after exhausting all administrative appeals, most orders of removal can

be appealed to a federal court of appeals by filing a petition for review. 8 U.S.C.

§ 1252(a)(5), (b). While the immigration statute contains various jurisdictional hurdles to

review, the statute also contains a "safety valve," which guarantees jurisdiction where a

noncitizen's appeal implicates constitutional or legal questions. 8 U.S.C. § 1252(a)(2)(D).

Noncitizens may concurrently request that a court of appeals stay their removal pending

judicial review. *See Nken v. Holder*, 556 U.S. 418 (2009). The removal period is tolled if the

court grants such a stay. 8 U.S.C. § 1231(a)(1)(B)(ii). But even where the court does not

grant a stay pending review, it may eventually vacate or reverse the removal order.

19.     In more than 18 years of representing immigrants in removal proceedings, I have

frequently and successfully litigated the propriety of a final removal order by filing a successful

motion to reopen before the Department of Justice, winning a petition for review at the federal

court of appeals, or helping my clients obtain lawful status from USCIS.

14

20.     For example, I represented a man from El Salvador who spent five years in ICE custody seeking asylum, withholding of removal, and CAT protection. He was originally ordered removed while *pro se*.  Following the issuance of the removal order, I represented him in an appeal to the BIA, in conjunction with a motion to remand proceedings to the immigration judge based on new evidence. The Ninth Circuit Court of Appeals subsequently remanded the case. *Aguilar v. Sessions*, 694 F. Appx. 531 (9th Cir. 2017). I represented a man from Jamaica who also spent approximately five years in ICE custody and who challenged his final order of removal in a petition for review before the Fifth Circuit Court of Appeals on the grounds that his criminal offense did not make him removable. He was ultimately successful. *Dale v. Holder*, 610 F.3d 294 (5th Cir. 2010). I also represented a young woman from Pakistan who had a long-standing removal order at the time ICE detained her, but who feared returning to Pakistan based on changed circumstances that arose after the removal order. She was detained for approximately two years and was also ultimately successful in reopening her case and vacating her removal order. *See Joseph v. Holder*, 579 F.3d 827 (7th Cir. 2009). Finally, I also represented a woman from Nigeria who sought asylum and a waiver of inadmissibility, who spent approximately two years in detention challenging her removal order. *Atunnise v. Mukasey*, 523 F.3d 830 (7th Cir. 2008). She was also ultimately successful. These are some of the matters that resulted in decisions at the courts of appeals, but the cases of most of the approximately 200 individuals that I have represented implicated similar legal and procedural issues. In each of these cases, a removal order was "final" for purposes of judicial review, but it was not conclusive—indeed, each order was ultimately vacated. Of these four cases, three of my clients were eventually able to regularize their status; one remains pending.

IV. **Summary Removal Proceedings for Recent Arrivals and Entrants**

21.      In addition to 240 removal proceedings, DHS is authorized to place people in summary removal proceedings in several circumstances—in particular, where individuals are apprehended at or near the border. In recent years, summary removals have constituted the overwhelming majority of removals from the United States.

22.      In 1996, the government created a new, summary removal proceeding known as expedited removal. 8 U.S.C. § 1225(b)(1); *see* American Immigration Council, *A Primer on Expedited Removal* at 2 (July 22, 2019) ("*Expedited Removal*"), https://bit.ly/3cVHENE. Unlike in 240 proceedings, individuals placed in expedited removal do not get a full hearing before an immigration judge. *See Expedited Removal* at 1. Instead, low-level immigration officers make the determination of whether a noncitizen may be removed. *See id.* Typically, the government places noncitizens in expedited removal if they are encountered by government officials at or near the border, soon after arrival, and if they do not have proper documentation for entry into the United States. *See id.* at 2. If the noncitizen asserts a fear of return to her country of origin, she must be referred for a screening with an asylum officer, known as a "credible fear interview." 8 U.S.C. § 1225(b)(1)(B). If the asylum officer determines that the noncitizen has a "credible fear"— that there is a significant possibility that the noncitizen will face persecution or torture if removed to their country of origin—that individual is referred to an immigration judge for a removal proceeding under 8 U.S.C. § 1229b, described above.

23.      Those noncitizens placed in expedited removal are almost always quickly removed from the United States. The process is so expedited, in part, because there are severe limits on judicial review of the immigration officer's determination. *See* 8 U.S.C. § 1252(a)(2)(A); (e)(1). Expedited removal orders also cannot be appealed to the BIA; such an

order becomes administratively final either when a Customs and Border Protection officer issues the order, or—if there is a credible fear interview—when an immigration judge affirms the denial of credible fear after limited review (if the noncitizen seeks such review). 8 U.S.C. § 1225(b)(1)(B)(iii)(III); (C).

24.     Recent arrivals at the border who lack visas or immigration status are typically placed into expedited removal, rather than 240 proceedings, and often deported in a matter of days or weeks.

