**UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION**

|  |  |  |
|---|---|---|
| STATE OF TEXAS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | No. 6:21-cv-00003 |
| | ) | |
| UNITED STATES OF AMERICA, *et al.* | ) | |
| | ) | |
| Defendants.[1] | ) | |

**DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES
IN OPPOSITION TO PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**

---

[1] Pursuant to Fed. R. Civ. Pro. 25(d), the Secretary of Homeland Security, Alejandro Mayorkas, is substituted for former Acting Secretary David Pekoske. Troy Miller is a Defendant in his official capacity as now the Acting Commissioner of U.S. Customs and Border Protection, and Tracy Renaud is a Defendant in her official capacity as now the Acting Director of U.S. Citizenship and Immigration Services.

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................. 1

BACKGROUND .................................................................................................. 2

ARGUMENT ....................................................................................................... 5

I.  Texas Cannot Establish Standing, Let Alone Irreparable Harm. ...................... 6

II.  Texas's APA Claims Lack Merit. ................................................................... 9

    A.  Texas cannot clear four threshold obstacles to its APA claims. ............. 9

        1.  The challenged action is "committed to agency discretion by law." .......... 9

            i.  The Acting Secretary's action is committed to Executive discretion and presumptively unreviewable. ................................. 10

            ii.  Congress has reinforced, not undermined, the presumption of unreviewability. .......................................................... 11

        2.  Congress has precluded judicial review of these types of decisions. ....... 15

            i.  Congress expressly eliminated judicial review of Texas's claims. ......................................................................... 15

            ii.  Statutory structure and context reinforce that judicial review is unavailable. ............................................................ 17

        3.  Texas falls outside the "zone of interests" of the relevant statute. .......... 18

        4.  The challenged action is not "final agency action" subject to APA review. ................................................................................. 20

    B.  Texas's APA claims fail on the merits. ............................................... 21

        1.  The Memorandum is not "contrary to law." ............................... 21

        2.  The Acting Secretary's temporary pause on removals is a reasonable effort to enact the new Administration's immigration priorities. ........................................................................... 23

        3.  The Acting Secretary's pause on removals is exempt from notice and comment. ..................................................................... 27

III.  The MOU is Invalid, Unenforceable, and Cannot Be the Basis of Relief for Texas ........ 31

    A.  Mr. Cuccinelli purported to enter into the MOU without proper authority. ......... 31

1.      DHS cannot contract away its sovereign discretion over immigration enforcement.................................................... 31

2.      Texas has not identified any permissible statutory authority for DHS to enter into this Agreement............................... 32

B.      This court cannot order specific performance of the MOU's terms. ................... 33

C.      Texas did not provide requisite consideration for the MOU. ............................. 34

IV.     Texas Fails to State an Independent Claim Under the Take Care Clause. ...................... 34

V.      An Injunction Restraining Core Article II Authority Outweighs Any Harm to Texas and Undermines the Public Interest.......................................................... 36

VI.     Any Injunction Should Be Limited and Any Final Judgment Should Be Complete. ....... 38

A.      Any Injunction Should Be Narrowly Drawn. ...................................... 38

B.      Any Final Judgment Should Extend to All Claims............................... 40

CONCLUSION.................................................................................................. 40

# TABLE OF AUTHORITIES

## CASES

*Aguilar v. ICE,*
  510 F.3d 1 (1st Cir. 2007) .................................................................................. 16

*Ala. Rural Fire Ins. Co. v. Naylor,*
  530 F.2d 1221 (5th Cir. 1976) ........................................................................... 33

*Amino Brothers Co. v. United States,*
  372 F.2d 485, *cert denied*, 389 U.S. 846 (1967) ............................................ 31

*Arizona v. United States,*
  567 U.S. 387 (2012) ..................................................................................... *passim*

*Armstrong v. Exceptional Child Center,*
  575 U.S. 320 (2015) ...................................................................................... 9, 35

*Ayuda, Inc. v. Reno,*
  7 F.3d 246 (D.C. Cir. 1993) ............................................................................... 18

*Baker v. Carr,*
  369 U.S. 186 (1962) ........................................................................................... 35

*Bennett v. Spear,*
  520 U.S. 154 (1997) ........................................................................................... 20

*Bhd. of Ry. Carmen Div. v. Pena,*
  64 F.3d 702 (D.C. Cir. 1995) ............................................................................. 13

*Biodiversity Assocs. v. Cables,*
  357 F.3d 1152 (10th Cir. 2004) ......................................................................... 31

*Blackie's House of Beef, Inc. v. Castillo,*
  659 F.2d 1211 (D.C. Cir. 1981) ......................................................................... 37

*Block v. Cmty. Nutrition Inst.,*
  467 U.S. 340 (1984) .............................................................................. 15, 17, 18

*Bowen v. Public Agencies Opposed to Social Security Entrapment,*
  477 U.S. 41 (1986) ............................................................................................. 31

*Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.,*
  419 U.S. 281 (1974) ........................................................................................... 23

*CACI, Inc. v. Stone,*
  990 F.2d 1233 (Fed. Cir. 1993) ......................................................................... 32

*California v. Azar,*
   911 F.3d 558 (9th Cir. 2018) ................................................................. 40

*Campos v. INS,*
   62 F.3d 311 (9th Cir. 1995) ................................................................... 15

*Channer v. Hall,*
   112 F.3d 214 (5th Cir. 1997) ................................................................. 20

*Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.,*
   467 U.S. 837 (1984) .............................................................................. 24

*Chicago v. Morales,*
   527 U.S. 41 (1999) ........................................................................ 13, 22

*City of El Cenizo v. Texas,*
   890 F.3d 164 (5th Cir. 2018) ................................................................. 34

*Clapper v. Amnesty Int'l,*
   568 U.S. 398 (2013) ................................................................................ 9

*Contributors to Penn. Hospital v. City of Philadelphia,*
   245 U.S. 20 (1917) ................................................................................ 32

*Crane v. Johnson,*
   783 F.3d 244 (5th Cir. 2015) ...................................................... 1, 6, 7, 8

*Crane v. Napolitano,*
   920 F. Supp. 2d 724 (N.D. Tex. 2013) .................................................... 7

*Dalton v. Specter,*
   511 U.S. 462 (1994) .............................................................................. 35

*Davidson v. Glickman,*
   169 F.3d 996 (5th Cir. 1999) ................................................................. 33

*Del. Dep't of Nat. Res. & Envt'l Control v. FERC,*
   558 F.3d 575 (D.C. Cir. 2009) ................................................................ 6

*Demore v. Kim,*
   538 U.S. 510 (2003) ................................................................................ 3

*Dep't of Commerce v. New York,*
   139 S. Ct. 2551 (2019) .......................................................................... 24

*DHS v. New York,*
   No. 19A785, 2020 WL 413786 (U.S. Jan. 27, 2020) ............................. 38

*DHS v. Regents of the Univ. of Cal.*,
    140 S. Ct. 1891 (2020) ................................................................. 16, 17, 25

*E. Bay Sanctuary Covenant v. Barr*,
    934 F.3d 1026 (9th Cir. 2019) ............................................................ 39

*Elrod v. Burns*,
    427 U.S. 347 (1976) ....................................................................... 36

*Ex parte Young*,
    209 U.S. 123 (1908) ........................................................................ 9

*Fiallo v. Bell*,
    430 U. S. 787 (1977) ...................................................................... 17

*Franklin v. Massachusetts*,
    505 U.S. 788 (1992) ....................................................................... 35

*Global Crossing Telecomms., Inc. v. Metrophones Telecomms., Inc.*,
    550 U.S. 45 (2007) ........................................................................ 27

*Gonzales & Gonzales Bonds & Ins. Agency, Inc. v. Dep't of Homeland Sec.*,
    490 F.3d 940 (Fed. Cir. 2007) ........................................................... 33

*Gutierrez de Martinez v. Lamagno*,
    515 U.S. 417 (1995) ....................................................................... 13

*Harisiades v. Shaughnessy*,
    342 U.S. 580 (1952) ....................................................................... 10

*Heckler v. Chaney*,
    470 U.S. 821 (1985) ................................................................. *passim*

*Hernandez-Avalos v. INS*,
    50 F.3d 842 (10th Cir. 1995) ............................................................ 19

*Holmes v. United States*,
    657 F.3d 1303 (Fed. Cir. 2011) ......................................................... 34

*In re Aiken Cty.*,
    725 F.3d 255 (D.C. Cir. 2013) .......................................................... 12

*J.E.F.M. v. Lynch*,
    837 F.3d 1026 (9th Cir. 2016) ........................................................... 16

*Jama v. ICE*,
    543 U.S. 335 (2005) ................................................................. 14, 22

*Jennings v. Rodriguez*,
  138 S. Ct. 830 (2018) ........................................................................................................ 3

*Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*,
  335 F.3d 357 (5th Cir. 2003) ........................................................................................... 5

*Karnoski v. Trump*,
  926 F.3d 1180 (9th Cir. 2019) ....................................................................................... 27

*Knapp v. U.S. Dep't of Agric.*,
  796 F.3d 445 (5th Cir. 2015) ......................................................................................... 23

*Lane v. Pena*,
  518 U.S. 187 (1996) ........................................................................................................ 33

*Lexmark Int'l, Inv. v. Static Control Components, Inc.*,
  572 U.S. 118 (2014) ................................................................................................ 19, 20

*Lincoln v. Vigil*,
  508 U.S. 182 (1993) ............................................................................................ 9, 26, 28, 29

*Lipschultz v. Charter Advanced Servs. (MN), LLC*,
  140 S. Ct. 6 (2019) ......................................................................................................... 21

*Lujan v. Nat'l Wildlife Fed'n*,
  497 U.S. 871 (1990) ........................................................................................................ 18

*Madsen v. Women's Health Ctr., Inc.*,
  512 U.S. 753 (1994) ........................................................................................................ 38

*Maine Cmty. Health v. United States*,
  140 S. Ct. 1308 (2020) ................................................................................................... 12

*Massachusetts v. EPA*,
  549 U.S. 497 (2007) .......................................................................................................... 6

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*,
  567 U.S. 209 (2012) ................................................................................................ 19, 20

*Mathews v. Diaz*,
  426 U.S. 67 (1976) .......................................................................................................... 10

*Mendoza v. Perez*,
  754 F.3d 1002 (D.C. Cir. 2014) ..................................................................................... 19

*Merrion v. Jicarilla Apache Tribe*,
  455 U.S. 130 (1982) ........................................................................................................ 32

*Mississippi v. Johnson*,
    71 U.S. (4 Wall.) 475 (1867) .................................................................................... 35

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983) ...................................................................................... 25, 26

*Munaf v. Geren*,
    553 U.S. 674 (2008) ......................................................................................... 40

*N. Am.'s Bldg. Trades Unions v. Occupational Safety & Health Admin.*,
    878 F.3d 271 (D.C. Cir. 2017) ........................................................................... 25

*Ncube v. I.N.S. Dist. Directors & Agents*,
    1998 WL 842349 (S.D.N.Y. Dec. 2, 1998) ...................................................... 20

*New York v. DHS*,
    969 F.3d 42 (2d Cir. 2020) ................................................................................ 40

*Nken v. Holder*,
    556 U.S. 418 (2009) ......................................................................................... 37

*Perales v. Casillas*,
    903 F.2d 1043 (5th Cir. 1990) .......................................................................... 20

*Perez v. Mortg. Bankers Ass'n*,
    575 U.S. 92 (2015) ........................................................................................... 28

*Prof'ls & Patients for Customized Care v. Shalala*,
    56 F.3d 592 (5th Cir. 1995) .............................................................................. 28

*Quantum Entm't Ltd. v. U.S. Dep't of the Interior, Bureau of Indian Affairs*,
    597 F. Supp. 2d 146 (D.D.C. 2009) .................................................................. 24

*Reno v. Am.-Arab Anti-Discrimination Comm.*,
    525 U.S. 471 (1999) ................................................................................. *passim*

*Richbourg Motor Co. v. United States*,
    281 U.S. 528 (1930) ......................................................................................... 12

*Sanders v. United States*,
    252 F.3d 1329 (Fed. Cir. 2001) ........................................................................ 34

*SEC v. Chenery Corp.*,
    332 U.S. 194 (1947) ......................................................................................... 28

*Sierra Club v. Whitman*,
    268 F.3d 898 (9th Cir. 2001) ............................................................................ 13

*Spokeo, Inc. v. Robins*,
  136 S. Ct. 1540 (2016) ............................................................................. 9

*Suburban Mortg. Assocs., Inc. v. U.S. Dep't of Hous. & Urban Dev.*,
  480 F.3d 1116 (Fed. Cir. 2007) ............................................................... 33

*Texas v. United States*,
  106 F.3d 661 (5th Cir. 1997) ......................................... 11, 12, 13, 35

*Texas v. United States*,
  328 F. Supp. 3d 662 (S.D. Tex. 2018) ..................................................... 7

*Texas v. United States*,
  809 F.3d 134 (5th Cir. 2015), *as revised* (Nov. 25, 2015) ............ *passim*

*The Floyd Acceptances*,
  74 U.S. 666 (1868) ................................................................................. 32

