**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**VICTORIA DIVISION**

| | |
|---|---|
| The STATE OF TEXAS,<br><br>   *Plaintiff,*<br><br>v.<br><br>The UNITED STATES OF AMERICA, et al.,<br><br>   *Defendants*. | Civ. Action No. 6:21-cv-00003 |

**TEXAS'S REPLY IN SUPPORT OF ITS**
**MOTION FOR PRELIMINARY INJUNCTION**

i

# TABLE OF CONTENTS

TABLE OF CONTENTS ........................................................................................................ ii

TABLE OF AUTHORITIES ............................................................................................... iii

INTRODUCTION ................................................................................................................ 1

UPDATED STATEMENT OF FACTS ............................................................................... 2

ARGUMENT IN REPLY .................................................................................................... 3

   I.   The January 20 Memorandum violated the APA. ............................................. 3

      a.   The January 20 Memorandum was arbitrary and capricious. ....................... 3

      b.   The January 20 Memorandum is contrary to Section 1231. ......................... 5

      c.   The January 20 Memorandum required notice-and-comment rulemaking. ................... 7

   II.   No threshold issue bars this Court's review. ................................................... 8

      a.   Texas has standing. ..................................................................................... 9

      b.   Defendants lack the discretion to ignore Congress's directives entirely. .................... 10

      c.   Congress has not insulated the abdication statutory duties from judicial review. ........ 12

      d.   Texas has a clear interest in how Defendants enforce immigration law ...................... 12

      e.   The January 20 Memorandum was a final agency action. ............................. 15

   III.   The Agreement with Texas is binding and enforceable. ................................ 16

      a.   The Agreement was statutorily authorized. ................................................ 17

      b.   The Agreement did not contract away sovereign authority. ......................... 18

      c.   The Agreement did not violate the nondelegation doctrine. ......................... 19

      d.   The Agreement was not a legislative rule subject to notice-and-comment requirements under the APA. ................................................................................................ 19

      e.   Texas does not seek specific performance of the Agreement. ...................... 20

      f.   Texas provided consideration for the Agreement. ....................................... 21

   IV.   The January 20 Memorandum violates the Take Care Clause. ...................... 22

   V.   The substantial injury to Texas outweighs any harm to Defendants and a preliminary injunction is in the public interest. ................................................................. 24

   VI.   What is required now is a complete set aside of the January 20 Memorandum. .............. 25

CONCLUSION .................................................................................................................. 25

CERTIFICATE OF WORD COUNT ................................................................................ 27

CERTIFICATE OF SERVICE .......................................................................................... 27

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Aiken County,*
725 F.3d 225 (D.C. Cir. 2013) ..................................................................................10

*Arizona v. United States,*
567 U.S. 387 (2012) ..........................................................................................1, 3, 4, 9

*Ass'n of Data Processing Serv. Orgs., Inc. v. Camp,*
397 U.S. 150 (1970) ..................................................................................................12

*Avoyelles Sportsmen's League, Inc. v. Marsh,*
715 F.2d 897, 908 (5th Cir.1983) .................................................................................7

*Biodiversity Associates v. Cables,*
357 F.3d 1152 (10th Cir. 2004) .................................................................................17

*Cardoza v. Commodity Futures Trading Comm'n,*
768 F.2d 1542 (7th Cir. 1985) ...................................................................................18

*Center for Auto Safety v. Dole,*
846 F.2d 1532 (D.C. Cir. 1988) .................................................................................18

*Chennareddy v. Bowsher,*
935 F.2d 315 (D.C. Cir. 1991) ...................................................................................18

*Clarke v. Sec. Indus. Ass'n,*
479 U.S. 388 (1987) .............................................................................................13, 14

*Crane v. Johnson,*
783 F.3d 244 (5th Cir. 2015) ..................................................................................7, 26

*Dalton v. Specter*
511 U.S. 462, 473 (1994) ...........................................................................................24

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.,*
140 S. Ct. 1891, 1913–14 (2020) ........................................................................1, 4, 15

*Doe v. United States,*
37 Fed. Cl. 74 (1996) .................................................................................................21

*Drakes v. United States,*
28 Fed. Cl. 190 (1993) ...............................................................................................22

*Fed. Commc'ns Comm'n v. Fox Television Stations, Inc.*,
  556 U.S. 502 (2009)............................................................................................15

*Franklin v. Massachusetts*,
  505 U.S. 788 (1992)............................................................................................23

*Georgia Railroad & Banking Co. v. Redwine*,
  342 U.S. 299 (1952)............................................................................................21

*Gonzaga Univ. v. Doe*,
  536 U.S. 273 (2002)......................................................................................12, 13

*Grundy v. United States*,
  2 Cl.Ct. 596 (1983) ............................................................................................22

*Hernandez-Avalos v. INS*,
  50 F.3d 842 (10th Cir. 1995) ........................................................................12, 13

*International Fabricare Inst. v. EPA*,
  972 F.2d 384 (D.C. Cir. 1992) ...........................................................................19

*J.E.F.M. v. Lynch*,
  837 F.3d 1026 (9th Cir. 2016) ............................................................................10

*Johnson v. Seacor Marine Corp.*,
  404 F.3d 871 (5th Cir. 2005) ..............................................................................23

*Kania v. United States*,
  650 F.2d 264 (Ct. Cl. 1981) ...............................................................................22

*Kendall v. United States ex rel. Stokes*
  37 U.S. (12 Pet.) 524, 612–13 (1838) ................................................................25

*League of Women Voters of United States v. Newby*,
  838 F.3d 1 (D.C. Cir. 2016) ...............................................................................27

*Lexmark Intern., Inc. v. Static Control Components, Inc.*,
  572 U.S. 118 (2014)............................................................................................12

*Little v. Barreme*,
  6 U.S. (2 Cranch) 170 (1804)..............................................................................25

*Make the Rd. New York v. Pompeo*,
  475 F. Supp. 3d 232 (S.D.N.Y. 2020) ................................................................24

*Mendoza v. Perez*,
  754 F.3d 1002 (D.C. Cir. 2014) ..........................................................................14

*Mississippi v. Johnson,*
    71 U.S. (4 Wall.) 475 (1867) ...................................................................................26

*Morton v. Ruiz,*
    415 U.S. 199 (1974) .................................................................................................17

*Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Auto Ins. Co.,*
    463 U.S. 29 (1983) ...................................................................................................15

*N.Y. Stock Exch. LLC v. SEC,*
    962 F.3d 541 (D.C. Cir. 2020) ..................................................................................4

*Nak Kim Chhoeun v. Marin,*
    8:17-cv-1898, 2018 WL 1941756 (C.D. Cal. Mar. 26, 2018) .................................11

*Oglala Sioux Tribe of Indians v. Andrus,*
    603 F.2d 707 (8th Cir. 1979) ...................................................................................18

*Reno v. American-Arab Anti-Discrimination Comm.,*
    5525 US 471, 484 n. 8 (1999) ....................................................................................9

*Sabra as next friend of Baby M. v. Pompeo,*
    453 F. Supp. 3d 291 (D.D.C. 2020) .........................................................................24