25.     Another form of summary removal is reinstatement of removal, which applies to noncitizens who have been previously ordered removed but who return to the United States without authorization. 8 U.S.C. § 1231(a)(5). Noncitizens subject to reinstatement of removal also are typically subject to rapid removal because the government takes the position that they may not seek to have their prior order reopened or reviewed and may be removed "at any time after reentry." 8 U.S.C. § 1231(a)(5). A noncitizen may file a petition for review of his reinstated order with the courts of appeals on specific grounds. *See, e.g.*, *Ojeda-Terrazas v. Ashcroft*, 290 F.3d 292, 295 (5th Cir. 2002). Additionally, the government remains subject to the prohibition against removing an individual to a country where it is more likely than not that she would be persecuted or subject to torture. Therefore, if a noncitizen expresses a fear of return to their country of origin, regardless of placement in summary removal proceedings, the noncitizen must be referred to an asylum officer for a screening known as a "reasonable fear interview" to determine eligibility for withholding of removal and deferral of removal under CAT. *See* 8 C.F.R. §§ 208.31, 241.8(e). If found to have a reasonable fear of persecution or torture, the individual may apply for protection before an immigration judge in "withholding only" proceedings. *See* 8 C.F.R. § 208.31(e).

17

26.     Significantly, in recent years, expedited removals and reinstatements of removal have made up the vast majority of removals—82.7 percent of total removals from 2017, 2018, and 2019, or more than 800,000 of approximately 976,000 removals. *See* Office of Immigration Statistics, *Immigration Enforcement Actions: 2019*, at 10 (U.S. Department of Homeland Security), https://bit.ly/36XJOsh.

27.     Expedited removal is almost exclusively applied to people who recently arrived in the U.S. and who are apprehended at or near the border (or at airports). Similarly, reinstatement orders are issued against people apprehended at or near the border. Indeed, a majority of *all* removals in the immigration system are made up of these summary procedures applied to recent arrivals. Going forward, these removals will not be impacted by the 100-day pause on deportations because the policy does not apply to those "not physically present in the United States before November 1, 2020." *See* Memorandum of David Pekoske, Acting Director, U.S. Department of Homeland Security, "Review of and Interim Revision to Civil Immigration Enforcement and Removal Policies and Priorities," at 3 (Jan. 20, 2021), https://bit.ly/2ZaKxCl.

28.     Removals via 240 proceedings, as well as via summary removal processes have fallen in the last year, in part because of the operational challenges presented by the COVID-19 pandemic. *See* U.S. Immigration and Customs Enforcement, *Fiscal Year 2020 Enforcement and Removal Operations Report* 19, https://bit.ly/3d7FmLx (reporting 185,884 removals during FY2020, a 30 percent drop in removals from FY2019).

29.     At the same time, a large number of summary expulsions have been effectuated by U.S. Customs and Border Protection (CBP) under Title 42 of the U.S. Code since March 2020 in the name of addressing the COVID-19 pandemic. *See* Centers for Disease Control

and Prevention, *Order Suspending Introduction of Certain Persons Where a Communicable Disease Exists*, (Mar. 20, 2020), *available at* https://bit.ly/3736Lue (updated Oct. 2020). From March 2020 through September 2020, CBP conducted 206,783 Title 42 expulsions. CBP, *FY 2020 Nationwide Enforcement Encounters: Title 8 Enforcement Actions and Title 42 Expulsions* (Nov. 20, 2020), https://bit.ly/3dgs7bJ. These Title 42 expulsions also apply to recent arrivals, occur quickly, and are not impacted by the 100-day pause on removals.

### V.   Immigration Detention and Circumstances Governing Release

#### A. *Statutes Governing Detention and Release*

30.     Various statutes govern immigration detention, depending on the manner in which the noncitizen comes into DHS custody and the posture of the individual's removal proceedings. *See generally* 8 U.S.C. §§ 1225 (expedited removal detention), 1226 (detention pending removal proceedings), 1231 (post-final order detention).

31.     Of most relevance to this case, once an individual receives a final order of removal (*see* ¶ 13, *supra*) her detention is governed by 8 U.S.C. § 1231(a). Section 1231(a) generally directs that ICE detain individuals with a final order of removal for the 90 days after the order becomes final and prohibits the release of noncitizens ordered removed on certain grounds during this period. *Id.* This 90-day period is referred to as the "removal period."

32.     ICE retains discretion to detain individuals beyond the removal period, including in cases where the individual has certain criminal convictions, or the government determines the person "to be a risk to the community or unlikely to comply with the order of removal." 8 U.S.C. § 1231(a)(6). ICE is authorized to continue the detention of such persons, subject to administrative post-order custody reviews. *See* 8 C.F.R. § 241.4.