*Thompson v. N. Am. Stainless, LP*,
  562 U.S. 170 (2011) ............................................................................... 18

*Total Med. Mgmt., Inc. v. United States*,
  104 F.3d 1314 (Fed. Cir. 1997) ............................................................... 33

*Town of Castle Rock v. Gonzales*,
  545 U.S. 748 (2005) ............................................... 13, 14, 21, 23

*Town of Chester v. Laroe Estates, Inc.*,
  137 S. Ct. 1645 (2017) ........................................................................... 38

*Tran v. Mukasey*,
  515 F.3d 478 (5th Cir. 2008) ................................................................. 23

*Trauma Servs. Grp. v. United States*,
  104 F.3d 1321 (Fed. Cir. 1997) ............................................................... 34

*Trump v. Hawaii*,
  138 S. Ct. 2392 (2018) ......................................... 10, 17, 27, 38

*U.S. Dep't of Labor v. Kast Metals Corp.*,
  744 F.2d 1145 (5th Cir. 1984) ............................................................... 30

*U.S. Telecom Ass'n v. F.C.C.*,
  359 F.3d 554 (D.C. Cir. 2004) ............................................................... 32

*United States Trust Co. v. New Jersey*,
  431 U.S. 1 (1977) ................................................................................... 31

*United States v. Fausto*,
    484 U.S. 439 (1988)..................................................................................... 15, 18

*United States v. Johnson*,
    319 U.S. 302 (1943)............................................................................................ 9

*United States v. Jones*,
    131 U.S. 1 (1889)............................................................................................. 33

*United States v. Thames*,
    214 F.3d 608 (5th Cir. 2000) ........................................................................... 31

*United States v. Winstar Corp.*,
    518 U.S. 839 (1996).......................................................................................... 34

*Va. Soc'y for Human Life, Inc. v. FEC*,
    263 F.3d 379 (4th Cir. 2001), *overruled on other grounds*,
    *The Real Truth About Abortion, Inc. v. FEC*, 681 F.3d 544 (4th Cir. 2012) ........... 40

*Valley v. Rapides Parish Sch. Bd.*,
    118 F.3d 1047 (5th Cir. 1997) ......................................................................... 36

*Whitman v. Am. Trucking Ass'ns*,
    531 U.S. 457 (2001)..................................................................................... 14, 32

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008).............................................................................................. 5

*Zadvydas v. Davis*,
    533 U.S. 678 (2001)................................................................................. *passim*

## STATUTES

5 U.S.C. § 553.................................................................................... 26, 27, 28, 30

5 U.S.C. § 701....................................................................................... 9, 11, 15, 17

5 U.S.C. § 702....................................................................................................... 18

5 U.S.C. § 704................................................................................................. 20, 33

6 U.S.C. § 202........................................................................................ 1, 13, 15, 30

8 U.S.C. § 1101........................................................................................................ 2

8 U.S.C. § 1103........................................................................................ 1, 13, 15, 30

8 U.S.C. § 1187........................................................................................................ 2

8 U.S.C. § 1225 ................................................................................................ 2, 3, 18

8 U.S.C. § 1226 ...................................................................................................... 3, 17

8 U.S.C. § 1226a ......................................................................................................... 17

8 U.S.C. § 1228 ............................................................................................................ 2

8 U.S.C. § 1229 ............................................................................................................ 2

8 U.S.C. § 1229a ..................................................................................................... 2, 18

8 U.S.C. § 1229c ......................................................................................................... 17

8 U.S.C. § 1231 ................................................................................................... *passim*

8 U.S.C. § 1252 ................................................................................................... *passim*

**RULES**

Fed. R. Civ. P. 54 ....................................................................................................... 40

**REGULATIONS**

8 C.F.R. § 241.5 ........................................................................................................... 4

8 C.F.R. § 241.6 ....................................................................................................... 2, 4

8 C.F.R. § 241.13 ......................................................................................................... 4

8 C.F.R. § 1003.1 ......................................................................................................... 2

8 C.F.R. § 1003.13 ....................................................................................................... 2

8 C.F.R. § 1003.14 ....................................................................................................... 2

8 C.F.R. § 1208.31 ....................................................................................................... 2

8 C.F.R. § 1240.12 ....................................................................................................... 2

*Continued Detention of Aliens Subject to Final Orders of Removal*,
   66 Fed. Reg. 56,967 (Nov. 14, 2001) ............................................................... 22, 23

**UNITED STATES CONSTITUTION**

U.S. Const. art. I, § 8 .................................................................................................... 1

U.S. Const. art. II, § 1 ................................................................................................. 30

**OTHER AUTHORITIES**

1 Richard J. Pierce, Jr., Administrative Law Treatise § 6.3 (5th ed. 2010) ............................ 28, 29

6 C. Gordon, S. Mailman, & S. Yale–Loehr, Immigration Law and Procedure § 72.03 (1998) .. 11

Black's Law Dictionary 1345 (10th ed. 2014) ............................................................................ 29

H.R. Rep. 104-469, pt. 1 (1996) ......................................................................................... 15, 22

Tex. Gov't Code § 752.053 ............................................................................................................ 34

Tex. Code of Crim. Pro. Art. 2.251 ............................................................................................. 34

## INTRODUCTION

"The federal power to determine immigration policy is well settled." *Arizona v. United States*, 567 U.S. 387, 395 (2012); *see* U.S. Const. art. I, § 8, cl. 4. Congress vested the Secretary of Homeland Security with broad statutory authority to "establish such regulations," to "issue such instructions," and to "perform such other acts as he deems necessary for carrying out his authority." 8 U.S.C. § 1103(a)(3); *see* 6 U.S.C. § 202(5). At "each stage" of the removal process— "commencing proceedings, adjudicating cases, and executing removal orders"—"the Executive has discretion to abandon the endeavor." *Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 483 (1999) (*AADC*) (alterations and citation omitted). The Secretary likewise generally maintains the discretion whether to detain individuals with final orders of removal. *See* 8 U.S.C. § 1231(a)(2), (a)(6); *Zadvydas v. Davis*, 533 U.S. 678, 701 (2001).

On the first day of his Administration, President Biden signed an Executive Order laying out a "reset [of] policies and practices for enforcing civil immigration laws." AR_0001 (ECF No. 59-1). To effectuate this change in priorities, the Acting Secretary of Homeland Security issued a Memorandum that, *inter alia*, pauses the execution of removal orders of most noncitizens for 100 days while the Department of Homeland Security (DHS) reviews its immigration enforcement policies and reallocates resources to other priorities. Granting the relief Texas seeks would undermine the Executive's discretion. The State seeks to dictate to the Executive when noncitizens must be removed and asks the Court to superintend questions of immigration enforcement discretion.

Texas's efforts fail at the start, because the State lacks standing. Texas's alleged injury is substantively identical to the generic budgetary objection that the Fifth Circuit rejected in *Crane v. Johnson*, 783 F.3d 244, 252 (5th Cir. 2015). Texas's Administrative Procedure Act (APA) claims also fail to clear four threshold obstacles: (i) removal decisions are committed to agency discretion by law; (ii) Congress has precluded judicial review of the decisions to execute removal orders; (iii) Texas falls outside of the zone of interests of the statute it invokes; and (iv) the Memorandum is not final agency action. Moreover, each of the APA claims fails on the merits.

1

The State has essentially abandoned its breach of contract claim based on the purported Memorandum of Understanding (MOU). Texas similarly fails to state an independent claim under the Take Care Clause. Finally, the balance of harms and the public interest overwhelmingly favor denying an injunction.

Further briefing and factual development have made the defects in Texas's claims more clear. The Court should reject Texas's efforts to impede a new Administration's constitutional and statutory prerogative to set its immigration enforcement priorities.

## BACKGROUND

<u>Statutory and Regulatory Background</u>

The Immigration and Nationality Act (INA) establishes the framework for arresting, processing, and removing aliens who are illegally present in the United States. For aliens apprehended by DHS, removability is usually determined by an immigration judge in a removal proceeding. *See* 8 U.S.C. § 1229a; *see also, e.g.*, 8 U.S.C. §§ 1225(b)(1), 1228(b), 1231(a)(5), 1187(b)(2); 8 C.F.R. § 1208.31(e) (instances of more limited proceedings in specific circumstances). DHS initiates a removal proceeding by filing a Notice to Appear with the immigration court. *See* 8 U.S.C. § 1229(a); 8 C.F.R. §§ 1003.13, 1003.14. The immigration judge then determines whether the alien is removable and, if so, whether to enter an order of removal or to grant relief or protection from removal. 8 U.S.C. § 1229a(a); 8 C.F.R. § 1240.12. The alien may appeal the removal order to the Board of Immigration Appeals (BIA). 8 C.F.R. § 1003.1(b). If the BIA dismisses the alien's appeal, the alien may petition for review of the decision by a court of appeals, and may request a stay of removal pending judicial review of the order. 8 U.S.C. § 1252(a)(5).

Once an alien has an (administratively) final order of removal, *see* 8 U.S.C. § 1101(a)(47)(B), not subject to a judicial stay, *see, e.g.*, 8 U.S.C. § 1231(a)(1)(B)(ii), DHS exercises discretion on how to proceed. *See* 8 C.F.R. § 241.6 (discretion to consider requests for administrative stays of removal). Each removal effort requires a highly individualized combination of resources: the process varies depending on the destination country, and removals require

considerable coordination and effort. DHS must obtain individualized authorization to remove an alien to the destination country—commonly referred to as "travel documents"—and coordinate the logistics of removal. *See* Decl. of Peter B. Berg, Acting Deputy Executive Associate Director, U.S. Department of Homeland Security, U.S. Immigration and Customs Enforcement, Enforcement and Removal Operations, ¶ 6 (ECF No. 78-1) (Berg Decl.).

Congress also enacted a multi-layered statutory scheme for civil detention of aliens during removal proceedings and pending removal. *See, e.g.*, 8 U.S.C. §§ 1225, 1226, 1231. The specific conditions of entry into the United States, the stage of the removal process, and other case-specific circumstances determine where an alien falls within this scheme and whether detention of the alien is discretionary or mandatory. For aliens apprehended in the United States, 8 U.S.C. § 1226 "generally governs the process of arresting and detaining . . . aliens pending their removal." *Jennings v. Rodriguez*, 138 S. Ct. 830, 837 (2018). Pending a decision whether the noncitizen is to be removed, § 1226(a) provides generally that "an alien may be arrested and detained pending a decision on whether the alien is to be removed from the United States." 8 U.S.C. § 1226(a). But if the alien has been convicted of certain enumerated criminal offenses, § 1226(c) mandates detention during removal proceedings for most cases. 8 U.S.C. § 1226(c)(1)(A)–(D); 8 U.S.C. § 1226(c)(2); *Demore v. Kim*, 538 U.S. 510, 513 (2003).

Once a removal order becomes final, § 1231(a) sets out ICE's detention authority. 8 U.S.C. § 1231(a)(1)(B)(i),(ii). Section 1231 sets a "removal period" of 90 days that begins when the removal order becomes "administratively final" or when certain other criteria are satisfied. 8 U.S.C. § 1231(a)(1). Section 1231(a)(2) authorizes detention during the removal period, and mandates it for certain criminal aliens. *See* 8 U.S.C. § 1231(a)(2).

The Court inquired about "the legal ramifications of deferring an individual's removal beyond the first 90 days following a final order of removal." ECF No. 51. Consistent with Congress's "doubt" that "all reasonably foreseeable removals could be accomplished" within the 90-day period, many individuals remain in the United States beyond the 90-day mark. *Zadvydas*, 533 U.S. at 701. Indeed, § 1231 expressly contemplates—but generally does not require—

detention and removal *after* the expiration of the removal period. *Id.*; *see* 8 U.S.C. § 1231(a)(1)(C) (non-compliance with removal); § 1231(a)(6) (removal in the reasonably foreseeable future). Generally, outside those authorities, the alien must be released on an order of supervision. *Id.* § 1231(a)(3). The order of supervision contains specific reporting requirements that the alien must abide by while released from ICE custody. 8 C.F.R. § 241.5. Those with a criminal record are required to report once every two months; immigration violators without a criminal record are required to report once every four months; and asylum applicants are required to report once every six months. Berg Decl. ¶ 11. Of the 22,712 individuals with final orders of removal released from January 20, 2019 to January 30, 2021, approximately 447 have so far failed to return to ICE and subsequently have been classified as fugitives. *Id.* ¶ 12. If an alien has been detained pending removal for six months, the alien can obtain temporary release by showing that there is no significant likelihood of removal in the reasonably foreseeable future. *Zadvydas*, 533 U.S. at 701; 8 C.F.R. § 241.13. Regardless, whether the 90-day removal period has expired, or whether the alien is in custody, DHS retains the same discretion to grant an administrative stay of removal. *See* 8 C.F.R. § 241.6.

In part because of the COVID-19 pandemic, ICE is currently detaining fewer than 6,000 of the over one million individuals with administratively final orders of removal. Berg Decl. ¶¶ 6, 8. Moreover, the pause is, in part, designed to address the complications associated with removal during a global pandemic, which causes significant delays in the removal process. *See id.* ¶ 6. At the start of the COVID-19 pandemic, use of commercial flights to effectuate removals was significantly reduced. *Id.* Further, removals can require considerable coordination and planning across the country. *Id.* Of those who became subject to a final order of removal since January 2019, ICE has removed fewer than 18% of the individuals. *Id.* ¶ 12.