*Sealed Petitioner v. Sealed Respondent,*
    829 F.3d 379 (5th Cir. 2016) ...................................................................................11

*SEC v. Chenery Corp.,*
    318 U.S. 80 (1943) .....................................................................................................4

*Singh v. U.S. Dep't of Justice,*
    461 F.3d 290 (2d Cir. 2006) .....................................................................................18

*Smith v. Resor,*
    406 F.2d 141 (2d Cir. 1969) .....................................................................................18

*Texas v. United States,*
    328 F. Supp. 3d 662 (S.D. Tex. 2018) ...............................................................8, 15, 25, 27

*Texas v. United States,*
    809 F.3d 134 (5th Cir. 2015) ........................................................................... *passim*

*Town of Castle Rock, Colo. v. Gonzales,*
    545 U.S. 748 (2005) ...................................................................................................5

*Tran v. Mukasey,*
    515 F.3d 478 (5th Cir. 2008) .....................................................................................4

*Tunik v. Merit Sys. Prot. Bd.*,
    407 F.3d 1326 (Fed. Cir. 2005) ............................................................... 18

*U.S. Dep't of Labor v. Kast Metals Corp.*,
    744 F.2d 1145 (5th Cir. 1984) ................................................................. 20

*U.S. Telecom Ass'n v. F.C.C.*,
    359 F.3d 554 (D.C. Cir. 2004) ......................................................... 19, 20

*Ulysse v. Dep't of Homeland Sec.*,
    291 F. Supp. 2d 1318 (M.D. Fla. 2003) ..................................................... 4

*United Keetoowah Band of Cherokee Indians in Okla. v. FCC*,
    933 F.3d 728, 744 (D.C. Cir. 2019) ........................................................... 4

*United States v. Midwest Oil Co.*,
    236 U.S. 459 (1915) ................................................................................ 25

*United States v. Smith*,
    27 F. Cas. 1192 (C.C.D.N.Y. 1806) ......................................................... 25

*USAir, Inc. v. Department of Transp.*,
    969 F.2d 1256 (D.C. Cir. 1992) ............................................................... 18

*Ex parte Young*,
    209 U.S. 123 ........................................................................................... 21

*Zadvydas v. Davis*,
    533 U.S. 678 (2001) ................................................................................ 11

**Statutes**

5 U.S.C.
    § 706(2) ..................................................................................................... 1
    § 706(2)(A) ............................................................................................... 4

6 U.S.C.
    § 202(5) ................................................................................................... 16
    § 361(b)(4) .............................................................................................. 16

8 U.S.C. 1252(g) ............................................................................................ 14

8 U.S.C.
    §1103(g)(2) ............................................................................................. 16
    § 1231(a)(1)(A) ................................................................................. 5, 6, 9
    § 1231(h) ................................................................................... 11, 12, 13
    § 1252(a)(5) ............................................................................................ 10

28 U.S.C. § 2241 .................................................................................................................11

Administrative Procedure Act ("APA") 5 U.S.C. § 553 ........................................3, 8, 19

Immigration and Nationality Act ("INA"), 8 U.S.C. § 1101, *et seq.* ...........................11, 13, 14, 24

**Other Authorities**

U.S. Const. art. II, §3 (Take Care Clause) .............................................................25, 26

## INTRODUCTION

The January 20 Memorandum was arbitrary and capricious, as Defendants' concessions make clear. They admit that they did not consider—and incredibly assert they did not *have* to consider—what costs they would impose on Texas or any other state by halting the vast majority of final orders of removal. According to Defendants: "The cost to individual states is *not a relevant concern* that the Acting Secretary was required to consider . . . ." *Id.* at 26 (emphasis added). Of course, that requires Defendants to ignore the Supreme Court's admonition that the "problems posed to the State by illegal immigration *must not be underestimated*." *Arizona v. United States*, 567 U.S. 387, 397 (2012) (emphasis added). Indeed, Defendants appear oblivious to their obligation to "be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account." *See Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1913–14 (2020). And Defendants wholly omit from their response the glaring admission that they do not know even who drafted the January 20 Memorandum: "DHS lacks knowledge regarding who authored, co-authored, or provided input to the Pekoske Memorandum prior to its issuance on January 20, 2021."

Thus, even after the Court gave Defendants a chance to explain their decision-making process, *see* ECF 16 at 11, the record lacks any evidence of *who* considered any of these trade-offs or that costs to the States and their legitimate reliance interests were considered at all. It is now clearer than ever that Defendants' action was arbitrary and capricious on these failures alone—and contrary to law further, by violating Congress's duly enacted immigration laws, and again procedurally improper because of the lack of notice-and-comment rulemaking.

Defendants try to avoid these numerous failings—any one of which would suffice to set aside the rule—by claiming that this Court is powerless to even review their decision. Once again,

they attempt to conflate a blanket stop to the execution of nearly all fully adjudicated final orders of removal with a truly individualized determination made on a case-by-case basis. The Court has already rejected that argument, ECF 16 at 7–9, and Defendants offer no reason to depart from that analysis.

Once the merits of the January 20 Memorandum are laid bare, its unlawfulness is clear. "Defendants do not object to Texas's request for a final judgment on its APA claims." ECF 83 at 40. Thus, the January 20 Memorandum must be set aside and a permanent injunction entered against enforcing *any* of the policies in the Memorandum—as the whole Memorandum is indeed arbitrary and capricious. 5 U.S.C. § 706(2).

## UPDATED STATEMENT OF FACTS

Defendants provided nothing in an administrative record suggesting any consideration of the January 20 Memorandum whatsoever—let alone consideration of alternative possible policies. ECF 62 at 1. It is now clear why the record is wholly lacking: Defendants do not know who drafted the January 20 Memorandum.

During the limited discovery period before submission of Texas's motion for a preliminary injunction, Texas asked Defendants for the names of anyone "who authored, co-authored, or provided input to the Pekoske Memorandum prior to its issuance on January 20, 2021." Ex. 19 at 5. In response, Defendants originally answered that "DHS lacks knowledge regarding who authored, co-authored, or provided input to the Pekoske Memorandum prior to its issuance on January 20, 2021." *Id.* They then supplemented with the names of three people—Esther Olavarria, Justin Florence and David Shahoulian—who they claim provided input. *Id.* But they provided no clarity over what input they provided or who authored the January 20 Memorandum.

As detailed in the declaration from counsel for one of the amici, the metadata of the January 20 Memorandum indicates that Ms. Olavarria was its original author. ECF 72-4. It appears that information was scrubbed from DHS's website on February 9, 2021. *Id.* The version now accessible on DHS has that metadata added back in.

For clarity, Texas asked Defendants to admit that Ms. Olavarria was the author of the January 20 Memorandum. Defendants responded that "the information DHS knows or can readily obtain is insufficient to enable it to admit or deny this request." Whether Ms. Olavarria's authorship is legally significant is unclear; this ambiguity, however, demonstrates that Defendants lack even the most basic knowledge about how the January 20 Memorandum came about. It was certainly not the result of a reasoned decision-making process required by the Administrative Procedures Act ("APA").