19

33.     The Supreme Court has held that continued detention under 8 U.S.C. § 1231(a)(6) is permitted only where the person's removal is significantly likely in the reasonably foreseeable future. *Zadvydas v. Davis*, 533 U.S. 678, 701 (2001). Under *Zadvydas*, six months is the presumptively reasonable period to effectuate a noncitizen's removal. *Id.* However, even after six months, release is not automatic. Instead, under the burden-shifting framework established by *Zadvydas*, the noncitizen bears the initial burden of showing "good reason to believe" that removal is not significantly likely in the reasonably foreseeable future. *Id*. And even if the individual does so, the government may rebut that showing and thus continue to detain the noncitizen while seeking to effectuate the removal order. *Id*.

34.     In my experience, noncitizens with final orders are routinely detained for periods significantly beyond six months—indeed, in some cases, even years.

35.     Whether removal is significantly likely in the reasonably foreseeable future is a highly individualized assessment that depends, among other things, on the country of repatriation, the individual circumstances of the noncitizen, and factors outside of both the government and the noncitizen's control such as, more recently, the COVID-19 pandemic. Based on my experience, I expect that a 100-day pause in removals will have a determinative effect in few, if any, of these individualized assessments regarding release from detention post removal order. Indeed, adjudication of habeas petitions can be quite slow, so it is doubtful that the question could even be briefed and resolved, much less decided in the noncitizen's favor, within the short duration of the pause in more than a handful of cases—if any.

36.     Should ICE release an individual with a final order of removal, for any of the reasons discussed above, the agency is required by statute to issue an Order of Supervision (OSUP). *See* 8 U.S.C. § 1231(a)(3); 8 C.F.R. § 241.5(a). Similar to probation or supervised

release, an OSUP will specify a number of conditions the supervisee must observe, including regularly reporting to ICE, assisting with efforts to procure travel documents, and in some instances electronic ankle monitoring. 8 C.F.R. § 241.5(a). Neither the statute nor the regulation limits the time period during which a noncitizen ordered removed may be subject to an administrative order of supervision.

37.     Recently, a federal court order in *Fraihat v. ICE* has compelled ICE to consider releasing individuals with medical and mental health issues pursuant to the federal Rehabilitation Act. In April 2020, the *Fraihat* court ordered ICE to implement a system to identify individuals in civil immigration detention who are at risk of serious illness or death from exposure to COVID-19 due to certain specified Risk Factors and to consider them for release under ICE's own custody review procedures. *See Fraihat v. ICE*, 445 F. Supp. 3d 709, 751 (C.D. Cal. 2020). Those procedures prohibit release where individuals pose a danger to persons or property. *Id*. at 727, 751. The *Fraihat* order has not resulted in mass release of detained non-citizens.

38.     At present, ICE detention is at its lowest level in several years. At its highest level in August 2019, ICE detained approximately 55,000 people. Isabela Dias, *ICE is Detaining More People than Ever—And Far Longer*, Pacific Standard (Aug. 1, 2019), http://bit.ly/3rRCfeG. As of this week, ICE holds fewer than 14,000 people in its custody. *See* ICE, *ICE Guidance on Covid 19*, https://www.ice.gov/coronavirus#detStat (detainee statistics tab) (last visited February 7, 2021).

### B.  Alternatives to Detention and Conditions of Release

39.     When ICE releases an individual—whether the individual is still in removal proceedings or has a final order of removal—the agency has multiple options to ensure that the individual complies with his or her immigration obligations. ICE operates an Alternative to

Detention (ATD) program, which is a supervision program for individuals who ICE has determined can be released from custody and are in ongoing removal proceedings. ICE, *Detention Management*, https://www.ice.gov/detain/detention-management (Feb. 10, 2021). The supervision includes "global positioning system (GPS) tracking devices" in the form of electronic ankle monitors, "telephonic reporting (TR), or a smartphone application (SmartLINK) – and case management levels, which include frequency of office or home visits." *Id.* ICE leadership has lauded the program as "an effective flight risk mitigation tool" that "has demonstrated great success in improving compliance rates for those aliens assigned to the program." *Ramirez v. U.S. Immigration & Customs Enf't*, 471 F. Supp. 3d 88, 104 (D.D.C. 2020) (quoting deposition testimony of ICE ATD Unit Chief Eric Carbonneau).

40.     In my view, and the view of other advocates, the program would have even greater success if it were transitioned completely to administration by the non-governmental sector and discontinued the use of onerous and inhumane practices, such as ankle monitors. Nonetheless, it may be viewed by some as preferable to incarceration in jails or prisons.

41.     ICE's ATD program costs about $4.43 per day, while it costs the government on average $125.06 per day to detain a non-citizen in adult detention. ICE FY 2021 Congressional Budget Justification, at 7, 171, https://bit.ly/3rOJrsg.

I declare under penalty of perjury under the laws of the State of Illinois and the United States that the foregoing is true and correct to the best of my knowledge and belief.

Executed on this 12th day of February, 2021 in Chicago, Illinois.

_____

Claudia Valenzuela

23