<u>Factual and Procedural Background</u>

As one of his first acts on January 20, 2021, President Biden issued Executive Order (EO) 13993, Revision of Civil Immigration Enforcement Policies and Priorities, setting out an immediate "reset [of] policies and practices for enforcing civil immigration laws." 86 Fed. Reg.

7051 (published Jan. 25, 2021), AR_00001 (ECF No. 59-1). That same day, Acting Secretary of Homeland Security David Pekoske issued a Memorandum to implement the EO by ordering a review of enforcement policies and redirecting resources to new priorities in the interim. *See* Pekoske Mem., AR_00003–0007. In Part C of the Memorandum, the Acting Secretary temporarily suspended the execution of most removal orders so that "DHS's limited resources" could be shifted to "provide sufficient staff and resources to enhance border security" and other operations at the southwest border and to "protect the health and safety of DHS personnel" and the public in light of the ongoing COVID-19 pandemic. *Id.*, AR_00005–06.

Texas seeks to enjoin Part C of the Memorandum. In challenging the pause on removals, Texas brings claims pursuant to the APA, the Take Care Clause, and the Tucker Act for a breach of a purported "Agreement" between DHS and Texas. Twelve days prior to President Biden's inauguration, a subordinate political official in DHS signed that MOU. *See* ECF No. 1-1 ("MOU") at 3. The MOU purports to permit a single state to halt nationwide immigration policy for 180 days by requiring DHS to "[c]onsult with Texas before taking *any action* or making *any decision* that could reduce immigration enforcement, increase the number of removable or inadmissible aliens in the United States, or increase immigration benefits or eligibility for benefits for removable or inadmissible aliens." *Id.* (emphases added).

On January 29, 2021, this Court temporarily enjoined Part C of the Memorandum. The Temporary Restraining Order is set to expire on February 23, 2021.

## ARGUMENT

To obtain preliminary injunctive relief, the moving party must show: (1) a likelihood of success on the merits; (2) a likelihood of irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in its favor; and (4) that an injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). "[A] preliminary injunction is 'an extraordinary remedy' which should only be granted if the party seeking the injunction has 'clearly carried the burden of persuasion' on all four requirements." *Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*, 335 F.3d 357, 363 (5th Cir. 2003).

5

I.      **Texas Cannot Establish Standing, Let Alone Irreparable Harm.**

Texas has failed to show it will be harmed by the temporary removal pause at *all*, let alone

irreparably, as is required for injunctive relief. In fact, Texas *admits* that its purported injury from

that pause is "speculative." Texas Resp. Interrog. No. 3 (Ex. 1). Texas merely recites the alleged

costs from the general presence of noncitizens it already incurs, but those costs are not attributable

to this pause. The disconnect between Texas's purported injury and the challenged conduct is

evident in Texas's claim that a 100-day pause on removals somehow grants "temporary amnesty

to tens of millions of illegal aliens." Texas's Motion for Prelim. Inj. (ECF No. 62) (Mot.) 1. There

are not even close to "tens of millions" of individuals subject to removal orders.  *See* Berg. Decl.

¶ 8.

The argument on which Texas rests its standing was rejected by the Fifth Circuit in *Crane

v. Johnson*. *See* 783 F.3d at 252. Just like Mississippi in *Crane*, Texas here makes no serious effort

to connect the conduct it challenges (a removal pause) with any specific harm.  Instead, it argues

generally that any alteration in immigration enforcement increases costs that the state already

incurs as a result of immigration. That was not enough to establish standing in *Crane*, and it is not

enough here.

Texas's claim to "special solicitude" as a state, *see* Mot. 10, does not advance its assertion

of standing and certainly does nothing for it in demonstrating irreparable harm from that conduct.

In *Texas*, the Fifth Circuit found that a state may have "special solicitude" for standing based on

an allegation as a sovereign that it is being "pressure[d] to change state law." *Texas v. United

States*, 809 F.3d 134, 154–55 (5th Cir. 2015), *as revised*, (Nov. 25, 2015). There is no such

allegation in this case. In any event, "special solicitude" does not eliminate the injury requirement.

*See Massachusetts v. EPA*, 549 U.S. 497, 522 (2007) (finding that Massachusetts demonstrated

injury); *see also, e.g.*, *Del. Dep't of Nat. Res. & Envt'l Control v. FERC*, 558 F.3d 575, 579 n.6

(D.C. Cir. 2009).

Indeed, in *Crane*, Mississippi made the same argument Texas makes here: "[t]he State of

Mississippi alleges that the deferred action has caused additional aliens to remain in the state and,

thus, causes the state to spend money on providing social services." *Crane*, 783 F.3d at 247. Just as Texas focuses on law enforcement, education, and healthcare costs, *see* Mot. 10–11, 23–25, Mississippi focused on the allegation that "beneficiaries of DACA who remain in the state will cost the state money in education, healthcare, law enforcement, and lost tax revenue," *Crane*, 783 F.3d at 249. Texas rests on the same conclusory conjectures Mississippi relied upon. *See Crane v. Napolitano*, 920 F. Supp. 2d 724, 745–46 (N.D. Tex. 2013) (finding Mississippi's conjectures of harm were "conclusory" "[e]ven if it is true that many illegal immigrants are permitted to remain in the state of Mississippi [because of the challenged policies]").

Texas cannot rely on how the Fifth Circuit distinguished *Crane* in the DAPA litigation. The heart of Mississippi's standing argument was the general fiscal harm from a change in immigration policy. The Fifth Circuit noted only that Mississippi waived certain *specific* arguments, particularly the "driver's-license rationale." *Texas*, 809 F.3d at 150 n.24 (citing *Crane*, 783 F.3d at 252 n. 34). In *Texas*, the driver's license rationale—the idea that Texas was required to provide driver's licenses to deferred action recipients—was the entire basis for standing in Texas's DAPA case, *see* 809 F.3d at 150 (declining to address other standing arguments). Texas does not make the driver's license argument here, as there is no suggestion of any such requirement in the present circumstances and, accordingly, the Fifth Circuit's DAPA decision is inapposite. Nor does the district court decision in *Texas v. United States*, 328 F. Supp. 3d 662 (S.D. Tex. 2018), help Texas establish standing. *See* Mot. 25. There, an expert opined that DACA would encourage over twenty percent of recipients who would otherwise have left the country to remain in the United States. *Texas*, 328 F. Supp. 3d at 702–03. As an initial matter, the district court there did not address *Crane*'s holding. *See id*. Regardless, even if this Court agreed that, notwithstanding *Crane*, such a showing would be sufficient, Texas has made no such showing here.

Instead, just like in *Crane*, the "evidence" Texas puts forward is a general accounting of how much illegal immigration purportedly costs the state. *Compare* Decl. of Rebecca Waltz (ECF No. 63-10) ¶¶ 6–7 (stating generally how much Texas was reimbursed by the federal government in 2017–2018 for incarceration); Decl. of Leonardo Lopez (ECF No. 63-12) ¶ 8 (speculating Texas

would have higher costs in providing public education "to the extent" there is an increase in unaccompanied children enrolled in public education); *and* Decl. of Lisa Kalakanis (ECF No. 63-13) ¶ 13 (stating a "belie[f] that the total costs to the State of providing [healthcare] services and benefits to undocumented immigrants will continue to reflect trends to the extent that the number of undocumented immigrants residing in Texas increases or decreases each year"), *with Crane*, 783 F.3d at 249 ("Mississippi points to a 2006 study conducted by Mississippi officials that estimates the net fiscal burden of illegal immigration as a whole at $25 million per year"), *and Crane v. Napolitano*, No. 3:12-3247 (N.D. Tex.), 2006 State Auditor Report, Attach. 2 to Pls.' Am. Compl. (ECF No. 15-2) (30-page audit on purported costs of illegal immigration that both the district court and Fifth Circuit found did not satisfy Article III standing).

Neither Texas nor Mississippi tried to connect the challenged action to the purported costs, besides *ipse dixit* that there would be increased social service expenditures. *Crane*, 783 F.3d at 249, 252. Here, the lack of evidence connecting the purported injury to the challenged action is stark. For incarceration, Texas makes no effort to show it will now have to incarcerate individuals with pending removal orders beyond their sentences. For education, Texas fails to show that any unaccompanied minor with a removal order would enroll in public education in Texas because of the removal pause. For healthcare, Texas provides no evidence that anyone who would be released because of the pause would incur any healthcare cost that Texas must bear without reimbursement.

Texas has explicitly admitted that any financial harm *caused by* the Memorandum is speculative. Defendants inquired of Texas: "[f]or each social service" that Texas provides to undocumented noncitizens, "provide the amount that you would have expended on that service in excess of the amount you had previously budgeted, if the Pekoske Memorandum were in effect." Texas Resp. Interog. No. 3. Texas replied: "Plaintiff cannot answer this interrogatory as it concerns a future event contingent on many factors and therefore calls for speculation." *Id.* "Any response would not be based on any empirical knowledge or opinion based on such knowledge of facts and is therefore speculative." *Id.* Texas merely recites a list of existing expenses and concedes that it

is "speculation" as to whether a mere removal pause will increase them. *Clapper v. Amnesty Int'l*, 568 U.S. 398, 409 (2013).

Finally, Texas cannot rely on the MOU to confer standing or as an acknowledgment of irreparable harm. *See* Mot. 10, 23. Injury is a jurisdictional requirement and must be established as a matter of fact; standing cannot be manufactured via agreement. *See United States v. Johnson*, 319 U.S. 302, 304–05 (1943); *cf. Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1549 (2016).

Texas lacks standing, and comes nowhere close in establishing irreparable harm.

## II.    Texas's APA Claims Lack Merit.

### A.   Texas cannot clear four threshold obstacles to its APA claims.

"Even the APA—potentially the most versatile tool available to an enterprising state— imposes a number of limitations." *Texas*, 809 F.3d at 161. Four such limitations bar Texas's APA claims in this case. The first such limitation precludes Texas's "arbitrary and capricious" and "contrary to law" claims. The second, third, and fourth limitations each independently preclude *all* of Texas's APA claims, including its notice-and-comment claim. These defects are thus fatal to Texas's APA claims, and similarly fatal to any "equitable" cause of action outside the APA, *contra* ECF No. 72-3 (amicus citing *Ex parte Young*, 209 U.S. 123, 160 (1908)). *See Armstrong v. Exceptional Child Center*, 575 U.S. 320, 327 (2015) ("The power of federal courts of equity to enjoin unlawful executive action is subject to express and implied statutory limitations.").

### 1.   The challenged action is "committed to agency discretion by law."

The APA precludes review "of certain categories of administrative decisions that courts traditionally have regarded as 'committed to agency discretion.'" *Texas*, 809 F.3d at 165 (quoting *Lincoln v. Vigil*, 508 U.S. 182, 191 (1993)); *see* 5 U.S.C. § 701(a)(2). An exercise of nonenforcement discretion like the Acting Secretary's temporary pause here is the epitome of a decision "committed to agency discretion by law" and is therefore exempt from judicial review.

>    i.   *The Acting Secretary's action is committed to Executive discretion and presumptively unreviewable.*

The Executive's "[r]efusals to take enforcement steps" are presumptively not subject to judicial review. *Heckler v. Chaney*, 470 U.S. 821, 831 (1985). Whether to enforce a law in a particular instance or set of instances "involves a complicated balancing of a number of factors which are peculiarly within [the Executive's] expertise," including "whether agency resources are best spent on this violation or another" and "whether the particular enforcement action requested best fits the agency's overall policies." *Id.* at 831. These exercises of prosecutorial discretion are inherent to the Executive power that the Constitution confers on the President.

Discretion in immigration enforcement is especially important. "[A]ny policy toward aliens is vitally and intricately interwoven with contemporaneous policies in regard to the conduct of foreign relations [and] the war power." *Harisiades v. Shaughnessy*, 342 U.S. 580, 588–89 (1952). A "principal feature of the removal system," therefore, "is the broad discretion exercised by immigration officials." *Arizona*, 567 U.S. at 396. The Executive must consider a host of issues not present even in ordinary enforcement decisions, such as the "dynamic nature of relations with other countries" and the need for enforcement policies to be "consistent with this Nation's foreign policy with respect to these and other realities." *Id.* at 397. "Because decisions in these matters may implicate 'relations with foreign powers,' or involve 'classifications defined in the light of changing political and economic circumstances,' such judgments 'are frequently of a character more appropriate to either the Legislature or the Executive.'" *Trump v. Hawaii*, 138 S. Ct. 2392, 2418–19 (2018) (quoting *Mathews v. Diaz*, 426 U.S. 67, 81 (1976)).