## ARGUMENT IN REPLY

### I. The January 20 Memorandum violated the APA.

#### a.  The January 20 Memorandum was arbitrary and capricious.

Defendants' response to Texas's motion for a preliminary injunction confirms that the January 20 Memorandum was arbitrary and capricious, not the result of a reasoned decision-making process. Defendants concede that they did not consider any cost to any state that would be imposed by a 100-day pause on executing final orders of removal: "The cost to individual states is not a relevant concern that the Acting Secretary was required to consider." ECF 83 at 26. That contradicts the Supreme Court's ruling that "problems posed to the State by illegal immigration *must not be underestimated*." *Arizona*, 567 U.S. at 397 (emphasis added). Thus, it is not surprising then that Defendants did not consult with any state or local officials before such a dramatic shift. Ex. 19 at 3.

What's worse, Defendants even acknowledge that federal immigration policy is
"'important' to the states." *Id.* (citing *Arizona*, 567 U.S. at 397). Indeed, the Supreme Court in that
very case recognized the reality that that states "bear[] many of the consequences of unlawful
immigration." *Arizona*, 567 U.S. at 397. Tens of thousands of illegal immigrants are removed from
Texas every year. ECF 63-5. And Texas has to provide various social services to the illegal
immigrants living in Texas, and many of those services are mandated by federal law. Thus,
"problems posed to the State by illegal immigration *must not be underestimated*." *Arizona*, 567
U.S. at 397 (emphasis added). Texas has significant reliance interests on the continued
enforcement of federal immigration law which Defendants were obligated to at least consider prior
to issuing the January 20 Memorandum—including by considering policies which would have
upset Texas's reliance interests less. *Regents*, 140 S. Ct. at 1913–14.

Here, Defendants did not merely underestimate the costs imposed on Texas. They refused
to consider those costs at all. In other words, Defendants are not saying that the costs to the States
are outweighed by other benefits. They are saying that the costs to the States are irrelevant to their
analysis. But no agency is permitted to disregard costs altogether when changing policies,
especially when those policies impose substantial costs on others. An agency that "refused to
consider whether the costs of its decision outweighed the benefits" did not engage in "reasoned
decisionmaking." *Michigan v. EPA*, 576 U.S. 743, 750 (2015); *see also N.Y. Stock Exch. LLC v.
SEC*, 962 F.3d 541, 558 (D.C. Cir. 2020) (explaining *Michigan*'s relevance to arbitrary-and-
capricious review).

Defendants' admission justifies a vacatur of the January 20 Memorandum in precisely the
same way. And that is in addition to the concerns that the Court has already raised. ECF 16 at 11
("DHS, however, never explains how the pause in removals helps accomplish these goals.").

"[T]he grounds upon which an administrative order must be judged are those upon which the record discloses that its action was based." *SEC v. Chenery Corp.*, 318 U.S. 80, 87 (1943). The Court gave Defendants the opportunity to supplement the record, and they have not done so with any meaningful additional information to support their decision-making process. Thus, on that ground alone, the January 20 Memorandum must be set aside as arbitrary and capricious. 5 U.S.C. § 706(2)(A).

Defendants also argue they need not consider more limited alternative policies unless they are presented "with a discrete number of choices." ECF 83 at 25. The doctrine is not so limited. *See, e.g.*, *United Keetoowah Band of Cherokee Indians in Okla. v. FCC*, 933 F.3d 728, 744 (D.C. Cir. 2019) (holding agency action arbitrary and capricious because it "did not adequately address . . . the potential for further streamlining review without eliminating it altogether").

Finally, Defendants insist that failing to consider the Agreement was not arbitrary and capricious because the Agreement is itself unlawful. See ECF 83 at 26. The Agreement is lawful for the reasons explained below, but even if it were not, Defendants still would have been obligated to explain their departure from it (as well as the other similar agreements with other states, *see* Ex. 19 at 3). *See Regents*, 140 S. Ct. at 1913–14 (holding DHS's recission of DACA arbitrary and capricious because it did not adequately address reliance interests on a program "that it views as unlawful").

    **b.**    **The January 20 Memorandum is contrary to Section 1231.**

Defendants' attempt to shirk their statutory duty to remove illegal aliens fares no better than it did prior to the Court granting the temporary restraining order. "Where Congress uses specific language within its immigration statutes to direct the Attorney General toward a specific result, courts are not free to assume based on a matrix of principles, statutes, and regulations that

the [Secretary's] authority is simply 'a matter of discretion.'" ECF 16 at 7 (citing *Zadvydas v. Davis*, 533 U.S. 678, 688 (2001)).

The Fifth Circuit got it right when, in *Tran v. Mukasey*, 515 F.3d 478, 479 (5th Cir. 2008), it said that "the government must facilitate that alien's removal from the United States within ninety days." (citing 8 U.S.C. § 1231(a)(1)(A)); *see also Ulysse v. Dep't of Homeland Sec.*, 291 F. Supp. 2d 1318, 1325 (M.D. Fla. 2003)). Defendants now blithely cast that aside as an "offhand description" and not "an authoritative interpretation of that provision." ECF 83 at 23. And, again, they confuse an individual determination of prosecutorial discretion in *Town of Castle Rock, Colo. v. Gonzales,* 545 U.S. 748, 764–65 (2005), with the blanket refusal to enforce a duly enacted statute at issue in this case. It's one thing for police officers to retain discretion to enforce an individual restraining order on a case-by-case basis. It would be another matter entirely if the Castle Rock Police Department announced a policy of not enforcing any restraining orders at all.

Similarly, it would be one thing if full compliance with Congress's mandate were impossible. But Defendants' refusal to comply—even when compliance is possible—is another. Defendants emphasize the Supreme Court's "doubt that when Congress shortened the removal period to 90 days in 1996 it believed that all reasonably foreseeable removals could be accomplished in that time." *Zadvydas*, 533 U.S. at 701; *see* ECF 83 at 12. But that is a red herring. First, Defendants do not argue that the relevant removals cannot be accomplished. They simply do not want to accomplish them as a matter of policy. Second, Congress expressly "outlin[ed] procedure in the event that practical circumstances prevent removal within 90 days." ECF 16 (citing 8 U.S.C. § 1231(a)(1)(C)). Statutory provisions controlling Defendants' action in the event "practical circumstances prevent removal within 90 days" foreclose Defendants' argument that such "practical circumstances" necessitate agency discretion.

6

Likewise, Defendants' argument about Section 1231(a)(2) proves this point. No doubt, Defendants would argue that under the first sentence of that section—"During the removal period, the [Secretary] shall detain the alien."—leaves them discretion to release individuals on a case-by-case basis. However, that does not mean that Defendants would be free to release all defendants as a matter of blanket immigration enforcement. And, by the second sentence, Congress merely proscribed their discretion to preclude them from releasing certain individuals, even after an individualized review. As the administrative record shows, no individualized consideration of particular cases happened here. Defendants made a categorical decision not to enforce immigration laws.