No surprise, then, that the Executive has long exercised discretion in this field and that Congress has specifically empowered it to do so. As Justice Scalia instructed shortly after Congress enacted § 1231, "the Executive has discretion to abandon the endeavor" of removing an alien at "each stage" of the removal process, and for any reason—whether "for humanitarian reasons or simply for its own convenience." *AADC*, 525 U.S. at 483–84; *see also id.* at 484 (noting that the Executive "may decline to institute proceedings, terminate proceedings, or decline to execute a

final order of deportation" (quoting 6 C. Gordon, S. Mailman, & S. Yale–Loehr, Immigration Law and Procedure § 72.03 [2][h] (1998))). For decades, the Executive has exercised its discretion not to enforce both by establishing enforcement priorities and by declining enforcement action. *See AADC*, 525 U.S. at 483–84; *Texas*, 809 F.3d at 165–66.

The discretionary nature of the challenged conduct resolves Texas's substantive APA claims: the statute "commits enforcement of the INA to h[is] discretion," and the exercise of that discretion "is not subject to judicial review." *Texas v. United States*, 106 F.3d 661, 667 (5th Cir. 1997); *see Chaney*, 470 U.S. at 831; 5 U.S.C. § 701(a)(2). In this case, the Acting Secretary exercised his inherent and statutory authority to defer, for a brief period, execution of certain final orders of removal so that resources could be shifted to other more pressing priorities. Many weighty priorities in a nationwide immigration system compete for limited resources. The brief pause was thus undertaken to shift resources to DHS's other statutory responsibilities like border security, while continuing to remove higher priority aliens.  Although Texas attempts to brand the pause as "an abdication" of statutory duty, Mot. 7–8 (citation omitted), that contention ignores the basic executive prerogative to choose to focus scarce enforcement resources on new aliens entering the country instead of on aliens already here. Moreover, the Memorandum specifically provides that the pause does not apply to individuals for whom DHS has determined "removal is required by law." *See* Pekoske Mem. at 3–4.

### ii. *Congress has reinforced, not undermined, the presumption of unreviewability.*

The basic presumption of unreviewability is buttressed by a host of immigration provisions that "are aimed at protecting the Executive's discretion from the courts—indeed, that can fairly be said to be the theme of the legislation." *AADC*, 525 U.S. at 486–87. As explained in more detail below, *infra* Section II.A.2, the statutory scheme for judicial review that Congress established *categorically* precludes challenges like Texas's—irrespective of the agency's discretion in this field. *See* 5 U.S.C. § 701(a)(1). But for purposes of § 701(a)(2), the important point is that Congress did not override the presumption of unreviewability.

Binding Fifth Circuit precedent already establishes this point. In an earlier Texas challenge to allegedly inadequate federal enforcement of immigration laws, the Fifth Circuit held that Congress had "commit[ed] enforcement of the INA to [the Attorney General's] discretion," and that any decision "not to take enforcement actions is unreviewable under the [APA]." *Texas*, 106 F.3d at 667. (Congress has since transferred the relevant powers to the Secretary of Homeland Security.) The Fifth Circuit reaffirmed this view in 2015, emphasizing that the "Secretary has broad discretion to 'decide whether it makes sense to pursue removal at all,'" so decisions to not pursue enforcement fall within § 701(a)(2)'s exception to judicial review. *Texas*, 809 F.3d at 165–66 (quoting *Arizona*, 567 U.S. at 396). Binding Fifth Circuit law forecloses Texas's APA claims.

In an effort to evade the clear unreviewability of this discretion, Texas argues that Congress limited the Secretary's discretion by providing that "the [Secretary] shall remove" an alien subject to a final order of removal "within a period of 90 days." 8 U.S.C. § 1231(a)(1)(A); *see* Mot. 8, 11–12. This Court found that the "word 'shall' usually connotes a requirement," Order Granting Pl.'s Emergency Application for a TRO, at 6, ECF No. 16 ("TRO Op.") (citation omitted); *see also* Mot. 12 (similar). But, as the Supreme Court observed in *Zadvydas*, it is doubtful "that when Congress shortened the removal period to 90 days in 1996 it believed that all reasonably foreseeable removals could be accomplished in that time." 533 U.S. at 701. Particularly "when used in a statute prospectively affecting government action," "'shall' is sometimes the equivalent of 'may.'" *Richbourg Motor Co. v. United States*, 281 U.S. 528, 534 (1930) (citation omitted). Indeed, "a law that purports to *require* the Executive Branch to prosecute certain offenses or offenders" would "interfere with the President's Article II prosecutorial discretion." *In re Aiken Cty.*, 725 F.3d 255, 266 n.11 (D.C. Cir. 2013) (Kavanaugh, J.). *Maine Community Health v. United States* is inapposite because it did not involve enforcement discretion. 140 S.Ct. 1308, 1320 (2020).

The Supreme Court has thus admonished that a statute directing enforcement—even one using the word "shall"—does not, standing alone, displace the Executive's inherent authority to exercise enforcement discretion. Congress displaces the presumption of unreviewability only if it "limit[s] an agency's exercise of enforcement power . . . either by setting substantive priorities, or

by otherwise circumscribing an agency's power to discriminate among issues or cases it will pursue." *Chaney*, 470 U.S. at 833. But a provision that merely directs that the enforcement authority "shall" enforce a law offers no such limitations. *See Town of Castle Rock v. Gonzales*, 545 U.S. 748, 761 (2005) (the "deep-rooted nature of law-enforcement discretion" persists "even in the presence of seemingly mandatory commands"). In *Castle Rock*, a statute provided that law enforcement "shall arrest . . . or seek a warrant" for the arrest of any violator of a restraining order, but the Supreme Court rejected the notion this imposed a mandatory duty; to be "a true mandate of police action would require some stronger indication" of legislative intent than the bare "shall." *Id.*; *see also Chicago v. Morales*, 527 U.S. 41, 62 n.32 (1999) (similar).

Courts routinely find nonenforcement decisions exempt from substantive judicial review, even in the face of seemingly mandatory language. *See, e.g.*, *Chaney*, 470 U.S. at 835 (nonenforcement under statute directing that violators "shall be imprisoned" was unreviewable); *Sierra Club v. Whitman*, 268 F.3d 898, 903–05 (9th Cir. 2001) (nonenforcement under statute directing that EPA "shall issue an order" or "shall bring a civil action" was unreviewable). Here, § 1231(a)(1)(A) provides that the Secretary "shall remove" certain aliens, but does not direct how he is to prioritize which of the million cases to pursue. *Cf. Chaney*, 470 U.S. at 833. Instead, Congress expressly empowered the Secretary to establish "national immigration enforcement policies and priorities," 6 U.S.C. § 202(5), and to "issue such instructions; and perform such other acts *as he deems necessary* for carrying out his authority" under the statute, 8 U.S.C. § 1103(a)(3) (emphasis added); *see id.* § 1103(a)(1). The Supreme Court and the Fifth Circuit have therefore repeatedly recognized this discretion. *See AADC*, 525 U.S. at 483; *Arizona*, 567 U.S. at 396; *Texas*, 106 F.3d at 667; *Texas*, 809 F.3d at 165–66.

The statutory and practical context here clarify beyond doubt that Congress set 90 days only as a target, and not as a mandate. *See Bhd. of Ry. Carmen Div. v. Pena*, 64 F.3d 702, 704 (D.C. Cir. 1995) ("absent a clear indication that Congress intended otherwise, we will deem a statutory deadline to be directory" rather than "mandatory"). The meaning of "shall" in a statute— "must," "'should,' 'will,' or even 'may'"—depends on context. *Gutierrez de Martinez v. Lamagno*,

515 U.S. 417, 432 n.9 (1995). The most important context here is the statute's subject matter: Executive enforcement of immigration law. The Court should not lightly infer from a naked "shall" an intent to displace such a core Executive function as discretion. *See Chaney*, 470 U.S. at 832; *Castle Rock*, 545 U.S. at 761; *cf. Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001) ("Congress, we have held, does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions—it does not, one might say, hide elephants in mouseholes.").

The statutory structure confirms that the Secretary retains "the broad discretion" that is a "principal feature of the removal system." *Arizona*, 567 U.S. at 396. Section 1231 defines a "removal period" of 90 days and then sets out rules that apply *after that period*. *See* 8 U.S.C. § 1231(a)(3) (providing for supervised release if "the alien does not leave or is not removed" within 90 days). Congress authorized regulations governing supervised release—additional evidence Congress contemplated some significant number of individuals would remain beyond 90 days.

Elsewhere in the very same statute, by contrast, Congress was quite clear when it wished to constrain enforcement discretion. Thus, during the 90-day period, "the [Secretary] shall detain the alien." *Id.* § 1231(a)(2). In that same subsection, Congress made clear the priorities the Secretary should use: even though he "shall detain the alien" generally, "*[u]nder no circumstance* during the removal period shall the [Secretary] release an alien who has been found inadmissible" under specified provisions. *Id.* (emphasis added). Congress thereby set the priorities for the Secretary to follow when deciding who to detain under § 1231(a)(2). Section 1231(a)(1) has no comparable constraints or guidelines. *See Jama v. ICE*, 543 U.S. 335, 341 (2005) ("We do not lightly assume that Congress has omitted from its adopted text requirements that it nonetheless intends to apply, and our reluctance is even greater when Congress has shown elsewhere in the same statute that it knows how to make such a requirement manifest.") (Scalia, J.).

The practical realities of immigration enforcement reinforce the retained discretion inherent in enforcing § 1231(a)(1). There are over a million aliens currently subject to a final order of removal. Berg Decl. at ¶ 8. DHS's ability to remove them all—while simultaneously enforcing other laws—is necessarily constrained by the resources Congress appropriates. *See Zadvydas*, 533

U.S. at 701. And Congress has not instructed the Secretary how to balance the competing priorities of executing removal orders and border security.

Finally, legislative history illuminates what is already evident: the House Committee Report described the provision's purpose as establishing "a *target* period of 90 days from the entry of" an order of removal by which an alien would be removed. H.R. Rep. 104-469, pt. 1, at 160 (1996) (emphasis added). That the provision set a target, and not an enforceable mandate, was important because various courts had earlier entertained mandamus actions seeking to compel the Attorney General to take specific steps in the removal process. *See, e.g.*, *Campos v. INS*, 62 F.3d 311 (9th Cir. 1995) (describing purpose of a related amendment).

Congress vested the Secretary with broad discretion to set immigration enforcement priorities. 6 U.S.C. § 202(5); 8 U.S.C. § 1103(a)(3). This Court lacks jurisdiction to review the Acting Secretary's decision temporarily not to enforce removal orders.

### 2.   Congress has precluded judicial review of these types of decisions.

An action also cannot proceed under the APA when another statute precludes judicial review. 5 U.S.C. § 701(a)(1). "Whether and to what extent a particular statute precludes judicial review is determined not only from its express language, but also from the structure of the statutory scheme, its objectives, its legislative history, and the nature of the administrative action involved." *Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 345 (1984). A detailed mechanism for review of some claims by some plaintiffs is "strong evidence that Congress intended to preclude [other types of plaintiffs] from obtaining judicial review." *United States v. Fausto*, 484 U.S. 439, 448 (1988).

#### i.   Congress expressly eliminated judicial review of Texas's claims.

Congress was explicit that only *noncitizens* could obtain judicial review of the type Texas seeks. Section 1252(a)(5) provides that "[n]*otwithstanding any other provision of law*," "a petition for review filed with an appropriate court of appeals . . . shall be the sole and exclusive means for judicial review of an order of removal."   And § 1252(b)(9) states that "Judicial review of all questions of law and fact . . . arising from any action taken or proceeding brought to remove an

alien from the United States under this subchapter shall be available only in judicial review of a final order under this section." 8 U.S.C. § 1252(b)(9). The section is an "unmistakable zipper clause" that means "no judicial review in deportation cases unless this section provides judicial review." *AADC*, 525 U.S. at 482–83.[1]

Section 1252(b)(9) thus channels judicial review of all "decisions and actions leading up to or consequent upon final orders of deportation," including "non-final order[s]," into one proceeding exclusively before a court of appeals. *AADC*, 525 U.S. at 483, 485. (A separate—and even more limited—scheme governs judicial review of expedited orders of removal. *See* 8 U.S.C. § 1252(a)(2)(A); *id.* § 1252(e).) This provision circumscribes district court jurisdiction over "*any* issue—whether legal or factual—arising from *any* removal-related activity," which "can be reviewed *only* through the [statutorily defined] process." *J.E.F.M. v. Lynch*, 837 F.3d 1026, 1029–30 (9th Cir. 2016); *see Aguilar v. ICE*, 510 F.3d 1, 9 (1st Cir. 2007) (similar). That includes "policies-and-practices challenges," *J.E.F.M.*, 837 F.3d at 1035, arising from any "action taken or proceeding brought to remove an alien," 8 U.S.C. § 1252(b)(9), whether or not the challenge is to an actual final order of removal or whether there even is a final order at all. *J.E.F.M.*, 837 F.3d at 1032.

The claims here "arise[] from" "action[s] taken or proceeding[s] brought to remove an alien." 8 U.S.C. § 1252(b)(9). Indeed, Texas effectively concedes this point when it argues that its claims arise from "Defendants' announcement *that they would not execute removal orders*." Mot. 7 (emphasis added). Because Texas seeks to require the execution of removal orders, its claims "arise from" the proceedings brought to remove the alien in the first instance.[2] Here, the Acting

---

[1] In Defendants' expedited TRO briefing, Defendants also cited § 1252(g), which bars claims brought "by or on behalf of any alien." That section underscores Congress's broad intent to limit judicial review in this context. In any event, section 1252(b)(9) contains no such limitation.