### c.    The January 20 Memorandum required notice-and-comment rulemaking.

Even setting the substantive unlawfulness of the January 20 Memorandum aside, it must still be vacated for failing to go through notice-and-comment rulemaking. The January 20 Memorandum is not a general statement of policy because it both imposes rights and obligations and does not leave decisionmakers free to exercise discretion. Courts considering whether an agency should have used notice-and-comment procedures are "suspicious of the agency's own characterization" and "focus[] primarily on whether the rule has binding effect on agency discretion or severely restricts it." *Texas I,* 809 F.3d at 171 (quoting *Shalala,* 56 F.3d at 595). Here, the January 20 Memorandum "severely restricts" individual immigration officers' discretion by prohibiting them from removing anyone who does not fall within the stated categories "unless the Acting Director of ICE . . . makes an individualized determination that removal is required by law." Ex. 1 at 4. Thus, immigration officers have no discretion, and the Acting Director of ICE is limited to making legal, not policy, determinations. Such an inversion of legal obligations—from a default to enforcing immigration laws to a strong presumption *against* enforcing those laws—

surely "severely restricts" agency discretion and was thus required to be promulgated after notice and comment.

Likewise, it is simply wrong to say that the January 20 Memorandum is a procedural rule because it does not modify any substantive right or benefit. Through it, Defendants have "disregarded their previous legal 'obligations' and adjudication of the aliens' 'rights' by inexplicably ordering a reassessment of *all* previous orders for removal and plainly ignoring the statutory mandate of § 1231(a)(1)(A) to remove aliens within 90 days." ECF 16 at 8–9. The Court granted the Defendant-Intervenors party status in this case, in part, because of the interests of "individuals *directly affected* by the January 20 Memorandum." ECF 65 at 8 (emphasis added); *see also* ECF 28-2 ¶ 15 ("The memo's temporary relief from the possibility of being removed thus provides a significant benefit for our clients with final orders . . . .").

Moreover, the January 20 Memorandum is substantive because it "produce[s] . . . significant effects on [Texas's] interests" and "narrowly constrict[s] the discretion of agency officials by largely determining the issue addressed." *Texas I*, 809 F.3d at 176 n.145 (quoting *Avoyelles Sportsmen's League, Inc. v. Marsh*, 715 F.2d 897, 908 (5th Cir.1983)). It also "forces the state to choose between spending millions of dollars [on services for illegal aliens] and amending its statutes." *Id.* at 176. Texas, as well as the rest of the country, was due at least notice and an opportunity to comment on Defendants' decision to grant that benefit to the over 1,000,000 illegal aliens currently subject to a final order of deportation. ECF 78-1 ¶ 4.

## II.    No threshold issue bars this Court's review.

Defendants try to hide the unlawfulness of their decision behind a litany of arguments related to this Court's jurisdiction. *See* ECF 83 at 6–21. The Court has already rejected most of those arguments. ECF 16. Defendants now go even further, saying that Texas does not have even

a minimal interest in the effective enforcement of federal immigration law, despite clear caselaw to the contrary. *Id.* at 18–20. Defendants cannot avoid the merits.

### a.      Texas has standing.

Once again, Defendants' standing argument rests on *Crane v. Johnson*, 783 F.3d 244 (5th Cir. 2015). But, as this Court has already acknowledged, *Crane* was decided based on the failure of Mississippi's evidence. ECF 16 at 5. There was no evidence, for example, that any DACA recipients lived in Mississippi. Here, Defendants' own data shows, among other things, that U.S. Immigration and Customs Enforcement ("ICE") deported 67,000 criminal illegal aliens from Texas in one year alone. *See* ECF 63-5 at 5. Those criminals have a high rate of recidivism. *See* ECF 63-11. If these criminals are not removed from Texas because of the January 20 Memorandum, they are likely to commit more crimes in Texas and end back up in Texas's jails and prisons—where Texas pays hundreds of millions of dollars to house them. ECF 63-10.

Contrary to Defendants' mischaracterization of Texas's discovery responses, Texas never said that incurring such costs is speculative. Defendants asked Texas to identify the specific amount of additional money that it would expend to provide social services to the illegal aliens who wouldn't be deported because of the January 20 Memorandum. That precise number is unknowable, but Defendants do not seriously dispute that Texas will spend *some* amount of money. No one doubts that, if the January 20 Memorandum goes into effect, Defendants will not remove the vast majority of individuals with a final order of removal. That is sure to increase the number of illegal aliens in Texas, for whom Texas is required to provide social services.

Faced with a nearly identical argument to that made by Defendants here, Judge Hanen found that Texas had standing to challenge the Deferred Action for Childhood Arrivals program:

> Though the Defendant-Intervenors lodge attacks against the evidence supporting
> each type of cost—education, healthcare, and law-enforcement services—the Court

> need not address those arguments line-by-line because the States only must show *some* injury, as opposed to a "substantial" injury.
>
> . . .
>
> For standing purposes, Texas need not plead damages from a particular individual when it pleads and has proof that it is being damaged by the entire program. In the scope of a program the size of DACA, with over 115,000 recipients in Texas alone, it is virtually certain that at least some DACA recipients utilize the emergency Medicaid services Texas is required to provide them.

*Texas v. United States*, 328 F. Supp. 3d 662, 701–02 (S.D. Tex. 2018). The court made clear that Texas was due special solicitude in a standing analysis. *Id.* at 693. And "even without a finding of special solicitude," the court would have found that Texas had standing. *Id.* at 705 n.51. So too here. If Defendants failed to remove the hundreds of individuals they typically do, it is "virtually certain" that Texas would have to provide social services to those illegal aliens while they remain.

Additionally, Texas claims that Defendants failed to follow the procedures required by the APA when they issued the January 20 Memorandum. Again, as Judge Hanen recognized, "typically, when a litigant seeks to vindicate a procedural right, 'that litigant has standing if there is some possibility that the requested relief will prompt the injury-causing party to reconsider the decision that allegedly harmed the litigant.'" *Id.* at 698 n.45 (citing *Texas I*, 809 F.3d at 150–51). Certainly, there is "some possibility" that vacating the blanket 100-day pause on nearly all final orders of removal will cause Defendants to reconsider its action. *See also* ECF 75 at 3–4.

### b.  Defendants lack the discretion to ignore Congress's directives entirely.

Next, Defendants claim that the Court cannot review the January 20 Memorandum because it is an exercise of prosecutorial discretion. ECF 83 at 10. The Court has already rejected that argument. ECF 16 at 8. "Defendants do not have discretion to completely disregard § 1231(a)(1)(A) and their January 20 Memorandum appearing to do so is reviewable." *Id.*

The cases cited by Defendants in their latest response do not help their cause. For example, in *Reno v. American-Arab Anti-Discrimination Committee*, the Supreme Court expressly

acknowledged that, based on the record before it, "there is no indication that the INS has ceased making this sort of [removal] determination on a case-by-case basis." 525 U.S. 471, 484 n.8 (1999). That is exactly what the January 20 Memorandum did: indeed, the only case-by-case decision-making the Memorandum contemplates is when an immigration official wishes to *enforce* an order of removal.