[2] This suit is unlike either *Regents* or the *Texas* DAPA decision; in both those cases the courts found that the policies at issue, in those courts' view, also conferred benefits. *See DHS v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1907 (2020); *Texas*, 809 F.3d at 164. Those courts thus thought review permissible only because the challenged policies were more than the unreviewable decision "temporarily [] not to enforce

Secretary's actions are unmistakably confined to briefly deferring enforcement of a removal order, and nothing more. Because § 1252 provides the sole mechanism for review of all "decisions and actions leading up to or consequent upon final orders of deportation," *AADC*, 525 U.S. at 485, and because Texas cannot invoke § 1252, its claims necessarily fail.

Underscoring that the statute precludes review of the sort Texas seeks—whether DHS is complying with § 1231—Congress expressly barred review of any claim, by *any* party, invoking § 1231 *against* the government. 8 U.S.C. § 1231(h). That provision "limit[s] the circumstances in which judicial review . . . is available," and "forbids courts to construe [§ 1231] 'to create any . . . procedural right or benefit that is legally enforceable.'" *Zadvydas*, 533 U.S. at 688 (quoting 8 U.S.C. § 1231(h). In *Zadvydas*, of course, the petitioner did not seek to enforce § 1231, as Texas attempts here, but rather challenged his detention through habeas.

*ii. Statutory structure and context reinforce that judicial review is unavailable.*

Multiple statutory provisions expressly preclude review in district court, and over the substantive and procedural issues raised here. *See* 5 U.S.C. § 701(a)(1). But even in their absence, judicial review would still be precluded. *See Block*, 467 U.S. at 345 (judicial review may be precluded by statutory structure and other context). Congress has established a detailed scheme that carefully restricts judicial interference with Executive discretion in immigration enforcement. "For more than a century, this [Supreme] Court has recognized that the admission and exclusion of foreign nationals is a 'fundamental sovereign attribute exercised by the Government's political departments largely immune from judicial control.'" *Hawaii*, 138 S. Ct. at 2418 (quoting *Fiallo v. Bell*, 430 U. S. 787, 792 (1977)). Thus, even as Congress set a 90-day removal period, it enacted numerous provisions "aimed at protecting the Executive's discretion from the courts." *AADC*, 525 U.S. at 486–87. *See* 8 U.S.C. §§ 1226(e); 1226a(b)(1); 1229c(f); 1231(h); 1252(a)(2)(A), (a)(2)(B), (a)(2)(C), (b)(4)(D), (b)(9), (d), (f), (g).

---

the immigration laws as to a class" of aliens, and instead also "affirmatively confer[red] 'lawful presence' and associated benefits." *Texas*, 809 F.3d at 166; *see Regents*, 140 S. Ct. at 1907.

Recall, again, what it is that Texas actually challenges in this action: although memorialized in writing, what the Acting Secretary *did* was defer enforcement of certain orders of removal for a brief period. Congress has set forth a detailed—and narrow—path for judicial review of removal decisions. Removal actions generally proceed under one of two statutory sections: either full removal proceedings under 8 U.S.C. § 1229a or expedited removal proceedings under 8 U.S.C. § 1225(b)(1). The avenues for judicial review of removal-related determinations are determined—and limited—by that placement. Neither applies here; nor does Texas invoke them.

To be sure, this statutory review scheme does not offer a means for Texas, a state, to challenge any decision related to removal. *Cf. Ayuda, Inc. v. Reno*, 7 F.3d 246, 250 (D.C. Cir. 1993) (holding that organizational plaintiff could not challenge INS policies "that bear on an alien's removal"). But that is precisely the point: the detailed mechanism for review of *some* claims by *some* parties, is "strong evidence that Congress intended to preclude [other plaintiffs] from obtaining judicial review." *United States v. Fausto*, 484 U.S. 439, 448 (1988). Thus, in *Fausto*, the Supreme Court concluded that the "deliberate exclusion" of certain types of employees from administrative and judicial review provisions related to federal employment prevented those employees from seeking relief *at all*. *Id.* at 455. Similarly, in *Block*, Congress provided a specific review scheme for "dairy handlers" but not for "consumers." 467 U.S. at 346–47. This did not mean that milk consumers could resort to the APA to challenge the agency action; it meant they could not challenge the action at all. *Id.* at 347. Just so here.

### 3.   Texas falls outside the "zone of interests" of the relevant statute.

Among the threshold obstacles that an APA plaintiff must clear is to show that it is "aggrieved . . . within the meaning of a relevant statute." 5 U.S.C. § 702. The Supreme Court has long "held that this language establishes a regime under which a plaintiff may not sue unless he 'falls within the zone of interests sought to be protected by the statutory provision whose violation forms the legal basis for his complaint.'" *Thompson v. N. Am. Stainless, LP*, 562 U.S. 170, 177 (2011) (Scalia, J.) (quoting *Lujan v. Nat'l Wildlife Fed'n,* 497 U.S. 871, 883 (1990)); *see also*

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 224 (2012). A plaintiff "suing under the APA must satisfy" the zone-of-interests test. *Patchak*, 567 U.S. at 224. If the plaintiff is outside the zone of interests, then all his APA claims—including claims that the challenged action is arbitrary or capricious or failed to follow required procedures—fail as a matter of law. *See, e.g.*, *Mendoza v. Perez*, 754 F.3d 1002, 1016 (D.C. Cir. 2014).

Congress could scarcely have been clearer in its intent to preclude Texas's claims in this case. The focus of the zone-of-interests inquiry is "whether [the plaintiff] falls within the class of plaintiffs whom Congress has authorized to sue" under the applicable statute—a question answered "using traditional tools of statutory interpretation." *Lexmark Int'l, Inv. v. Static Control Components, Inc.*, 572 U.S. 118, 128 (2014). The "statute that [Texas] says was violated," *Patchak*, 567 U.S. at 224, expressly states that "[n]othing in [§ 1231] shall be construed to create any substantive or procedural right or benefit that is legally enforceable by *any party* against the United States or its agencies or officers or any other person," 8 U.S.C. § 1231(h) (emphasis added). Congress was unmistakable that it wanted no party to judicially enforce § 1231.

The Tenth Circuit thus interpreted an almost identical statutory provision to bar a claim seeking injunctive relief against the government. *Hernandez-Avalos v. INS*, 50 F.3d 842, 844 (10th Cir. 1995). The plaintiff had invoked a statute directing that "the Attorney General shall begin any deportation proceedings as expeditiously as possible," 8 U.S.C. § 1252(i) (since amended), but a separate provision stated, just like § 1231(h), that "nothing" in that section "shall be construed to create any substantive or procedural right or benefit that is legally enforceable by any party against" the government. *Hernandez-Avalos*, 50 F.3d at 844. The court applied the "zone of interests" test applicable to APA actions and readily concluded that the statute "means that no one can satisfy the zone of interests test," and that "no would-be plaintiff" could bring suit, either directly or indirectly. *Id.*

This is scarcely surprising: § 1231 concerns the manner in which the Executive enforces immigration laws set by Congress. As evidenced in a series of statutory provisions, Congress "aimed at protecting the Executive's discretion from the courts," *AADC*, 525 U.S. at 486–87.

19

Faithful to this purpose and the attendant statutory text, courts have consistently recognized the limitations on enforcing § 1231 with respect to aliens and sovereign entities alike. Under § 1231(h), a party may not "sue directly under § 1231, or indirectly" under other provisions, to compel that "the [Secretary] [] remove [an] alien from the United States within a period of 90 days." *Ncube v. I.N.S. Dist. Directors & Agents*, 1998 WL 842349, at *12 (S.D.N.Y. Dec. 2, 1998); *see also Channer v. Hall*, 112 F.3d 214, 216 (5th Cir. 1997).

It is no answer that the Supreme Court did not view § 1231(h) as an obstacle to *habeas* review in *Zadvydas*. *See* Mot. 12–13. The law that governs a habeas action is entirely different from that governing an APA action. The APA "do[es] not declare self-actuating substantive rights, but rather . . . merely provide[s] a vehicle for enforcing rights which are declared elsewhere." *Perales v. Casillas*, 903 F.2d 1043, 1050 n.3 (5th Cir. 1990). And Congress made explicit that Texas has *no rights* under § 1231. Texas's assertion that § 1231(h) "does not matter here, where the APA allows suits to challenge agency action that violates a statute," Mot. 12, is simply wrong. A plaintiff "suing under the APA *must satisfy*" the zone-of-interests test. *Patchak*, 567 U.S. at 224 (emphasis added). Thus, in an APA case the plaintiff *lacks a valid cause of action* if he is not "within the class of plaintiffs whom Congress has authorized to sue." *Lexmark*, 572 U.S. at 128. *Zadvydas* is inapposite in this respect because there is no similar limitation on a habeas action. Section 1231 unmistakably precludes any cause of action against the federal government to enforce its provisions, including one under the APA.

### 4.   The challenged action is not "final agency action" subject to APA review.

For yet another independent reason, Texas's APA claims all fail. The APA allows challenges only to "final agency action." 5 U.S.C. § 704. Agency action is "final" under the APA only if it both is "the consummation of the agency's decisionmaking process" and also determines "rights or obligations." *Bennett v. Spear*, 520 U.S. 154, 178 (1997). Texas challenges the Acting Secretary's policy of deferring enforcement for a brief period; that policy does not determine or

alter any individual's legal rights or obligations, or whether any individual will ultimately be removed, and so is not "final" under the APA.

The Memorandum does not change any person's legal status, determine any legal benefits, or reverse any final order of removal. Quite the opposite: noncitizens subject to a final order of removal have no legal right to remain in the United States after the Memorandum to the exact same extent as they did before. That point is underscored by the Memorandum's plain text indicating that it does not "create any right or benefit." Pekoske Mem. at 4. The Memorandum is therefore simply a temporary shift in priorities. Such a policy is not "final agency action" because the agency's discretionary decision not to enforce a law against a private party in particular circumstances does not make that party's underlying conduct lawful. *Cf. Lipschultz v. Charter Advanced Servs. (MN), LLC*, 140 S. Ct. 6, 7 (2019) (Thomas, J., concurring in denial of certiorari) (commenting that "a policy of nonregulation . . . likely is not final agency action because it does not mark 'the consummation of the agency's decisionmaking process' or determine [a party's] 'rights or obligations.'").

Contrary to Texas's suggestion otherwise, Mot. 9, the Secretary retains the discretion to change or abandon this nonenforcement policy at any time. Nor does the Memorandum itself impose on Texas any obligation to provide social services to anyone; any such obligation is imposed by other sources of law. So, too, any change in the Secretary's authority to detain or release noncitizens subject to a final order of removal is entirely secondary to the decision not to immediately execute a removal order.

### B. Texas's APA claims fail on the merits.

#### 1. The Memorandum is not "contrary to law."

As just explained, four doctrines preclude Texas from asserting its claim that the 100-day pause is "contrary to law." But even if Texas could pursue that claim, it would fail on the merits.

Texas asserts that the Acting Secretary's decision to temporarily suspend execution of removal orders violates § 1231(a)(1), which provides that "when an alien is ordered removed," the

Secretary "shall remove the alien from the United States within a period of 90 days." But, despite its language, that statute does not impose a mandate on the Secretary.

As discussed above, a statute directing enforcement, even one using the word "shall," still preserves the Executive's inherent authority to exercise enforcement discretion. Section 1231(a)(1)(A) lacks the "stronger indication" of intent necessary to impose a true mandate that the Supreme Court said was required in *Castle Rock*. *See* 545 U.S. at 761 ("a true mandate of police action would require some stronger indication" of legislative intent than the bare "shall"); *Morales*, 527 U.S. at 62 n.32 (finding that interpreting the use of the word "shall" to dissolve police officers' discretion "flies in the face of common sense"). Like the statutes in *Castle Rock* and *Morales*, the statute here directs that an enforcement officer "shall" take a particular action in specified circumstances. But it goes no further.

Indeed, the statute explicitly recognizes that not all those subject to a final order of removal will be removed within the 90-day removal period. *See, e.g.*, 8 U.S.C. § 1231(a)(3) (supervised release if "the alien does not leave or is not removed" within 90 days). Thus, Congress expected a large number of aliens to remain beyond 90 days. Likewise, the legislative history emphasizes that Congress set "a *target* period of 90 days from the entry of" a removal order for its execution. H.R. Rep. 104-469, pt. 1, at 160 (emphasis added).