Additionally, in *Texas v. United States*, the plaintiffs did not "contend that federal defendants are doing nothing to enforce the immigration laws or that they have consciously decided to abdicate their enforcement responsibilities." 106 F.3d 661, 667 (5th Cir. 1997). Texas is contending precisely that in this case. Curiously, Defendants point to the Fifth Circuit's DAPA opinion as "[b]inding Fifth Circuit law foreclos[ing] Texas's APA claim." ECF 83 at 12. There, of course, the court held that it did have jurisdiction to review an agency action that the defendants claimed was a mere act of prosecutorial discretion. *Texas I*, 809 F.3d at 165. In part, "the government has not rebutted the strong presumption of reviewability with clear and convincing evidence that, *inter alia*, it is making case-by-case decisions here." *Id.* So too here.

Prosecutorial discretion has traditionally encompassed two principles: first, the notion that a prosecutor obligated to enforce many laws must make trade-offs in particular cases among enforcing all of those laws, and second, that a prosecutor may elect not to prosecute a particular individual where doing so would work a manifest injustice. Defendants cannot expand these principles to flatly refuse to enforce a congressional directive altogether. "Put another way, prosecutorial discretion encompasses the discretion not to enforce a law against private parties; it does not encompass the discretion not to follow a law imposing a mandate or prohibition on the Executive Branch." *In re Aiken County*, 725 F.3d 225, 266 (D.C. Cir. 2013).

**c.      Congress has not insulated the abdication statutory duties from judicial review.**

Defendants claim that, through Sections 1252(a)(5) and 1252(b)(9), Congress closed Texas's right to seek relief in this case. ECF 83 at 15. Not so. Those sections apply to "judicial review of an *order of removal* entered or issued under any provision of this chapter," 8 U.S.C. § 1252(a)(5) (emphasis added), and judicial review of questions "arising from any action taken or proceeding *brought to remove an alien* from the United States." *Id.* § 1252(b)(9) (emphasis added). These provisions do not apply because Texas is not asking this Court to review any order of removal. *Id.* § 1252(a)(5) (providing "the sole and exclusive means for judicial review of an order of removal"); *id.* § 1252(b) (listing requirements for "review of an order of removal"). Texas is seeking review of the January 20 Memorandum.

The authority cited by Defendants shows that not all immigration-related cases must be funneled through those two sections. "First, while these sections limit *how* immigrants can challenge their removal proceedings, they are not jurisdiction-stripping statutes that, by their terms, foreclose *all* judicial review of agency actions." *J.E.F.M. v. Lynch*, 837 F.3d 1026, 1032 (9th Cir. 2016). Additionally, "and equally importantly, § 1252(b)(9) has built-in limits. By channeling only those questions 'arising from any action taken or proceeding brought to remove an alien,' the statute excludes from the [petition for review] process any claim that does not arise from removal proceedings." *Id.* Texas's claims do not "arise from removal proceedings." They arise from Defendants' issuance of the January 20 Memorandum.

**d.      Texas has a clear interest in how Defendants enforce immigration law.**

In their response, Defendants filter their previously rejected argument that Section 1231(h) precludes review through a new framework: the zone-of-interests test. But the Fifth Circuit has already rejected Defendants' position. Texas's interests in reducing the number of illegal aliens

"fall within the zone of interests of the [Immigration and Nationality Act ("INA")]." *Texas I*, 809 F.3d at 163. The INA "[r]eflect[s] a concern that 'aliens have been applying for and receiving public benefits from Federal, State, and local governments at increasing rates.'" *Id.* (quoting 8 U.S.C. § 1601). That determination squarely forecloses Defendants' zone-of-interests arguments.

Besides, this Court has already correctly held that Section 1231(h) does not bar Texas's claim. *See Texas v. United States*, 6:21-cv-00003, 2021 WL 247877, at *4 (S.D. Tex. Jan. 26, 2021). And rightly so: Section 1231(h) "simply forbids courts to construe *that section* 'to create any . . . procedural right or benefit that is legally enforceable.'" *Zadvydas*, 533 U.S. at 687. Just as "it does not deprive an alien of the right to rely on 28 U.S.C. § 2241 to challenge detention that is without statutory authority," it does not deprive Texas of the right to rely on the APA to challenge unlawful agency action. *Id.* at 688. "Section 1231(h)'s bar is irrelevant to this case" because Texas does "not bring any claims under that section." *Nak Kim Chhoeun v. Marin*, 8:17-cv-1898, 2018 WL 1941756, at *5 n.3 (C.D. Cal. Mar. 26, 2018).

If Defendants were correct, then Section 1231(h) would prevent any party challenging an agency decision from relying on Section 1231, but that is not the law. For example, courts frequently review the BIA's decisions denying withholding of removal for compliance with the standard set out in Section 1231(b)(3). *See, e.g.*, *Sealed Petitioner v. Sealed Respondent*, 829 F.3d 379, 380–81 (5th Cir. 2016). In such cases, Defendants do not argue that Section 1231(h) prevents aliens from relying on the legal standard established in Section 1231.

Additionally, the zone-of-interests test is famously lenient. "That test . . . is not meant to be especially demanding and is applied in keeping with Congress's evident intent when enacting the APA to make agency action presumptively reviewable." *Texas I*, 809 F.3d at 162 (quotations omitted). "The Supreme Court 'ha[s] always conspicuously included the word "arguably" in the

test to indicate that the benefit of any doubt goes to the plaintiff,' and '[w]e do not require any "indication of congressional purpose to benefit the would-be plaintiff."' *Id.* (quoting *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 225 (2012)).

Section 1231 is irrelevant to the zone-of-interests test. As this Court recognized, Section 1231(h) is meant to prevent would-be plaintiffs from arguing that Section 1231 itself implicitly creates a cause of action. It does not address the zone-of-interests test, which applies as part of the APA's creation of a cause of action. *See Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 129 (2014); *Ass'n of Data Processing Serv. Orgs., Inc. v. Camp*, 397 U.S. 150, 153 (1970).

The Supreme Court has expressly distinguished these two inquiries. *See Gonzaga Univ. v. Doe*, 536 U.S. 273, 283 (2002). The inquiry into whether "the plaintiff falls within the general zone of interest that the statute is intended to protect" is "something less than what is required for a statute to create rights enforceable directly from the statute itself under an implied private right of action." *Id.* A plaintiff's "interests" are "broader" than a plaintiff's "rights." *Id.* So the declaration that Section 1231 does not create a "right," *see* 8 U.S.C. § 1231(h), does not undermine the existence of Texas's interests protected by Section 1231.

Defendants rely on an out-of-circuit, pre-*Gonzaga* decision, *see* ECF 83 at 19, but the plaintiffs in that case had "not made a claim under the APA." *Hernandez-Avalos v. INS*, 50 F.3d 842, 845 n.8 (10th Cir. 1995). In any event, the court's reasoning supports allowing Texas to sue. The relevant INA provision "was enacted not for the benefit of incarcerated aliens, but for the benefit of taxpayers, the objective being to save money at the federal, state and local levels . . . ." *Hernandez-Avalos v. INS*, 50 F.3d 842, 847 (10th Cir. 1995). So too here. Section 1231, and the INA more broadly, were enacted to protect Americans from the costs that illegal aliens impose.