Texas nonetheless argues that removal within 90 days is mandatory. *See* Mot. 11–12. But Congress knows how to impose a true enforcement mandate. In the very same statutory section, Congress provided for detention during the removal period but made it mandatory only for certain criminal and terrorist aliens. *See Jama*, 543 U.S. at 341. The relevant provision contains two sentences: "During the removal period, the [Secretary] shall detain the alien. Under no circumstance during the removal period shall the [Secretary] release [certain terrorist and criminal aliens]." 8 U.S.C. § 1231(a)(2). Reading "shall" to impose a mandate in the first sentence of § 1231(a)(2) would make the second sentence superfluous. DHS has thus long read the second sentence to require the detention of terrorist and criminal aliens, and the first sentence to authorize but not require the detention of other aliens. *See Continued Detention of Aliens Subject to Final*

*Orders of Removal*, 66 Fed. Reg. 56,967, 56,969 (Nov. 14, 2001). Consistent with that understanding, the Supreme Court has explained that Section 1231(a) only "mandates detention of *certain criminal aliens*" during the removal period. *Zadvydas*, 533 U.S. at 698 (emphasis added).

To be sure, some courts have suggested that the 90-day period imposes some sort of duty. But those courts have done so only in dicta generally describing the statutory scheme. Thus, in *Tran v. Mukasey*, the Fifth Circuit confronted a habeas challenge to continued detention beyond 90 days. 515 F.3d 478, 479 (5th Cir. 2008). The court, citing § 1231(a)(1)(A), first observed that "the government must facilitate that alien's removal from the United States within ninety days" and then proceeded to discuss the law that governed *detention* when the alien is not removed in that period. *Id.* at 481. Nothing in that case turned on any supposedly "mandatory" duty to remove within 90 days; the court's offhand description of § 1231(a)(1)(A) was not, and did not purport to be, an authoritative interpretation of that provision. Even if it were, to the extent that an alien subject to a final order of removal seeks the government's assistance in bringing about his own removal, the removal pause imposes no barrier to the government offering such "facilitation."

Texas's claim that § 1231(a)(1) imposes a mandate rests on the use of the word "shall." But, and especially in the context of a statute providing for government enforcement, a "stronger indication" of intent to impose a mandate is needed to displace the "deep-rooted nature of law enforcement discretion." *Castle Rock*, 545 U.S. at 761. That indication is absent here.

> 2.   The Acting Secretary's temporary pause on removals is a reasonable effort to enact the new Administration's immigration priorities.

Texas likewise cannot establish that the Memorandum is arbitrary and capricious. "The arbitrary and capricious standard is highly deferential." *Knapp v. U.S. Dep't of Agric.*, 796 F.3d 445, 453 (5th Cir. 2015); *see Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974) (court must "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned."). Here, the Acting Secretary engaged in reasoned decisionmaking.

On his very first day of office, President Biden issued EO 13993, *see* AR_0001, which articulated baseline values and priorities for the Administration with respect to the enforcement of

the civil immigration laws. That same day, the Acting Secretary took steps, including the temporary pause at issue here, to allow DHS to reconsider its broad discretion.

At the outset, the Memorandum identifies two primary goals: "conduct[ing] a review of policies and practices concerning immigration enforcement," and "surg[ing] resources to the border" given the "unique circumstances" of "the most serious global public health crisis in a century." Pekoske Mem. at 1. To accomplish those goals, the Memorandum "sets interim policies" "to enable focusing the Department's resources where they are most needed." *Id.* One of those interim policies is the 100-day pause of removals. *Id.* at 1, 3. The Memorandum then reiterates that the 100-day pause is warranted to prioritize DHS's resources, reassign staff and resources to the border, comply with COVID-19 protocols, and reassess enforcement priorities. *Id.* at 3. As the Memorandum explains, a 100-day pause will allow the Department to temporarily shift the resources that removal operations consume to instead address the agency's new priorities, including increased border control. *See Quantum Entm't Ltd. v. U.S. Dep't of the Interior, Bureau of Indian Affairs*, 597 F. Supp. 2d 146, 152 (D.D.C. 2009) ("Nothing more than a 'brief statement' is necessary [under the APA], as long as the agency explains 'why it chose to do what it did.'").

An "agency to which Congress has delegated policy-making responsibilities may, within the limits of that delegation, properly rely upon the incumbent administration's views of wise policy to inform its judgments." *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 865 (1984). Undoubtedly, the 100-day pause is driven by a new Administration's policy priorities. Texas evidently disagrees with the Administration's judgment. But "a court may not set aside an agency's policymaking decision solely because it might have been prompted by an Administration's priorities," as "policymaking is not a rarified technocratic process" unaffected by the responsible choices of an Administration's politically accountable officials. *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2573 (2019).

Texas's contrary arguments miss the point. Texas seems to assume that DHS was rushing out broad new policies, but in reality the Memorandum announced a limited temporary pause to enable DHS to *develop* long-term policies, consistent with its priorities.

First, Texas discounts the text of the Memorandum when it argues that DHS failed to consider relevant factors or engage in reasoned decision-making. *See* Mot. 13–15. But, as just explained, the Memorandum sets out a reasonably discernable path of implementing a pause to allow DHS to prioritize its resources while it reassesses its enforcement priorities.

Second, Texas stresses that the Memorandum did not explain "why 100 days *specifically* is needed to accomplish these goals." TRO Op. at 11; Mot. 13. The Memorandum, however, explicitly ties the removal pause to the period for the agency to review its enforcement priorities. *See* Pekoske Mem. at 2 (announcing "Department-wide review of policies and practices concerning immigration enforcement" with recommendations for revised policies no later than 100 days after Memorandum issuance); *id.* at 3 (explaining that 100-day pause is "pending the completion of the review"). Texas has not argued that a 100-day review period is unreasonable. Nor could it in this context, given the time necessary for newly-appointed DHS leadership to evaluate how previous enforcement policies interplay with the new administration's priorities.

Third, Texas misapplies a line of cases that stand for the simple proposition that when faced with a discrete number of choices, the agency must consider each choice or else it has "failed to consider an important aspect of the problem." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). *See* Mot. 14–15. In *State Farm,* an existing regulation provided two means of compliance: automated seatbelts or airbags. 463 U.S. at 46. The agency was faced with either keeping the existing regulation, repealing it altogether, or retaining just one of the two requirements. The agency failed to consider keeping the airbags, and so acted arbitrarily. *Id.* at 51. So too in *Regents*, which related to the attempted repeal of DACA: The Supreme Court found that the existing policy provided both removal deferral and attendant benefits. 140 S. Ct. at 1901. The agency was faced with keeping the policy, repealing it altogether, or keeping just one aspect of it. *Id.* at 1912.

Here, there is no analogous situation of the agency being faced with the prospect of partially repealing a previous policy; the 100-day pause is simply a temporary measure while DHS reassesses policies going forward. Indeed, Texas has not identified a reasonable alternative that

DHS failed to consider. *Cf. N. Am.'s Bldg. Trades Unions v. Occupational Safety & Health Admin.*, 878 F.3d 271, 305–06 (D.C. Cir. 2017) ("[T]he force of the evidence and argument that [the agency] must offer to defend its choice will vary with the force of the proponent's evidence and argument." (citation omitted)).

Texas's claim is all the more baseless because DHS considered *and issued* a limited alternative to an indefinite full pause of removals. The pause lasts for only 100 days—a discrete and limited time for DHS to evaluate its policies—and excludes four categories of aliens from the pause. Pekoske Mem. at 3. Accepting Texas's argument would essentially require an agency to explicitly compare its chosen policy with every hypothetical, more "limited" policy—a process for which Texas provides no guidance—and then explain why it is not discarding its chosen option for the countless hypothetical alternative policies. The law is the opposite: an agency enjoys great deference when, as here, a discretionary decision "requires a complicated balancing of a number of factors which are peculiarly within its expertise." *Vigil*, 508 U.S. at 193.

<u>Fourth</u>, Texas's discussion of costs ignores the reality of immigration policy. *See* Mot. 14. Federal immigration policy implicates "trade, investment, tourism, [] diplomatic relations for the entire Nation," and "human concerns." *Arizona*, 567 U.S. at 395–96. The cost to individual states is not a relevant concern that the Acting Secretary was required to consider, notwithstanding the fact that immigration policy is "importa[nt]" to the State. *See id.* at 397. Moreover, Texas fails to establish what "costs" the Acting Secretary should have considered when implementing a short-term pause to allow the Executive to reevaluate its priorities.

<u>Fifth</u>, Texas faults DHS for failing to provide a reasoned analysis for departing from the MOU. *See* Mot. 15. As detailed below, the MOU is invalid, unenforceable, and affords Texas no right to relief. Moreover, the authority that Texas relies on says only that "an agency changing its course *by rescinding a rule* is obligated to supply a reasoned analysis for the change." *State Farm*, 463 U.S. at 42 (emphasis added). To the extent the MOU was a "rule," then it is invalid for the additional reason that its adoption did not follow the APA rulemaking process. *See* 5 U.S.C. § 553.

Sixth, Texas's suggestion that the relatively limited Administrative Record evinces unreasoned decisionmaking is baseless. Especially in areas where the Executive exercises core Article II authority, a memorandum detailing the agency's decision, standing alone, is sufficient. In *Trump v. Hawaii*, the Supreme Court held that a 12-page document sufficed to allow judicial review for a policy that swept significantly more broadly than the 100-day pause in removals. *See* 138 S. Ct. at 2409; *see also Karnoski v. Trump*, 926 F.3d 1180, 1206 n.22 (9th Cir. 2019). Moreover, the APA generally does not impose a requirement that agencies produce a detailed record; a brief, reasonable explanation is all that is required. *See Global Crossing Telecomms., Inc. v. Metrophones Telecomms., Inc.*, 550 U.S. 45, 63–64 (2007) (agency decision satisfied reasoned decisionmaking even though it "simply states that the carrier's practice is unreasonable under § 201(b)"). The Memorandum announces only a short-term pause based on an Executive Order, rather than enacting a new policy. The Administrative Record fully explains the agency's reasons and is sufficient for the Court to uphold the 100-day pause. *Cf. Hawaii*, 138 S. Ct. at 2409.

Texas disagrees with the policy choice made by the Acting Secretary. But that is not an argument that the pause on removals is arbitrary and capricious. The Acting Secretary adequately explained the basis for issuing such a limited pause: the need to shift efforts to the Administration's enforcement priorities while it takes stock of its limited resources and ensures that its enforcement of immigration laws is consistent with its priorities.

### 3.   The Acting Secretary's pause on removals is exempt from notice and comment.

Part C of the Acting Secretary's Memorandum is exempt from the APA's notice and comment requirements; it is not a substantive rule, notwithstanding Texas arguments to the contrary. *See* Mot. 16–17. Rather, pursuant to the APA, the pause is a general statement of policy regarding how DHS will exercise its enforcement discretion under the INA or, otherwise, a procedural rule governing internal agency practice. The APA's requirement that an agency follow notice-and-comment procedures before promulgating rules, 5 U.S.C. § 553(b), does not apply to "general statements of policy," *id.* § 553(b)(3)(A). Likewise, the APA also exempts procedural

rules—such as this one providing for internal agency procedures and processes—from notice and comment. *See id*. Whether this Court views the pause on removals as a general statement of policy or as a procedural rule, Texas's notice and comment claim must fail.

General statements of policy are those that "advise the public prospectively of the manner in which the agency proposes to exercise a discretionary power." *Vigil*, 508 U.S. at 197. By contrast, legislative rules adopted through notice-and-comment procedures have the force and effect of law, and thus create legally enforceable rights or obligations in regulated parties. *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 96 (2015). The APA leaves to the agency the choice of which mode to employ. *See* 5 U.S.C. § 553(b); *cf. SEC v. Chenery Corp.*, 332 U.S. 194, 209 (1947).

The quintessential use of policy statements is for an agency to announce how and when it will pursue (or forbear from) enforcement—a decision "generally committed to an agency's absolute discretion." *Chaney*, 470 U.S. at 831. Unlike substantive rules, a general statement of policy is one "that does not impose any rights or obligations" and that "genuinely leaves the agency and its decisionmakers free to exercise discretion." *Prof'ls & Patients for Customized Care v. Shalala*, 56 F.3d 592, 595 (5th Cir. 1995). An agency is not required to use notice-and-comment procedures when changing its general enforcement policies because to do so would hamper the exercise of the agency's discretion. *See* 1 Richard J. Pierce, Jr., Administrative Law Treatise § 6.3, at 424–25 (5th ed. 2010) (Pierce). Such policies must remain subject to ready amendment, in response to changing circumstances, funding, and priorities, and without the time-consuming process of notice and comment.

In light of these principles, the pause is exempt from notice-and-comment requirements. The Fifth Circuit has held that "the starting point" in determining whether an agency pronouncement is a statement of policy "is 'the agency's characterization of the rule.'" *See Prof'ls & Patients for Customized Care*, 56 F.3d at 596. The Acting Secretary referred to his Memorandum, including the pause on removals, as "Department-wide guidance." The Memorandum's substance reflects that characterization: an announcement of how the Secretary intends to exercise his discretion. *See Vigil*, 508 U.S. at 197.

Indeed, in *Vigil*, the Supreme Court had to decide whether an announcement by the Indian Health Services to discontinue certain "direct clinical services" violated the APA. *Id*. at 189. Besides finding the decision to expend general appropriations was committed to agency discretion, *id*. at 190–195, the Supreme Court also rejected the notice-and-comment claim that an announcement to cease providing these services was required to undergo notice and comment, *id*. at 195–99. In particular, the Supreme Court stated, "Whatever else may be considered a 'general statemen[t] of policy,' the term surely includes an announcement like the one before us, that an agency will discontinue a discretionary allocation of unrestricted funds from a lump-sum appropriation." *Id*. at 197. The same is true here. A general statement of policy must extend to the Acting Secretary of Homeland Security's announcement how he will exercise longstanding discretion to temporarily re-allocate enforcement resources by having a limited pause on removals.