14

In any event, Defendants focus too narrowly on Section 1231(h). "In considering whether the 'zone of interest' test provides or denies standing," an argument fails if it "focuses too narrowly on [a particular section], and does not adequately place [that section] in the overall context of the [act as a whole]." *Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 401 (1987). Thus, the Court should look to "Congress' overall purposes in the" INA. *Id.* And the Fifth Circuit has already addressed that issue. Texas's interests in reducing the number of illegal aliens "fall within the zone of interests of the INA." *Texas I*, 809 F.3d at 163. The INA "[r]eflect[s] a concern that 'aliens have been applying for and receiving public benefits from Federal, State, and local governments at increasing rates.'" *Id.* (quoting 8 U.S.C. § 1601).

This approach is especially important for Texas's arbitrary-and-capricious and notice-and-comment claims. Those claims do not depend on Section 1231, so Defendants' theory that Section 1231 does not protect Texas is irrelevant. Defendants cite one case for the proposition that the zone-of-interests test applies to such claims, *see* ECF 83 at 19, but that case considered whether "whether [the plaintiffs] fall within the zone of interests sought to be protected by the substantive statute pursuant to which the Department of Labor acted: the INA," not an isolated provision of the INA. *Mendoza v. Perez*, 754 F.3d 1002, 1016 (D.C. Cir. 2014). In this case, Defendants do not dispute that the INA as a whole protects Texas's interests. Nor could they, in light of the Fifth Circuit holding that the INA "[r]eflect[s] a concern that 'aliens have been applying for and receiving public benefits from Federal, State, and local governments at increasing rates.'" *Texas I*, 809 F.3d at 163f (quoting 8 U.S.C. § 1601). That defeats Defendants' arguments regarding Texas's interests.

> e.    **The January 20 Memorandum was a final agency action.**

Finally, Defendants again claim that the January 20 Memorandum was not a final agency action subject to judicial rule because it "does not determine or alter any individual's legal rights

or obligations." ECF 83 at 20–21. This Court has already found otherwise. ECF 16 at 8–9. And it need look no further than the Defendant-Intervenors in this case for confirmation. *See* ECF 28-2 ¶ 15 ("The memo's temporary relief from the possibility or being removed thus provides a significant benefit for our clients with final orders . . . .").

Additionally, beyond the illegal aliens who will no longer be removed, the January 20 Memorandum "impacts the obligations of the individual States" just like DACA does because they will "spend money on various social services" as a result of the program. *Texas*, 328 F. Supp, 3d at 731. And "the program affects the obligations of the United States Government" because "it obligates the Government to forebear from implementing immigration enforcement proceedings." *Id.*

### III.    The Agreement with Texas is binding and enforceable.

This Court may set aside the Memorandum and permanently enjoin its enforcement without ruling on the legality or enforceability of the Agreement between Texas and DHS (the "Agreement"). ECF 83 at 31–35. As an initial matter, the January 20 Memorandum did not even acknowledge the existence of the Agreement, much less articulate any reason to disregard it. That makes the January 20 Memorandum arbitrary and capricious.

Any new defenses against enforcing the January 20 Memorandum based on the supposed invalidity of the Agreement are "impermissible *post hoc* rationalizations." *Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1909 (2020). "An agency's action must be upheld, if at all, on the bases articulated by the agency itself," not those articulated after the fact by its lawyers. *Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Auto Ins. Co.,* 463 U.S. 29, 50 (1983). A court may not "supply a reasoned basis for the agency's action that the agency itself has not given." *Id.* at 43 (quoting *SEC v. Chenery Corp.,* 332 U.S. 194, 196 (1947)). The requirement that an agency provide reasoned explanation for its action would ordinarily demand that it display awareness that it is changing

16

position. "An agency may not, for example, depart from a prior policy sub silentio or simply disregard rules that are still on the books." *Fed. Commc'ns Comm'n v. Fox Television Stations, Inc.*, 556 U.S. 502, 515–16 (2009) (citation omitted).

The Court should not consider any of Defendants' new arguments for failing to consider the Agreement when issuing the January 20 Memorandum. And arguments raised by Amici Curiae (*e.g.*, that the DHS official who signed the Agreement was without authority to do so, Brief Amici Curiae States of New York, *et al.*, ECF 81 at 12, an argument rebutted by DHS at https://www.dhs.gov/sites/default/files/publications/20_0817_ogc_gao-as1-succession-response.pdf) cannot justify the process surrounding the issuance of the January 20 Memorandum. In any event, Defendants' arguments are meritless, and the Agreement is enforceable on its own terms.[1]

### a. The Agreement was statutorily authorized.

Congress has granted DHS broad authority to implement cooperative policies with the States. Congress specifically authorized DHS to "develop a process for receiving meaningful input from State and local government to assist the development of the national strategy for combating terrorism and other homeland security activities." 6 U.S.C. § 361(b)(4). The notice-and-comment process for receiving input from Texas provides a legitimate mechanism for receiving that meaningful input. Defendants' frequent invocation of the Secretary's authority to "perform such other acts as he deems necessary for carrying out his authority," ECF 83 at 13, is at war with their insistence that the Secretary lacks authority to sign a notice-and-consultation agreement. *See id.* at 31.

---

[1] To the extent that Defendants claim they have attempted to rescind the Agreement, the Agreement provides that a proper rescission is not effective for 180 days.

b.      **The Agreement did not contract away sovereign authority.**

Wrongly insisting that the Agreement contracted away sovereign authority over immigration, Defendants cite *Biodiversity Associates v. Cables*, 357 F.3d 1152 (10th Cir. 2004). There, Congress passed a statute to abrogate a particular settlement agreement that had flatly prohibited future government conduct. *Id.* at 1158. That case is inapposite. First, Congress has not passed a statute abrogating the Agreement. Second, agreeing to provide notice to and consult with relevant stakeholders does not substantively restrain Defendants' policy choices.

Under the Agreement, DHS is required to "[c]onsult with Texas before taking any action or making any decision that could reduce immigration enforcement, increase the number of removable or inadmissible aliens in the United States, or increase immigration benefits or eligibility for benefits for removable or inadmissible aliens." ECF 63-2 at 3. According to the Agreement, "consultation" involves DHS providing: "180 days' written notice" to Texas, "an opportunity [for Texas] to consult and comment on the proposed action," "consider[ation of] Texas's input," and "a detailed written explanation of the reasoning behind any decision to reject Texas's input before taking any action." *Id.* These provisions do not grant Texas a veto over federal immigration policy or substantively limit Defendants' authority. These provisions are analogous to the APA's notice-and-comment requirements, and no one contends that the APA is an abdication of federal sovereignty to States, interest groups, and individuals merely because it delays agency action.

There is nothing unusual—much less illegal—about an agency binding itself to follow certain procedures. Far from questioning the validity of these voluntarily adopted procedures, federal courts enforce their requirements. *See, e.g.*, *Morton v. Ruiz*, 415 U.S. 199, 235 (1974) (requiring an agency "to follow [its] own procedures . . . . even where the internal procedures are possibly more rigorous than otherwise would be required"); *Oglala Sioux Tribe of Indians v.*

*Andrus*, 603 F.2d 707, 717 (8th Cir. 1979) ("Failure of the [agency] to make any real attempt to comply with its own policy of consultation . . . violates those general principles which govern administrative decisionmaking.").