Further, the temporary pause does not create any rights or obligations or bind the agency in any manner. *See, supra*, section II.A.4. Texas's argument that the policy is binding because it purportedly circumscribes discretion of individual immigration officers, *see* Mot. 17, both misunderstands the relevant precedent and misses the entire nature of a general statement of policy. As the Fifth Circuit explained in reviewing DAPA, a policy is not a "policy statement" exempt from notice and comment if it "would not genuinely leave *the agency and* its employees free to exercise discretion." *Texas*, 809 F.3d at 176 (emphasis added). Here, the agency itself retains discretion to abandon the policy entirely or on an ad hoc basis. Thus, a blanket policy is still a "policy." *See* Black's Law Dictionary 1345 (10th ed. 2014) ("[P]olicy" means "[a] standard course of action that has been officially established by an organization."). A policy that restricts line officers' discretion is all the more clearly a "general" statement of policy because it advises the public of the manner in which the entire agency will exercise its discretion. Prohibiting senior officials from announcing policies that bind rank-and-file agents, without first following notice-and-comment procedures, also "would create horrible incentives." Pierce, Administrative Law Treatise § 6.3, at 424 ("If agencies are allowed to establish policies that limit the discretion of their employees only through use of the expensive and time-consuming notice and comment procedure,

they rarely will choose to limit the discretion of their employees charged with enforcement and prosecutorial responsibilities.").

A contrary rule here would undermine senior executives' ability to control the Executive Branch. *See* U.S. Const. art. II, § 1. The Secretary is responsible for administering and enforcing the immigration laws, 8 U.S.C. § 1103(a)(1), and for "[e]stablishing national immigration enforcement policies and priorities." 6 U.S.C. § 202(5). DHS must make decisions for innumerable situations each year. But the Secretary cannot set national policies without also exercising his authority to "control, direct[], and supervis[e]" his subordinates. 8 U.S.C. § 1103(a)(2). And, in any event, nothing in Part C binds the current Secretary of DHS from disbanding the pause, even before the conclusion of 100 days.

Even if this Court views the pause on removals as "binding" in some sense, the pause is still exempt from notice and comment because it would then be a procedural rule. *See Texas*, 809 F.3d at 176 (a "binding rule is not required to undergo notice and comment if it is one 'of agency organization, procedure, or practice'") (quoting 5 U.S.C. § 553(b)(A)). In the Fifth Circuit, "the substantial impact test is the primary means by which [a court would] look beyond the label 'procedural' to determine whether a rule is of the type Congress thought appropriate for public participation." *U.S. Dep't of Labor v. Kast Metals Corp.*, 744 F.2d 1145, 1153 (5th Cir. 1984) *accord Texas*, 809 F.3d at 176. In other words, the question is whether the agency action "modifies substantive rights and interests" of the public. *Kast Metals*, 744 F.2d at 1153. The answer is no.

The pause on removals does not modify any substantive right or interest. The individuals subject to final orders of removal are still subject to final orders of removal, absent an independent change in status. Nor is there any purported attendant benefit. Thus, this case presents different circumstances from those in the *Texas* DAPA case. There, the Fifth Circuit found that DAPA was not a procedural rule because it found that DAPA changed the substantive criteria for whether individuals were lawfully present in the United States. *See Texas*, 809 F.3d at 176–77. Here, there is no analogous change in criteria. Accordingly, the Acting Secretary's pause was not required to undergo notice and comment.

**III.    The MOU Is Invalid, Unenforceable, and Cannot Be the Basis of Relief for Texas.**

Texas briefly contends that the Memorandum violated a so-called agreement that Ken Cuccinelli purported to enter on DHS's behalf. *See* Mot. 19–20. This argument is undeveloped, and fails to engage with the weighty issues already identified by the Court and parties, TRO Op. at 2; Defs.' Mem. of P.&A. in Opp'n to Pls.' Emergency Application for a TRO, at 3–6, ECF No. 8 ("TRO Opp'n"). Texas has forfeited the argument. *See United States v. Thames*, 214 F.3d 608, 611 n.3 (5th Cir. 2000) (failure to develop argument constitutes forfeiture). But it is without merit in any event, as the MOU is void *ab initio* and unenforceable.

A.    *Mr. Cuccinelli purported to enter into the MOU without proper authority.*

1.    DHS cannot contract away its sovereign discretion over immigration enforcement.

Texas asserts that DHS contracted away the United States's right to decide federal immigration policy by imposing a 180-day stay on federal action, pending Texas's comments on that action. But a promise to abstain from taking a wide range of immigration-related actions until a State has exercised a 180-day comment power lies beyond the power of contract. An outgoing administration cannot contract away the federal government's plenary power over the enforcement of immigration law. *See Biodiversity Assocs. v. Cables*, 357 F.3d 1152, 1172 (10th Cir. 2004) ("The executive branch does not have authority to contract away the enumerated constitutional powers of Congress or its own successors…."); *see also United States Trust Co. v. New Jersey*, 431 U.S. 1, 23 (1977) ("[T]he Contract Clause does not require a State to adhere to a contract that surrenders an essential attribute of its sovereignty").

A long line of authority establishes that "[t]he Government cannot make a binding contract that it will not exercise a sovereign power." *Amino Brothers Co. v. United States*, 178 Ct. Cl. 515, 525, 372 F.2d 485, 491, *cert. denied*, 389 U.S. 846 (1967). In *Bowen v. Public Agencies Opposed to Social Security Entrapment*, 477 U.S. 41, 52 (1986), the Supreme Court reaffirmed that "we have declined in the context of commercial contracts to find that a 'sovereign forever waives the right to exercise one of its sovereign powers unless it expressly reserves the right to exercise that

31

power in' the contract." (quoting *Merrion v. Jicarilla Apache Tribe*, 455 U.S. 130, 148 (1982));
*see also Contributors to Penn. Hospital v. City of Philadelphia*, 245 U.S. 20 (1917).

Texas asserts that DHS contracted away the sovereign's right to alter Federal immigration
policy by imposing a 180-day stay on Federal action, pending Texas's response to that action. As
the above precedent establishes, DHS could not and did not do so.

### 2. Texas has not identified any permissible statutory authority for DHS to enter into this Agreement.

Further, Texas fails to identify any permissible statutory authority that contemplates DHS
entering into a contract to grant states the power to delay and review agency policy
decisions. Indeed, it has long been a principle of federal government contract law that an individual
entering a contract on behalf of the federal government must have statutory authority to do so:
"Our statute books are filled with acts authorizing the making of contracts with the government
through its various officers and departments, but, in every instance, the person entering into such
a contract must look to the statute under which it is made, and see for himself that his contract
comes within the terms of the law." *The Floyd Acceptances*, 74 U.S. 666, 679–80 (1868); *see
also CACI, Inc. v. Stone*, 990 F.2d 1233, 1237 (Fed. Cir. 1993) ("[T]here cannot be a contract
when the government agent lacks actual authority to create one."). None of the statutory authorities
cited in the agreement provides the authority for the agreement that Texas purportedly entered with
DHS. *Compare* MOU § I (listing the purported statutory authorities to enter into this agreement)
*with* TRO Opp'n at 4 (discussing Homeland Security Act). All applicable statutes preserve federal
prerogatives.

Not only was the purported agreement executed without statutory authority, it runs afoul
of the non-delegation doctrine. *U.S. Telecom Ass'n v. F.C.C.*, 359 F.3d 554, 565 (D.C. Cir. 2004)
("subdelegations to outside parties are assumed to be improper absent an affirmative showing of
congressional authorization"). Had Congress intended to authorize such extraordinary agreements,
it certainly would have done so expressly with unmistakable clarity. *See, e.g.*, *Am. Trucking Ass'ns*,
531 U.S. at 468. The MOU is therefore unauthorized by statute. The MOU would also violate the

32

APA if it were binding. An agency cannot use its contracting authority to circumvent the provisions of the APA by constraining the agency from making future changes to immigration policy. Any such constraint would be a legislative rule that binds the agency and determines legal rights and obligations by locking in place current regulations and policies. Such a rule would be subject to the requirements of the APA. *See, e.g.*, *Davidson v. Glickman*, 169 F.3d 996, 999 (5th Cir. 1999). Thus, to the extent the purported agreement requires the United States to take actions that are inconsistent with its existing statutory and regulatory obligations, such an agreement is void— even if it meets all the other elements of a binding contract. *See Total Med. Mgmt., Inc. v. United States*, 104 F.3d 1314, 1320 (Fed. Cir. 1997).

### B.   This court cannot order specific performance of the MOU's terms.

Texas's claim for injunctive relief based on the MOU also fails because the United States has not waived sovereign immunity for such claims. A waiver of sovereign immunity must be enacted by statute, must be strictly construed in the Government's favor and must unambiguously extend to the type of relief sought. *Lane v. Pena*, 518 U.S. 187, 192 (1996). Circuit courts have consistently recognized that the United States has not waived sovereign immunity for contract claims seeking specific performance—which is what Texas necessarily seeks by asking this Court to enforce its terms and enjoin the Memorandum based on the MOU. *See generally Gonzales & Gonzales Bonds & Ins. Agency, Inc. v. Dep't of Homeland Sec.*, 490 F.3d 940, 945 (Fed. Cir. 2007); *Ala. Rural Fire Ins. Co. v. Naylor,* 530 F.2d 1221, 1229–30 (5th Cir. 1976); *see also United States v. Jones*, 131 U.S. 1, 18 (1889) (Tucker Act did not authorize specific performance against the federal government).

Texas again cannot rely on the APA to circumvent this basic principle. For agency action to be subject to APA review, there must be "no other adequate remedy in a court." 5 U.S.C. § 704. Here, to the extent the MOU is enforceable at all for the amount Texas claims is at issue, the Tucker Act would be the proper remedy—in the Court of Federal Claims. *See Suburban Mortg. Assocs., Inc. v. U.S. Dep't of Hous. & Urban Dev.*, 480 F.3d 1116, 1128 (Fed. Cir. 2007). At most,

if there were a valid contract, Texas might possess a contract claim for money damages. Such a claim is consistent with federal case law that "damages are always the default remedy for breach of contract." *Sanders v. United States*, 252 F.3d 1329, 1334 (Fed. Cir. 2001) (quoting *United States v. Winstar Corp.*, 518 U.S. 839, 885 (1996) (plurality opinion)); *accord Holmes v. United States*, 657 F.3d 1303, 1314 (Fed. Cir. 2011). And, any question about the monetary cost of any purported breach can be addressed in that forum.

### C.  Texas did not provide requisite consideration for the MOU.

The MOU is also invalid because Texas did not provide any consideration in exchange for its asserted control over federal immigration policy. *Trauma Servs. Grp. v. United States*, 104 F.3d 1321, 1325 (Fed. Cir. 1997) (requiring mutual consideration for a valid contract). Here, the purported agreement appears to require DHS to consult with Texas before "taking any action, adopting or modifying a policy or procedure, or making any decision" that could affect various aspects of immigration enforcement, MOU at 2–3, and provides Texas with 180 days to comment on any proposed change. *Id.* at 3. In exchange for this opportunity to comment, and to delay Federal policy changes, Texas agrees only to "[s]upport DHS's immigration enforcement by honoring 'detainer requests' or 'requests to hold' issued to Texas by ICE or CBP, and honoring DHS requests for records or information from the Texas Department of Motor Vehicles." *Id.* at 4. But Texas does not claim that it had to begin performing these tasks due to the MOU, indeed it could not identify a single instance when it had not previously honored DHS's requests. Texas Resp. Interog. No. 5; *see, e.g.*, *City of El Cenizo v. Texas*, 890 F.3d 164, 173 (5th Cir. 2018) (citing, *inter alia*, Tex. Gov't Code § 752.053; Tex. Code of Crim. Pro. Art. 2.251). Accordingly, Texas failed to provide the United States with any consideration.

## IV.   Texas Fails to State an Independent Claim Under the Take Care Clause.

Texas asserts that the pause on removals violates the Take Care Clause, Art. II, § 3, because it violates § 1231(a)(1)(A). *See* Mot. 17. That assertion collapses into their argument that the pause exceeds the Acting Secretary's statutory authority, and is flatly contradicted by the Supreme

Court's admonishment in *Dalton v. Specter* that "claims simply alleging that the President has exceeded his statutory authority are not 'constitutional' claims." 511 U.S. 462, 473 (1994). As demonstrated above, however, the Memorandum—far from being incompatible with the statute— is firmly supported by its text and structure, foundational principles concerning the exercise of enforcement discretion, and a long history recognized by the Supreme Court.