This principle not only supports Texas's arbitrary-and-capricious claim, as discussed above, but also refutes Defendants' contention that agencies cannot bind themselves. On the contrary, agencies can bind themselves to more rigorous procedures, including by agreeing to consult with relevant stakeholders. And when an agency fails to live up to its commitments, federal courts enforce them.

### c.   The Agreement did not violate the nondelegation doctrine.

Defendants suggest that the Agreement constitutes an illegal "subdelegation" to Texas. ECF 83 at 32 (citing *U.S. Telecom Ass'n v. FCC*, 359 F.3d 554 (D.C. Cir. 2004)). But that case "recognize[d] . . . specific types of legitimate outside party input into agency decision-making processes," including "fact gathering" and "advice giving." *Id*. at 566. In particular, "a federal agency may turn to an outside entity for advice and policy recommendations, provided the agency makes the final decisions itself." *Id.* at 568.

Here, the Agreement allows Texas to provide both factual information and policy advice before Defendants alter certain immigration policies. And that benefits not only Texas but also Defendants. "DHS relies on cooperation with Texas and information shared by Texas to carry out DHS's immigration enforcement functions." ECF 63-2 at 2.

### d.   The Agreement was not a legislative rule subject to notice-and-comment requirements under the APA.

Defendants argue that if the Agreement were binding, it must be a legislative rule and thus invalid because it did not undergo notice-and-comment rulemaking. ECF 83 at 32–33. But even if the Agreement could be construed as a "Rule," it would be one "of agency organization, procedure,

or practice," 5 U.S.C. § 553(b)(A), with no requirement of notice-and-comment rulemaking. Agencies can bind themselves to follow additional procedures without first going through notice-and-comment rulemaking. *See, e.g.*, *Ruiz*, 415 U.S. at 235; (requiring an agency to follow "its own internal procedures" in a manual); *Oglala Sioux Tribe of Indians*, 603 F.2d at 717 (requiring an agency to follow "its own internal procedure" in guidelines).

   **e.    Texas does not seek specific performance of the Agreement.**

   Defendants claim that sovereign immunity bars this suit because Texas seeks specific performance. ECF 83 at 33–34. Defendants are wrong for at least four reasons. First, Texas is not seeking specific performance to affirmatively require DHS to provide notice and follow the procedure in the Agreement. Rather, it seeks the normal remedies for unlawful agency action, setting aside the January 20 Memorandum and prohibiting its enforcement. *See* ECF 1. Defendants ignore the fundamental distinction between relief "ordering the cessation of the conduct complained of" and relief "requir[ing] affirmative action by the sovereign." *Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682, 691 n.11 (1949). But that distinction is the basis for the long-standing rule that ultra vires suits against federal officers (and analogous *Ex parte Young* suits against state officers) do not implicate sovereign immunity. "[I]f the federal officer, against whom injunctive relief is sought, allegedly acted in excess of his legal authority, sovereign immunity does not bar a suit. . . . [T]here is no sovereign immunity to waive—it never attached in the first place." *Chamber of Commerce of U.S. v. Reich*, 74 F.3d 1322, 1329 (D.C. Cir. 1996).

   Second, Defendants have waived sovereign immunity. The Agreement itself waives sovereign immunity by expressly calling for "injunctive relief, including specific performance, to enforce" its terms and authorizing "adjudicate[ion] in a United States District Court located in Texas." ECF 63-2 at 5. "The Supreme Court has recognized that a waiver of sovereign immunity can take a contractual form." *Wells Fargo Bank, Nat'l Ass'n v. Se. N.M. Affordable Hous. Corp.*,

877 F. Supp. 2d 1115, 1140 (D.N.M. 2012). The APA also waives sovereign immunity. See 5 U.S.C. § 702. "It bears emphasis that, although § 702's waiver of sovereign immunity makes its appearance in the APA, it applies broadly to all claims, not just those that seek to invoke the APA's cause of action." Charles Alan Wright, *et al.*, 33 *Federal Practice & Procedure* § 8353 (2d ed.); *see also Sabra ex rel.Baby M. v. Pompeo*, 453 F. Supp. 3d 291, 315 (D.D.C. 2020) ("[T]he APA waives the federal agency's sovereign immunity even when the claim is one directly under the Constitution and not under the APA.").

Third, Defendants argue that the Tucker Act allows Texas to sue in the Court of Federal Claims, but that is not true. The Tucker Act does not cover the Agreement because DHS entered the agreement in its sovereign capacity, not in its proprietary capacity: "[The Court of Federal Claims'] jurisdiction over contract claims turns on whether the Government was acting in its sovereign or proprietary capacity when it entered into the contract or agreement at issue." *Doe v. United States*, 37 Fed. Cl. 74, 77-78 (1996). "The contract liability which is enforceable under the Tucker Act consent to suit does not extend to every agreement, understanding, or compact which can semantically be stated in terms of offer and acceptance or meeting of minds. The Congress undoubtedly had in mind as the principal class of contract case in which it consented to be sued, the instances where the sovereign steps off the throne and engages in purchase and sale of goods, lands, and services, transactions such as private parties, individuals or corporations also engage in among themselves." *Kania v. United States*, 650 F.2d 264, 268 (Ct. Cl. 1981); *see also Drakes v. United States*, 28 Fed. Cl. 190 (1993); *Grundy v. United States*, 2 Cl. Ct. 596 (1983).

### f. Texas provided consideration for the Agreement.

The Agreement requires DHS to consult with Texas before "taking any action, adopting or modifying a policy or procedure, or making any decision" that could affect various aspects of

immigration enforcement, ECF 63-2 at 2–3, and provides Texas with 180 days to comment on any proposed change. *Id*. at 3.

The Agreement creates an obligation on Texas beyond previous practice or law. If Texas wants to change its practice, including by changing state law, it must give DHS notice that it is terminating the Agreement. This additional obligation and procedural requirement are sufficient consideration, benefitting DHS by granting it an opportunity to adjust to any planned changes in cooperation by Texas. "[E]ven if a contract does not require any performance that would not have been done in the absence of the contract, as long as the contracting parties gain some legally enforceable right as a result of the contract which they previously did not have, consideration is present." *Johnson v. Seacor Marine Corp.*, 404 F.3d 871, 875 (5th Cir. 2005) (citing Restatement (Second) of Contracts § 73(d) (1981) ("But the tendency of the law has been simply to hold that the performance of contractual duty can be consideration if the duty is not owed to the promisor.")) (other citation omitted).

## IV.     The January 20 Memorandum violates the Take Care Clause.

Defendants argue the Court cannot "superintend how the President performs his executive functions," ECF 83 at 35, but Texas does not seek an injunction against the President regarding an executive order. It seeks relief against subordinate Executive Branch personnel regarding agency action. Even when courts have no "jurisdiction of a bill to enjoin the President in the performance of his official duties," *Franklin v. Massachusetts*, 505 U.S. 788, 802–03 (1992) (plurality op.), "[r]eview of the legality of Presidential action can ordinarily be obtained in a suit seeking to enjoin the officers who attempt to enforce the President's directive." *Id*. at 828 (Scalia, J., concurring in part and concurring in the judgement); *see also Chamber of Commerce of U.S.*, 74 F.3d at 1328 ("[C]ourts have power to compel subordinate executive officials to disobey illegal Presidential commands.").