The Take Care Clause, nevertheless, cannot furnish a basis for affirmative relief in an Article III court. For the Judicial Branch to superintend how the President performs his executive functions would express a "lack of the respect due" to the Nation's highest elected official. *Baker v. Carr*, 369 U.S. 186, 217 (1962). Indeed, the Supreme Court has recognized that "the duty of the President in the exercise of the power to see that the laws are faithfully executed" "is purely executive and political," and not subject to judicial direction. *Mississippi v. Johnson*, 71 U.S. (4 Wall.) 475, 499 (1867). In fact, *Armstrong v. Exceptional Child Center, Inc.*, 575 U.S. 320 (2015), on which Texas relies, *see* Mot. 18, stands for the exact opposite proposition: "It is equally apparent that the Supremacy Clause is not the source of any federal rights, and certainly does not create a cause of action." *See Armstrong*, 575 U.S. at 324 (citations omitted). Here, it is equally apparent that the Take Care Clause is not the source of any federal rights, and it certainly does not create its own cause of action either to challenge the President's action or inaction. *See Franklin v. Massachusetts*, 505 U.S. 788, 796 (1992).

In any event, the Acting Secretary is faithfully—and vigorously—executing the immigration laws by ensuring DHS's limited resources are utilized for the highest priorities. Indeed, in issuing the pause on removals, the Acting Secretary is seeking to "ensure that [DHS's] removal resources are directed to the Department's highest enforcement priorities." Pekoske Mem. at 3; *see also id*. at 1. "Real or perceived inadequate enforcement of immigration laws does not constitute a reviewable abdication of duty." *Texas*, 106 F.3d at 667. This is a proper act of discretion, not a failure to enforce immigration law. *See id.*

Texas's Take Care Clause claim improperly invites this Court to assume the President's role to execute immigration law. The claim is baseless.

**V.      An Injunction Restraining Core Article II Authority Outweighs Any Harm to Texas
         and Undermines the Public Interest.**

Texas cannot establish that any injury to it outweighs the harm to the Defendants and serves

the public interest. *See Valley v. Rapides Parish Sch. Bd.*, 118 F.3d 1047, 1051 (5th Cir. 1997). As

Texas candidly concedes, it cannot show it will spend even a penny more than it already budgeted;

any estimated increase "would not be based on any empirical knowledge" and "is therefore

speculative." Texas Resp. Interog. No. 3. But even if Texas could establish some fiscal injury

actually caused by the pause, any such injury pause would border on negligible. DHS is currently

detaining fewer than 6,000 noncitizens subject to a final order of removal nationwide. Only some

subset will be released during the pause—some DHS will continue to detain and some will be

removed consistent with the Memorandum's exceptions. Of those released, only a smaller portion

would end up in Texas. And of those, a still smaller portion, if any, would rely on Texas social

services. Yet Texas seeks a nationwide injunction based on this small fraction of individuals for

whom Texas "speculat[es]" it may provide some unidentified amount of benefits to, a fraction that

is exponentially smaller than the "tens of millions" they claim harm from.

Weighed against this highly uncertain and at most minor financial harm to Texas is the

severe burden on core Article II authority. As the Supreme Court emphasized in *AADC*, challenges

to immigration enforcement discretion "invade a special province of the Executive." 525 U.S. at

489. An injunction that dictates to the Executive that it must continue a set of removals that it does

not wish to undertake at this time would interfere with a core constitutional power conferred on

the Executive, which is irreparable harm *per se*. *Cf. Elrod v. Burns*, 427 U.S. 347, 373 (1976).

But the injury to the United States is not just a constitutional injury in the abstract—

although that injury is substantial. As the Acting Secretary explained in the Memorandum, the

pause is necessary to allow DHS to shift resources to those efforts it deems a higher priority:

operations at the southwest border and safe administration of COVID-19 protocols. Pekoske Mem.

at 3. Removal operations are resource intensive even in ordinary times: DHS must obtain travel

documents for each alien prior to removal and must coordinate the removal logistics. Berg Decl.

¶ 6. ICE works with the alien to collect the evidence the destination country requires. Some countries require an in-person consular interview with the detainee at the country's consulate in the United States. *See id.* Those operations are costly in time and dollars: DHS must arrange for flights for removal to any country outside Mexico or Canada, coordinate those flights with the other countries, obtain travel documents for each alien on the flight, and ensure that each alien boards the flight. *Id.* Pausing these operations allows DHS to focus on matters more urgent and pressing: reinforcing the southwest border and ensuring safe operations during a pandemic. Pekoske Mem. at 3. The harm to the United States—both the government and the public—therefore goes well beyond that the Fifth Circuit discussed in *Texas* DAPA decision. *See Texas*, 809 F.3d at 187 (emphasizing that "the injunction does not enjoin or impair the Secretary's ability to marshal his assets or deploy the resources of the DHS or to set priorities.") (citation & alterations omitted).

As to the public interest, the cases that the Court previously cited all arose in the context of the Executive seeking to remove a noncitizen or investigate an immigration violation and support Defendants' position here: *the Executive* administers immigration enforcement *on behalf of the public*. *See Nken v. Holder*, 556 U.S. 418, 436 (2009); *Blackie's House of Beef, Inc. v. Castillo*, 659 F.2d 1211, 1221 (D.C. Cir. 1981). The public interest here thus favors the Executive's exercise of its core Article II authority over removal, including the discretion to determine whether particular removals are ultimately in the public interest, considering opportunity costs. *See Arizona*, 567 U.S. at 395 (noting how "[i]mmigration policy can affect trade, investment, tourism, and diplomatic relations for the entire Nation, as well as the perceptions and expectations of aliens in this country who seek the full protection of its laws"); *id*. at 396 (and "human concerns."). It may be that Texas disagrees with DHS's prioritizing border control over removal of those already here. But that underscores the constitutional harm: the Executive—not Texas, not the Judiciary—is charged with enforcing immigration laws, and in its assessment resources must be shifted from removal operations to border control and COVID-19 response. An injunction that interferes with

that assessment is unwarranted in any circumstance. But it is especially unwarranted when the only countervailing harm Texas can assert is a wholly speculative—and, at most, small—fiscal harm.

## VI.   Any Injunction Should Be Limited and Any Final Judgment Should Be Complete.

### A.   Any Injunction Should Be Narrowly Drawn.

As an initial matter, if the Court grants an injunction, relief should be limited to Part C of the Memorandum (the entire focus of Texas's complaint, TRO application, and current motion). In addition, the relief should be limited to final orders of removal of noncitizens *in Texas*.

As this Court has recognized, "[n]ationwide injunctions of executive action are a topic of fierce and ongoing debate in both the courts and the legal academy." *See* TRO Op. 14–15. That is for good reason. Nationwide relief that would affect those who are not parties to this case would exceed this Court's authority under Article III and violate longstanding equitable doctrines. "Article III of the Constitution limits the exercise of the judicial power to 'Cases' and 'Controversies.'" *Town of Chester v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1650 (2017) (citation omitted); *see also DHS v. New York*, No. 19A785, 2020 WL 413786, at *1 (U.S. Jan. 27, 2020) (Gorsuch, J., concurring); *Trump v. Hawaii*, 138 S. Ct. at 2429 (Thomas, J., concurring). In the end, an injunction must "be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Madsen v. Women's Health Ctr., Inc*., 512 U.S. 753, 765 (1994).

In granting nationwide relief, this Court relied on the Fifth Circuit's *Texas* DAPA decision. *See* TRO Op. 15–16. But none of the circumstances present in that case warrant granting nationwide relief in this case. First, the Fifth Circuit's reliance on the need for a uniform immigration system that provides for the vigorous and uniform enforcement of immigration laws is inapplicable to the present circumstance because removal decisions are inherently discretionary and non-uniform. *See Texas*, 809 F.3d at 187–88.

Second, in its *Texas* DAPA decision, the Fifth Circuit found that the federal policy would "affirmatively confer 'lawful presence' and associated benefits" on a class of aliens nationwide. *Id.* at 166. In this case, by contrast, regardless of the geographical scope of any injunction, nothing

about Section C of the Acting Secretary's Memorandum itself changes the legal status of any individual or otherwise confers lawful presence. Rather, DHS would be merely exercising discretion that it has long had regarding whether to execute a final order of removal. *See AADC*, 525 U.S. at 484. That is, an alien in detention in California is potentially subject to discretionary relief by the Secretary regardless of whether Section C is enjoined. The question for the Court in deciding the scope of any injunction in this case, then, is whether to limit relief to any harm Texas suffers, or else to displace the Secretary's role nationwide, thereby possibly harming parties not before the Court who do not object to the pause. Further, a nationwide injunction prevents similar issues from percolating in separate circuits (including a now-pending case in Arizona, *Arizona, et al. v. DHS, et al.*, Civil Action No 2:21-00186 (D. Az.)) and potentially ultimately being resolved by the Supreme Court. *See E. Bay Sanctuary Covenant v. Barr*, 934 F.3d 1026, 1030 (9th Cir. 2019).

The Fifth Circuit's other basis for the DAPA nationwide injunction—"a substantial likelihood that a geographically-limited injunction would be ineffective because DAPA beneficiaries would be free to move among states"—is no more applicable. *See Texas*, 809 F.3d at 188. Texas has made no such showing in this case. As explained above, Texas cannot show that it suffers any injury as a result of the pause on removals. But, regardless, Texas's statutory argument is based on its theory that individuals must be removed within 90 days; Texas cannot make any argument that someone in California who remains there beyond 90 days causes any harm to Texas. Nor can Texas rely on any claimed harm of someone being released in California who is still subject to a final order of removal. Out of the more than one million aliens subject to final orders of removal, fewer than 6,000 are currently detained. *See* Berg Decl. ¶ 8. It is speculative to presume that such an individual will: 1) be released in another state, 2) move to Texas, and 3) rely on any Texas social service in a way that causes any cost to Texas's budget beyond what Texas has already appropriated. Putting aside any disagreement with the Fifth Circuit's analysis, Texas's speculation about the impact of a 100-day pause is much more attenuated than a DAPA recipient having a two-year work authorization, subject to renewal, and not being subject to removal during that period.

Finally, Texas cannot rely on the provisions of the APA for a nationwide injunction. Courts have previously declined to rely upon the APA to issue a nationwide injunction when it was not warranted. *See* TRO Op. 16 n.6 (citing *California v. Azar*, 911 F.3d 558, 584 (9th Cir. 2018)). That is so for the same reasons just explained; Article III and equitable principles still apply under the APA. Even when agency action under the APA is "set aside," courts often limit the scope of any such vacatur. *See, e.g.*, *New York v. DHS*, 969 F.3d 42, 87–89 (2d Cir. 2020); *Va. Soc'y for Human Life, Inc. v. FEC*, 263 F.3d 379, 393–94 (4th Cir. 2001), *overruled on other grounds by The Real Truth About Abortion, Inc. v. FEC*, 681 F.3d 544 (4th Cir. 2012).

In the end, Article III and equitable principles, including respect for sister courts, dictate that any injunction should be no broader than necessary to address the purported harm that would occur absent a preliminary injunction.

### B.  Any Final Judgment Should Extend to All Claims.

Defendants do not object to Texas's request for a final judgment on its APA claims, though do disagree with Texas about whom that judgment should favor and do object to piecemeal litigation. Should this Court resolve any claim on final judgment, it should resolve all of the claims. For the reasons explained above for why Texas both lacks standing and cannot demonstrate a likelihood of success on the merits, Defendants are entitled to judgment on all of Texas's claims. *See Munaf v. Geren*, 553 U.S. 674, 692 (2008). Should Texas prevail on this motion on one or more claims, the Court should still resolve all counts if it were to consider final judgment, or at a minimum, enter judgment on the specific counts that it does resolve. *See* Fed. R. Civ. P. 54(b).

## CONCLUSION

For the reasons stated herein, Texas's motion for a preliminary injunction should be denied and judgment should be entered for Defendants.

Dated: February 12, 2021

Respectfully submitted,

BRIAN M. BOYNTON
Acting Assistant Attorney General

AUGUST FLENTJE
Special Counsel

BRIGHAM J. BOWEN
Assistant Branch Director

_/s/ Adam D. Kirschner_
ADAM D. KIRSCHNER
Attorney-in-charge
IL Bar. No. 6286601
Senior Trial Counsel
BRIAN C. ROSEN-SHAUD
ME Bar No. 006018
MICHAEL F. KNAPP
CA Bar No. 314104
Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
Tel: (202) 353-9265
Fax: (202) 616-8460
Email:  Adam.Kirschner@usdoj.gov
        Brian.C.Rosen-Shaud@usdoj.gov
        Michael.F.Knapp@usdoj.gov

Mailing Address:
Post Office Box 883
Washington, D.C. 20044

Courier Address
1100 L Street NW, Room 11020
Washington, D.C. 20005
_Attorneys for Defendants_


DANIEL DAVID HU
Assistant United States Attorney
Chief, Civil Division
State Bar No. 10131415
S.D. I.D. 7959
Southern District of Texas
1000 Louisiana, Suite 2300 Houston, TX 77002
Tel: (713) 567-9000

Fax: (713) 718-3300
Daniel.Hu@usdoj.gov
*Local Counsel*

## CERTIFICATE OF SERVICE

I certify that a true and accurate copy of the foregoing document was filed electronically (via CM/ECF) on February 12, 2021.

*/s/ Adam D. Kirschner*
ADAM D. KIRSCHNER