22

Defendants rely on *Dalton v. Specter* for the proposition that "claims simply alleging that the President has exceeded his statutory authority are not 'constitutional' claims," 511 U.S. 462, 473 (1994). But while "[t]he *Dalton* Court made clear that not every action by the President, or by another executive official, in excess of his statutory authority is *ipso facto* in violation of the Constitution, [it] by no means found that action in excess of statutory authority can *never* violate the Constitution or give rise to a constitutional claim." *Make the Rd. N.Y. v. Pompeo*, 475 F. Supp. 3d 232, 258 (S.D.N.Y. 2020) (quoting *Sierra Club v. Trump*, 929 F.3d 670, 696 (9th Cir. 2019)) (other internal citations and quotation marks omitted). Where a claim is not "that the President simply did not fully comply with a congressionally prescribed process, . . . [but is] that the President's actions affirmatively displaced a congressionally mandate[], [it implicates] constitutional separation of powers concerns not present in *Dalton*, [and] are thus appropriately considered as constitutional claims subject to judicial review." *Make the Rd. N.Y.*, 475 U.S. at 258–59. Texas's claim here is that the January 20 Memorandum is a wholesale repudiation of Congress's commands in the INA and is therefore a claim of a dispensing power beyond merely exceeding the bounds of a statute.

Defendants cite *Texas v. United States* for the proposition that "[r]eal or perceived inadequate enforcement of immigration laws does not constitute a reviewable abdication of duty," 106 F.3d 661, 667 (5th Cir. 1997), but in that case the State did not challenge a specific agency action, but the entire programmatic scheme of enforcement. The court found "no workable standard against which to judge the agency's exercise of discretion." *Id*. at 667. In this case, however, the workable standard is the mandate set by Congress in Section 1231.

The Supreme Court has forcefully rejected the proposition that the President can dispense with laws he does not want to enforce. "To contend that the obligation imposed on the President

23

to see the laws faithfully executed, implies a power to forbid their execution, is a novel construction of the [C]onstitution, and entirely inadmissible." *Kendall v. United States ex rel. Stoke*s, 37 U.S. (12 Pet.) 524, 612–13 (1838). To recognize such a power "would be vesting in the President a dispensing power, which has no countenance for its support in any part of the [C]onstitution." *Id.* at 613; *see also Little v. Barreme*, 6 U.S. (2 Cranch) 170, 177–78 (1804) (finding that the President's orders regarding execution of federal law were invalid where "the legislature seem to have prescribed" a different "manner in which this law shall be carried into execution").

Defendants cite *Mississippi v. Johnson* for the proposition that the president's actions are "not subject to judicial direction," ECF 83 at 35, but that rule applies only when relief would direct the president's "exercise of judgment," 71 U.S. (4 Wall.) 475, 499 (1867). But Texas here does not seek such an order—or any injunction compelling the President to act in any way. It has sued the principal officers responsible for administering the January 20 Memorandum and seeks to enjoin or set aside the policy.

## V.    The substantial injury to Texas outweighs any harm to Defendants and a preliminary injunction is in the public interest.

Defendants doubt the significance of Texas's irreparable injury, *see* ECF 83 at 36, but their own data demonstrate the substantial costs imposed by the presence of illegal aliens. *See* ECF 63-5 at 5; ECF 63-10; ECF 63-11. Defendants also complain of a supposedly "severe burden on core Article II authority," ECF 83 at 36, but if Texas is right on the merits, then they have no legitimate interest in implementing an unlawful policy. "There is generally no public interest in the perpetuation of unlawful agency action. To the contrary, there is a substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operations." *League of Women Voters of United States v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) (internal citations and quotation marks omitted). "Where Congress uses specific language within

its immigration statutes to direct the Attorney General toward a specific result, courts are not free to assume based on a matrix of principles, statutes, and regulations that the [Secretary's] authority is simply 'a matter of discretion.'" ECF 16 at 7 (citing *Zadvydas*, 533 U.S. at 688).

## VI.   What is required now is a complete set aside of the January 20 Memorandum.

Texas has consistently asked the Court for a final judgment setting aside the January 20 Memorandum. ECF 31 at 4 n.1; ECF 68 at 20–22. Now, "Defendants do not object to Texas's request for a final judgment on its APA claims." ECF 83 at 40. As a result, granting such relief is squarely within this Court's power even at this early stage of the litigation.

If the Court determines that an injunction is warranted in addition to the vacatur, such an injunction must extend nationwide. *See Texas I*, 809 F.3d at 187–88. Defendants recognize that the Fifth Circuit has already acknowledged the "need for a uniform immigration system." ECF 83 at 38. They claim, however, that the need "for the vigorous and uniform enforcement of immigration laws is inapplicable to the present circumstance because removal decisions are inherently discretionary and non-uniform." *Id.* Not so. Although aliens may face non-uniform outcomes due to their individual circumstances, Defendants are obligated to apply uniform rules regardless of the State in which they operate.

## CONCLUSION

Because the entirety of the January 20 Memorandum is fatally flawed on numerous procedural and substantive bases, this Court should set is aside and permanently enjoin its enforcement in its entirety.

Respectfully submitted this 16th day of February, 2021.

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

PATRICK K. SWEETEN
Associate Deputy Attorney General for
Special Litigation

*/s/ Todd Lawrence Disher*
TODD LAWRENCE DISHER
Deputy Chief, Special Litigation Unit
*Attorney-in-Charge*
Texas Bar No. 24081854
Southern District of Texas Bar No. 2985472

WILLIAM T. THOMPSON
Special Counsel
Special Litigation Unit
Texas Bar No. 24088531
Southern District of Texas Bar No. 3053077

RYAN D. WALTERS
Special Counsel
Special Litigation Unit
Texas Bar No. 24105085
Southern District of Texas Bar No. 3369185

Special Litigation Unit
P.O. Box 12548
Austin, Texas 78711-2548
Phone: (512) 936-2567
Fax: (512) 936-0545
Patrick.Sweeten@oag.texas.gov
Todd.Disher@oag.texas.gov
Will.Thompson@oag.texas.gov
Ryan.Walters@oag.texas.gov

*Counsel for the State of Texas*

26

## CERTIFICATE OF WORD COUNT

I certify that the total number of words in Plaintiff's Motion for Preliminary Injunction, exclusive of those sections designated for omission, is 8,041 words, as registered by Microsoft Word. I further certify that the Motion for Preliminary Injunction, exclusive of those sections designated for omission for word limit purposes, is 25 pages and does not exceed 25 pages pursuant to the Scheduling Order dated January 30, 2021. ECF 44.

*/s/ Todd Lawrence Disher*
TODD LAWRENCE DISHER

## CERTIFICATE OF SERVICE

I certify that on February 16, 2021, a true and accurate copy of the foregoing document was filed electronically (via CM/ECF) and served on all counsel of record.

*/s/ Todd Lawrence Disher*
TODD LAWRENCE DISHER